# 23-14102

## In the
## United States Court of Appeals
### For the Eleventh Circuit



JIANGMEN BENLIDA PRINT CIRCUIT CO., LTD.,

*Plaintiff-Counter Defendant-Appellant,*

ROK PRINTED CIRCUIT CO., LTD.,

*Plaintiff,*

versus

CIRCUITRONIX, LLC,

*Defendant-Counter Claimant-Appellee.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA,
NO. 0:21-cv-60125-RNS (HON. ROBERT N. SCOLA)

## BRIEF FOR PLAINTIFF-COUNTER DEFENDANT-APPELLANT

RICHARD E. LERNER
JEAN-CLAUDE MAZZOLA
MAZZOLA LINDSTROM, LLP
*Attorneys for Plaintiff-Counter Defendant-Appellant*
1350 Avenue of the Americas, 2nd Floor
New York, New York 10019
(646) 216-8300
richard@mazzolalindstrom.com
jeanclaude@mazzolalindstrom.com

APPELLATE INNOVATIONS
(914) 948-2240

21349

**Certificate of Interested Persons and Corporate Disclosure Statement**

Pursuant to Eleventh Circuit Local Rule 26.1-1(a)(2) the undersigned counsel of record for plaintiff-appellant Jiangmen Benlida Printed Circuit Co., Ltd. certifies that the following is the full and complete list of plaintiff's members/owners:

Huang Xiangjiang

Huang Hanchao

Zhang Qing

Liu Yusheng

Guangdong Yuda Investment Partnership

**Statement Regarding Oral Argument**

Plaintiff-appellant Jiangmen Benlida Printed Circuit Co., Ltd. requests oral argument to allow the Court to investigate the facts and legal issues presented in a lengthy record with key disputes of material fact.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons and Corporate Disclosure Statement.................C-1

Statement Regarding Oral Argument.........................................................................i

Table of Contents ..................................................................................................... ii

Table of Authorities.................................................................................................vi

Abbreviations and Dramatis Personae .....................................................................x

Statement of Subject-Matter and Appellate Jurisdiction .........................................1

Statement of the Issues.............................................................................................1

Statement of the Case...............................................................................................1

Questions Presented .................................................................................................7

Standard of Review..................................................................................................9

Statement of Facts..................................................................................................10

    Benlida.............................................................................................................10

    CTX-US and its Affiliates ...............................................................................10

    CTX-US's Central Processing of Orders from All Its Affiliates.......................13

    The Manufacturing Agreement and the Exclusive Customer List....................14

    The 2014 Business Authorization (ECF-177-1, p.22).......................................17

    The 2016 Letter Agreement (ECF-281-3).......................................................17

    The Parties' Accounting and Course of Dealing ..............................................19

Relevant Procedural History ...................................................................22

Summary of Argument ...........................................................................24

ARGUMENT

Point I:

 The District Court Erred When it Held that Benlida was Re-
 quired to Plead a Vicarious Liability Theory ...................................25

  A. Benlida Satisfied Rule 8's Pleading Requirements; Florida Law Incor-
  porates Agency and Vicarious Theories of Liability and They Need
  Not Be Pled Separately from Breach of Contract ...................................25

   1. Agency Theories of Liability are Incorporated into a Claim for
   Breach of Contract Under Fla. Stat. §671.103 and §671.205 ........26

  B. Benlida Satisfied Rule 8's Notice Requirements .....................................32

   1. CTX-US Admitted it Was on Notice that Benlida's Breach
   of Contract Claim Encompassed Obligations Incurred by
   CTX-HK on CTX-US's Behalf.......................................................32

   2. Benlida Properly Applied Payments to Earliest Invoices .............35

  C. It Was a Violation of Established Precedent to Grant CTX-US Sum-
  mary Judgment on the Basis that the TAC Failed to
  Plead an Agency Theory; Notice Pleading Does Not Require
  Pleading Theories ...................................................................37

Point II:

    Benlida Raised Numerous Disputed Issues of Material of

    Fact; The District Court Erred in Taking the Fact-Finding

    Role From the Jury and Improperly Resolving these Disputed

    Material Facts in Favor of CTX-US...................................................42

     A. Benlida Raised Disputed Issues of Fact Concerning the Parties'

       Course of Dealing......................................................................42

        1. Pursuant to the Manufacturing Agreement, and by Virtue

          of the Exclusive Customer List, CTX-US is Responsible

          for Paying the "CCT-HK" Invoices ...............................................42

        2. Benlida's Records Show that CTX-US Owed Money to

          Benlida Pursuant to the Manufacturing Agreement; the

          District Court Erred in Deeming it Undisputed that

          CTX-US Owed no Money to Benlida, Thereby

          Disregarding the Material Facts.....................................................45

     B. The Business Authorization and Letter Agreement Raised Disputed

       Material Facts; Summary Judgment for CTX-US Was Improper............48

Point III:

    The District Court Erred in Precluding Benlida's Expert CPA

    from Testifying About the Unreasonableness of the Position of

    CTX-US's Experts as to the CCT-HK Invoices, and the Com-

    mercial Reasonableness of Applying FIFO Principles to the

    CCT-HK Invoices ...............................................................................50

Conclusion ...............................................................................................54

Certificate of Compliance ........................................................................55

Certificate of Service ...............................................................................56

# TABLE OF AUTHORITIES

Page

## Cases:

*A.P. Frederick v. Sprint/United Mgmt.,*

246 F.3d 1305 (11th Cir. 2001)..............................................................9

*Adickes v. S.H. Kress,*

398 U.S. 144 (1970) ...........................................................................42

*Anderson v. Liberty Lobby,*

477 U.S. 242 (1986) .............................................................................9

*Bennett v. Schmidt,*

153 F.3d 516 (7th Cir. 1998)..............................................................38

*Branch Banking v. Papa & Gipe,*

2016 WL 3655312 (M.D. Fla. 2016) ...............................................50

*Ewing v. Carnival,*

2020 WL 3839699 (S.D. Fla. 2020)...................................................28

*Frasca v. NCL,*

654 F. App'x 949 (11th Cir. 2016) ...................................................35

*GeorgiaCarry.Org v. Georgia,*

687 F.3d 1244 (11th Cir. 2012)..........................................................35

*Gilmour v. Gates, McDonald,*

    382 F.3d 1312 (11th Cir. 2004).........................................................32

*Henry v. Halifax Hospital,*

    368 So.2d 432 (Fla. DCA 1979) ......................................................35

*Jeffery v. Sarasota White Sox,*

    64 F.3d 590 (11th Cir. 1995)..............................................................9

*Johnson v. City of Shelby,*

    574 U.S. 10 (2014) ..........................................8, 24, 30, 37, 38, 41

*Jones v. Unity Behavioral Health,*

    2021 U.S. App. LEXIS 34835 (11th Cir. 2021) ..............................47

*Maestrelli v. Arrigoni,*

    476 So.2d 756 (Fla. DCA 1985) ......................................... 26-27, 32

*MDS (Canada) Inc. v. Rad Source Technologies,*

    720 F.3d 833 (11th Cir. 2013).........................................................53

*MSP Recovery Claims v. United Auto.,*

    60 F.4th 1314 (11th Cir. 2023) .......................................................33

*Newcomb v. Spring Creek Cooler,*

    926 F.3d 709 (11th Cir. 2019)...........................................................9

*PBT Real Est. v. Town of Palm Beach,*

    988 F.3d 1274 (11th Cir. 2021).......................................................38

*Randall v. Pettes,*

    12 Fla 517 (1868) ................................................................4, 7, 21, 36

*Ray v. Comm'r, Alabama Dep't of Corr.,*

    915 F.3d 689 (11th Cir. 2019)...................................................33, 34

*Rutig v. Lake Jem Land Co.,*

    155 Fla. 420, 20 So.2d 497 (1945)...................................................53

*Skop v. City of Atlanta,*

    485 F.3d 1130 (11th Cir. 2007).......................................................42

*Solitron Devices v. Veeco Instruments,*

    492 So.2d 1357 (Fla. DCA 1986) ...................................................26

*St. Joseph's Hosp. v. Hosp. Corp.,*

    795 F.2d 948 (11th Cir. 1986)........................................................33

*Tiara Condo. Ass'n. v. Marsh & McLennan,*

    607 F.3d 742 (11th Cir. 2010)..........................................................9

*Urrea v. Koplow,*

    359 So.3d 1212 (Fla. DCA 2023) ...................................................36

*US Iron v. GMA Garnett,*

    660 F. Supp.3d 1212 (N.D. Fla. 2023), reconsid. den'd,

    2023 WL 3685819 (N.D. Fla. 2023)................................................27

*Vincent v. City Colleges of Chicago.,*

    485 F.3d 919 (7th Cir. 2007)....................................................................40

*Whitaker v. Milwaukee County,*

    772 F.3d 802 (7th Cir. 2014)...................................................................40

*Winther v. U.S. Steel,*

    852 F. App'x 482 (11th Cir. 2021) ..........................................................33

## **Rules, Laws and Statutes:**

28 U.S.C. §1291 ...........................................................................................1

28 U.S.C. §1332 ...........................................................................................1

Eleventh Circuit Rule 26.1-1 ...................................................................C-1

Eleventh Circuit Rule 36-2 .......................................................................47

UCC §671.103 ................................................................................4, 26, 32

UCC §671.201 .............................................................................................42

UCC §671.205 ................................................................................4, 26, 43

UCC §672.208 .............................................................................................43

FRCP 8 ..............................................................................................3, 4, 37

FRCP 9 ..................................................................................................4, 39

## Abbreviations and Dramatis Personae

| | | |
|---|---|---|
| **Plaintiff Jiangmen Benlida Printed Circuit Co., Ltd.** | "Benlida" or "BLD" | China-domiciled manufacturer of printed circuit boards. |
| ROK Printed Circuit Co., Ltd. | "ROK" | Benlida affiliate; formerly a named plaintiff. |
| Huang "Tracy" Sulan | | Benlida sales director. |
| Douglas Huang | | Benlida general manager. |
| Huang Xiangjiang | | Benlida CEO . |
| Wu "Roger" Yukun | | Benlida CFO. |
| Chen Zhanjiao | | Benlida bookkeeper. |
| **Defendant Circuitronix, LLC** | "CTX-US" or "Circuitronix" | A Florida-based worldwide distributor of printed circuit boards. |
| Circuitronix (Hong Kong) Ltd. | "CTX-HK" | Hong Kong-based CTX-US affiliate. |
| Circuitronix (ShenZhen) Tech Ltd. | "CTX-SZ" | Mainland China-based CTX-US affiliate and subsidiary of CTX-HK. |

| | | |
|---|---|---|
| Richi Circuitronix Pvt. Ltd. | "CTX-India" | CTX-India functions as the back office, housing the "inside sales" team (as explained below). |
| Rishi Kukreja | | Sole member/principal of CTX-US; director of CTX-HK; head of the Circuitronix group of companies. |
| Akshay Koul | | CTX-HK general manager. |
| Sunny Kapoor | | CTX-HK's former general manager. |
| Sourabh Sharma | | CTX-India general manager/global manager of "inside sales" for the CTX group of companies. |
| Standard Manufacturing and Representation Agreement | "Manufacturing Agreement" | 2012 agreement between Benlida/ROK and CTX-US. (ECF-281-2). |

| | | |
|---|---|---|
| CTX-US Exclusive Customers | "Exclusive Customers" | Customers appearing on the Exclusive Customers List appended to the Manufacturing Agreement over which CTX-US had exclusivity, relative to its affiliates, including CTX-HK; these were CTX-US's exclusive customers. |
| "CCT-HK" denominated invoices | "CCT-HK Invoices" | The name on an invoice issued by Benlida when CTX-HK ordered for CTX-US's Exclusive Customers generally included the characters "BLD" and "CCT-HK.[1] |
| Barry Mukamal | | CTX-US's expert CPA. |
| Mark Parisi | | CTX-US's expert CPA. |
| Randall Paulikens | | Benlida's expert CPA. |
| Third Amended Complaint | "TAC" | |

---

[1] "CCT" is an abbreviation used interchangeably with "CTX." "CCT" was Benlida's internal convention; "CTX" was Circuitronix's. In this brief, for the most part, "CTX" is used, though the invoices used the "CCT" convention. "BLD" was the parties' mutual convention to refer to Benlida.

| | | |
|---|---|---|
| Printed circuit boards | "PCBs" | Printed circuit boards that use conductive lines to connect electronic components together. |
| First-in, first out | "FIFO" | Payments made by CTX-US to Benlida were applied to the oldest invoices first. |
| District court docket entries | "ECF" | |
| Trial Transcript | "TT" | The transcripts are docketed at ECF-319-324. |

## Statement of Subject-Matter and Appellate Jurisdiction

This district court had diversity jurisdiction, pursuant to 28 U.S.C. §1332, and this Court has appellate jurisdiction following entry of a final amended judgment dated April 22, 2024 (ECF-333), pursuant to 28 U.S.C. §1291, and a timely amended notice of appeal filed therefrom on May 10, 2024. (ECF-335).

## Statement of the Issues

The core issue presented is, Is there a triable issue of fact whether defendant CTX-US – an exclusive distributor of PCBs manufactured by plaintiff Benlida – has an obligation to pay for PCBs ordered by its Hong Kong affiliate CTX-HK for CTX-US's Exclusive Customers? A subsidiary issue is whether Benlida was required to expressly plead the legal theory that CTX-HK was acting as an agent, alter-ego or division of CTX-US when it placed orders requesting that Benlida manufacture PCBs for CTX-US's Exclusive Customers, or whether it sufficed to plead that CTX-US was liable to pay the "CCT-HK" denominated invoices, as alleged in 171 separate paragraphs in the complaint, for orders placed by CTX-HK for CTX-US's Exclusive Customers?

## Statement of the Case

The appeal arises out of a contractual dispute between Benlida, a China-based manufacturer of PCBs, and CTX-US, a Florida-based distributor of PCBs. The parties have been doing business together since 2005 (TT-225, l.12) and still

do business together despite this dispute. (TT-567,709,775). In 2012 they entered into a Manufacturing Agreement (ECF-281-2), which provided that Benlida would produce PCBs for CTX-US's Exclusive Customers, and granted CTX-US exclusive rights with respect to the sale of PCBs to the Exclusive Customers enumerated in the Manufacturing Agreement and in amendments thereto.

The dispute below centers on unpaid invoices for PCBs ordered by CTX-US itself and by its Hong Kong affiliate CTX-HK for CTX-US's Exclusive Customers pursuant to the terms of the Manufacturing Agreement. Benlida contended that, as CTX-US was *the* party to the agreement, when either CTX-US or its affiliates (including CTX-HK) placed orders for CTX-US's Exclusive Customers, CTX-US was obligated to pay for them. (ECF-186). CTX-US, by contrast, argued that CTX-US was not obligated to pay invoices issued for orders placed by CTX-HK, and that instead CTX-US had *overpaid* Benlida by millions of dollars and was entitled to reimbursement.

On appeal Benlida challenges several district court determinations, including orders granting summary judgment in favor of CTX-US, denying Benlida's motion for reconsideration, and certain *in limine* rulings. In granting summary judgment for CTX-US, the district court improperly imposed heightened pleading standards on Benlida and did not consider disputed facts in the light most favorable to Benlida. Rather than construing the TAC – the third amended complaint – in such

manner as to do substantial justice (see FRCP 8(e)), and rather than viewing the declarations and documentary evidence submitted in opposition to the motion for summary judgment in the light most favorable to non-movant Benlida, the district court impermissibly construed disputed facts in favor of CTX-US. It also erred in finding that the TAC did not put CTX-US on notice that it was being sued by Benlida for unpaid "CCT-HK" invoices, as each "CCT-HK" allegation (ECF-26 TAC ¶¶261-431) specifically stated that such invoice was issued to "Circuitronix" which had failed to pay therefor. CTX-US's principal also knew (as shown on motion for reconsideration) from reading the TAC that Benlida was suing CTX-US for the unpaid "CCT-HK" Invoices (ECF-267, pp.194-196).

At the core of this appeal is the following issue, illustrated with a hypothetical. CTX-US's position in this case is as follows:

*If:* (**a**) CTX-US orders $10,000,000 in PCBs for the CTX-US Exclusive Customers, and

(**b**) CTX-HK also orders $10,000,000 in PCBs for the CTX-US Exclusive Customers, and

(**c**) CTX-US wires $15,000,000 to Benlida,

*Then:* (**d**) CTX-US now has a credit balance with Benlida of $5,000,000, and CTX-HK still owes Benlida $10,000,000, and

(**e**) Benlida should look to CTX-HK for $10,000,000, and Benlida should give back to CTX-US the $5,000,000 on its counterclaim.

In considering this appeal, the Court should be mindful of these overarching legal principles:

1. As Florida law governs the Manufacturing Agreement (ECF-281-2, p.9), when CTX-US made payments to Benlida without designating, ***at the time of payment***, the particular invoices being paid down, Benlida could apply those payments on a FIFO basis. *Randall v. Pettes*, 12 Fla 517, 534 (1868).

2. FRCP 8 only requires notice pleading of claims, not pleading of legal theories upon which claims are based, unless more specificity is required by FRCP 9. As the law of agency and the law merchant are incorporated into every contract that is governed by Florida law (see UCC §§ 671.103 and 671.205), CTX-US was liable to Benlida for orders placed by CTX-HK as its agent, if not also as its alter-ego or mere division of CTX-US.

The case involves the longstanding practice whereby payments made by CTX-US were applied on a FIFO basis. The district court's restrictive interpretation of the notice pleading standards, misreading of the TAC, and exclusion of relevant documentary evidence and testimonies resulted in Benlida being barred from proving CTX-US's responsibility for the "CCT-HK" Invoices at trial. Because the district court held that Benlida could not recover against CTX-

US for the CCT-HK Invoices, this case proceeded to trial on the utterly commercially unreasonable theory that CTX-US overpaid Benlida and was entitled to a refund because, as CTX-US contended, Benlida improperly treated CTX-US's payments as paying down the oldest "CCT" and "CCT-HK" Invoices. The error was compounded, resulting in a prejudicial trial, by the district court's order granting CTX-US's motion *in limine* (ECF-237), which precluded Benlida from defending itself at trial with the argument that, because the PCBs were manufactured for CTX-US's Exclusive Customers, the payments were properly attributed to "CCT-HK" Invoices and that CTX-US's theory was commercially unreasonable.

Central to Benlida's argument is the Manufacturing Agreement, which makes CTX-US the exclusive distributor of Benlida's PCBs to CTX-US's designated "Exclusive Customers." Benlida demonstrated that orders processed through CTX-HK were intended for CTX-US's Exclusive Customers, thereby making CTX-US responsible for payment, and Benlida so pled, in 171 separate paragraphs, that CTX-US was responsible for paying such invoices, each invoice denominated by its separate "CCT-HK" number, indicating that the order had been placed by CTX-HK for CTX-US's Exclusive Customers. (ECF-26, TAC ¶¶261-431).

The determination that CTX-US was not responsible for the "CCT-HK" Invoices disregarded (**a**) historical business practices, (**b**) discount structures applied to *all* orders, (**c**) lead-time penalties calculated on *all* orders, (**d**) that the same central CTX entity – CTX-India – issued purchase orders to Benlida, and (**e**) the benefits that CTX-US received by orders being placed by CTX-HK. This resulted in an unfair trial, where the jury awarded damages in favor of CTX-US for alleged overpayments.

# Questions Presented

1. Could a jury reasonably infer that CTX-US breached the Manufacturing Agreement when it failed to pay the "CCT-HK" Invoices?

   Answer: *Yes*. The issue is not of CTX-US's liability for the *debts* of CTX-HK, but of CTX-US's *own* liability for the CCT-HK Invoices, because they were issued for orders placed *for CTX-US's Exclusive Customers* by CTX-HK. The district court's decision granting summary judgment to CTX-US on this issue must be reversed, requiring vacatur of the judgment and retrial.

2. Where CTX-US regularly made payments to Benlida without designating, ***at the time of payment***, whether it was paying down any particular invoice, could a jury reasonably find that Benlida properly applied those payments on a FIFO basis to both "CCT" and "CCT-HK" Invoices?

   Answer: *Yes*. So holds *Randall v. Pettes*, 12 Fla 517, 534 (1868). The district court's error in precluding evidence that CTX-US payments were properly attributed to both "CCT" and "CCT-HK" denominated invoices, resulted in an unjust trial, requiring vacatur of the judgment and remand for retrial.

3. Did the district court err in finding that the TAC failed to give CTX-US notice it was being sued for the "CCT-HK" Invoices?

   Answer: *Yes*. Each of the 171 paragraphs that alleged non-payment of a "CCT-HK" denominated invoice also alleged that CTX-US was responsible

therefor. The district court's misreading of the TAC was clearly erroneous, in light of *Johnson v. City of Shelby*, 574 U.S. 10 (2014), and thus the order granting summary judgment must be reversed, the judgment vacated, and the case remanded for retrial.

4. Was Benlida deprived of a fair trial because it was precluded from introducing evidence to show that CTX-US's claimed overpayments were false, and were based upon the commercially unreasonable view that CTX-US was not responsible for paying CCT-HK Invoices?

Answer: *Yes.* The summary judgment order and consequent *in limine* rulings resulted in the case being tried by half truths. Benlida was prevented from showing that it properly applied payments on a FIFO basis (as pled in Benlida's answer to the counterclaim) and from showing that CTX-US owed Benlida money on the "CCT-HK" Invoices for PCBs manufactured by Benlida for CTX-US's Exclusive Customers pursuant to the Manufacturing Agreement.

# Standard of Review

This Court reviews *de novo* a district court's grant of summary judgment, applying the same legal standards as the district court. *Newcomb v. Spring Creek Cooler*, 926 F.3d 709, 713 (11th Cir. 2019). As the district court should have done, this Court must construe the evidence and draw all permissible inferences in the light most favorable to non-movant Benlida. *Tiara Condo. Ass'n. v. Marsh & McLennan*, 607 F.3d 742, 745 (11th Cir. 2010); *A.P. Frederick v. Sprint/United Mgmt.*, 246 F.3d 1305, 1311 (11th Cir. 2001). It may not decide credibility, nor may it weigh the parties' evidence. *Id*. Summary judgment is not appropriate "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox*, 64 F.3d 590, 594 (11th Cir. 1995). An issue of fact is "material" if it might affect the outcome of the case under the governing law, and it is "genuine" if the record taken as a whole could lead a rational fact finder to find for the non-movant. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

With respect to the trial, it is "well-settled that an erroneous ruling which relates to the substantial rights of a party is ground for reversal unless it affirmatively appears from the whole record that it was not prejudicial." *McCandless v. U.S.*, 298 U.S. 342, 347-48 (1936). Here, the district court's erroneous rulings tainted the entire trial, because Benlida was precluded from

showing that it had properly applied payments received from CTX-US to the "CCT-HK" Invoices and that CTX-US thus owed it the moneys claimed in the TAC.

<strong>Statement of Facts[2]</strong>

**Benlida**

PCB manufacturer Benlida and CTX-US have been doing business together since 2005 (ECF-203-3, Kukreja Dep. 38:1-9), and still do business together despite this dispute (TT-567,709,775) because CTX-US considers Benlida to be a good and honest company that produces the "best in class" for the types of PCBs required by CTX-US's Exclusive Customers. (TT-269-279,665-666).

**CTX-US and its Affiliates**

CTX-US is a limited liability company (ECF-34, p.8, ¶6) whose sole member is Rishi Kukreja. (ECF-34, p.8, ¶8). CTX-US, with Kukreja at the helm, is at the apex of the Circuitronix group of companies, which has its global headquarters in Florida. (TT-592-593; see also TT-653: "The headquarters are where I sit.")). While CTX-US is at the apex (TT-586), the companies function as a

---

[2] As this is an appeal from a post-trial judgment and orders granting summary judgment, denying reconsideration, and granting *in limine* preclusion, this recitation incorporates references to both the motion papers and the trial transcript and exhibits. The facts elicited in both are congruent, and so the clearer or more illustrative record references are used herein.

group. (TT-581: "I'm grooming Akshay Koul [of CTX-HK] to be the ***group***

CEO.") (emphasis added).

Nonparty CTX-HK is based in Hong Kong, and also managed by Kukreja.

(ECF-203-3; Kukreja Dep. at 52:7-25 ("I manage Hong Kong."); 53:16 ("I have

overall management authority.")). Between approximately 2013 and March of

2015, Sunny Kapor ran CTX-HK's day-to-day operations from Hong Kong as "co-

CEO" of "Circuitronix globally" together with Kukreja. (ECF-203, Kukreja Dep.

146). From March of 2015 to the present, CTX-HK's day-to-day operations have

been run by Akshay Koul, its general manager. (TT-1242).

Pursuant to the Manufacturing Agreement and the parties' course of dealing,

CTX-US orders PCBs from Benlida and sells them to manufacturers around the

world. Since 2012 the parties' course of dealing has consisted of the inclusion of

"X" numbers on purchase orders from all CTX-affiliated entities. (ECF-186, ¶9;

see exemplar purchase orders at 186-2). These "X" numbers identify CTX-US's

Exclusive Customers. (ECF-34, p.8, ¶7, p.9 ¶15; *see also* Exclusive Customer List,

ECF-285-2). As they are "exclusive" CTX-US customers (TT-214,562), if Benlida

had circumvented CTX-US to sell to these customers, Benlida would have been in

breach of contract. (*Id.*) Kukreja acknowledged that Benlida had never tried to

circumvent CTX-US. (*Id.*, at 569). Thus, as Benlida's sales manager Tracy Huang

attested, when CTX-HK placed orders using the unique "X" numbers, they were placed for CTX-US's Exclusive Customers. (ECF-186, ¶¶6,13,15, and *passim*).

CTX-US and CTX-HK both market Benlida's PCBs to the CTX-US Exclusive Customers, and both identify the customers using "X" numbers on purchase orders. (TT-721-723). One cannot tell from the "X" numbers where the customer is located, as Koul testified. (ECF-185-6, p.22).[3] Benlida likewise treated all orders it received as being for Exclusive Customers, invoicing them according to the "X" number. (ECF-186-3, ECF-190). Though CTX-US has argued that it and CTX-HK would place orders for different customers, the purchase orders do show them placing orders for exactly the same customers. (See, *e.g.*, ECF-191, at pp.6-7) (exemplar purchase orders from both CTX-US and CTX-HK showing orders for the

---

[3] At trial, Kukreja contradicted Koul, stating that "Every entity ships to different customers. We [*i.e.*, CTX-US, CTX-HK, and CTX-SZ] have no common customers. *Q.* What do you mean you 'have no common customers'? *A.* I gave the example of Lear. The U.S. ships into Lear North America, and Hong Kong would ship into, say, Lear Philippines. The U.S. would never ship into Philippines. *Q.* Does that say that on the purchase order? *A.* I cannot recollect, but it's communicated to them as to where the parts are going for sure." (TT-723-724). Not only did Kukreja contradict Koul's testimony, it is also at odds with the fact that there is only one "X" number for Lear on the Exclusive Customer List. (ECF-285-2). Additionally, the exhibits to the Huang declaration showed that both CTX-US and CTX-HK would use the same "X" numbers on orders, and only direct that the PCBs be delivered to the CTX-HK facility in Hong Kong or, on occasion, DHL in Hong Kong. (See ECF-186-3 and ECF-190). Finally, when Kukreja testified about Lear, he referred to it as a single company. (TT-205).

same "X57" Exclusive Customer). Kukreja acknowledged that he never had any material objections to any of the invoices, and that he did receive them. (TT-776-777).

**CTX-US's Central Processing of Orders from All Its Affiliates**

Specific CTX entities take orders for specific territories and then send the order information on to affiliate CTX-India for central processing and management. (ECF-203-3, Kukreja Dep. at 8-13). Regardless which CTX entity takes an order, CTX-India primarily draws up the purchase orders and other requisite documents and tracks the progress of the production. (TT-935,969-970 (testimony of Sourabh Sharma, CTX-India's general manager, in charge of "inside sales")); see also TT-820, *et seq.*).[4] More than 90% of all purchase orders issued for CTX-US, CTX-HK, and CTX-SZ are centrally issued out of CTX-India. (TT-969).

Benlida was directed to ship all PCB's to CTX-HK's Hong Kong facilities (which Kukreja repeatedly referred to as "our" warehouse (TT-238,260,264,358)), or sometimes to DHL in Hong Kong, regardless whether they were ordered by CTX-US or CTX-HK. (See designated shipping address on the purchase orders at

---

[4] "Inside sales" means sales to existing customers, as distinct from "outside salesmen," whose job is to "hunt" down new customers. (TT-215). The inside sales team in India is responsible for placing orders for CTX-US and CTX-HK. (TT-823-825).

ECF-186-3 and ECF-190). CTX-US – without Benlida's involvement – would then have the PCBs re-shipped from its central warehouse to its customers. (TT-369).

CTX-US and CTX-HK operated in parallel but maintained separate books, with, as Sourabh testified, 90% of the purchase orders being issued out of CTX-India (TT-969), with both entities using the same "X" numbers from the Exclusive Customer List (ECF-186-3, ECF-190), and with both entities being controlled by Kukreja. (ECF-197-4, p.4 ("I manage Hong Kong....I have overall management authority.") Both entities also added customers to the Exclusive Customer List. (See, *e.g.*, ECF-186, p.2, ¶5, and ECF-186-1 (email requests from both CTX-US and CTX-HK to add customers to the Exclusive Customer List)).

**The Manufacturing Agreement and the Exclusive Customer List**

In 2012 the parties entered into the Manufacturing Agreement, which defined the relationship between Benlida and ROK[5] (collectively, "Manufacturer") on the one side, and *only* CTX-US on the other, and granted CTX-US certain exclusivity rights to distribute PCBs to "Identified Potential Customers" (ECF-281-2, p.3). CTX-US secured exclusivity rights as follows: (emphasis added)

> **1.4 Marketing Period. (a)** *Identified Potential Customers.* Circuitronix shall, from time to time, provide a list to Manufacturer of potential customers....If the Manufacturer does not timely object to a potential customer (each an "***Identified Potential Customer***"), Circuitronix shall have

---

[5] ROK, a Benlida affiliate, was dismissed from the case, as it was no longer a necessary party, as ROK's invoices had been fully-paid, on a FIFO basis, by the time suit was brought.

the exclusive right, for a period of twelve (12) months thereafter (the
"***Marketing Period***") to promote and solicit the sale of Products to the
Identified Potential Customers....**Schedule A** attached hereto contains a
current list of Identified Potential Customers....

**1.5 Exclusive Sales Period.** If Circuitronix procures a Purchase
Order…from an Identified Potential Customer during the Marketing Period
(any such Identified Potential Customer being hereinafter referred to as a
"***Circuitronix Customer***"), Circuitronix shall have [an] ***Exclusive Sales
Period, to deal exclusively*** with such Circuitronix Customer....

CTX-US customers were assigned a unique "X" number for use on all
purchase orders sent to Benlida and the invoices issued pursuant thereto. (ECF-
186, pp.5-6, ¶¶8-18). Given CTX-US's exclusivity rights, when CTX-HK placed
orders for CTX-US's Exclusive Customers, it necessarily did so on behalf of CTX-
US. (*Id.*, ¶13). Paragraph 1.5 of the agreement expressly calls them "***Circuitronix
Customer[s]***." It is a defined term. Under the agreement, CTX-US's Exclusive
Customers ***are not CTX-HK customers***. Indeed, "[o]n myriad occasions, CTX-US
made clear that it would not countenance sales of products by Benlida to customers
on the Exclusive Customer List, other than through CTX-US, thus manifesting to
Benlida in general, and to me [Tracy Huang] specifically, that it understood that
purchase orders issued by CTX-HK were indeed made on behalf of CTX-US."
(*Id.*, ¶14).

At all relevant times, Benlida understood – from representations made to it
from CTX-US – that CTX-HK had authority to issue orders for Exclusive
Customers and had authority to add customers to the Exclusive Customer List.

(See ECF-186, p.2, ¶5, and ECF-186-1 (exemplar email requests from both CTX-US and CTX-HK to add customers to the Exclusive Customer List)). Indeed, emails requesting that customers be added to the list bore the customer's name in the subject line, along with the words "Exclusive Customer List." (See *id*.) ***At no time was there ever a request that a customer be designated a customer of CTX-HK***. (*Id.*) And at trial, Kukreja acknowledged that Koul was authorized to speak for CTX-US. (TT-736, 752; see also TT-439 (Koul authorized by Kukreja to attend meeting with Benlida for CTX-US)).[6]

When CTX-US entered into the Manufacturing Agreement, there were 29 "Identified Potential Customers." (ECF-281-2, p.10). The Exclusive Customer List would eventually have 189 companies *worldwide*, identified by numbers "X1" through "X189," with both CTX-US and CTX-HK using the same CTX-US Exclusive Customer numbers on purchase orders. (ECF-191;[7] ECF-285-2; ECF-186, ¶8; ECF-285-2). CTX-HK had no exclusivity rights to any of CTX-US's

---

[6] Kukreja hedged, however, stating that Koul was authorized to speak for CTX-US for "certain" things. But the only limitation that Kukreja mentioned was that Koul could not remove customers from the Exclusive Customer List, which serves to prove Benlida's point that Exclusive Customers are only the exclusive customers of CTX-US. (TT-736). Either way, Koul had apparent, if not actual, authority, as ratified by Kukreja to speak for CTX-US to Benlida.

[7] Notably, CTX-HK (by Koul) even requested that North American companies be added to the Exclusive Customer List. (see ECF-186-1).

Exclusive Customers (ECF-186, ¶8), and Benlida always understood that orders placed by CTX-HK were placed on behalf of CTX-US. (*Id.*, ¶11).

Furthermore, exhibits submitted by Benlida in opposition to the motion for summary judgment provided examples of payments by CTX-US for CCT-HK Invoices between 2012 through 2017 (ECF-186-5, 186-6, and 186-7). These exhibits showed that the parties' course of dealing included CTX-US's acknowledgment and payment of CCT-HK Invoices. (*Id.*)

In addition to Benlida's understanding that CTX-US was obligated to pay for *all* orders for Exclusive Customers, CTX-US also acknowledged its responsibility to pay CCT-HK Invoices, admitting that CTX-HK's obligations to Benlida were incurred on behalf of CTX-US. (See, e.g., ECF-178, p.10 ("one of the primary reasons for entering into the Letter Agreement in 2016 was to formally add CTX-HK as a party to the Manufacturing Agreement, allowing it to be a full participant, and eliminating any need for CTX[-US] to provide separate assurances for particular obligations ***that may be incurred by CTX-HK on CTX[-US]'s behalf***.") (emphasis added)).

**The 2014 Business Authorization (ECF-177-1, p.22)**

In 2014, Kukreja, on behalf of CTX-US, expressly authorized CTX-HK to place orders to Benlida on behalf of CTX-US.

**The 2016 Letter Agreement (ECF-281-3)**

In July of 2016, Benlida and ROK on the one hand, and CTX-US and CTX-HK on the other, signed the "2016 Letter Agreement." That agreement (drafted by CTX-US on its letterhead and signed by Kukreja on behalf of both CTX-US and CTX-HK) made reference to the Manufacturing Agreement (the "Existing Agreement") and to a dispute concerning amounts owed. It also obligated the parties to negotiate in good faith the terms of a "Secondary Manufacturing Agreement," and, until then, CTX-US would continue to make payments to Benlida "in accordance with the payment schedule set forth in the Existing Agreement…." (See ECF-281-3, p.1, ¶2). It is undisputed that the parties never consummated a Secondary Manufacturing Agreement. (ECF-203-3, p.60).[8]

The merger clause in the 2016 Letter Agreement also makes clear that the parties understood the terms of the Manufacturing Agreement to remain force. (ECF-281-3, ¶6 ("This Agreement *and the Existing Agreement* represent the parties' full and complete understanding regarding the subject matter hereof. All other prior agreements...that refer or relate to the employment relationship have either been merged into this Agreement *and/or the Existing Agreement* or have been intentionally omitted therefrom.") (emphasis added)).

---

[8] At trial, Kukreja referred to the 2016 Letter Agreement as the "secondary" agreement (see TT-398-399); however, the parties never consummated such an agreement, as Kukreja testified at deposition. (ECF-203-3, p.60).

In 2017, Kukreja also signed an audit confirmation that acknowledged that CTX-US customarily paid "CCT-HK" Invoices, writing on the audit form: "***Payments owed need to be offset with payments made by Circuitronix, USA on behalf of CTX-HKG /s/ Rishi Kukreja***." (ECF-187-2) (emphasis added).

**The Parties' Accounting and Course of Dealing**

After the Manufacturing Agreement was executed, CTX-India would issue purchase orders for virtually all the Exclusive Customers, regardless which entity the order originated from. (TT-969). The invoices issued by Benlida when CTX-HK ordered for CTX-US's Exclusive Customers used the "CCT-HK" convention.[9] Moreover, penalties assessed against Benlida for late deliveries – referred to as lead time penalties – were calculated based upon *all* orders placed for CTX-US's Exclusive Customers orders, *whether such orders had been placed by CTX-US, CTX-HK or CTX-SZ.* (TT-705-707,757-759).

When CTX-US would make payments to Benlida, it would typically send large tranches of money, in round numbers, rather than specifically invoiced amounts. (ECF-197-3, pp.41-42,162-163,169). CTX-US customarily paid CCT-HK Invoices. (ECF-186 ¶13). At the time of payment, CTX-US never identified

---

[9] Likewise, there were invoice names containing "ROK" and "CCT," and invoice names containing "ROK" and "CCT-HK."

which invoices these payments should be applied against, as Benlida's bookkeeper Chen Zhanjiao testified. (ECF-185-7, pp.8-12,25).

Accordingly, Benlida applied these payments on a "FIFO" (*i.e.*, first-in, first-out) basis, regardless whether they were "CCT" or "CCT-HK" Invoices. (ECF-177-1 ¶1). CTX-US and CTX-HK kept separate spreadsheets, as did Benlida for the different invoices; Benlida, however, treated the overall amounts due as being a single total number, as Benlida's CFO explained: "I treated the two companies as one and the same, and – from my standpoint as Benlida's CFO – the important issue was how much was owed in total, not the nuances of how the amounts should be divided up – or even if they should be divided up – as between the two companies." (ECF-187, ¶6). Moreover, CTX-US and CTX-HK "were always understood to be one and the same company controlled by Rishi Kukreja." (ECF-187, ¶13).

What is unusual, and what has led to this litigation, is that when CTX-US would send payments to Benlida, CTX-US would apparently treat such payments *as being solely* for the PCBs bearing the "CCT" invoice numbers, not the "CCT-HK" invoice numbers, notwithstanding (**a**) that the CTX-HK orders were placed by CTX-HK for CTX-US's Exclusive Customers, as evidenced by such purchase orders bearing CTX-US's unique Exclusive Customer "X" numbers (see, e.g., ECF-186-2 & ECF-186-3), and (**b**) that CTX-US's own payment details showed

CTX-US, on occasion, expressly acknowledging responsibility for "CCT-HK" Invoices. (ECF-186-5, 186-6, and 186-7). But because CTX-US treated its payments as (mostly) only being for the "CCT" invoices on the CTX-US/CTX-HK books, in CTX-US's view CTX-US increasingly went into an "overpaid" position, while CTX-HK increasingly went into an underpaid position.

There is, however, no reasonable explanation why CTX-US would overpay Benlida by many millions of dollars. At trial, CTX-US argued that it was fronting money to Benlida to keep it afloat. (TT-332-333). To the contrary, however, the record shows that CTX-US was not overpaying; instead Benlida was continually asking CTX-US to pay up because it owed Benlida millions of dollars. (ECF-186, ¶25; see also ECF-201-2, Mukamal Dep., pp.180-181 ("*Q.* You said [Benlida was] always begging [CTX-US] for money. *A.* I didn't say 'begging.' *Q.* 'Harping' or 'chasing' for money…. *A.* I saw emails to that effect. *Q.* Do you think maybe they were chasing for money because…they were owed $13 million? *A.* I'm sure that had a part of it. They should have then pursued [CTX-HK] for that. That would be one way to deal with it.")).

Based upon Florida law, the moneys paid by CTX-US were properly used to pay down the oldest invoices.[10] Attributing CTX-US's payments on a FIFO basis,

---

[10] See *Randall v. Pettes*, 12 Fla 517, 534 (1868) (discussed infra).

in accordance with Florida law,[11] resulted in the "CCT" and CCT-HK Invoices listed in the TAC being unpaid as of the time of filing.

## Relevant Procedural History

In its TAC, Benlida claimed $13,655,335.93 in damages[12] by expressly delineating each unpaid invoice it had issued to and for which CTX-US was responsible: (**a**) "CCT-HK" Invoices worth roughly $4.2 million (exclusive of an agreed-upon price increase) (ECF-26, ¶¶261-431); and (**b**) "CCT[-US]" Invoices worth roughly $7.3 million, exclusive of the aforementioned price increase. (*Id*., ¶¶13-260; *Id*., ¶¶261-431). The value of the price increase, about $2.1 million, was also demanded, which increase applied to orders placed by both CTX-US and CTX-HK for CTX-US's Exclusive Customers. (*Id.*, ¶¶432-437).

The TAC set forth two causes of action, one for breach of contract relating to an overall failure to pay all accounts receivable (ECF-26, pp.48-49), and another for account stated relating to each of the hundreds of invoices listed (ECF-26, pp.49-50). CTX-US answered and filed a counterclaim for money damages, alleging that CTX-US had overpaid Benlida. (ECF-34). Benlida answered the counterclaim, denied the counterclaims, and asserted that the alleged

---

[11] *Id.*

[12] This was later decreased by $230,744.78 and reflects some cleared A/R because of (**a**) continued business between CTX-US with Benlida; and (**b**) pre-paid invoices to pay down arrearage to Benlida, with additional percentage points, which varied, added to pay down past debt.

"overpayments" by CTX-US were applied on a FIFO basis to past debts. (ECF-43).

CTX-US later moved (ECF-177, 178) for summary judgment dismissing Benlida's claims respecting the "CCT-HK" Invoices, arguing that CTX-HK was a nonparty, and that CTX-US had no notice that Benlida was suing it for the invoices issued to CTX-HK.[13] The district court agreed (ECF-221), essentially treating Benlida's complaint as two entirely separate actions, one against CTX-US and one against non-party CTX-HK, notwithstanding that every order placed by CTX-HK identified in the TAC was for CTX-US's Exclusive Customers.

Holding that Benlida could not recover on the CCT-HK Invoices led to the dismissal of the claims and defenses respecting the "CCT" invoices. This is because the district court adopted CTX-US's position that its payments to Benlida were not for both the "CCT" and "CCT-HK" Invoices, but only the "CCT" invoices, and that therefor CTX-US had habitually overpaid Benlida, because it was not responsible for paying the CCT-HK Invoices.

---

[13] Benlida made a motion for an enlargement of the very short two-week deadline within which to respond to the motion for summary judgment (ECF-181), but the court denied the motion. (ECF-183) (paperless order). Benlida submits that this denial of a request for a brief extension of time is itself problematic, particularly since the court then faulted Benlida for not using pincites to precise paragraph numbers in the Wu declaration when rebutting CTX-US's statement of proposed undisputed facts (see Point II.A.2, *infra*), which would not have happened if Benlida had been afforded a few extra days.

Benlida moved for reconsideration (ECF-267), arguing that Kukreja had testified that he knew CTX-US was being sued on the "CCT-HK" Invoices, and that the TAC had pled that CTX-US was responsible for those invoices, and thus the district court's finding that CTX-US lacked notice thereof was fundamentally flawed. The motion was denied. (ECF-293).

Based upon the summary judgment decision, on motions *in limine* (ECF-197, 198), Benlida was precluded from offering evidence at trial that CTX-US was in arrears because of the unpaid CCT-HK Invoices. (ECF-237).

The case was tried from October 16-23, 2024 (ECF-319-324). The jury awarded CTX-US $7,585,847; $4,760,847 for "overpayment" on the "CCT" invoices, and $2,825,000 for payments by CTX-US that Benlida had attributed, on a FIFO basis, to paying down CCT-HK Invoices. Benlida appeals from the entire judgment, as amended.

Further facts will be subsumed within the argument section of this brief.

## Summary of Argument

The district court erred in granting summary judgment for CTX-US, incorrectly reasoning that Benlida had failed to plead an agency or vicarious liability theory, such that CTX-US would be responsible for PCBs ordered by CTX-HK. The court erred because legal theories need not be pled, but instead all that was required was that Belinda present a short and plain statement of the claim

against CTX-US. *Johnson v. City of Shelby*, 574 U.S. 10 (2014). In 171 short and plain allegations, Benlida put CTX-US on notice that it was suing it for non-payment of the "CCT-HK" Invoices, which represented PCBs ordered by CTX-HK for CTX-US's Exclusive Customers. CTX-US's principal Kukreja acknowledged that he understood that CTX-US was being sued for those unpaid invoices. The district court thus erred in granting summary judgment dismissing those claims, taking the issue from the jury, and in then precluding Benlida from presenting evidence regarding those unpaid invoices at trial.

## Argument

**Point I:    The District Court Erred When it Held that Benlida was Required to Plead a Vicarious Liability Theory.**

The district court granted summary judgment for CTX-US primarily on the basis that Benlida did not plead an agency, alter ego, or some other vicarious liability theory. (ECF-221, p.7). The court committed reversable error – necessitating a new trial – when it found that that "Benlida's theories of liability [were not] properly before" it. (ECF-221, p.6).

### A. Benlida Satisfied Rule 8's Pleading Requirements; Florida Law Incorporates Agency and Vicarious Theories of Liability and They Need Not Be Pled Separately from Breach of Contract.

Review of the relevant allegations in the TAC indicates that Benlida sued CTX-US to recover damages for unpaid invoices due pursuant to the

Manufacturing Agreement. Benlida's opposition to CTX-US's motion for summary judgment did not present a new responsive theory. Instead, it explained why CTX-US breached the Manufacturing Agreement; Benlida has never varied from theories of liability firmly grounded in breach of contract.

1. **Agency Theories of Liability are Incorporated into a Claim for Breach of Contract Under Fla. Stat. §671.103 and §671.205.**

Since this case concerns the sale of goods and is governed by Florida law, by pleading the contract itself, CTX-US had notice that Benlida was seeking to hold it liable under the contract for unpaid "CCT-HK" Invoices. Agency, if even relevant, need not have been expressly pled, as Florida's UCC (Fla Stat. §671.103) implies into every contract principles of law and equity, the law merchant, the laws concerning principals and agents, and the parties' course of dealing, which must be considered by the jury. (Fla Stat. §671.205). The district court thus erred when it required agency or alter ego theories of liability to have been formally pled. *Solitron Devices v. Veeco Instruments*, 492 So.2d 1357, 1360 (Fla. DCA 1986) ("the [UCC] does not exist in a vacuum. Existing and related rules of law and principles of equity continue to be applicable to commercial transactions, as well, it is hoped, as common sense and custom and usage.") (Citing Fla. Stat. §671.103).

Moreover, even outside the UCC, both the state and federal courts in Florida recognize that there is no requirement that a plaintiff reference an agency theory in

a complaint for breach of contract. See *Maestrelli v. Arrigoni*, 476 So.2d 756, 757 (Fla. DCA 1985);[14] *accord*, *US Iron v. GMA Garnett*, 660 F. Supp.3d 1212, 1220 (N.D. Fla. 2023), *reconsid. den'd*, 2023 WL 3685819 (N.D. Fla. 2023) ("under Florida law, ***a plaintiff 'need not refer to the agency in the complaint but may merely allege the legal effect of the agent's action by averring that the contract was made by the principal himself*** .") (emphasis added).

The district court stated that Benlida's allegations in the TAC that CTX-US "ordered" goods invoiced to CTX-HK is tantamount to saying that CTX-US *itself* spoke the ordering words to Benlida for purchase of goods. According to the district court, this was incorrect because Benlida raised an agency theory of liability in opposition to summary judgment. But as CTX-HK issued orders for CTX-US's Exclusive Customers and Koul was authorized to speak for CTX-US (TT-439,736,752), these were indeed orders for CTX-US, primarily being issued by CTX-India from which CTX-US and its affiliates all issued purchase orders for the Exclusive Customers. (TT-969). Again, after all, "Circuitronix Customer" is a

---

[14] "A principal's liability for the acts of his agent ***is not*** a 'theory of liability,' in the sense of a cause of action, such as debt or express or implied contract that must be pleaded to invoke the trial court's subject matter jurisdiction and to meet due process notice requirements. ***As a general rule, one suing upon a contract made for the defendant by an agent need not refer to the agency in the complaint but may merely allege the legal effect of the agent's action by averring that the contract was made by the principal himself***." (Citations omitted; emphasis added).

defined term in ¶1.5 of the Manufacturing Agreement. (ECF-281-2, p.3). And again, CTX-US Exclusive Customers *are not* CTX-HK customers.

Whether CTX-HK was placing orders for the Exclusive Customers as an agent, alter ego or functional division of CTX-US is immaterial, as it was expressly alleged that CTX-US was responsible to pay for each of the "CCT-HK" Invoices because they were issued pursuant to the Manufacturing Agreement and that CTX-US was therefore obligated to pay them. The Manufacturing Agreement's exclusivity requirements make CTX-US liable for breach, not vicariously, but rather for its own failure to pay those invoices. The issue is whether – when an order is placed by CTX-HK for CTX-US's Exclusive Customers pursuant to the contract, and Benlida produces them – is CTX-US obligated to pay for them? The district court read Benlida's complaint alleging "breach of contract," and then impermissibly relied upon *tort* law concepts regarding imputation of liability, rather than asking itself, Is there an issue of fact whether "CCT-HK" Invoices must be paid by CTX-US?

The district court's reliance on the maritime tort case of *Ewing v. Carnival*, 2020 WL 3839699 (S.D. Fla. 2020), was misplaced. There, the plaintiff contended for the first time on summary judgment that a cruise line employee was negligent and that the company was vicariously liable therefor. *Id.*, at *7. Importantly, this shift in theory from direct to vicarious liability meant that, in the plaintiff's view, it

was unnecessary to plead an otherwise required element of his cause of action – namely, actual or constructive notice of the hazard – thereby changing the entire landscape of the parties' dispute, necessitating, *inter alia*, additional discovery. *See id*.

The case at bar is not a tort action; it's a claim for breach of contract. The evidence has shown that CTX-US benefited from the terms of the Manufacturing Agreement by obtaining an additional two years of exclusivity for Exclusive Customers when PCBs were ordered for them by CTX-HK (TT-745-746; confirming Benlida's point made in opposition to summary judgment, see ECF-188, pp.3 *et seq.*). CTX-US also benefited by the overall discount that CTX-US received for volume purchases. (TT-683-684). Moreover, penalties assessed by CTX-US against Benlida for late deliveries – referred to as lead time penalties – were calculated based upon all orders placed for CTX-US's Exclusive Customers orders, whether placed by CTX-HK, CTX-SZ, or CTX-US. (TT-705-707,757-759).

CTX-US cannot have it both ways: It cannot claim the benefit of different CTX entities placing orders and then argue that it was not obligated to pay for such orders. When CTX-HK placed orders, they were designated as being for CTX-US's Exclusive Customers (ECF-186; TT-1316) and, pursuant to the Manufacturing Agreement, CTX-US was responsible for paying for PCBs

produced pursuant thereto. (ECF-281-2, p.4) (payment due within 60 days after monthly statement). CTX-US received the benefit of discounts that were triggered by amounts ordered by all CTX-affiliated entities (TT-683-684), yet unreasonably claimed it has no obligation to pay for PCBs ordered by CTX-HK. And CTX-US claimed lead time penalties for orders in excess of capacity, where the capacity was filled by all of the CTX-affiliated entities. (TT-706-707).

The district court stated that Benlida failed to allege in its complaint that CTX-US assumed CTX-HK's "debts" or that CTX-HK was acting as CTX's agent, but – as the Supreme Court made clear in *Johnson v. City of Shelby*, 574 U.S. 10 (2014) (discussed *infra* in Point I.C.) – this was not necessary. The complaint *did* allege that CTX-US was responsible for *all* the invoices. (ECF-26). So the complaint clearly did allege that CTX-US was responsible to pay the unpaid "CCT-HK" Invoices. The issue was not whether CTX-US is obligated to pay CTX-HK's *debts*, but whether the "CCT-HK" Invoices represented debts of CTX-US, by virtue of the PCBs having been ordered by CTX-HK for CTX-US's Exclusive Customers.

The district court posited that Benlida's claim was in contradiction to the TAC's "straightforward" assertions that "[CTX-US] ordered circuit boards from Benlida," that "'[CTX-US] agreed to pay [Benlida]'," and that "CTX-US 'expressly agreed' to purchase the boards and pay for the amounts specified in the invoices." (ECF-221, pp.3-4). But CTX-US acknowledged that no special

assurances were required by CTX-US for orders placed by CTX-HK for the

Exclusive Customers, and thus that any orders for those customers were, by

definition, the responsibility of CTX-US.[15] The district court opined that Benlida's

argument that CTX-US was responsible to pay for the "CCT-HK" Invoices was

undermined by Benlida's alternative argument that CTX-US was liable by virtue of

CTX-HK acting as an agent or alter-ego of CTX-US: (ECF-221, p.7)

> Benlida's reliance on its allegations that "Circuitronix ordered circuit boards
> from plaintiffs" and that Circuitronix "expressly agreed to pay the amounts
> specified in the invoices" actually undercuts its position that it has been
> proceeding under an agency or alter-ego theory all along. Both allegations
> attribute the debt to orders placed by Circuitronix itself, going so far as to
> describe Circuitronix as having "*expressly*" agreed to pay for the orders.
> Those allegations are diametrically opposed to allegations of agency or alter
> ego.

There is no contradiction, however: the TAC and Benlida's opposition to

summary judgment are *consistent*. It is the Manufacturing Agreement that

establishes CTX-US's responsibility to pay for the PCBs manufactured by Benlida

for the Exclusive Customers, as CTX-US is the only party to the agreement that

has an obligation thereunder to pay for such orders. Benlida and CTX-US agreed

that CTX-US was the *only* distributor to whom Benlida was contractually allowed

---

[15] See ECF-188, p.10 ("one of the primary reasons for entering into the Letter
Agreement in 2016 was to formally add CTX-HK as a party to the Manufacturing
Agreement…eliminating any need for [CTX-US] to provide separate assurances
for particular obligations that may be incurred by CTX-HK on [CTX-US's]
behalf."). Ergo, CTX-US acknowledged that CTX-HK was indeed making
purchases on CTX-US's behalf.

to sell PCBs for CTX-US's Exclusive Customers. Thus, if CTX-HK places an order for the Exclusive Customers, then it is an order for which CTX-US is responsible, whether CTX-HK was acting as an agent, alter-ego, or as a mere division of CTX-US. After all, ¶1.5 of the Manufacturing Agreement expressly denominates them "Circuitronix Customer[s]." (ECF-281-2, p.3).

When a principal orders goods through an agent or subsidiary, it is correct to say that *the principal orders the goods*, and sufficient to aver that the contract was made by the principal itself. *Maestrelli*, 476 So.2d at 757. Under §671.103, agency rules are read into every contract for the sale of goods, and thus the district court committed reversible error by failing to acknowledge that agency was incorporated into Benlida's claim that CTX-US failed to pay for the "CCT-HK" Invoices for PCBs ordered for CTX-US's Exclusive Customers.

## B. Benlida Satisfied Rule 8's Notice Requirements.

### 1. CTX-US Admitted it Was on Notice that Benlida's Breach of Contract Claim Encompassed Obligations Incurred by CTX-HK on CTX-US's Behalf.

*Gilmour v. Gates, McDonald*, 382 F.3d 1312 (11th Cir. 2004), relied on by the district court, does not state that new ***theories of liability*** cannot be raised on summary judgment. Rather, the "liberal pleading standard" under Rule 8(a) "does not afford plaintiffs with an opportunity to raise ***new claims*** at the summary judgment stage." *Id.*, at 1315 (emphasis added). In *Gilmour*, the initial claim

32

sounded in tort, while the "new claim" sought to be added on summary judgment sounded in contract. *Id.* Here, Benlida's claim has only and always sounded in contract.

While "new claims" may not be raised at the summary judgment stage, Eleventh Circuit precedent makes clear that a "complaint need not specify in detail *the precise theory* giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests." *MSP Recovery Claims v. United Auto*., 60 F.4th 1314 (11th Cir. 2023) (Citation omitted).

It is well settled that "the federal notice pleading standard only requires allegations as to every material point necessary to sustain a claim *on any legal theory*, even if it is not the precise theory advanced by the plaintiff." *Ray v. Comm'r, Alabama Dep't of Corr.*, 915 F.3d 689, 697 n.3 (11th Cir. 2019) (emphasis added). A pleading "must contain either direct allegations on every material point necessary to sustain a recovery on any legal theory, even though it may not be the theory suggested or intended by the pleader, *or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial*." *St. Joseph's Hosp. v. Hosp. Corp.*, 795 F.2d 948, 954 (11th Cir. 1986) (emphasis added). Indeed, *Winther v. U.S. Steel*, 852 F. App'x 482 (11th Cir. 2021), which was relied on by CTX-US in support of summary judgment (ECF-

188, p.7), reiterates this standard: "The federal notice pleading standard only requires allegations as to every material point necessary to sustain a claim on any legal theory, even if it is not the precise theory advanced by the plaintiff."

Here, CTX-US was on notice that Benlida sued it for nonpayment of the 171 separately delineated "CCT-HK" Invoices (plus 247 "CCT" Invoices), as well as the grounds for this claim, namely CTX-US's breach of the Manufacturing Agreement. (ECF-26, TAC ¶¶261-337,341-431; ECF-267, pp.194-196). Kukreja testified that he understood on reading the complaint that CTX-US was being sued for such invoices: "*Q.* But you do know based upon this document [the TAC] that Benlida is suing you here in the US…for [non]-payment of these Hong Kong invoices? You know that, right?…[*A.*] I do." (ECF-267, pp.194-196).

In short, it was "clear from the [invoice references in the complaint] that the court and the parties understood that [Benlida] was asserting this claim, too." *Ray*, 915 F.3d at 697, n.3. With respect to each invoice identified in TAC ¶¶261-431 (ECF-26), Benlida alleged that each such "CCT-HK" Invoice "was issued by [Benlida] to Circuitronix for a total of $[…]. To date, Circuitronix has paid no portion of the amount owed." These paragraphs expressly put CTX-US on notice that Benlida was suing it directly for the unpaid "CCT-HK" Invoices that it was obligated to pay. Yet CTX-US feigned surprise that Benlida was seeking to hold it liable for those invoices, and the district court nonetheless held, erroneously, that

CTX-US hadn't received due notice that Benlida was seeking to hold it liable for those invoices.[16]

## 2. Benlida Properly Applied Payments to Earliest Invoices.

The district court improperly disregarded facts raised by Benlida regarding its FIFO accounting practices in granting summary judgment to CTX-US: "[T]he magistrate judge took that proposition [that new claims cannot be raised in opposition to a motion for summary judgment] too far when it relied on a footnote in *GeorgiaCarry.Org v. Georgia*, 687 F.3d 1244, 1258 n.27 (11th Cir. 2012), to support the idea that a party cannot introduce additional facts at the summary judgment stage." Frasca v. NCL, 654 F. App'x 949, 954 n.6 (11th Cir. 2016).[17]

Despite Kukreja's testimony that FIFO is contrary to "international accounting rules" (ECF-203-3, pp.86-87),[18] ***Florida law*** is clear that payments may

---

[16] Even CTX-US's expert CPAs confirmed that the complaint made clear that CTX-US was being sued for CCT-Invoices. (CPA Parisi Dep., ECF-201-1, pp.126-127; CPA Mukamal Dep., ECF-201-2, pp.62-63,131).

[17] In its answer to CTX-US's counterclaims, Benlida put CTX-US on notice – if such was even necessary – that it had applied payments by CTX-US on a FIFO basis. (See ECF-43, ¶36 "Deny as alleged, and note that overpayments offset past debt, on a [FIFO basis].")

[18] Kukreja felt that FIFO is improper because new money can't be used to pay down old, time-barred debts. (ECF-203-3, pp.85-86). His "understanding," however, is also contrary to Florida law: The running of a statute of limitations "does not extinguish the debt itself but only precludes the bringing of legal action to collect that debt." *Henry v. Halifax Hospital*, 368 So.2d 432, 433 (Fla. DCA 1979) (citations omitted).

be attributed by the vendor to whatever invoice it deems appropriate if, *at the time of payment*, the payor does not expressly direct that a specific invoice is therewith being paid:[19]

> [A debtor who] owes two or more separate debts…has a right to apply the payment to which of the debts he pleases, *provided he elects at the time of payment the purpose for which it is made.* If he does not so designate, the payee may elect how it shall be applied. It has been held in some cases that the creditor may appropriate at a future day, even at the time of bringing his action, and is not compelled to make the *appropriation **immediately**, like the debtor.*

*Randall v. Pettes*, 12 Fla 517, 534 (1868) (emphasis added).[20]

At trial, the district court agreed with the FIFO principle, and so charged the jury, but removed from the equation, so to speak, Benlida's attribution of payments by CTX-US to the CCT-HK Invoices, charging the jury as follows:

> The Court has issued a ruling which you must follow, that this case is only between CTX-US and Benlida, and that CTX-US is not, as a matter of law, responsible for any debts of CTX-HK or [CCT-HK Invoices]. The law does not permit Benlida to apply CTX-US's payments to CTX-HK's invoices, and any amounts owed between CTX-HK and Benlida are irrelevant and are

---

[19] CTX-US global operations manager Lina Ochoa also admitted that (**a**) there were inexplicable delays between Benlida's receipt of payments and corresponding payment details (TT, pp.860-870), and (**b**) she was aware that Benlida was applying payments on a FIFO basis. (*Id.*, 889-890).

[20] Relying upon *Urrea v. Koplow*, 359 So.3d 1212 (Fla. DCA 2023), CTX-US argued that Benlida could not properly apply payments to "CCT-HK" Invoices, because CTX-US and CTX-HK are separate companies, and it is improper to "FIFO" the debts of one company with payments by the other. The argument, however, is baseless, because Benlida didn't apply CTX-US's payments to the "debts" of CTX-HK; rather, it applied the payments to CCT-HK Invoices for orders placed by CTX-HK for CTX-US's Exclusive Customers.

not to be considered when determining whether Benlida breached the contract and whether CTX-US was damaged financially.…

Benlida contends that payments made by CTX-US were attributed by it to invoices for goods ordered for Exclusive Customers. Benlida contends that it had the right to apply those payments to the earliest invoices, because at the time of the payment, CTX-US did not designate specific invoices of CTX-US to which the payments were to be attributed.

When there is no direction for payment to a specific debt by a debtor, here CTX-US, the creditor, here Benlida, may apply the funds to an earlier unpaid invoice of the debtor, CTX-US. The right of a [debtor] such as CTX-US to apply a payment to a specific invoice must be exercised at a reasonably prompt time after the payment or such right is waived. A debtor's belated application of payments to specific invoices is not effective.

(TT-1645-1647).

## C. It Was a Violation of Established Precedent to Grant CTX-US Summary Judgment on the Basis that the TAC Failed to Plead an Agency Theory; Notice Pleading Does Not Require Pleading Theories.

FRCP 8(e) provides that pleadings must be construed so as to do substantial justice. When a complaint alleges facts that, if proved, would support a legal theory for recovery, it is error to grant summary judgment on the basis that such legal theory had not been pled, as the Supreme Court held in *Johnson*, supra: (internal quotes and citations omitted; punctuation revised; emphasis added)

Federal pleading rules call for a short and plain statement of the claim showing that the pleader is entitled to relief;…A basic objective of the rules is ***to avoid civil cases turning on technicalities***.…A federal court may not apply a standard more stringent than the usual pleading requirements of Rule 8(a).…A plaintiff…must plead facts sufficient to show that her claim has substantive plausibility.…The federal rules effectively abolish the restrictive theory of the pleadings doctrine, ***making it clear that it is unnecessary to set out a legal theory for the***

***plaintiff's claim for relief.*** The court should freely give leave to amend a pleading when justice so requires.

574 U.S. 10 (2014).

Following *Johnson*, the Eleventh Circuit held in *PBT Real Est. v. Town of Palm Beach*, 988 F.3d 1274, 1286 (11th Cir. 2021), that Rule 8 does "not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." Also, in line with – albeit preceding – the *Johnson* decision, the Seventh Circuit stated:

> Complaints need not plead law or match facts to every element of a legal theory….

> To the extent the district court required plaintiff to include in the complaint allegations sufficient (if proved) to prevail at trial, the court imposed a requirement of fact-pleading. But…a complaint is not required to allege all, or any, of the facts logically entailed by the claim…. A plaintiff does not have to plead evidence….[A] complaint does not fail to state a claim merely because it does not set forth a complete and convincing picture of the alleged wrongdoing.

> Defendants urge on us another supposed defect in the complaint. They observe that the complaint seeks relief under state as well as federal law but that it does not identify any "state causes of action." ***This is a defect, however, only if a complaint must identify legal theories. It need not.*** This is the difference between notice pleading and code pleading; abandonment of code pleading is the fundamental choice behind Rule 8, the reason why it does not contain the phrase "cause of action"….

*Bennett v. Schmidt*, 153 F.3d 516, 518-519 (7th Cir. 1998) (citations omitted; emphasis added).

CTX-US argued below that the pleadings case law relied upon Benlida is inapt because the TAC failed to allege the material facts necessary to sustain a cause of action for CTX-US to be liable on the CCT-HK Invoices (ECF-288, p.5). However, only notice pleading is required, and CTX-US (through Kukreja) admitted having notice. Kukreja drew the "reasonable inference" that CTX-US was being sued for unpaid "CCT-HK" Invoices, because they were specifically listed and referenced in the TAC, and it was alleged that pursuant to the Manufacturing Agreement, CTX-US was responsible therefor. Thus, the requirements of notice pleading were satisfied.

The district court's belief that a "new" unpleaded theory of liability was *improperly* raised for the first time in opposition to the motion for summary judgment is clearly contrary to the rules. And inasmuch as legal theories need not be pled, the idea that one cannot oppose a motion for summary judgment with a "new" legal theory misapprehends the law and invites gamesmanship through feigned ignorance of what was actually being alleged. After all, it would only be in opposition to a motion for summary judgment (if there has been no prior motion to dismiss on the pleadings) that the opponent would raise the legal theories undergirding the causes of action alleged, and thus any argument made in opposition to a motion for summary judgment could then be claimed to be "new."

It is FRCP 9 that states which particular facts *must* be pled; principal/agency is not on the list. Rule 8 merely requires a pleading that suffices to put the defendant on

notice of the general nature of the claim. Benlida's complaint *did* give CTX-US notice that Benlida was suing it for non-payment of CCT-HK Invoices. As shown above, the invoices were identified by "CCT" and "CCT-HK" numbers, and Kukreja testified that he understood that CTX-US was being sued for *all* those invoices.

Fair notice is supplied where the legal theory is supported by facts alleged in the complaint. *Whitaker v. Milwaukee County*, 772 F.3d 802, 808 (7th Cir. 2014). Judge Easterbrook, who was on the panel that decided *Whitaker*, further elaborated on the principle in *Vincent v. City Colleges of Chicago*. Writing for the majority, Judge Easterbrook was far more pointed in his criticism of decisions like the district court's herein:

> [A] judicial order dismissing a complaint because the plaintiff did not plead facts has a short half-life. Any decision declaring "this complaint is deficient because it does not allege X" is a candidate for summary reversal, unless X is on the list in [FRCP] 9(b). [Rule] 8 calls for a short and plain statement; the plaintiff pleads claims, *not facts or legal theories*. Factual detail comes later – …*perhaps in response to a motion for summary judgment.* Until then, the possibility that facts to be adduced later, and consistent with the complaint, could prove the claim, is enough for the litigation to move forward.
>
> Facts that substantiate the claim ultimately must be put into evidence, but the rule "plaintiff needs to prove Fact Y" does not imply "plaintiff must allege Fact Y at the outset."….
>
> *It is disappointing to see a federal district judge dismiss a complaint for failure to adhere to a fact-pleading model that federal practice abrogated almost 70 years ago*….
>
> Any district judge…tempted to write 'this complaint is deficient because it does not contain...' should stop and think: What rule of law *requires* a complaint to contain that allegation?...[O]nly the claim…enough to alert the defendant to the nature of the grievance…need be pleaded.

485 F.3d 919, 923-925 (7th Cir. 2007) (emphasis added; citations omitted; punctuation revised).

In light of, *inter alia*, the Supreme Court's *Johnson* decision, which, after all, involved a motion for summary judgment, Benlida submits that, at the very least, the district court should have afforded Benlida leave to replead to add an allegation of principal/agent liability, rather than insist on a "punctiliously" pled principal/agent theory.[21] FRCP 15(a)(2) ("The court should freely give leave when justice so requires.") The district court erred in dismissing half of Benlida's claims because of a technicality that was disavowed by *Johnson*, warranting reversal and retrial of the case in its entirety, as the evidentiary orders of preclusion that barred Benlida from asserting that CTX-US owed it any money prevented Benlida from obtaining a fair trial, having been precluded from showing that CTX-US, rather than being in a multi-million dollar overpayment position, actually owed Benlida millions of dollars.

---

[21] CTX-US did move to dismiss the TAC for failure to state a cause of action (ECF-27), but it made no argument whatsoever that there was a failure to state a claim that CTX-US was responsible for CCT-HK Invoices; rather, it admitted that it understood at the time that "in the TAC, Benlida purports to assert claims against CTX based on over 170 invoices issued to CTX-HK, not CTX." (Motion to dismiss TAC, ECF-27, p.13).

**Point II:** **Benlida Raised Numerous Disputed Issues of Material of Fact; The District Court Erred in Taking the Fact-Finding Role From the Jury and Improperly Resolving these Disputed Material Facts in Favor of CTX-US.**

Benlida raised numerous disputed issues of material fact that the district court disregarded, sidestepping the standard of review required for a motion for summary judgment. *Adickes v. S.H. Kress*, 398 U.S. 144, 158-59 (1970) ("At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmovant"); *Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007) (court may not weigh conflicting evidence to resolve disputed factual issues).

### A. Benlida Raised Disputed Issues of Fact Concerning the Parties' Course of Dealing.

#### 1. Pursuant to the Manufacturing Agreement, and by Virtue of the Exclusive Customer List, CTX-US is Responsible for Paying the "CCT-HK" Invoices.

In opposition to the motion for summary judgment, Benlida pointed to the Exclusive Customer List attached to the contract, which included about 189 "exclusive" CTX-US customers by the time of trial. (ECF-285-2). The district court disregarded the fact that the invoices Benlida was suing on were all for CTX-US's Exclusive Customers. This was error, as the parties' "agreement," as that term is defined under the Florida UCC, includes the contract terms and the parties' course of dealing. Fla. Stat. §671.201(3) ("'Agreement,' as distinguished from

'contract,' means the bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of dealing, usage of trade, or course of performance as provided in §§671.205 and 672.208.")

The parties' course of dealing was explained by Benlida sales manager Tracy Huang: (ECF-186)

- Both CTX-HK and CTX-US would independently request that new customers be added to the Exclusive Customer List. (¶¶3,4,5).

- Under the 2016 Letter Agreement, CTX-US agreed, **and CTX-HK did not agree**, to continue paying down unpaid invoices until CTX-US, CTX-HK and Benlida entered into the Secondary Manufacturing Agreement or the Manufacturing Agreement terminated. (¶¶21,22).

- Kukreja acknowledged on February 16, 2022 that the Manufacturing Agreement remained in full force as regarded the Exclusive Customer List, corroborating Benlida's understanding that when CTX-HK placed orders, it was doing so for CTX-US's Exclusive Customers. (¶¶21,22).

- Benlida would routinely chase CTX-US for payment and CTX-US never responded to such requests with anything like, "Why are you looking to us to pay the CTX-HK invoices? Go ask CTX-HK for the money." (¶25).

- CTX-US claimed credits owed for goods ordered by CTX-HK. (¶26).

- Since CTX-HK was not a party to the Manufacturing Agreement, it had no right itself to an offset, and thus CTX-US's requests for offsets as to CCT-HK Invoices were understood by Benlida to be a claim for an offset from CTX-US's total outstanding receivables. (¶26).

- CTX-US would calculate the lead-time penalties for both CTX-US and CTX-HK purchase orders. For example, in August of 2017, CTX-HK put in a Hong Kong purchase order A19-VA6264EU-X57(HK), with customer code X57. Benlida then sent CTX-HK invoice "BLDCCT-HK1708022." Due to a claim of late delivery, CTX-US calculated a lead-time penalty for it. (¶27).[22] This showed that it was CTX-US's own position that CCT-HK Invoices were CTX-US's responsibility, for it cannot be that Benlida owed an obligation of timely delivery to CTX-US but that CTX-US owed no obligation to timely pay Benlida for such orders.

- The chart calculated and listed the lateness penalties on Benlida and ROK shipments for both CTX-US and CTX-HK purchase orders. But CTX-HK – being a nonsignatory to the Manufacturing Agreement – never had a right to claim its own offsets. Thus, as Ms. Huang explained, it was understood that such claimed offsets were for CTX-US's benefit as signatory. (¶28).

---

[22] See ECF-186-9, line 66 of a chart called "Jiangmen Benlida & ROK Penalty for Lead-Time Exceedances for Aug 2017 Purchase Orders."

(ECF-186).

Benlida's CFO Wu "Roger" Yukun also demonstrated (ECF-187, ¶12) that Kukreja inscribed on a requested audit confirmation: "Payments owed need to be offset with payments made by [CTX-US] on behalf of CTX-HKG /s/ Rishi Kukreja." (ECF-187-2). Kukreja thus acknowledged that (**a**) money was owed by the Hong Kong entity; (**b**) CTX-US was making payments; (**c**) such moneys owed would be paid down by CTX-US "on behalf of CTX-HK"; and (**d**) Benlida should offset the amounts owed by CTX-HK with funds from CTX-US. CTX-US thus acknowledged that it was paying down CTX-HK orders.

> **2. Benlida's Records Show that CTX-US Owed Money to Benlida Pursuant to the Manufacturing Agreement; the District Court Erred in Deeming it Undisputed that CTX-US Owed no Money to Benlida, Thereby Disregarding the Material Facts.**

The district court disregarded Benlida's showing of a triable issue of fact – as demonstrated by Ms. Huang's declaration – as to whether CTX-US was responsible for CCT-HK Invoices pursuant to the Manufacturing Agreement and the 2016 Letter Agreement, which obligated CTX-US to continue making payments for the entirety of the amount owed. (ECF-281-3, p.1, ¶2).

Ms. Huang stated, and demonstrated with purchase orders and emails from both CTX-US and CTX-HK, that (**a**) both entities added customers to the Exclusive Customer List; (**b**) both entities serviced those customers; (**c**) between 2012 and

2014 CTX-US paid CCT-HK Invoices; and (**d**) CTX-US's debit memos show

payments for CCT-HK Invoices. (See ECF-186-3; 186-5; 186-6; 186-7).

Wu explained in his declaration the mistaken audit confirmation that

erroneously stated that CTX-US owed nothing to Benlida: (ECF-187, ¶¶5-7)

> The audit confirmations requested that CTX-US and CTX-HK confirm that
> these were the total amounts owed from each of the two companies, but this
> was an error, because the moneys were actually owed by CTX-US, and because
> CTX-HK's purchases were made for [Exclusive Customers]. The error
> occurred because I treated the two companies as one and the same, and – from
> my standpoint as CFO – the important issue was how much was owed in total,
> not the nuances of how the amounts should be divided up – or even if they
> should be divided up – as between the two companies. That is, for convenience
> (and because from an auditing perspective it was irrelevant whether or to what
> extent the debt was owed by one or both of the two CTX entities), rather than
> dividing the numbers up into amounts then owed by CTX-HK and amounts
> then owed by CTX-US, the numbers were aggregated, and, inadvertently,
> CTX-HK was designated as the company that owed the $12,154,164.25.

Moreover, Kukreja himself acknowledged that CTX-US had made payments of

CCT-HK Invoices, inscribing on a 2017 audit confirmation request: "Payments

owed need to be offset with payments made by Circuitronix, USA on behalf of CTX-

HKG /s/ Rishi Kukreja." (ECF-187-2).

Such evidence was sufficient to raise a triable issue of material fact to defeat

summary judgment with respect to the material issue whether CTX-US was

responsible for, and otherwise acknowledged responsibility for, the orders placed by

CTX-HK for CTX-US's Exclusive Customers. But notwithstanding Kukreja's

acknowledgement or Wu's explanation contradicting the argument that no money was

owed by CTX-US, the district court nevertheless deemed it undisputed that CTX-US was in an overpayment position. It erred in concluding that Wu's explanation was a legal conclusion about the relationship between CTX entities, as opposed to an explanation of why the claimed overpayment was incorrect and the factual support grounding that claim. The court's determination was not only incorrect but irrelevant, given the facts Benlida presented in the Huang declaration concerning the parties' course of dealing and Kukreja's acknowledgements.

Benlida also raised other disputed facts, including that one cannot tell from the "X" numbers where the customer is located and that Benlida was instructed to deliver all PCBs for Exclusive Customers to the central warehouse in Hong Kong, regardless of ultimate destination. Accordingly, it should have been up to a jury to decide Kukreja's credibility. Disregarding these disputed facts was reversible error.

Relying upon an unpublished and thus nonbinding decision[23] – *Jones v. Unity Behavioral Health*, 2021 U.S. App. LEXIS 34835 (11th Cir. 2021) – the district court erred when it faulted Benlida for not providing pincites to the specific paragraph numbers in the Wu declaration that countered certain of CTX-US's statements of proposed undisputed facts. In *Jones*, a party had submitted to the court a document with no pincites at all *and failed to remedy this failure by a certain date specified by*

---

[23] Under Eleventh Circuit Rule 36-2, unpublished opinions are not considered binding precedent, but may be cited as persuasive authority.

*the court*. Here, the district court failed to offer Benlida an opportunity to cure, but more significantly, the district court erred because virtually the entire Wu declaration, which the court *did* actually review, countered CTX-US's claimed undisputed facts, obviating the need for specific pincites.

The district court should have let the jury decide whether to believe Wu's explanation why there were two separate audit confirmations, why the audit confirmation showing that CTX-US owed no money was a mistake, and what the correct amount owed by CTX-US to Benlida was. Accordingly, the decision and order granting summary judgment (and denying reconsideration) should be reversed, the *in limine* rulings that followed from the grant of summary judgment should be reversed, and the case be remanded for a retrial.

## B. The Business Authorization and Letter Agreement Raised Disputed Material Facts; Summary Judgment for CTX-US Was Improper.

On summary judgment, CTX-US argued in its reply papers (ECF-204) that the 2014 "Business Authorization," pursuant to which CTX-US had *expressly* agreed to pay for orders placed by CTX-HK, was superseded by the terms of the 2016 Letter Agreement, and that CTX-US was therefore no longer obligated to pay for the "CCT-HK" Invoices. (ECF-204, pp.1-3). While CTX-US argued that CTX-HK was made a party to the Manufacturing Agreement by the 2016 Letter Agreement, there is nothing to indicate that Exclusive Customers thereby became

CTX-HK's customers, as this would have rendered meaningless CTX-US's exclusivity as to them, and ¶1.5 of the Manufacturing Agreement, which expressly demoninates them "Circuitronix Customers."

Moreover, pursuant to the Letter Agreement, CTX-US expressly agreed to continue to making payments to Benlida, and CTX-HK made no such express agreement (ECF-281-3, p.1, ¶2). The parties' course of dealing also remained unchanged after entry into that agreement, and there is absolutely no evidence that Benlida ever requested that CTX-US "loan" it many millions of dollars.

Thus, the reasonable reading of the Manufacturing Agreement and the Letter Agreement, taken together, and in accordance with the parties' course of dealing, is simply that CTX-US and CTX-HK would continue to place orders for CTX-US's Exclusive Customers and CTX-US would continue to pay for those orders. After all, pursuant to the 2016 Letter Agreement, CTX-US agreed to continue making payments to Benlida, and there is nothing in that agreement to suggest that CTX-HK would make any payments:

> In evaluating the written terms of a contract, every provision should be given meaning and effect and apparent inconsistencies reconciled if possible. Absent any evidence that the parties intended to endow a special meaning in the terms used in the agreement, the unambiguous language is to be given a realistic interpretation based on the plain, everyday meaning conveyed by the words. A court must construe a contract in a manner that accords with reason and probability; and avoid an absurd construction.

*Branch Banking v. Papa & Gipe*, 2016 WL 3655312, at *5 (M.D. Fla. 2016): (citations omitted; punctuation revised).

The Letter Agreement makes clear that the parties understood that the Manufacturing Agreement remained unchanged and its terms remained in force. (ECF-281-3, ¶6) ("This Agreement *and the Existing Agreement* represent the parties' full and complete understanding regarding the subject matter hereof. All other prior agreements...that refer or relate to the employment relationship have either been merged into this Agreement *and/or the Existing Agreement* or have been intentionally omitted therefrom.") (emphasis added).

Whether CTX-HK was CTX-US's agent, alter ego or mere division of CTX-US changes nothing: CTX-US was responsible for paying for the orders placed by CTX-HK for CTX-US's Exclusive Customers pursuant to the unaltered Manufacturing Agreement. The district court impermissibly construed the terms of the Manufacturing Agreement in a commercially unreasonable manner, ignoring the import of the exclusivity provisions and the parties' course of dealing.

**Point III:    The District Court Erred in Precluding Benlida's Expert CPA from Testifying About the Unreasonableness of the Position of CTX-US's Experts as to the CCT-HK Invoices, and the Commercial Reasonableness of Applying FIFO Principles to the CCT-HK Invoices.**

At deposition, Randall Paulikens, Benlida's accounting expert, explained (and but for the *in limine* orders would have so testified at trial) that accounting

principles, the overall relationship, and course of dealing between the parties showed:

- There was no overpayment. CTX-US's overpayment by millions of dollars would be economically anomalous unless properly contextualized (ECF-197-3, pp.39,146-147,187,215-216,244,262) – *viz*. that CTX-US was responsible for *all* invoices (ECF-197-3, pp.215-216,225).

- Payments were made in large, lump-sum round numbers, which is consistent with payments on account, rather than payoffs of specific invoices (ECF-197-3, pp.41-42,162-163,169).

- CTX-US never designated payments for specific invoices, and thus FIFO is appropriate, and it is commercially cumbersome and unreasonable to later reattribute payments to specific invoices. (ECF-197-3, p.170).

- It would be commercially unreasonable for CTX-US to carry on its books that it had loaned Benlida millions of dollars. (ECF-197-1, pp.251-252).

Before the summary judgment motion was decided, CTX-US filed a motion *in limine* requesting that the court preclude Benlida from arguing or seeking to introduce evidence at trial of "debts" that CTX-HK owed to Benlida. (ECF-198). One week after the district court granted summary judgment to CTX-US, it agreed to preclude Benlida from presenting evidence "of CTX-HK's debts or Circuitronix's responsibility therefor." (ECF-237).

The day before the trial began, CTX-US moved to enforce the district court's order on the motion *in limine*. During the colloquy, the court stated, "[I] didn't grant summary judgment against you because you couldn't prove that [CTX-HK] owed you money [but, rather,] because you didn't plead that. There may be overwhelming evidence that [CTX-HK] owes you millions of dollars…but based upon the pleadings….*[I]t's not coming in. It's not relevant*." (TT-124 (emphasis added)).

The district court erred by precluding evidence that CTX-US owed money to Benlida by virtue of the orders placed by CTX-HK for CTX-US's Exclusive Customers, which, at the very least, would have been probative whether or not CTX-US actually overpaid by millions of dollars. Benlida's expert CPA Paulikens would have testified, in rebuttal, in accordance with his deposition, that no sophisticated businessperson would overpay by millions of dollars, that CTX-US's theory was contrary to any normal commercial practice, was unreasonable, and was contrived.

Moreover, Benlida did plead in response to the counterclaim for the alleged overpayments that they were applied to past debts on a FIFO basis. (See ECF-26, ¶36). Benlida argued that "CTX-US is liable for every order placed by CTX-HK because they are the [invoices for CTX-US's Exclusive Customers]," to which the

district court responded, "Okay. But I already made a ruling that was not properly pled, so you can't now use that as a defense." (TT-1040).

Benlida pled that CTX-US owed money on the CCT-HK Invoices. And it pled, in defense to the counterclaim, that moneys received from CTX-US were applied on a FIFO basis to all debts. Thus, Benlida never waived a claim, much less a defense to a counterclaim. *MDS (Canada) Inc. v. Rad Source Technologies*, 720 F.3d 833 (11th Cir. 2013).[24] The district court compounded the prejudice by telling the jury that CTX-US was not legally responsible for CTX-HK's debt (TT-1645-1647), taking from the jury the right to decide whether CTX-US was responsible for the CCT-HK Invoices, and that CTX-US was therefore not entitled to claim a refund.

Precluding evidence from Benlida and testimony from its expert thereby precluded argument [25] that CTX-US was responsible for the "CCT-HK" Invoices

---

[24] "We note that the issue of waiver is an issue of fact. See *Rutig v. Lake Jem Land Co.*, 155 Fla. 420, 20 So.2d 497, 498 (1945) ('The question of waiver is usually one of fact for consideration by a trial jury on issues properly defined.')" *MDS (Canada)* at 851.

[25] On the fourth day of the trial (outside the presence of the jury), the district court reiterated that, "you can't say, my defense to your claim they owe us money is…you are responsible for the debt of another company, because you're basically applying, saying, I find you are responsible for the debts of this other company, and under FIFO I'm applying it. And I've already ruled that that legal defense – whether I'm right or wrong, I've already ruled that that legal defense does not apply in this case. You didn't plead it." (TT-1033).

for PCBs ordered by CTX-HK for CTX-US's Exclusive Customers, and thereby

tainted the entire trial, requiring a do-over.

## Conclusion

For all the foregoing independent reasons, it is respectfully submitted that

the Benlida's claims against CTX-US must be reinstated, and the case must be

remanded for a new trial.

Dated: New York, New York
      July 29, 2024

                      Respectfully submitted,

                      MAZZOLA LINDSTROM, LLP

                      By: /s/Richard E. Lerner
                           Richard E. Lerner
                      Counsel for plaintiff-appellant Jiangmen
                      Benlida Printed Circuit Co., Ltd.
                      1350 Avenue of the Americas, 2nd Floor
                      New York, New York 10019
                      917-584-4864
                      richard@mazzolalindstrom.com

Of Counsel:
      Jean-Claude Mazzola

# CERTIFICATE OF COMPLIANCE

I, Richard E. Lerner, furnish the following in compliance with Fed. R. P. 32.

1.     I hereby certify that this brief conforms to the rules contained in Fed R. App. P. 32(a)(7)(B) because:

This brief contains 12,343 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     I hereby certify that this brief conforms the rules contained in Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in proportionally space typeface using Microsoft Word and 14 point Times New Roman font.

MAZZOLA LINDSTROM, LLP

By: /s/Richard E. Lerner
     Richard E. Lerner
Counsel for plaintiff-appellant Jiangmen
Benlida Printed Circuit Co., Ltd.
1350 Avenue of the Americas, 2nd Floor
New York, New York 10019
917-584-4864
richard@mazzolalindstrom.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2024, I caused to be electronically filed the foregoing Brief for Plaintiff-Counter Defendant-Appellant with the Clerk of Court using the CM/ECF system, which automatically sends an electronic notification to CM/ECF participants.

MAZZOLA LINDSTROM, LLP

By: /s/Richard E. Lerner
Richard E. Lerner
Counsel for plaintiff-appellant Jiangmen
Benlida Printed Circuit Co., Ltd.
1350 Avenue of the Americas, 2nd Floor
New York, New York 10019
917-584-4864
richard@mazzolalindstrom.com