# 23-14102

In the
# United States Court of Appeals
For the Eleventh Circuit

JIANGMEN BENLIDA PRINTED CIRCUIT CO., LTD.,

*Plaintiff-Counter Defendant-Appellant,*

ROK PRINTED CIRCUIT CO., LTD.,

*Plaintiff,*

v.

CIRCUITRONIX, LLC,

*Defendant-Counter Claimant-Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA,
NO. 0:21-cv-60125-RNS (HON. ROBERT N. SCOLA)

## APPENDIX FOR PLAINTIFF-COUNTER DEFENDANT-APPELLANT
## Volume IV of XI

RICHARD E. LERNER
JEAN-CLAUDE MAZZOLA
MAZZOLA LINDSTROM, LLP
*Attorneys for Plaintiff-Counter Defendant-Appellant*
1350 Avenue of the Americas, 2nd Floor
New York, New York 10019
(646) 216-8300
richard@mazzolalindstrom.com
jeanclaude@mazzolalindstrom.com

APPELLATE INNOVATIONS
(914) 948-2240

# Table of Contents

**Docket/Tab#**

## Volume I of XI

U.S. District Court Docket Entries,
Civil Docket for Case #: 0:21-cv-60125-RNS .......................... A

Third Amended Complaint, Dated June 1, 2021 .......................... 26

Circuitronix, LLC's Motion to Dismiss Plaintiffs' Third
Amended Complaint, Dated June 15, 2021 .............................. 27

Plaintiffs' Memorandum of Law in Opposition to Motion,
Dated June 28, 2021 ................................................................ 28

Order of Honorable Robert N. Scola, Jr. Granting in
Part and Denying in Part Motion to Dismiss,
Dated September 22, 2021 ....................................................... 31

Answer by Defendant and Affirmative Defenses to Plaintiff's
Third-Amended Complaint and Defendant's Counterclaim,
Dated October 15, 2021 ........................................................... 34

Answer by Plaintiff to Defendant's Counterclaim,
Dated November 29, 2021 ....................................................... 43

Circuitronix, LLC's Statement of Material Facts in Support of
its Motion for Summary Judgment,
Dated June 9, 2023 .................................................................. 177

## Volume II of XI

Exhibit 1 to Statement of Material Facts -
Declaration of Christina H. Martinez, for Defendant,
Dated June 9, 2023, with Exhibits A to L Annexed Hereto ......177-1

Circuitronix, LLC'S *Corrected* Motion for Summary Judgment,
Dated June 9, 2023 .................................................................. 178

Motion for Extension of Time from June 26th to July 14th
for Jiangmen Benlida to File Response to Defendant
Circuitronix, LLC's Motion for Summary Judgment,
Dated June 19, 2023 ................................................................ 181

Paperless Order of Honorable Robert N. Scola, Jr. Denying
Motion by Plaintiff, Dated June 20, 2023 ................................ 183

**Docket/Tab#**

Notice of Filing Defendant Circuitronix, LC's Corrected Motion for Summary Judgment and Statement of Material Facts Adding ECF References to Cited Documents, Dated June 20, 2023 .................................................... 184

Exhibit A - Defendant Circuitronix, LLC's *Corrected* Motion for Summary Judgment Adding ECF References to Cited Documents, Dated June 9, 2023 ....................................184-1

Declaration of Jean-Claude Mazzola, for Plaintiff, in Opposition to Motion, Dated June 26, 2023

Exhibit F to Mazzola Declaration - Excerpts of Deposition Transcript of Akshay Koul, Witness, Dated May 27, 2022 ..................................................185-6

Exhibit G to Mazzola Declaration - Excerpts of Deposition Transcript of Chen Zhanjiao, for Plaintiff, Dated May 25, 2023, with Exhibits Annexed Hereto........................................................................185-7

**<u>Volume III of XI</u>**

Declaration of Huang Sulan, for Plaintiff, in Opposition to Motion, Dated June 26, 2023 ......................... 186

Exhibit A to Sulan Declaration - Various E-Mail Correspondences Between Rishi Kukreja, Akshay Koul and Tracy Benlida ..............................................186-1

Exhibit B to Sulan Declaration - Various Purchase Orders of Circuitronix, LLC ........................186-2

Exhibit C to Sulan Declaration - Various Shipments Details and Purchase Order .......................186-3

Exhibit E to Sulan Declaration - Various Commercial Invoices from Jiangmen Benlida Printed Circuit Co., Ltd. to Circuitronix, LLC..........................186-5

Exhibit F to Sulan Declaration - Various Commercial Invoices from Jiangmen Benlida Printed Circuit Co., Ltd. to Circuitronix, LLC, with Payment Details from Circuitronix, LLC to Jiangmen Benlida Printed Circuit Co., Ltd. .............................186-6

**Docket/Tab#**

Exhibit G to Sulan Declaration -
Payment Details from Circuitronix, LLC to ROK Printed Circuit Co., Ltd. ........ 186-7

Exhibit I to Sulan Declaration -
Statement of Penalty for Lead-Time Exceedances for August 2017 Purchase Orders, for Jiangmen Benlida Printed Circuit Co., Ltd. and ROK Printed Circuit Co., Ltd. ........ 186-9

Declaration of Wu Yukun, for Plaintiff, in Opposition to Motion, Dated June 25, 2023 ........ 187

Exhibit A to Yukun Declaration -
Confirmation for Audit Purpose ........ 187-1

Exhibit B to Yukun Declaration -
Confirmation of Balances Send to Circuitronix (HongKong) Limited, Dated June 1, 2018 ........ 187-2

Jiangmen Benlida Circuit Co., Ltd.'s Memorandum of Law in Opposition to Motion, Dated June 26, 2023 ........ 188

Jiangmen Benlida Printed Circuit Co., Ltd.'s Response to Circuitronix, LLC's Statement of Material Facts, Dated June 26, 2023 ........ 189

Notice of Correction of Plaintiff's Exhibit B to the Huang Declaration for the Motion for Summary Judgment, Dated June 27, 2023, with Corrected Exhibit B Annexed Hereto ........ 190

Notice of Correction of Plaintiff's Exhibit C to the Huang Declaration for the Motion for Summary Judgment, Dated June 27, 2023, with Corrected Exhibit C Annexed Hereto ........ 191

Circuitronix, LLC's Reply in Support Motion, Dated July 5, 2023 ........ 193

Jiangmen Benlida Printed Circuit Co., Ltd.'s Motion *in Limine* (a) to Preclude Expert on Chinese Law and Testimony Related Thereto; and (b) to Preclude Testimony Regarding Trade-Credit Insurance, Dated August 8, 2023 ........ 196

**Docket/Tab#**

Circuitronix, LLC's Motion to Exclude or Limit Testimony of Plaintiff's Rebuttal Expert with Incorporated Memorandum of Law, Dated August 8, 2023 .......... 197

**Volume IV of XI**

Exhibit 1 to Motion to Exclude - Plaintiff's Response Report, Prepared by A.J Santye & Co., Dated July 8, 2023 .......... 197-1

Exhibit 3 to Motion to Exclude - Excerpts of Deposition Transcript of Randall M. Paulikens, Expert Witness, Dated July 20, 2023 .......... 197-3

Exhibit 4 to Motion to Exclude - Excerpts of Deposition Transcript of Rishi Kukreja, Witness, Dated June 1, 2023 .......... 197-4

Circuitronix, LLC's Omnibus Motion *in Limine* and Incorporated Memorandum of Law, Dated August 8, 2023 .......... 198

Jiangmen Benlida Printed Circuit Co., Ltd.'s Memorandum of Law in Opposition to Motion *in Limine*, Dated August 22, 2023 .......... 201

Exhibit A to Memorandum of Law - Excerpts of Deposition Transcript of Mark Parisi, Witness, Dated July 31, 2023 .......... 201-1

Exhibit B to Memorandum of Law - Excerpts of Deposition Transcript of Barry Mukamal, Witness, Dated August 1, 2023 .......... 201-2

Jiangmen Benlida Printed Circuit Co., Ltd.'s Memorandum of Law in Opposition to Second "Omnibus" Motion, Dated August 22, 2023 .......... 203

Exhibit C to Memorandum of Law - Excerpts of Deposition Transcripts of Rishi Kukreja, Witness, Dated June 1, 2023 and July 18, 2023 .......... 203-3

Reply of Stephen F. Rosenthal, for Circuitronix, LLC, in Support of Omnibus Motion, Dated August 29, 2023 .......... 204

Order of Honorable Robert N. Scola, Jr. Granting Motion, Dated September 25, 2023 .......... 221

**Docket/Tab#**

Omnibus Order of Honorable Robert N. Scola, Jr. on Pretrial Motions, Dated October 3, 2023 .............................................. 237

Circuitronix, LLC's Motion to Minimize Prejudice from Inadvertent Display of Redacted Information to Jury During Trial, Dated October 23, 2023 ..................................... 266

Jiangmen Benlida Circuit Co., Ltd.'s Motion for Reconsideration of Order Granting Partial Summary Judgment, Dated October 23, 2023........................................... 267

Circuitronix, LLC's Motion for Partial Judgment as a Matter of Law, Dated October 24, 2023 .................................. 269

Verdict Form, Dated October 24, 2023........................................ 273

**<u>Volume V of XI</u>**

Trial Exhibit 21 -
Standard Manufacturing and Representation Agreement Between Jiangmen Benlida Circuit Co., Ltd., ROK Printed Circuit Co., Ltd. and Circuitronix, LLC,
Dated March 1, 2012.................................................................281-2

Trial Exhibit 40 -
Letter Agreement Between Circuitronix, LLC, Jiangmen Benlida Circuit Co., Ltd. and ROK Printed Circuit Co., Ltd.,
Dated July 21, 2016...................................................................281-3

Trial Exhibit P-255 -
Schedule A - Identified Potential Customers and Circuitronix Customers, Updated on March 7, 2020....................................285-2

Circuitronix, LLC's Response in Opposition to Jiangmen Benlida Circuit Co., Ltd.'s Motion for Reconsideration, Dated November 6, 2023 ......................................................... 288

Jiangmen Benlida Circuit Co., Ltd.'s Opposition to Circuitronix, LLC's Motion for a Directed Verdict, Dated November 7, 2023 ......................................................... 290

Jiangmen Benlida Circuit Co., Ltd.'s Reply to Circuitronix, LLC's Opposition to Motion for Reconsideration of Order Granting Partial Summary Judgment, Dated November 13, 2023 ....................................................... 291

Circuitronix, LLC's Reply in Support of Motion for Partial Judgment as a Matter of Law, Dated November 14, 2023........ 292

**Docket/Tab#**

Order of Honorable Robert N. Scola, Jr. Denying Plaintiff's Motion for Reconsideration and Defendant's Motion for Judgment as a Matter of Law, Dated November 30, 2023........ 293

Amended Final Judgment of Honorable Robert N. Scola, Jr., Dated April 22, 2024 .......... 333

Amended Notice of Appeal, Dated May 10, 2024 .......... 335

Transcript of Proceedings, Dated October 16, 2023 (Volume I) (Jury Voir Dire Omitted) .......... 319

**Volume VI of XI**

Transcript of Proceedings, Dated October 17, 2023 (Volume II) (to transcript page 538) .......... 320

**Volume VII of XI**

Transcript of Proceedings, Dated October 17, 2023 (Volume II) (Continued: transcript page 539 to ECF 321, transcript page 791)) .......... 320

**Volume VIII of XI**

Transcript of Proceedings, Dated October 18, 2023 (Volume III) (Continued: ECF 321, transcript page 792 to ECF 322, transcript page 1028) .......... 321

**Volume IX of XI**

Transcript of Proceedings, Dated October 19, 2023 (Volume IV) (Continued: ECF 322, transcript page 1029 to ECF 323, transcript page 1297) .......... 322

**Volume X of XI**

Transcript of Proceedings, Dated October 20, 2023 (Volume V) (Continued: ECF 323, transcript page 1298 to ECF 324, transcript page 1525) .......... 323

**Volume XI of XI**

Transcript of Proceedings, Dated October 24, 2023 (Volume VI) (Continued: ECF 324, transcript page 1526 to end) .......... 324

Certificate of Service

Docket/Tab #197-1

# EXHIBIT 1

---

**JIANGMEN BENLIDA PRINTED CIRCUIT CO., LTD**

**v.**

**CIRCUTRONIX, LLC**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRCT OF FLORIDA

Civil Action No 21-60125-Civ-Scola/Snow

PLAINTIFF'S RESPONSE REPORT

July 8, 2023

A·J Santye & Co.
ACCOUNTING ▪ TAX ▪ ADVISORY

36 East Main St
Somerville, New Jersey 08876
Tel: (908) 704-1400
www.santye.com

**JIANGMEN BENLIDA PRINTED CIRCUIT CO., LTD**
**v.**
**CIRCUTRONIX, LLC**

## Table of Contents


| | Tab |
|---|---|
| Independent Forensic Accountants' Report Letter | A |
| Assumptions and Limiting Conditions | B |
| Sources of Information Relied Upon | C |
| Curriculum Vitae- Randall M. Paulikens, CPA/ABV/CFF/CITP | D |

**Exhibits**

| | |
|---|---|
| Excerpts "2012-2019 reconciliation analysis – 2019.11.15 CCT" | Exhibit -1 |
| Excerpts "Benlida Payment Details CTX-US 2012-2021 v5" | Exhibit - 2 |
| Excerpts "Benlida Shipment and Payment Details CTX-HK 2012-2019" | Exhibit - 3 |
| Excerpts "Benlida Payment Details CTX-HK 2015-2019_v2.1" | Exhibit - 4 |
| Excerpts "Benlida Payment Details CTX-US 2012-2021_v5 (up to 2019 only" | Exhibit -5 |
| Excerpts "Benlida Payment Details CTX-US 2015-2019_v2.1" | Exhibit - 6 |

# Tab - A

A·J Santye & Co.
ACCOUNTING ▪ TAX ▪ ADVISORY

July 7, 2023

**Transmitted Via Email**

Jean Claude Mazzola, Esq.
Richard Lerner, Esq.
Mazzola Lindstrom, LLP
1350 Avenue of the Americas, Second Floor
New York, NY 10019

Re: Jiangmen Benlida Printed Circuit Co, Ltd et al ("Plaintiff") v Circuitronix, LLC, et al. ("Defendant")

Dear Counselors:

You have engaged A. J. Santye & Co. P.A. ("Santye") as an expert in the above matter. As part of our retention, we have prepared this response report to the expert report prepared by Barry Mukamal, CPA/PFS/ABV/CFE/CFF/CIRA/CGMA and Mark Parisi, CPA/CFE/CIRA/CTCE. Until January 31, 2023, both were employed at Kapila/Mukamal CPAs, ("KM"). Mr. Parisi has since become employed by Citrin Cooperman. For purposes of identification, we will refer to the report as the "KM Report" and the individual authors by their last names (Mukamal and Parisi, respectively).

As we will discuss in the following pages, it is not what is in the KM Report that should be instructive to the trier of fact – it is what is not in the KM Report that actually informs the reader of the order of magnitude of the amount being sought by the Plaintiff Benlida and why.

The limitations of the KM report are properly spelled out on page 3 of the KM Report. In short, the KM Report simply reconciled the claims of the litigants based solely on reconciliations provided by CTX and Benlida. The KM Report also "examined and summarized calculations prepared by CTX with respect to lead time penalties owed from Benlida".[1]

Further, the KM Report emphasized that it did not perform any other analysis of the underlying claims. *"We relied on the records of CTX as produced, the CTX Recon, and the Belinda Recon, and did not perform any additional procedures to provide assurance as to their reliability beyond the procedures enumerated herein."* Buried in footnote 4 on page 3 and again in footnote 14 on page 7 are the only references that there may be more to the issues between the litigants.

The KM Report contains 25 pages including the cover page, table of contents and 10 pages of the preparers' CVs and testimony experience. The majority of pages 4 and 5 contain a summary of the same information contained in the 10 pages of the CVs of the two preparers. In short, out of the entire 25 pages, less than half (11 pages) contain their analysis and findings. None of their calculations were attached to enable us to validate KM's work. We have attached excerpts of the files in the exhibits section of this report to provide a reference to the tables included in this response.

We reprint a copy of the penultimate conclusion from page 14 of the KM Report.

Table 7: Summary of Payable Reconciliation between CTX and Benlida

| | | Per CTX | Per Benlida | Difference per KM Report | Difference With Math Correction |
|---|---|---|---|---|---|
| **Reconciliation Period Through July 2019** | | | | | |
| Payments | Table 2 | $ 67,623,456 | $ 67,636,070 | (12,614) | $ (12,614) |
| Invoices | Table 3 | (65,176,316) | (65,839,234) | 662,918 | 662,918 |
| Debit Memos | Table 5 | 2,313,707 | 1,843,314 | 97,264 | 470,393 |
| | | $ 4,760,847 | $ 3,640,150 | $ 747,568 | $ 1,120,697 |
| | | | | | |
| **Lead Time Penalties after January 2016** | | | | | |
| Lead Time Pen | Table 6 | 3,107,778 | N/A | | |
| | | | | | |
| **Owed by Benlida to CTX** | | **$ 7,868,625** | | | |

There is an unexplained math error on the Debit Memo line that we cannot trace.

[1] KM Report page 3, paragraph one.

As mentioned previously, we take issue not as much with what is included in the KM Report but what is not included in the KM Report. Broadly speaking, Benlida and Circuitronix have been doing business together since 2012 and as I understand from attending portions of a hearing in Miami on Friday January 13, 2023, the key members of the litigants have a long relationship outside of business as neither side denied a level of familiarity.

This fact, as well as the actions of all sides, needs to be considered to fully understand the economic relationship between the parties and where the state of the ultimate economic relationship lies.

**The Dispute**

The dispute between the parties is over payments and compensation the Plaintiff is claiming it is owed by the Defendant pursuant to a multi-year contract and relationship where the Plaintiff manufactures various printed circuit boards for the Defendant. The Defendant is claiming that there are offsets to the amounts being owed due to contractually mandated penalties for delivery delays and other quality issues. Neither KM nor A.J. Santye & Co. were engaged to opine on the validity or the appropriateness of those offsets.

We have been provided with KM's "documents relied upon" as referenced in KM's Report as well as emails and other information as both sides attempted to reconcile the amounts owed and come to a resolution outside of litigation[2]. Understanding that settlement talks are not subject to discovery, the business records exchanged are subject to discovery to our understanding as accountants. By way of illustration, detailed lists of invoices and payments that were exchanged as part of the reconciliation process are business records. Those records provide useful insight as to the payment status of the business transactions between the parties.

It is clear from the litigants' multiple communications and exchanges of information that neither side maintained a set of records that agreed to the other. In each round of information exchange, invoices and payments that were not listed on one side's books were communicated to the other.

[2] Our list of "Information Relied Upon" relied upon is included at Tab C

In general, the new information was accepted by the other side as the parties attempted to determine the actual amounts due.

As a result of the confusing production of information, it is difficult for either side to "know" which source is the final word. (Since the KM Report did not produce any information or analysis with regard to CTX-HK or ROK, the KM Report is not a source as to the entire economic picture either.) Further, given the size of the litigants and the fact that they routinely transact business on multiple continents, whether directly or indirectly, it is difficult to appreciate why there was so much information missing from each other's records.

The significant disparity in information, and the implication that, any one source is better is, best illustrated by an email from Rishi Kukreja on November 11, 2012 at 10:28 PM. That email claims that CTX-US overpaid Benlida by $5,314,868 and that CTX-HK overpaid by $2,179,988.74. (As we will show information from KM and others show that CTX-HK owes about $13 million. We understand that it is Benlida's position that CTX-US is responsible for orders placed by CTX-HK, and that it is CTX-US's position that it is not responsible for orders placed by CTX-HK, but that is beyond the purview of an accountant). In response to that email, an analysis was created by the Benlida accounting department. That analysis was communicated in an Excel file "2012-2019 reconciliation analysis-2019.11.15CCT". According to the file creation information contained in the Excel workbook, that file was first created November 3, 2019. The dating of November 15, 2019 suggests the work was completed and communicated at approximately the same date. The file contained approximately 33 pages of information comparing various sources of information between the litigants. Many of the largest discrepancies were from the earlier years of the relationships. We have reprinted this analysis at Exhibit 1[3]. The summary page in reprinted below:

[3] Note that the name of the file was modified to show "working copy July 2023" since a certain amount of reformatting the pages was necessary to allow them to be included in this report.

**Reconciliation analysis report 2012-2019**

币种：美元

| | Transactions between BLD and Circuitronix US | | | | Transactions between ROK and Circuitronix US/HK | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Year | CTX missing inv. | inv. Discrepancy (BLD-CTX) | Payment Discrepancy (CTX-BLD) | DM records Discrepancy | CTX missing inv. | inv. Discrepancy (ROK-CTX) | Payment Discrepancy (CTX-ROK) | DM records Discrepancy | Discount Discrepancy (CTX-ROK) |
| 2012 | 13,716.50 | (4,864.51) | | 4,460.27 | | 8,536.08 | (46,723.30) | 27,486.09 | |
| 2013 | 90,699.84 | (84,538.65) | | 75,202.21 | 1,973.37 | 0.00 | 27,105.00 | 711,435.59 | 63,478.46 |
| 2014 | 139,828.91 | (38,579.02) | 1,853,799.47 | 213,364.36 | 117,356.58 | (145,948.56) | 60,000.00 | 391,189.77 | |
| 2015 | | 246,302.49 | 231,126.05 | 33,337.40 | 19,436.95 | 110,056.82 | | 179,866.33 | |
| 2016 | | 159,929.31 | | 116,743.74 | 478.80 | 313,882.77 | | 31,756.74 | |
| 2017 | | 116,453.22 | 385,000.00 | 37,041.10 | | 124,089.05 | 142,000.00 | 23,778.12 | |
| 2018 | | 24,230.02 | | 6,681.01 | | 853.75 | 200,000.00 | 5,889.20 | |
| 2019.01-2019.07 | | 0.00 | 100,000.00 | 108.64 | | 0.00 | | | |
| 合计 | 244,245.25 | 418,932.86 | 2,569,925.52 | 486,938.73 | 139,245.70 | 411,469.91 | 382,381.70 | 1,371,401.84 | 63,478.46 |

The KM Report did not include the details of their analysis in their report; rather, they included summaries within the body of their report. As a result, we are unable to recreate the KM Report's results and are not in a position to fully agree or disagree with portions of their findings. We reprint the penultimate conclusion from the KM Report from page 3 below:

Table 7: Summary of Payable Reconciliation between CTX and Benlida

| | | Per CTX | Per Benlida | Difference per KM Report | Difference With Math Correction |
|---|---|---|---|---|---|
| **Reconciliation Period Through July 2019** | | | | | |
| Payments | Table 2 | $ 67,623,456 | $ 67,636,070 | (12,614) | $ (12,614) |
| Invoices | Table 3 | (65,176,316) | (65,839,234) | 662,918 | 662,918 |
| Debit Memos | Table 5 | 2,313,707 | 1,843,314 | 97,264 | 470,393 |
| | | $ 4,760,847 | $ 3,640,150 | $ 747,568 | $ 1,120,697 |
| | | | | | |
| **Lead Time Penalties after January 2016** | | | | | |
| Lead Time Pen: | Table 6 | 3,107,778 | N/A | | |
| | | | | | |
| **Owed by Benlida to CTX** | | **$ 7,868,625** | | | |

While we have not been able to recreate exactly the KM Report's results, overall, with regard to CTX-US and Benlida, there is a certain amount of consistency. As is made clear in footnote 14 of the KM Report, KM only included the CTX-US numbers and not the CTX-HK and ROK numbers. Without the details of the KM Report's analysis, we cannot opine if we agree with KM's analysis. However, given the multitude of data sources and the ongoing work by the respective litigants to determine exactly what is owed, for purposes of this analysis, we will not take issue with the "Reconciliation Period" portion of the KM Report's conclusion for CTX-US.

The KM Report does not include any discussion of how common, (or uncommon), it is for a customer to overpay on its account to the level concluded to in the KM Report. According to the

KM Report and the table on the next page, CTX-US has maintained "prepaid balance" approaching three to six month months of invoices. The author and signer of this report for A.J. Santye & Co has not seen anything like this in 37 years of public accounting. KM was silent on this issue.

The table below is reprinted (with formatting changes and additional analysis from us) from the KM Report's documents. Broadly, this document, which is noted as version 5 in the file name, meshes with the KM Report. Again, the KM Report did not provide their actual analysis but we note that there is a level of congruence.

| Source Benlida Payment Details CTX-US_2012-2021 v5 | | | | | | Payment Type | |
|---|---|---|---|---|---|---|---|
| Payment Detail Year | Total Invoices | Total Debit Memos | Total Payments | Balance Due/(Credit Balance) | Cummulative | Non rounded | 000s |
| 2012 | $ 1,168,214.09 | $ (13,087.96) | $ (1,052,134.79) | $ 102,991.34 | $ 102,991.34 | 6 | 1 |
| 2013 | $ 3,477,155.95 | $ (169,253.24) | $ (3,455,959.35) | $ (148,056.64) | $ (45,065.30) | 3 | 7 |
| 2014 | $ 6,887,622.54 | $ (80,930.99) | $ (7,858,569.80) | $ (1,051,878.25) | $ (1,096,943.55) | 4 | 16 |
| 2015 | $ 9,293,546.49 | $ (855,066.49) | $ (8,953,676.45) | $ (515,196.45) | $ (1,612,140.00) | 4 | 25 |
| 2016 | $ 8,754,631.41 | $ (710,083.81) | $ (7,868,054.90) | $ 176,492.70 | $ (1,435,647.30) | 4 | 23 |
| 2017 | $ 9,197,773.44 | $ (61,717.14) | $ (12,722,992.87) | $ (3,586,936.57) | $ (5,022,583.87) | 1 | 44 |
| 2018 | $ 16,683,255.06 | $ (836,614.95) | $ (17,080,547.82) | $ (1,233,907.71) | $ (6,256,491.58) | 1 | 51 |
| 2019 | $ 11,006,040.23 | $ (28,345.44) | $ (9,605,676.58) | $ 1,372,018.21 | $ (4,884,473.37) | 14 | 26 |
| 2020 | $ 2,541,885.39 | $ (1,840.85) | $ (3,214,290.89) | $ (674,246.35) | $ (5,558,719.73) | 29 | 2 |
| 2021 Ends February | $ 253,000.12 | $ - | $ (327,954.90) | $ (74,954.78) | **$ (5,633,674.51)** | 12 | 0 |
| | **$ 69,263,124.71** | **$ (2,756,940.87)** | **$ (72,139,858.35)** | **$ (5,633,674.51)** | | 78 | 195 |
| NOTE- The years 2012 to 2013 invoices and payments are listed on a Fiscal year basis ending in October. Beginning in 2014 the invoices are listed on a Fiscal year basis ending in September w hile the payments are listed on a calendar year basis | | | | | | | |

The live file which came from KM, includes the details of the payments. We note that there were a total of 273 payments listed. Of those payments, 195 were in even thousands of dollars. (Example $250,000 at a time.) We include the summaries of each year at Exhibit-2. As shown in the table above, through 2018, substantially all of the payments were in even amounts. In fact, it was not until the August 8, 2019 payment that the payments ceased being rounded even amounts and the payments were made in very specific amounts (dollars and cents).

This is noteworthy. Such payments and the frequency of them are consistent with ongoing "payments on account" and not specific payments on invoices. Ordinarily it is customary to apply "payments on account" to the oldest invoice first, unless, in a timely manner, specific invoices are identified. We understand that this is an area of dispute in this matter. We also note that much of the Excel files were created at around this time when the parties were trying to reconcile the amounts owed to one another which was in the latter half of 2019. It is also in the latter half of

2019 that the payment pattern of even thousands amounts changes for payments received by both Benlida and ROK.

KM did not discuss this issue even though the data was available to them.

This impacts the starting point of when to start the analysis. Since CTX-US payments were almost entirely consistent with payments on account, an arbitrary start date that does not consider the running balance is misleading. We understand that this is also a dispute in the matter and that there are statute of limitation issues which are legal in nature.

We will return to this issue, later in this report. KM did not discuss it at all.

**What is not in the KM Report**

As stated earlier, there are two Benlida entities (Benlida and ROK) and there are two Circuitronix entities (CTX-US and CTX-HK).

We reprint a portion of a spreadsheet that was included in the KM Reports documents relied upon. This shows the information that was not included in the KM Report as it related to the invoicing and payments made to ROK. We include the summary page and the annual summaries at Exhibit -3.

| Source Benlida Shipment and Payment Details CTX-HK_2012-2019 | | | | | | Payment Type | |
|---|---|---|---|---|---|---|---|
| Payment Detail Year | Total Invoices | Total Debit Memos | Total Payments | Balance Due/(Credit Balance) | Cummulative | Non rounded | 000s |
| 2012 | $ 50,844.68 | | $ - | $ 50,844.68 | $ 50,844.68 | | |
| 2013 | $ 663,041.04 | $ (39,550.39) | $ 242,827.24 | $ 380,663.41 | $ 431,508.10 | 7 | |
| 2014 | $ 2,127,957.19 | $ (15,911.64) | $ 776,987.44 | $ 1,335,058.11 | $ 1,766,566.20 | 4 | 3 |
| 2015 | $ 4,866,595.96 | | $ 3,959,983.86 | $ 906,612.10 | $ 2,673,178.30 | 5 | 15 |
| 2016 | $ 7,449,167.92 | | $ 5,572,718.50 | $ 1,876,449.42 | $ 4,549,627.72 | 5 | 23 |
| 2017 | $ 7,095,140.71 | | $ 4,405,490.00 | $ 2,689,650.71 | $ 7,239,278.43 | 1 | 24 |
| 2018 | $ 9,451,795.08 | | $ 4,555,000.00 | $ 4,896,795.08 | $ 12,136,073.51 | 0 | 22 |
| 2019.01-07 | $ 3,602,117.12 | | $ 2,245,367.06 | $ 1,356,750.07 | $ 13,492,823.58 | 7 | 8 |
| | $ 35,306,659.70 | $ (55,462.03) | $ 21,758,374.10 | $ 13,492,823.58 | | 29.00 | 95.00 |
| Source | | | | | | | |
| Benlida Shipment and Payment Details CTX-HK_2012-2019 | | | | | | | |
| Original creation date 11-1-2019 | | | | | | | |

As shown previously, CTX-US's and Belinda's data indicate that CTX overpaid Benlida by approximately $5.4 million (depending upon the data source). This is covered extensively by KM.

CTX has underpaid the Benlida Group by $13.5 million. This has been studiously not covered by KM. Thus, even if the offsets claimed by CTX are ultimately proved at trial and accounted for, the CTX group would still owe the Benlida Group as much as $8.0 million, again depending upon the data source.

We also note that similar to CTX-US and Benlida, the payments reflected for CTX-HK and Benlida/ROK are largely in even thousands until August 2019 when the parties apparently began to try to reconcile their accounts.

KM did not comment on this entire issue except to say they would comment on this issue after a potential response report. Why the CTX-HK/Benlida/ROK issue, which is significant, and as discussed later, is intentionally left out of the KM Report, will potentially be made after a response report, is interesting. Ignoring the CTX-HK/Benlida/ROK issue, as KM does, makes the entire conclusion of the KM Report difficult to accept, as it is predicated upon an untenable theory that the two parties have such an inverse relationship to the norm. We will discuss this later in this report.

**Illustration of the Statue of Limitation Issue**

We recognize that there is a dispute between the parties and that the Florida statute of limitations for breach of contract is five years. We understand that that would include the period from January 2016 forward, as measured from the date of the filing of the complaint. In fact, the KM Report appears to begin its analysis with a look back to 2012.

This was not discussed in the KM Report. However, within the KM files produced to us, there were worksheets that illustrate the amounts due for the period from 2015 to through approximately July 2019. These documents are from the KM files. Included at Exhibit 3 and Exhibit 4 are excerpts from two files- "Benlida Payments Details CTX-HK_2015 to 2019 v2.1" (Exhibit 3) and Benlida Payments Details CTS-US_2015-2019_v2.1" (Exhibit 4).

For the periods shown, CTX owes Benlida/ROK approximately $8,843,225 and Benlida owes CTX approximately $5,723,591. As shown in the files relied upon by KM, Benlida is owed approximately a net amount of $3,119,634 as shown on the next page.

| Source: Benlida Shipment and Payment Details CTX-HK_2015-2019 v2.1 | | | | |
|---|---|---|---|---|
| **Payment Detail Year** | **Total Invoices** | **Total Debit Memos** | **Total Payments** | **Balance Due/(Credit Balance)** |
| 2015 | $ 4,632,142.06 | $ (830,291.63) | $ (3,392,641.63) | $ 409,208.80 |
| 2016 | $ 7,277,462.51 | $ (227,386.40) | $ (5,995,254.45) | $ 1,054,821.66 |
| 2017 | $ 6,918,653.29 | $ (163,942.27) | $ (4,405,492.90) | $ 2,349,218.12 |
| 2018 | $ 9,406,334.03 | $ (1,400,210.14) | $ (4,555,000.00) | $ 3,451,123.89 |
| 2019.01-07 | $ 2,666,698.53 | $ (47,845.42) | $ (1,040,000.00) | $ 1,578,853.11 |
| | **$ 30,901,290.42** | **$ (2,669,675.86)** | **$ (19,388,388.98)** | **$ 8,843,225.58** |

| Source: Benlida Shipment and Payment Details CTX-US_2015-2019 v2.1 | | | | |
|---|---|---|---|---|
| **Payment Detail Year** | **Total Invoices** | **Total Debit Memos** | **Total Payments** | **Balance Due/(Credit Balance)** |
| 2015 | $ 9,095,077.35 | $ (813,048.16) | $ (7,815,190.90) | $ 466,838.29 |
| 2016 | $ 9,206,847.74 | $ (560,380.12) | $ (7,623,054.90) | $ 1,023,412.72 |
| 2017 | $ 9,388,547.43 | $ (237,259.16) | $ (12,972,992.87) | $ (3,821,704.60) |
| 2018 | $ 17,527,528.38 | $ (666,958.02) | $ (17,080,547.82) | $ (219,977.46) |
| 2019 | $ 3,743,032.36 | $ (15,192.91) | $ (6,900,000.00) | $ (3,172,160.55) |
| | **$ 48,961,033.26** | **$ (2,292,838.37)** | **$ (52,391,786.49)** | **$ (5,723,591.60)** |

**Total**

| Payment Detail Year | Total Invoices | Total Debit Memos | Total Payments | Balance Due/(Credit Balance) |
|---|---|---|---|---|
| 2015 | $ 13,727,219.41 | $ (1,643,339.79) | $ (11,207,832.53) | $ 876,047.09 |
| 2016 | $ 16,484,310.25 | $ (787,766.52) | $ (13,618,309.35) | $ 2,078,234.38 |
| 2017 | $ 16,307,200.72 | $ (401,201.43) | $ (17,378,485.77) | $ (1,472,486.48) |
| 2018 | $ 26,933,862.41 | $ (2,067,168.16) | $ (21,635,547.82) | $ 3,231,146.43 |
| 2019 | $ 6,409,730.89 | $ (63,038.33) | $ (7,940,000.00) | $ (1,593,307.44) |
| | **$ 79,862,323.68** | **$ (4,962,514.23)** | **$ (71,780,175.47)** | **$ 3,119,633.98** |

Going back to the earliest analysis prepared by the litigants, from 2012 to 2019, KM acknowledges that CTX owes Benlida/ROK approximately $13,492,823 and maintains for the purpose of analysis that Benlida owes CTX approximately $9,428,652. As shown in these files, according to KM, Benlida is owed approximately a net amount of $4,064,171.

**Source: Benlida Shipment and Payment Details CTX-HK_2012-2019 (Exhibit 3)**

| Calender Year Payment Detail Year | Total Invoices | Total Debit Memos | Total Payments | Balance Due/(Credit Balance) | Cummulative |
|---|---|---|---|---|---|
| 2012 | $ 50,844.68 | $ - | $ - | $ 50,844.68 | $ 50,844.68 |
| 2013 | $ 663,041.04 | $ (39,550.39) | $ (242,827.34) | $ 380,663.31 | $ 431,507.99 |
| 2014 | $ 2,127,957.19 | $ (15,911.64) | $ (776,987.44) | $ 1,335,058.11 | $ 1,766,566.10 |
| 2015 | $ 4,866,595.96 | $ - | $ (3,959,983.86) | $ 906,612.10 | $ 2,673,178.20 |
| 2016 | $ 7,449,167.92 | $ - | $ (5,572,718.50) | $ 1,876,449.42 | $ 4,549,627.62 |
| 2017 | $ 7,095,140.71 | $ - | $ (4,405,490.00) | $ 2,689,650.71 | $ 7,239,278.33 |
| 2018 | $ 9,451,795.08 | $ - | $ (4,555,000.00) | $ 4,896,795.08 | $ 12,136,073.41 |
| 2019.01-07 | $ 3,602,117.12 | $ - | $ (2,245,367.08) | $ 1,356,750.04 | $ 13,492,823.45 |
| | $ 35,306,659.70 | $ (55,462.03) | $ (21,758,374.22) | $ 13,492,823.45 | |

**Source:Benlida Shipment and Payment Details CTX-US_2012-2021 v5 (Exhibit 5)**

| Payment Detail Year | Total Invoices | Total Debit Memos | Total Payments | Balance Due/(Credit Balance) | Cummulative |
|---|---|---|---|---|---|
| 2012 | $ 1,168,214.09 | $ (13,087.96) | $ (1,052,134.79) | $ 102,991.34 | $ 102,991.34 |
| 2013 | $ 3,477,155.95 | $ (169,253.24) | $ (3,455,959.35) | $ (148,056.64) | $ (45,065.30) |
| 2014 | $ 6,887,622.54 | $ (80,930.99) | $ (7,858,569.80) | $ (1,051,878.25) | $ (1,096,943.55) |
| 2015 | $ 9,293,546.49 | $ (855,066.49) | $ (8,953,676.45) | $ (515,196.45) | $ (1,612,140.00) |
| 2016 | $ 8,754,631.41 | $ (710,083.81) | $ (7,868,054.90) | $ 176,492.70 | $ (1,435,647.30) |
| 2017 | $ 9,197,773.44 | $ (61,717.14) | $ (12,722,992.87) | $ (3,586,936.57) | $ (5,022,583.87) |
| 2018 | $ 16,683,255.06 | $ (836,614.95) | $ (17,080,547.82) | $ (1,233,907.71) | $ (6,256,491.58) |
| 2019 | $ 3,743,032.36 | $ (15,192.91) | $ (6,900,000.00) | $ (3,172,160.55) | $ (9,428,652.13) |
| | **$ 59,205,231.34** | **$ (2,741,947.49)** | **$ (65,891,935.98)** | **$ (9,428,652.13)** | |

**Total**

| Payment Detail Year | Total Invoices | Total Debit Memos | Total Payments | Balance Due/(Credit Balance) | Cummulative |
|---|---|---|---|---|---|
| 2012 | $ 1,219,058.77 | $ (13,087.96) | $ (1,052,134.79) | $ 153,836.02 | $ 153,836.02 |
| 2013 | $ 4,140,196.99 | $ (208,803.63) | $ (3,698,786.69) | $ 232,606.67 | $ 386,442.69 |
| 2014 | $ 9,015,579.73 | $ (96,842.63) | $ (8,635,557.24) | $ 283,179.86 | $ 669,622.55 |
| 2015 | $ 14,160,142.45 | $ (855,066.49) | $ (12,913,660.31) | $ 391,415.65 | $ 1,061,038.20 |
| 2016 | $ 16,203,799.33 | $ (710,083.81) | $ (13,440,773.40) | $ 2,052,942.12 | $ 3,113,980.32 |
| 2017 | $ 16,292,914.15 | $ (61,717.14) | $ (17,128,482.87) | $ (897,285.86) | $ 2,216,694.46 |
| 2018 | **$ 26,135,050.14** | $ (836,614.95) | $ (21,635,547.82) | $ 3,662,887.37 | **$ 5,879,581.83** |
| 2019 | $ 7,345,149.48 | $ (15,192.91) | $ (9,145,367.08) | $ (1,815,410.51) | **$ 4,064,171.32** |
| | **$ 94,511,891.04** | **$ (2,797,409.52)** | **$ (87,650,310.20)** | **$ 4,064,171.32** | |

To show the untenable position that CTX seeks to do by separating Benlida and ROK (where Benlida has been overpaid and ROK has been underpaid) we will combine the two balances to show that combined, Benlida and ROK have a commercially normal relationship with CTX. We use this illustration below.

In the table above, at the end of 2018, there is a combined the $5.879 million balance owed by CTX entities to Benlida/ROK. Also from the table above, during 2018, there was a combined $26.135 million in purchases by CTX. $26.135 million is approximately $2.2 million in purchases per month ($26.135 million in purchases /12 months = $2.177 per month). Based on the information in the above table, at the end of 2018 there is approximately 2.7 months of purchases

that CTX owes Benlida/ROK for using 2018 purchases as a guide. ($5.879 million owed /$2.177 million in monthly purchases = 2.7 months or 75 days of purchases.). This is not an unreasonable commercial relationship since it would take time for the invoices to be processed and paid.

**Lead Time Penalties ("LTPs")**

Another area in dispute is the imposition of penalties that are spelled out in the manufacturing agreement when Benlida does not ship the orders according to a specific and agreed time frame.

Based upon the language in the KM Report, KM provided a limited recalculation of approximately 8 worksheets[4] provided by CTX. *KM did not validate the inputs used to compute the LTP*[5]. Since KM, by its own report did not seek to validate the inputs, this claim is unsupported (other than mathematically in the KM Report). We are not aware of any acceptance, rejection, or waivers that both parties agreed to other than what is spelled out in the KM Report in paragraphs 34 to 36 of their report. We were also provided with the same information that supports the KM Report's calculations in paragraph 36 and Table 6 of their report. Similar to the other information summarized in the KM Report, KM did not actually provide their analysis so that we could trace their work and either agree or disagree with it. By way of illustration, the LTPs for April 2016 through March of 2018 were apparently calculated on one worksheet by CTX for both Benlida and ROK. KM did not discuss or disclose how the separation between ROK and Benlida was accomplished for those files.

We also note that the KM Report suggests that the LTPs since January 2016 have not been assessed by CTX against Benlida or ROK in the form of debit memos as they had been prior. It is ultimately a legal question when price adjustments or penalties need to be assessed before they are limited by the appropriate statute of limitations. As of the date of both expert reports, it is seven years since the LTPs measured by KM in paragraph 36 and Table 6 of their report. The earliest LTPs were for February 2016 to February 2017 according to KM,

[4] Paragraphs 30 to 33 of the KM Report.
[5] Footnote 22 of the KM Report

This provides an interesting insight into the relationship of the CTX entities. If the CTX entities are truly separate and CTX considers Benlida and ROK separate, why does CTX calculate the substantial Lead Time Penalties on the same Excel worksheet file and tabs. Further, arbitrarily not assessing the LTPs and then seeking to assess them at the very same time also is suggestive that CTX considers Benlida and ROK as one economic entity.

It would seem that CTX has control over CTX-HK. Put another way, CTX-HK and CTX-US would appear to be controlled and dominated by CTX. We also are not able from the information contained, to ascertain which LTPs were for Belinda or ROK. The KM Report is silent on how they made the determination.

**Inverse Commercial Relationship**

If CTX considers Benlida and ROK separate, why does CTX effectively lend Benlida money (by overpaying their debt to Benlida while CTX-HK owes more than two years of invoices to Benlida/ROK? KM does not address these issues but the data that was provided to KM, and ultimately us, from an accountant's point of view shows a very close relationship between all the litigants and further given the patterns of payment behavior (rounded even payment starting and stopping at nearly the same time) suggests strong operational control and influence that reduces the separation from CTX's perspective and Benlida/ROK's perspective. We understand that it is a legal issue whether orders placed by CTX-HK were actually placed for CTX-US; however, from an accountant's standpoint, the data clearly supports such a conclusion.

This is clearly an area of law and the issue was not discussed at all in the KM Report. We bring it up since the KM Report's focus on one entity to the exclusion of the other – especially given that one entity's financial behavior so would fall far outside the norm of customer and provider (CTX overpaying Benlida by months of revenue). Normally the opposite is true - the customer owes the supplier. In this case, the total relationship between CTX and Benlida/ROK mimics more normal commercial terms. This is clearly a legal dispute.

In addition, if the LTPs are appropriate (that CTX did not assess/assert), and if the inputs (that KM did not validate) are in fact correct and not in dispute, is also a legal issue. KM did not provide any analysis (other than a math checks) to support the LTPs. We reserve the right to recalculate LTPs once the necessary data is provided to us.

**Conclusion**

The KM Report is an 11 page summary of their calculations. We accept that there were multiple sources of information that were created at different times and that neither litigant's records should be considered pristine. We also recognize that the litigants themselves were working to reconcile and correct their books and records.

We believe that the KM Report only seeks to show one side of the economic relationship between the litigants – namely the side that best suits their clients' needs – that CTX has overpaid Benlida and nothing else. However, taking into consideration the CTX-HK/Benlida/ROK aspects, which is a substantial portion of the overall Benlida/CTX relationship, if LTP's are proved, then Benlida is actually owed between $3 and $8 million dollars depending upon when the analysis begins (based upon the statute of limitation) and the court's final decision on whether the payments by CTX to both Benlida and ROK were payments on account of specific invoices.

However, a deep dive into the records that KM relied upon shows that from an accounting perspective, the CTX entities and the Belinda/ROK entities are very intertwined. One affiliate has a large overpayment (CTX-US). The other entity has an even larger underpayment (the CTX-HK/Benlida/ROK claim). However, when combined, the relationship falls into more normal commercial terms.

Our role in this litigation, among others, is to analyze the KM report, and, consequently, quantify the amounts owed to Benlida, whether or not CTX-US or Benlida are successful in asserting or challenging LTP's, statute of limitations defenses or overpayment arguments This report has been prepared solely for use in the above-referenced litigation and is intended for no other purpose. This report may not be reproduced or circulated without the prior written consent of Santye. We

reserve the right to update our report should more supporting information and clarity become available.

This report was prepared and edited under the supervision and direction of Randall M. Paulikens, CPA/ABV/CFF/CITP. Should expert testimony be required in this matter, Randall M. Paulikens will testify. The partners and staff of Santye, have no present or contemplated future interests in any party related to this litigation that might prevent us from forming an unbiased opinion in this matter. Our compensation is not contingent upon the outcome of this or any related litigation. Mr. Paulikens billing rate is $550 per hour. Mr. Paulikens CV is included at Tab D.

Our engagement included an analysis of documentation that was believed to be relevant to our calculations. These documents were provided by counsel. Our investigation also included review of deposition transcripts in lieu of interviews as depositions are question and answer sessions under oath. We also performed our own independent research, and rely upon the "body of knowledge" accumulated as accountants and litigation/damage experts. A list or summary of this documentation is included at Tab C.

Very truly yours,
A.J. Santye & Co., P.A.



Randall M. Paulikens, CPA/ABV/CFF/CITP
Partner

# Tab - B

## ASSUMPTIONS AND LIMITING CONDITIONS

The primary assumptions and limiting conditions pertaining to the determination of economic analysis stated in this report are summarized below. Other assumptions may be cited elsewhere in this report. This economic analysis may not be used in conjunction with any other appraisal or study. The determination of economic amounts due stated in this report is based on the program of utilization described in the report, and may not be separated into parts.

As part of our engagement, we have been instructed by Counsel to assume certain facts and/or assertions regarding the actions of the defendants as well as the underlying law, proofs of which will be testified to and provided at trial. We are not responsible for proving the liability (and causation) aspects of this matter. In the narrative section of this report, A. J. Santye & Co., P.A. ("Santye") will be reciting certain of these facts in order to illustrate our methodology, as well as our rational in preparing our calculations and arriving at our opinions as to the damages calculated. We will be measuring the amount of damage based upon the determination of the existence and magnitude of liability.

We reserve the right to modify or even recall our report at our discretion in the event that counsel's representation should change. In addition, if additional information becomes available after our report is issued we also reserve the right to modify our report as appropriate.

No change of any item in this report shall be made by anyone other than Santye and we shall have no responsibility for any such unauthorized change. Unless otherwise stated in the report, the economic analysis of the amounts due to the Plaintiffs has not considered or incorporated the potential economic gain or loss resulting from contingent assets, liabilities or events existing as of the date of this report.

Neither all nor any part of the contents of the report shall be disseminated or referred to the public through advertising, public relations, news or sales media, or any other public means of communication or referenced in any publication without the prior written consent, approval and review by Santye.

Management is assumed to be competent, and the ownership to be in responsible hands, unless otherwise noted in this report. The quality of the business management can have a direct effect on the viability and the analysis of economic benefits and loss incurred by the Plaintiffs.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business because of future federal, state or local legislation, including any environmental or ecological matters or interpretations thereof.

As previously stated this report is solely for the stated litigation matter and should not be used for any other purpose or distributed to third parties, in whole or in part, without the express written consent of Santye.

All facts and data set forth in our report are true and accurate to the best of our knowledge and belief.

**ASSUMPTIONS AND LIMITING CONDITIONS (CONTINUED)**

During the course of the engagement, we have considered information provided by counsel, management and other third parties. We believe these sources to be reliable, but no further responsibility is assumed for their accuracy.

We have no responsibility or obligation to update this report for events or circumstances occurring subsequent to the date of this report.

We have relied upon the representations of counsel, as necessary, in preparing this report.

In all matters that may be potentially challenged by a Court, the Internal Revenue Service or others, we do not take any responsibility for the degree of reasonableness of contrary positions that others may choose to take, nor for the costs or fees that may be incurred in the defense of our recommendations against such challenge(s). We will, however, retain our supporting work papers for your matter(s), and will be available to assist in active defense of our economic damage calculations, at our then current rates, plus direct actual expenses and according to our then standard professional agreement.

# Tab - C

**JIANGMEN BENLINDA PRINTED CIRCUIT CO., LTD.,**
**V.**
**CIRCUITRONIX, LLC**
**CASE NO. 0:21-cv-60125-RNS**
**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**DOCUMENTS UTILIZED FROM OPPOSING EXPERT'S REPORT**

| No. | Document Description |
|---|---|
| **1** | Third Amended Complaint filed June 1, 2021 (Case 21-cv-60125-RNS-DE26 |
| **2** | Defendents Answer and Affirmative Defenses to Plaintiff's Third Amended Complaint and Defendents Counterclaim filed on October 15, 2021 *(Case 21-cv-60125-RNS-DE34)* |
| **3** | Benlida Payment Details CTX-US_2012-2019.xls |
| **4** | 2012-2019reconciliation analysis-2019.11.15 CCT |
| **5** | Email dated March 21, 2017 from tracy@benlida.com Rishi Kukreja |
| **6** | Email from tracy@benlida.org to Rishi Kukreja at CTX on July 28, 2016 and its attachments including the "cancel amount and payment.xls" spreadsheet |
| **7** | Debit Memo (BEN-DM20131020, BEN-DM20131203, BEN-DM20140120, BEN-DM20140520, BEN-DM20140620, BEN-DM20140720, BEN-DM20140820, BEN-DM20140919, BEN-DM20140920, BEN-DM20150310, BEN-DM20160321, and BEN-DM20171128-2 |
| **8** | Benlinda Payment Details CTX-US_2012-2021_v5.xls |
| **9** | JiangMen Benlinda Printed Circuit Co., Ltd Commercial Invoice to Circuitronix dated April 12, 2019 (*Invoice No. CCT-BLD-190412001* ) |
| **10** | JiangMen Benlinda Printed Circuit Co., Ltd Commercial Invoice to Circuitronix dated August 30, 2019 (*Invoice No. CCT-BLD-190830001)* |
| **11** | JiangMen Benlinda Printed Circuit Co., Ltd Commercial Invoice to Circuitronix dated September 3, 2019 *(Invoice No. CCT-BLD-190903002)* |
| **12** | Lead Time Penalty Spreadsheets from Febuary 2016 to March 2021 |
| **13** | "Meeting Minutes" of a meeting between CTX and Benlida on 10/20/2017 (BLD_00000582 and BLD00000073) |
| **14** | Circuitronix, LLC Citibank N.A. Account Ending in 2698 Bank Statements for the Period from May 1, 2012 through February 28, 2021 |
| **15** | Email from Rishi Kukreja dated November 11, 2019 subject: Circuitronix, USA Payment Reconciliation from 1st of April, 2012 until present from Benlinda and ROK and its attachements which include "Benlinda Payment Details CTX-US_2012-2019.xlsx" and "ROK Payment Details CTX-US-HK 2012-2019.xlsx" |
| **16** | Responding email from accounting@benlinda dated November 14, 2019 re:Circuitronix, USA payment reconciliation from 1st of April, 2012 until present for Benlida and ROK and its attachment "2012-2019reconciliation analysis-2019.11.15 CCT.xlsx" |
| **17** | Follow up email from accounting@benlinda dated November 22, 2016 re:Circuitronix, USA payment reconciliation from 1st of April, 2012 until present from Benlida and ROK and its attachment "CTX missing inv. Details.xlsx", "Payment Discrepency(1).xlsx" and Benlinda Shipment and Payment and Payment Details CTX-HK_2012-2019.xlsx" |
| **18** | Payments from Circuitronix, LLC to Jiangmen Belinda details for the period August 2019 through July 2020 |
| **19** | Belinda Complaint Invoice |

**ADDITIONAL DOCUMENTS UTILIZED**

| No. | Document Description |
|---|---|
| 20 | Benlida -- CTX stipulated and so-ordered protective order |
| 21 | CTX -- Ex. 2 exerpts from Ochoa deposition |
| 22 | CTX -- Ex. 3 -- exerpt from deposition of Nicole Donaldson |
| 23 | CTX -- Ex. 4 -- exerpts from Tracy Huang's deposition |
| 24 | CTX -- Ex.5 exerpts from Roger Wu deposition |
| 25 | Ctx -- Ex.6 -- exerpts from Lina Ochoa deposition |
| 26 | CTX -- motion and memorandum in support of summary judgement |
| 27 | CTX motion for SJ; Martinez declaration in support |
| 28 | CTX motion for summary judgement -- statement of facts |
| 29 | Benlida Payment Details CTX-HK_2015-2019 |
| 30 | Benlida Payment Details CTX-US_2015-2019 |
| 31 | Benlida Shipment and Payment Details CTX-HK_2012-2019 |
| 32 | BLDROK SHIPMENTS+PAYMENTS 07.20.2019 |
| 33 | Missing Invoice List |
| 34 | Response email from Rishi Kukreja dated July 30, 2019 to douglas@benlida.com, subject: Final Payment Reconciliation for CTX, HKG, CTXm USA and ROK. "CTX_00004704.pdf" |
| 35 | ROK Payment Details CTX-US-HK_2015-2019 |
| 36 | 01 - 2022年3月财务报表 - Untranslated March, 2022 Financials - Prepared by Jiangmen Benlida Electric Circuit Co., Ltd. |
| 37 | 02 - 2022年6月财务报表 - Untranslated June, 2022 Financials - Prepared by Jiangmen Benlida Electric Circuit Co., Ltd. |
| 38 | 03 - 2022年9月财务报表 - Untranslated September, 2022 Financials - Prepared by Jiangmen Benlida Electric Circuit Co., Ltd. |
| 39 | 2021年12月财务报表(2) - PDF File - Untranslated December, 2021 Financials |
| 40 | 2021年12月财务报表(2) - Excel File - Untranslated December, 2021 Financials |
| 41 | 2022年9月财务报表(1) - PDF - Untranslated September, 2021 Financials |
| 42 | 2022年9月财务报表(1) - Excel - Untranslated September, 2021 Financials |
| 43 | 6月BLD-CCT - Monthly Statement for Delivery Dated:2017.07.10 |
| 44 | 6月HK-CCT对账(BLD) - HK Monthly Statement for Delivery Dated:2017.07.10 |
| 45 | 2017 Statement Reconciliation Dated: January 10, 2018 |
| 46 | Benlida vs CTX Accounting Event Timeline |
| 47 | Email chain between Rishi Kukreja, douglas@benlida.com, tracy@benlida.com, and sourabhs@circuitronix.co.in. Subject: Procedure for Calculating Leadtime Exceedance Penalty Dated: June 16, 2016 through July 14, 2016 |
| 48 | Meeting Minutes dated December 13, 2016 and December 14, 2016 |
| 49 | Benlida Payment Details July 1 2016 ( April Invoices) |
| 50 | 2012 Manufacturing Agreement |
| 51 | 2016 Letter Agreement |
| 52 | Benlida - Circuitronix -- 2nd agreement -- 2016 |
| 53 | Benlida - Circuitronix Contract |
| 54 | Third Amended Complaint and Answer |
| 55 | Benlida Source for Complaint 12_1_20 (2) |
| 56 | Benlida Statement Reconciliation |
| 57 | ROK Statement Reconciliation |
| 58 | CTX_01533295 - Benlida Proforma Cost and Inventory Management |
| 59 | 2022.12.19 -- Circuitronix -- Chauncey Cole Reply Affidavit |
| 60 | 2022.12.19 -- Circuitonix reply re motion to enforce settlement |
| 61 | 2022.12.27; declaration of Tracy Huang in reply re motion to enforce settlement |
| 62 | Benlida v. CTX; declaration of Huang Hanchao |
| 63 | CIRCUITRONIX_ LLC_ D_B Duns Private Company Insight 4876-4235-2965 v.1 |
| 64 | CIRCUITRONIX-LLC_12-23-2022 D & B Report |
| 65 | Email chain exhibits included in 1-13-2023 Motions; Ex. 19, Ex. 20, Ex. 24, Ex. 26, Ex. 27, Ex. 28, Ex. 29, and Ex. 30. |
| 66 | 01 - 21 Benlida Audited Financial Statements(Revised) Benlida Version 11.8.2022 |
| 67 | 2021 Financials - 2021年12月财务报表(2) |

| | |
|---|---|
| **68** | 2022 Part Year Financials 2022年9月财务报表(1) |
| **69** | 2022 Part Year Financials 2022年9月财务报表(1) |
| **70** | Bal Sheet & P&L 2021FY_2022PartYear 2021 Audited financials |
| **71** | Conference call Thursday November 17, 2022 |
| **72** | Copy of Profit and Loss |
| **73** | excel Balance sheet |
| **74** | GAAP Balance Sheet |
| **75** | GAAP P&L |

# Tab - D

# RANDALL M. PAULIKENS

**CPA/ABV/CFF/CITP**

A·J Santye & Co.
ACCOUNTING ▪ TAX ▪ ADVISORY



## SUMMARY

Over 37 years of public accounting experience representing all sizes of clients from small solo practitioner professional practices to large Fortune 50 public companies. Performs all phases of litigation support, including lost profits and damage calculations, business valuations, matrimonial accounting, mergers and acquisitions, criminal (prosecution and defense), bankruptcies, forensic accounting, wrongful death calculations, and discovery. Many years of traditional accounting experience including the taxation and reporting for closely-held businesses and individuals. Involved in feasibility studies of new ventures or acquisitions from initial contact through "closing" both from the buying and selling side. Consults in connection with mergers and acquisitions, buy/sell agreements, compensation arrangements.

**Present Position:**

**Partner**
**A.J. Santye & Co**
36 E. Main Street
Somerville, NJ 08876
908-704-1400. Mobile 732-674-5462

2 Bridge Ave, Suite 522
Red Bank, New Jersey 07701
Email: rpaulikens@santye.com
Website: www.santye.com

September 2022 to Present

**Former Positions:**

**Partner/Managing Principal**
**Forensic Accounting, Litigation Support & Valuation Services**
Friedman LLP
February 2016 to September 2022

**Partner**
Litigation/Valuation/Law Firm Support Services
WithumSmith+Brown
November 1997 to January 2016

**Supervisor**
Litigation Support
Druker, Rahl & Fein
January 1995 to November 1997

**Manager/**
**Network Administrator**
A.J. Santye & Co.
September 1988 to January 1995

**Staff Accountant**
Sidney W. Binder & Co.
September 1986 to September 1988

**Staff Accountant**
Druckman & Hill
January 1986 to September 1986

# RANDALL M. PAULIKENS
**CPA/ABV/CFF/CITP**

---

## CREDENTIALS/EDUCATION

BA degree in Economics, Minor in Physics, *Rutgers University*

Certified Public Accountant (CPA), New Jersey

Accredited Business Valuation (ABV) from the AICPA

Certified in Financial Forensics (CFF) from the AICPA

Certified Information Technology Professional (CITP) for the AICPA

## PROFESSIONAL ORGANIZATIONS/MEMBERSHIPS

American Institute of Certified Public Accountants (AICPA)

New Jersey Society of Certified Public Accountants (NJSCPA)

## TRIAL/ARBITRATION EXPERT TESTIMONY

Catalyst Advisors Investors Global, Inc. v Catalyst Advisor L.P.
(Delaware Superior Court) - 2022

United States v Sergio Ramirez
(United States District Court – Eastern District of New York) 2021

Boyle v Boyle
(Civil Arbitration) 2020

Timothy Tyson, Keith Lyon and James Scandura v. Avara Pharmaceuticals, Avara Pharma Services, Ltd. And Leonard Levie
(Civil Arbitration) 2019

Gene Camali, Nada Camali and Core Fusion v. Paladino, Strike Zone Fitness et al
(Bergen County, NJ) 2019

Sergio Magarik, individually and on behalf of Kraus USA, Inc. v. Kraus USA, Inc., Michael Rukhlin, and Russel Levi
(Nassau County, NY) 2018, 2019

First Manhattan Consulting Group, LLC. v. Novantas, Inc. Andrew Frisbie, Peter Gilchrist and Jonathan West
(Manhattan County Supreme Court, NY) 2017

Zeus Scientific, Inc. v. Alere, Inc.
(Civil Arbitration) 2017

## TRIAL/ARBITRATION EXPERT TESTIMONY - Continued

Northern Star Management v. Castlepoint National Insurance Company
(Civil Arbitration) 2015

Hyundai Wie v. Nelson Rowell et al.
(Federal Bankruptcy) 2014

Silecky Firm v. Squire Sanders & Dempsey
(Civil Arbitration) 2011

Golden v. Golden
(Monmouth County Superior Court, NJ) 2007

Axelrod v. Central Garden & Pet et al
(Monmouth County Superior Court, NJ) 2005

In the Matter of Ketchow
(Monmouth County Chancery Court, NJ) 2005

Gillette Enterprises v. Amboy National Bank
(Middlesex County Superior Court, NJ) 2004

United States Dredging v. Murphy, Gallagher et al.
(Nassau County Supreme Court, NY) 2004

United States v. Joseph Luparella
(Criminal Federal Court) 2004

Cunningham v. Cunningham
(Mercer County Chancery Court, NJ) 2003

Thomas Neary v. Boro of Ridgefield Police Department
(Bergen County Municipal Court, NJ) 2001

Couri v. Couri
(Bergen County Chancery Court, NJ) 2001

Chesed Clothing v. Paul Fedder D/B/A Business Mailing Company
(Ocean County Superior Court, NJ) 2000

**RANDALL M. PAULIKENS**
**CPA/ABV/CFF/CITP**

## DEPOSITION TESTIMONY

Andrew Black, Hans Erik Molberg, Celestino Amore and Dr. Henry Balboa individually and on behalf of Phoenix Holdco, LP v Phoenix Cayman LTD, Vishal Garg, Raja Visweswaran, Nicholas Calamari and Triaxx Holdco, LLC.
Supreme Court of the State of New York
County of New York
Commercial Damages - 2023

Gary Hardwick v Ripple Collective, LLC; Another Green World Productions, Inc. et al
Supreme Court of the State of New York
County of New York
Business Valuation - 2022

Vincent H. Martinez Cienfuegos v Sean Aronsen, David McGrath, Glenco Contracting Group, Inc. Aro Construction Group, Inc.
Supreme Court of the State of New York
County of Westchester
Business Valuation - 2022

Intech Powercore Corporation et al v Albert Handtmann Eltecka GMBH & Co. KG
United States District Court of New Jersey
Economic Damages 2022

United States v Shant Hovnanian et al
United States District Court of New Jersey
Piercing the Trust Veil for Taxes - 2021

Catalyst Advisors Investors Global, Inc. v Catalyst Advisor L.P.
Delaware Superior Court
Valuation for Members Dissolution - 2021

Estate of Kentos v Richard D. Schibell, Esq., Schibell & Mennie, LLC, Schibell, Mennie & Kentos,
Monmouth County, NJ
Valuation for Shareholder Dissolution - 2021

Timothy Tyson, Keith Lyon and James Scandura v Avara Pharmaceuticals, Avara Pharma Services, Ltd. And Leonard Levie
Arbitration
Valuation for Shareholder Dissolution - 2019

US National Bank Association v. 2150 Joshua's Path et al
United States District Court
Eastern District of New York
Analysis of Trial Demonstratives - 2019

**DEPOSITION TESTIMONY - Continued**

Shinnick v STIGroup, Inc., et als
Bergen County, NJ
Valuation for Shareholder Dissolution - 2019

Sergio Magarik, individually and on behalf of Kraus USA, Inc. v.
Kraus USA, Inc., Michael Rukhlin, and Russel Levi
Nassau County, NY
Lost Profits/Commercial Damages, 2017 and 2018

DR Music, Inc. and DR Handmade Strings, Inc. v. Cenveo Corporation
Federal Court, District of New Jersey
Lost Profits/Commercial Damages, 2017

First Manhattan Consulting Group, LLC v. Novantas, Inc. Andrew Frisbie, Peter Gilchrist and Jonathan West
New York City
Lost Profits/Commercial Damages, 2017

Northern Star Management v. Castlepoint National Insurance Company
New York City
Lost Profits/Commercial Damages, 2015

Ocasio v. Rutgers University
Essex County, NJ
Lost Wages/Improper Termination, 2014

American Polymers Corporation v. PolyStar Products, Inc. et al.
Central Irrigation Supply, Inc. v. PolyStar Products, Inc et al and Consolidated Cases
Mercer County, NJ
Commercial Damages, 2013

McGee v. Kane et al.
Hudson County, New Jersey
Lost Profits, Commercial Damages, 2013

Paramount Homes at Asbury Park v. Tishman Construction Corp of New Jersey et al.
Monmouth County, New Jersey
Lost Profits, Commercial Damages, 2013

Public Service Electric And Gas Company v. Colonnelli Brothers, Inc. et al.
Union County, New Jersey
Commercial Damages, 2013

**DEPOSITION TESTIMONY - Continued**

Daelim Trading Co v. Giagni Enterprises et al.
United States District Court
Southern District of New York
Commercial Damages, 2013

Frank Leonard v. Claus Joens et al.
Essex County, NJ,
Shareholder Buyout, 2013

Miller v. South Amboy Board of Education
Middlesex County, NJ
Wrongful Termination, 2011

Ravin, Sarasohn, Cook, Baumgarten, Fisch and Rosen, P.C. v. Lowenstein Sandler, P.C.
Morris County, NJ
Lost Profits, Damages, 2009

Donald J. Pliner of Florida v. Carl R. Danziger, Operations Management Service
United States District Court
Southern District of New York
Breach of Fiduciary Duty, CPA Malpractice, 2008

Conoco Phillips v. Alstom Power, Inc.
Union County, NJ
Lost Profits/Commercial Damages, 2008

Entology v. Storch, Jolley, Amell
Morris County, New Jersey
Lost Profits, Breach of Contract, Business Valuation, 2007

Golden v. Golden
Monmouth County, New Jersey
Dispute of Payments, Business Ownership, 2005

Mazza v. NRI Data, Inc.
Mercer County, NJ
Lost Profits, Breach of Contract, Business Valuation, 2004

Bel Fuse, Inc. v. Lucent Technologies, Inc.
Middlesex County, New Jersey
Lost Profits, Breach of Contract, Business Valuation

---

**DEPOSITION TESTIMONY - Continued**

Gillette Enterprises et al v. Amboy National Bank, et al.
Middlesex County, New Jersey
Valuation of Payment Streams, 2004

Dr. Herbert R. Axelrod and Evelyn Axelrod v. Central Garden & Pet Company, Inc.
Monmouth County, New Jersey
Lost Profits, Breach of Contract, Business Valuation, 2003

**PRESENTATIONS**

**Webinars –**

The Knowledge Group
"Practical E discovery Advice for lawyers" – December 2015

WithumSmith+Brown
"Valuation Issues in Startup Companies" - September 2014

Meeker Sharkey
"Disaster Recovery" - February 2012

Accounting Today Institute
"Business Valuation Series FASB 157" – December 2010, May 2011

**Live Presentations-**

Newmark Title Services
CLE Series
"Avoiding Loan Workout Mistakes" – Panelist, June 2021
"Carbon Emissions, C-PACE, Green Financing" Panelist, July 2021

Eastern Monmouth Chamber of Commerce
"Tax and Financial Ideas for the end of 2020" November 2020

Friedman - Continuing Legal Education Programs
"The New Tax Code and Its Impact on The Matrimonial Practice" - 2018

American Academy of Matrimonial Lawyers – New Jersey Chapter
"Navigating COVID Disruptions" – July 2021

New Jersey Society of Certified Public Accountants – State Organization
"Cost of Capital" December 2015
"Ibbotson v. Duff & Phelps" - December 2009
"When Clients Divorce" - October 2009
"Employees – Your Most Important Asset –

---

How to Ensure that they are NOT a Liability" - September 2008
"Myths, Misconceptions, and the realities of the Financial Aspects of Divorce in New Jersey", multiple presentations - 2007, 2008
"Discussion of SSVS #1" - June 2008
"Valuation Tips for Intangibles and Goodwill for Controllers" - September 2007
"Standards of Value"- December 2005

<u>New Jersey Certified Public Accounting Society – Monmouth/Ocean Chapter</u>
"Tips on Recognizing Workplace Fraud" - November 2011
"Helping Clients with Family Owned Business Navigate Intergenerational Transfers" - December 2010
"Round Table Discussion Ibbotson v Duff & Phelps" - November 2009

<u>Jersey Society of Certified Public Accountants– Mercer Chapter</u>
"When Clients Divorce" - November 2010

<u>WithumSmith+Brown– Continuing Legal Education Programs</u>
"Quantifying Damages" - multiple presentations 2010 to 2014
'Reading and Understanding Financial Statements" - multiple presentations 2010 to 2014
"When Clients Divorce-Basic Economics" - December 2010
"Managing Cash Flow in a Professional Practice" - December 2010, March 2012
"Business Valuation Basics" - multiple presentations 2010 to 2012
"Preventing and Detecting Fraud in Not for Profits" - November 2011

<u>WithumSmith+Brown – In House Presentations</u>
"The New IRA Distribution Rules" - December 2001
"Engagement Management" - multiple presentations 2007 to 2013
"Know Your Strength – Supercharge your Marketing Success" - July 2009

<u>WithumSmith+Brown – Annual Partners' Network</u>
"Forensic Investigation – An Introduction, Also Known As Is Someone Stealing From Me?" - June, 2008
"Employees – Your Most Important Asset - How to ensure they are NOT a liability" - November, 2008

<u>Houston Family Law Conference– Houston Law School</u>
"Business Valuation for a Family Lawyer" May 2012, May 2014

<u>Association of Government Accountants – North Carolina Chapter –</u>
"Enabling a Fraudster" - April 2013

**PRESENTATIONS - Continued**

**Live Presentations- (continued)**

New Jersey Institute of Continuing Legal Education –

"Tax Aspects in Business Sales" - July 2013

New Jersey Healthcare Financial Management Association –

"Valuing a Medical Practice" - July 2014

New Jersey State Bar Association

"Round Table – Hot Tips for Litigators" May 2021

"You Thought Cash Was Hard – Try Cyber Currency" March 2019

"Use of Forensic Accountants in Civil Litigation –Panel Discussion" – May 2016

"Hot Tips for Hot Litigators –Panel Discussion" – October 2016

"Valuation of Assets/Tax Implications of Alimony Buyouts" - March 2012

State of Pennsylvania– Audit Training

"Enabling a Fraudster" - April 2012

Association of Government Accountants

"Tips Tipoff and Other Ideas to Recognize Workplace Fraud" - April 2012

Healthcare Management Association NY

"The Legal Aspects of Revenue Cycle Audits" - November 2011

Philadelphia Chapter Certified Fraud Examiners

"Enabling a Fraudster" - February 2012

National Association of Certified Valuation Analysts

"Current Trends in Business Valuation" - December 2008

"Commercial Damages" - July 2006

William Patterson College – Accounting Society

"Forensic Investigation – for College Students" - November 2008

## PRESENTATIONS - Continued

### Live Presentations- (continued)

Raymond James Financial Services

"Financial Fraud – at Home, in the Workplace and the Financial Markets" - September 2009

American Payroll Association – Jersey Shore Chapter

"Developing and Testing Internal Controls for Payroll Professionals"- August 2008

National Association of Trial Executives

"Fraud Prevention, Identity Theft & the Accountable CEO" - July 2011

DFK International -

"Mergers and Acquisitions – So Many Smart People Structured this – So Why Are They Fighting Now?" – May 2017

Central New Jersey Estate and Financial Planning Council

"Valuation Discounts" - December 2006

National Shooting Sports Symposium

"How to Write a Business Plan" - June 2000

Inn of Transactional Attorneys – Bergen Chapter

"How a CPA Can Help a Client Sell Their Business" – October 2016

## PUBLICATIONS

Law 360- "When Should You Rely on Your Company Counsel and When Should You Rely on Your Own" Fall 2016

Commerce Magazine- "Forensic Accounting Roundtable" September 2014

Commerce Magazine- "Forensic Accounting Roundtable" August 2012

New Jersey Society of CPAs Magazine– "The New Economics of Divorce" Jan/Feb 2012

New Jersey Society of CPAs Magazine– "Helping Your Client Measure the Costs of Eminent Domain" July/August 2011

New Jersey Society of CPAs Magazine– "Practical Considerations for Handling Shareholder and LLC Member Disputes" March/April 2011

Whitepaper - "Having Your Cake and Eating It Too", May 2008

Whitepaper – "Managing Cash Flow in a Professional Practice During Economic Downtimes", May 2008

The Journal - "Alternate Methods for Dispute Resolution" Fall 2007

New Jersey Society of CPAs (Website)– "Saving on Auto Insurance Properly" March 2007

The Journal – "A Hasty Agreement Can Lead to Litigation", Fall 2006

The Journal – "What is Your Business Worth?", Fall 2004

The Journal – "Welcome to the Fascinating World of Forensic Accounting", Winter 1999

New Jersey Lawyer – "Lawyers, CPAS Team to Combat Workplace Fraud", July 2004

Proceedings – "Developing a Business Plan" June 2000

The Range Reporter – "On Target With Your Taxes", Winter 2000

The Range Reporter - "The Tax Man Cometh", January/February 1999

Docket/Tab #197-3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
-----------------------------------------x
JIANGMEN BENLIDA PRINTED CIRCUIT CO., LTD.,

Plaintiff, :

- against -

CIRCUITRONIX LLC,

Defendant. :
-----------------------------------------x

1350 Avenue of the Americas
New York, New York

July 20, 2023
9:40 a.m.

EXAMINATION BEFORE TRIAL of RANDALL M. PAULIKENS, CPA/AVB/CFF/CITP, and Expert Witness on behalf of the Plaintiff herein, taken by the Defendant, pursuant to Court Order, held at the above-mentioned time and place, before Michelle Lemberger, a Notary Public of the State of New York.

A P P E A R A N C E S:

MAZZOLA LINDSTROM, LLP
Attorneys for Plaintiff
1350 Avenue of the Americas, 2nd Floor
New York, New York 10019
BY: RICHARD LERNER, ESQ.

A/P J.C. MAZZOLA, ESQ.

Adam Wiener

PODHURST ORSECK, P.A.
Attorneys for Defendant
One S.E. 3rd Avenue, Suite 2300
Miami, Florida 33131
BY: STEPHEN F. ROSENTHAL, ESQ.
Srosenthal@podhurst.com

* * * * *



S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before The Court.



R A N D A L L M. P A U L I K E N S, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

BY THE REPORTER:

**Q. Please state your name for the record.**

A. Randall Martin Paulikens.

**Q. What is your current business address?**

A. 36 East Main Street, Somerville, New Jersey 08876.

EXAMINATION BY
MR. ROSENTHAL:

**Q. Good morning, Mr. Paulikens.**

A. Good morning.

**Q. My name is Stephen Rosenthal. I represent Circuitronix LLC in this litigation.**

A. Okay.

**Q. I know you've been deposed many times before, so if at any point I ask a poor question please ask me to rephrase it and I'll do my best.**



**R. Paulikens**

A. Okay.

**Q. Prior to beginning today, you handed me a USB drive that was produced by you in response to our subpoena for your deposition today?**

A. Yes.

**Q. So I put this into my laptop computer; we're in an office where it is projected on a screen. I want to ask you some sort of housekeeping questions about that before we get into your report and opinions.**

A. Okay.

**Q. So on the drive there's a document --**

A. Can I go up and stand there so I can read the screen?

**Q. Of course. Whatever is comfortable for you.**

A. Thank you.

**Q. There's a folder that is called, Documents sent to counsel for deposition, right?**

A. Yes.

R. Paulikens
deposition or trial or arbitration. Faust never got to deposition, trial or arbitration so it is not listed.
**Q. Have you ever been disqualified or stricken by a court as an expert?**
A. No.
**Q. Has a court ever limited the scope of your expert testimony?**
A. No.
**Q. Has the court ever rejected your expert opinions as unreliable?**
A. No.
**Q. Has your methodology that you've used in your expert reports in other cases ever been deemed unrealistic?**
A. There was a case that my client lost, it was on Long Island. The judge didn't agree with my position. The case is under appeal. I said the company was worth 29 million, the other expert said 6. The judge chose 6.
Shortly after the decision, the company was sold for $103 million in cash plus 50 million in earn-outs. It's under


R. Paulikens
appeal.
**Q. So I think you answered this question. I think you gave that answer to a question that I asked, whether a court had called your methodology unrealistic. Is that what happened in that case?**
A. He was critical of the assumptions and following the forecasts that I made, which turned out to be pretty reliable. But there was criticism and it was written up, I think, in a couple of trade journals and nobody mentioned the sale of the company and the appeal.
**Q. But I guess the question is, do you know whether the Court in that case called your opinion unrealistic or not?**
A. No. I think he thought the forecasts that I relied upon were unrealistic, and I'm not trying to nuance it too much, but I think that's what he said.
**Q. Okay. Has any court ever found that you have relied on considerations that are not appropriate in your opinions?**
A. No, not that I remember.


R. Paulikens
**Q. Okay. When you were first retained in this case, in I think you told us May 2022?**
A. Correct.
**Q. Who were you retained by?**
A. JC Mazzola and Rich -- the two of them. And Mr. Richard Lerner.
**Q. We previously marked your report as Exhibit 144. I'll just refer to it as your report.**
**I'm going to go through this in detail to understand what you've written and your opinions. Okay?**
A. Okay.
**Q. On page 1, the very beginning you say, As part of our retention, we have prepared this response report.**
A. Yes.
**Q. So I'm just going to focus on that part.**
**What else were you retained to do by the Mazzola Lindstrom firm for this case?**
A. Well, as I said, we were initially retained in May of '22, so a little more than


R. Paulikens
a year ago. And we started working on and understanding the issues at hand. And roughly, I think it was mid June we were told the case was settled, pencils down.
So my first portion of my work was, you know, whether it was a consultant or expert, we were going to, you know, prepare some level of analysis for them. Then the case settled, at least --
**Q. Nominally?**
A. -- nominally settled, thank you. And it went quiet until the fall. And then worked on, you know, the enforcement of the settlement action, for lack of a better term, I became involved in the financial analysis. So kind of three distinct portions of work.
**Q. And returning to page 1 of your report, the sentence I read continues to say, We've prepared this response report to the expert report prepared by Barry Mukamal and Mark Parisi, I'm leaving out their acronyms.**
A. Yes.
**Q. So what is a response report in your practice, in general?**

R. Paulikens
A. It's basically, some people call it a response report, some people call it a rebuttal report. But another expert will produce a report that, and this sounds cliche, but we'll respond to, and/or answer or address what we either agree or disagree with that response report. So it's a response to another expert's report.
**Q. Okay. And would you consider this response report to be a full response or a full-throated response or something like that or is it a partial response?**
A. I believe it's a full-throated response to what was included in the four corners of the KM report. So, yes, it would be a full response to that. They had some waivers that they might want to amend in their report, and I also reserve the right to amend as the need arises.
**Q. So you were not instructed, you know, don't touch certain issues that are in the KM report, respond to it in its entirety as best you can?**
A. Yes.


R. Paulikens
**Q. Okay. You were never asked to prepare an affirmative report on behalf of Benlida before the KM report was created?**
A. That's correct.
**Q. Okay. And did you work on this report alone or did you have the assistance of other professionals?**
A. I had assistance of certain professionals, but the lion's share of all the work was done by me.
**Q. And how many other folks helped you with the report?**
A. Probably two people. One of them probably was mostly proofreading type of work, because I always try to have a cold set of eyes proofread. I had a junior, first-year student do some of the accumulations for me. But this particular report I probably did 90 percent of the man hours myself.
**Q. Okay. And the junior person that you mentioned, is that an employee of the company?**
A. Right, yes.


R. Paulikens
**Q. But you said a first-year student?**
A. I'm sorry, I said first-year staff member, I'm sorry.
**Q. Does that person have a professional degree?**
A. He's an accountant, he's a degreed accountant. Bachelor's degree, I think he's sitting for the exam. But we call them first years nowadays as opposed to junior and senior.
**Q. Okay. Just so it is clear, what is that person's name?**
A. I believe it was Michael Barry who helped me on this matter.
**Q. B-A-R-R-Y?**
A. Yes.
**Q. Let me ask you a couple of questions about finances.**
**Your hourly rate that you're charging for your work, I think you listed in your report?**
A. It's 550.
**Q. Okay. And did you charge a flat rate for this report or did you just do it**


R. Paulikens
**hourly?**
A. It's hourly.
**Q. Do you know how many hours you did that went into creating this report?**
A. I haven't looked at my timesheets so I couldn't -- I mean, it's a significant amount of hours, but I couldn't tell you if it's 30 or 50 as I'm sitting here. I haven't looked.
**Q. Do you have those records somewhere?**
A. We have the records, I just don't know them.
**Q. Okay. If we wanted to get those records as part of your total work on this case, can we get those through your counsel potentially?**
A. Potentially. I'll leave it to them what they're willing to produce.
**Q. Do you know the total amount you've been paid so far in this case representing Benlida or working as an expert for Benlida?**
MR. LERNER: Objection.
You could answer.
A. I have to bifurcate the answer. The

R. Paulikens

the invoices, the payments and the debit memos such as they are, there's a certain consistency that up until that subset or subtotal or stopping point, I'm not going to question that.

**Q. Okay.**

A. I later on say, the lead time penalties, you know, is, you know, they calculate them, they recalculate them -- recalculated them, but I'm not necessarily agreeing that they are appropriate or they're valid, because that's a legal question beyond either expert.

And, obviously, the total that KM is showing is the sum of their two numbers. And I'm saying -- all I'm saying is the subtotal here, for purposes of where we are, I'm not going to quibble with but it's only part of the big picture.

**Q. Got it. So just to oil all that down, we'll talk about lead time penalty separately, but for purposes of the reconciliation of accounts receivable through 2019 for Circuitronix U.S., you're not going**



**R. Paulikens**

**to quibble with the 4.7 million figure that KM came up with; is that correct?**

A. Not at this point, no.

**Q. Okay. Well at what point are you going to quibble with it?**

A. If, in fact, we have to -- there comes a need that I have to supplement my report or something else happens between now and trial, I may -- whatever work I do then may change what I'm prepared to say today.

**Q. Okay.**

A. With that caveat, at this moment, the 4.7 million, based on what they did, I can live with.

**Q. As you sit here today, based on all the work you've done to date on July 20, 2023, you have no basis to question the reliability of that figure, 4,760,847 that's listed on the chart on page 5 of your report for the accounts receivable for Circuitronix U.S. through July 2019, correct?**

MR. LERNER: Objection.

A. Right. As I said, as the subtotal or stopping point, yes. Because that's only



R. Paulikens

one part of the whole picture.

**Q. As a subtotal or stopping point, yes, you would quibble with it because it's -- or no, you're not quibbling with it? I want to understand your testimony.**

A. I'm sorry. As a subtotal or stopping point, I'm not quibbling with it as of today.

**Q. Got it. I understand your testimony that it is only a part of the full picture.**

A. That is correct.

**Q. So that's the basis of your criticism, correct?**

A. Correct.

**Q. Okay. And as of today, you're not aware of any other data that would call into question that $4.76 million figure, right?**

A. I'm not aware as I sit here today of other data that could, but it is possible that more data may come up that may materially change that number.

**Q. Okay, but as of now that's just a hypothetical possibility?**

A. It's a possibility. And given the



R. Paulikens

multitude of data exchanges between the parties, it might be a little bit more than hypothetical that there would be data that would change that number. Materially, I don't know.

**Q. Are you aware that discovery in this case has ended?**

A. Understood. But you said what I'm aware of. There could be data that could change the number.

**Q. Okay. So at the bottom of page 5 of your report, the last paragraph, you transition to a different subject. You say -- you write that the KM report does not include any discussion of how common or uncommon it is for a customer to overpay on its account to the level concluded to in the KM report, close quote, right?**

A. Yes.

**Q. I take it from your prior testimony today that you are referring here to what you described as an unusual situation based upon your experience that Circuitronix U.S. had, even according to Benlida's own books, an**

Page 146

**R. Paulikens**

**overpaid situation to the tune of something like $4.7 million; is that right?**

MR. LERNER: Objection.

A. Repeat that? I'm sorry.

MR. ROSENTHAL: I am going to have to ask Michelle to read that back.

(Whereupon, at this time, the requested portion was read by the reporter.)

A. Yes. It's -- that kind of, that magnitude of overpayment is strange or unusual. Sorry, unusual.

**Q. So how is the unusual nature of that situation relevant to how much they have or have not paid? In other words, the fact that it is unusual, that you flagged it in your report, how, if at all, does that relate to the magnitude of that difference?**

A. I'm not following your question, and I'm sorry.

**Q. Let me ask it in a simpler way.**

**The fact that it is unusual doesn't bear on the sort of veracity of the numbers themselves, right? They are what they are?**

Page 147

**R. Paulikens**

A. Okay. It's unusual that you have an overpayment to that magnitude, which would be multiple months of sales. When you have a customer, the customer ordinarily either owes you, meaning the supplier, money, or they don't owe you anything. And even in accounting and auditing, you look for significant overpayments for potential reclassification within the books of the financial statements.

So what I'm saying is, and I'll use a simple example. If your law firm invoiced $9,500 to a client, you would know they owed you 9,500. That's the typical relationship. If they happened to pay your firm 10,000, they would have an overpayment of $500, you know, not a big deal. If they sent $50,000 where you had an over -- your client overpaid you by $40,000, that is unusual, forgetting retainers, for attorneys, you know, for that matter.

That's unusual in a commercial setting where you have that magnitude of overpayment from an unrelated third party to

Page 148

R. Paulikens

a supplier. That's why I thought it was unusual and uncommon.

**Q. And you, in your report, at the top of page 6, you refer to a table on the next page about a prepaid balance.**

A. Yes.

**Q. And there wasn't a table on the next page, so I'm assuming you mean the one below it?**

A. The pagination changed at the very end.

**Q. Okay. And so when you're talking about CTX U.S. maintaining a prepaid balance approaching three to six months of invoices, you're referring to the table immediately below it?**

A. Yes.

**Q. Okay. And that's on page 6 of your report. Correct?**

A. Yes.

**Q. Okay. And you note that KM was silent on this issue, right?**

A. Correct.

**Q. And what is the issue you're**

Page 149

**R. Paulikens**

**referring to?**

A. The issue is how common it is for a third -- unrelated customer to consistently have three to six months of prepayments. And if you look right down the chart you can, you know, take the revenue, divide it by the receivable, and it was anywhere between three and six months. That's very, very unusual in my 30-something years of accounting.

And KM didn't mention it at all, positive or negative. It just -- and it's odd. It's not $500 as in my example with your law firm. It's six months of revenue, consistently, or three to six months of revenue. It's just odd.

**Q. So let me ask you, just so I can follow along, too. We're looking at the chart on page 6 of your report, and you write at the top a source, right?**

A. Um-hum.

**Q. And that's Benlida payment details CTX U.S. 2012 to 2021 V5, right?**

A. Yes.

**Q. I can show you your report, but this**

R. Paulikens
**amount to specific dollars and cents?**
A. Right. And it was circa August, and it's in the exhibit. And it was in the file and it lists out all the payments.
**Q. Do you know why that change occurred?**
A. Why that -- it was concurrent when they were trying to reconcile, you know, grand reconciliation was in the fall of 2019, at least started. And all I'm noting is they started making those payments -- I'm sorry, the payment structure changed at that point in time.
Specific reason why they did it that way, I don't know. But there was a profound change in the way that part of the relationship worked.
**Q. So your understanding was it had something to do with the fact that they were engaged in this reconciliation process at that time?**
A. The change happened concurrently with the reconciliation. If that was the gravamen for, you know, change in the payment


R. Paulikens
structure or there was some other issue, I simply noted there was a significant change in that dynamic of the relationship as they were trying to reconcile.
**Q. So other than your awareness that at the same time there was this reconciliation effort going on between the companies, you're not aware of any other reason, as you sit here today, why Circuitronix U.S. started paying in specific amounts in August 2019, correct?**
A. No, not as I'm sitting here today. Other than the timing, which I discussed in the report. And the fact that it was a significant change, circa August of 2019.
**Q. You are answering my question no, but, yes, you're not aware of any other reason, right?**
A. I'm not aware of any other reason, I'm sorry.
**Q. That's fine. And closely related to this subject, at the very bottom of page 6 of your report, you say -- three lines from the bottom, We also note that much of the Excel**


R. Paulikens
**files were created at around this time when the parties were trying to reconcile the amounts owed to one another, which was in the later half of 2019.**
**What was the point of bringing that up?**
A. It was a profound change in how literally that dynamic of the relationship worked. I didn't speculate in the report that they may have had an agreement that they were going to do things differently. But it was, from my chair, it was just a noteworthy profound change on what was an odd result, which we talked about about a half hour ago as to the relationship.
So something changed in August. And I know they were trying to reconcile.
MR. ROSENTHAL: This is a good point for a break if that makes sense to everybody.
(Whereupon, a brief recess was taken.)
BY MR. ROSENTHAL:
**Q. Mr. Paulikens, we left off before**


R. Paulikens
**lunch on page 6 of your report, we were talking about the analysis you did which showed the rounded payments that were being made?**
A. Yes.
**Q. And then the transition to non-rounded in August of 2019; do you recall that?**
A. Yes.
**Q. Okay. At the bottom of page 6 of your report you say, This is noteworthy.**
A. Yes.
**Q. What is noteworthy? What are you talking about?**
A. The change. Because I talked -- I mean, again, it was flowing from the paragraph above it, when I said in fact it was not until the payments -- not until August 8, 2019 that the payments ceased being rounded even amounts and the payments were made in very specific dollar and cents, and I said this is noteworthy.
**Q. And the noteworthy part is?**
A. The change.

R. Paulikens
**Q. And then you go on to say that, in your view this is consistent with ongoing payments on account. Right?**
A. Yes.
**Q. Can you define for us what payments on account is?**
A. Sure. Typically, when you have an ongoing relationship where you're constantly buying from a vendor, you can wait until you get the invoice that says, you know, $12,123 yadda, and pay it. But frequently, people will simply just send $10,000 or 13,000, even amounts, because they know they're going to owe it and they just send it. That's payment on account. And so that's different as opposed to specific invoice payment.
And when I see round payments like that, when you have an ongoing relationship, that is, I'll say, almost always a payment on account type of relationship.
**Q. Do you know whether there was a payment on account relationship between Circuitronix U.S. and Benlida?**
A. I don't know if they -- I know


R. Paulikens
there's discussion and dispute about that and that there's discussion about when the specific payments may or may not be identified. But the mere fact that for multiple years substantially payments were even 10,000s, that's the data and the actions that are suggestive of payment on account.
**Q. You say in your report that ordinarily it is customary to apply payments on account to the oldest invoice first unless in a timely manner specific invoices are identified, right?**
A. Yes.
**Q. Where is that customary, in your experience?**
A. It's customary in every business that I've been involved in. I mean, sometimes somebody will say, I'm paying these invoices and not this one because I'm disputing it, fine.
But ordinarily, any firm and company I've been in, we apply it to the oldest first. And every business -- I mean, I can't think of a business as I'm sitting here that


R. Paulikens
didn't apply, you know, payments on account to the oldest invoice. Otherwise you get your aging messed up. Because if you don't, your aging is going to have the oldest one still out there which may wreck your debt covenants so it's customary -- it may wreck your covenants with your banks and all.
So you typically pay the oldest one first, FIFO. That's what I've always seen, unless there's specific identification.
**Q. Of invoices?**
A. Of invoices.
**Q. The custom of applying payments on account presumes the existence of an account that the parties both know about, right?**
A. Say that again, please? I'm sorry.
**Q. The custom that you were referring to of paying -- of applying payments on account presumes the existence of an account that both parties know about, right?**
A. Well, an account, yeah, it would presume an obligation. I'm not sure how to answer your question. I mean, normally you don't pay an invoice for no reason. I'm just


R. Paulikens
not following your question, I'm sorry.
**Q. Well, have you had a case where one party applies payment to an account that's different from the one the party that's making the payment thinks that it is making payments towards?**
MR. LERNER: Objection.
A. Repeat that again? Please.
**Q. Have you ever had a case where one party applies payments it receives to an account that is different from the one that the paying party thinks it is making the payment towards?**
MR. LERNER: Objection.
A. When you say have I ever had a case, a litigation matter, not that I can think of on that specific fact. In terms of a broad general question, at some point the totality of the relationship, it would get corrected.
So if there was two affiliates, and I paid a million dollars to one and I should have paid it to another, sooner or later it would get corrected and reconciled. I haven't had a case like that in litigation,

R. Paulikens

and I don't, as I'm sitting here, can't think of just a commercial situation that I became involved in.

**Q. Well, yeah, so let me broaden it. Because you were -- when I said case, you thought litigation?**

A. Yes.

**Q. Let me ask you as broadly as possible. In your experience as an accountant, and as broader than just as an expert advising companies and doing various financial work for companies over your career, have you had a situation, have you ever been aware of a situation where one party was applying payments to an account that's different from the one that the paying party thinks it's making its payments for?**

A. I won't say never, because I've never thought of that. But that situation would wash out in the reconciliation process because then you get the divergent outcomes such as we have here.

We have one -- one is getting favored by payments and another is being



R. Paulikens

starved of payments. Sooner or later if they're related, they're going to try to figure it out.

**Q. I didn't ask you whether in this hypothetical they would wash out or not. I'm just asking you in your experience, have you ever had a situation that you're aware of where one party was applying payments to an account that was different from the one that the party making the payments thought it was making payments toward?**

MR. LERNER: Objection.

A. It's difficult to answer because ordinarily that would be reconciled, fixed in the ordinary course of business. And, again, when you say in your hypothetical, you are suggesting that there's two accounts, I think was your words or two entities, maybe I'm reaching, sooner or later they're going to talk to each other because the disparate treatment is going to get abnormal.

**Q. Can you think of a single example in your experience where this has happened?**

A. No. Because in my experience sooner



R. Paulikens

or later it would have been caught.

**Q. It would be very unusual for it to happen?**

A. It would be unusual and I can't think of one, and ordinarily it would be caught at some point.

**Q. Let me come back to what you were writing about on page 6 of your report that we talked about a few minutes ago, which is this custom of payment on account being applied to the -- on a FIFO basis unless there's a specification of specific invoices.**

A. Yes.

**Q. Is it your intention to offer an opinion in this case that that custom is applicable to the relationship between the parties in this case?**

MR. LERNER: Objection.

You could answer.

A. Because, I mean, a formal opinion, it's customary, again -- let me start the answer again.

To give a formal opinion, I'm unsure. Because it's such a strange -- the



R. Paulikens

payments on account to me is just basic business, that that's norm and I've seen that in every business I've seen in 35 years. So if that's an opinion you're asking, yes, I've seen that. You know, payments on account, apply the oldest one first. I've seen that consistently for 35 years.

If that's the opinion you're asking, yes, that's the opinion I would give on the witness stand.

**Q. Okay. Let me ask you a similar question about the timely specification of invoice exception to that custom.**

**Are you planning to give an opinion in this case whether Circuitronix made timely identification of invoices that it wanted its payments applied to Benlida or not?**

MR. LERNER: Objection.

A. At this point, I don't know that I'm going to give an opinion specifically on what is considered appropriate of a delay. I mean, ordinarily, if somebody is applying a specific invoice -- I'm sorry, a payment to a specific invoice, they would send the check

R. Paulikens

old school and say, invoice 12345. Or they would send wiring instructions with the follow up e-mail in short order so that the recipient knows that that payment is going to be specifically applied.

It's my understanding, as an accountant, that it is up to the recipient to determine how to apply the payment unless specifically instructed by the payor as to where to put the payment. And whether three days, ten days, you know, is a reasonable amount of time that may be acceptable, two, three, four months might become commercially cumbersome.

**Q. I didn't see in your report anything specific about this issue to the facts of this case. In other words, I didn't see you take a position one way or the other on whether or not Circuitronix did or didn't make timely designations of the invoices it wanted its money applied to; is that correct, it's not in your report?**

A. Correct. I didn't specifically take a position on that. I noted that that issue


R. Paulikens

is actually a dispute.

**Q. You're aware of that from reading summary judgment papers?**

A. Right. And there is a dispute, there is a question, it goes back to starting dates, it goes back to everything, because everything gets intertwined. So I'm aware of it and it is a dispute, I didn't take a position on it.

**Q. And you just referenced starting dates so I want to ask you about that. Because in your report on page 7, you say -- you have a sentence and I'm pointing up here, that says, This impacts the starting point of when to start the analysis.**

**What are you referring to when you say this, this impacts?**

A. We were talking about the FIFO arrangement, and I can answer it better perhaps by an illustration.

**Q. Okay.**

A. If you start on day zero and it was a $10,000 invoice, a $9,000 payment there's a running balance of $1,000. And then if


R. Paulikens

there's a $9,000 payment and a $20,000 payment maybe there's an overpayment of 11,000. And that's going to continue on when you're making round payments on account.

And at some point you're going to have at some later date an actual amount due. And if you start with that actual amount due on a date certain, fine, but if you arbitrarily pick July 1, 2018, to pick a date out of the air, and you don't know which one, if they have specific invoice charges or FIFO charges, that starting date balance could be very wrong because depending on where you apply the FIFO payments it may be older invoices due.

You may -- if you decide that you don't want to have payments applied to 2013 invoices by way of illustration, you know, they could still be outstanding, it doesn't change what's due. But I mean, so when you have a dynamic relationship like the receivable and payable relationship between customer and supplier, and you have payments on account or unspecified -- unspecific, you


R. Paulikens

have to be very careful as to where you start your analysis to make sure your beginning starting point is reasonable and even agreed upon. That's what I was talking about there.

**Q. Okay. Given that this is a rebuttal report that you've written, I'm struggling with how that commentary applies to the KM report.**

**Are you saying that they picked an arbitrary start date?**

A. No. What I said was the sentence above it, I said they didn't discuss the issue at all. And so in some aspects of the report they started at 2015, at other aspects they start at 2012.

I know there is a -- there is a debate as to what the starting point has got to do with the statute of limitations. And what I'm saying is, even the charts that are in the report that just showed running balances, in other words, invoices less payments gave you a running balance, we talked about the chart before lunch.

And we just need to know where we're

R. Paulikens

understand as you said earlier, the debate is to who is in the case, who meaning the entity.

**Q. But they say why, they say they're saving it for rebuttal?**

A. Well, why, yes, saving it for rebuttal, yes.

**Q. So they weren't deceptive or tricky as to why they're not revealing that information in their report, right? They said they're reserving it in their rebuttal?**

A. Yes. They said -- they're saying they're reserving it for rebuttal, but they didn't cover that issue. And it's a substantial issue.

**Q. You say in page 8 that, you know, why it is intentionally left out of the KM report is interesting, to use your phrase?**

A. Yes.

**Q. Why did you find it interesting, if you read that they're holding it for rebuttal?**

A. Because the penultimate conclusion of their report that says that a customer has



R. Paulikens

overpaid their supplier by three to six months' sales is an economically very strange occurrence as an accountant, where you don't have overpayments of months of sales.

If you are audited and if you have financial statements, you have to reclass it differently as a negative accounts payable, it would be receivable. It's just an oddity that to look and stop there was such an abnormal inverse relationship to what's the norm, strikes me as odd.

And interesting is why did you stop there? Have you ever seen that in your career that somebody overpays by six months and again, forgetting legal retainers aside.

**Q. You go on to say in that same part of your report, that, To ignore the CTX HK slash Benlida slash ROK issue as KM does makes the entire conclusion of the KM report difficult to accept, close quote. I want to ask you about that.**

**What exactly is the conclusion of the report, as you understand it?**

A. The conclusion of their report is



R. Paulikens

that dependent upon where you stop, Benlida -- I'm sorry, Benlida owes CTX U.S. $4 million or $7.9 million; depending on the final disposition with time penalties, that's a debate and they measured it.

But the issue, as far as our case is the parties are intertwined, and as I said a couple of minutes ago. The commercial relationship where a customer overpays to that magnitude is odd to me when they know there's a claim that a related party is underpaid to an even greater amount. And if we stop there, you're going to -- the economic conclusion doesn't make sense to me.

**Q. When you use the term "it's an untenable theory," right in your report --**

A. Correct. Because you have two entities that seemingly work somewhat in tandem. And you've got a combined commercial relationship that hits the norms and makes perfect sense and are covered on the next page, you know, that said if you net the two, for purposes of this question, they have between three and four months -- about three



R. Paulikens

months of revenue in accounts receivable or payable depending which side, and given that's kind of an ordinary commercial relationship because it takes time to process payments.

So on the combined basis, the commercial relationship makes sense. But the two pieces were so disparate from the norm, it strikes me as odd that they didn't cover it.

**Q. You understand that the authors of the KM report, Circuitronix's experts in this case, may have made a legal assumption that this case doesn't implicate the CTX Hong Kong account, right?**

A. Correct.

**Q. In fact, that's what they did, right, to your understanding?**

A. They may have made a legal assumption or they may have been told to assume that legal assumption. But regardless, the conclusion in their report, knowing they had the data strikes me as curious.

R. Paulikens

**Q. How did you calculate those totals?**

A. That's just added up. So if you look at the first two numbers, so taking 2012 is just an illustration, is $50,844 on the top chart.

**Q. Yes.**

A. And then add that to the 1,168,214 in the middle chart?

**Q. You mean $1,168,214 middle chart number?**

A. Yes. Gives you $1,219,000 and some change.

**Q. And so, basically, for purposes of this part of your report, you added the top chart, which is Circuitronix Hong Kong, the middle chart, which is Circuitronix U.S. and got a total?**

A. Yes.

**Q. Both total invoices, total debit memos, total payments and then the balance?**

A. Running balance.

**Q. And I want to look at what you said about that beneath these charts.**

**I'm paraphrasing, you say that it's**


**R. Paulikens**

**untenable to separate ROK and Benlida, correct? I'll read the specific sentence. You say, quote, To show the untenable position that CTX seeks to do by separating Benlida and ROK, parentheses, where Benlida has been overpaid and ROK has been underpaid, we will combine the two balances to show they're combined, Benlida and ROK have a commercially normal relationship with CTX.**

**Did I read that correctly?**

A. Yes.

**Q. So my first question is, is it untenable to separate ROK out?**

A. It's untenable to separate -- I think it's untenable to try to separate either of the parties from each other because they seem to work together. So all I'm showing here is, on the one hand you got the CTX U.S. that's got a significant overpayment, $9.4 million at the end of 2019. And yet you've got, basically, roughly the same time, CTX Hong Kong underpaid by 13.4.

And I'm just saying, and I talked about this earlier, that's just a very odd


R. Paulikens

relationship. And then you combine them, which is what the bottom did, and it's an illustration that combined is actually a fairly normal typical commercial relationship.

That's why trying to separate one from the other I don't think makes economic sense.

**Q. Let me ask you about the second line where you say, Where Benlida has been overpaid and ROK has been underpaid.**

**Do you see that?**

A. Um-hum.

**Q. Where does it show that ROK has been underpaid?**

A. It doesn't. It would be -- it should be -- it should have said HK was under -- what's the word I'm looking for?

What did you say?

**Q. Go ahead. Mr. Lerner was volunteering something, but thought better of it.**

A. What I'm trying to show in this chart is that when you look at the Hong Kong


R. Paulikens

portion and the CTX U.S. portion, you need to combine them. And perhaps my draftsmanship was imprecise.

**Q. Well, it was wrong, wasn't it?**

A. Imprecise or wrong.

**Q. You made a mistake by saying ROK, didn't you?**

A. It should have said Hong Kong or HK. Because I was trying to show that the two parties -- you can't separate the relationship.

**Q. Okay. But it's also a mistake to say, even if you change it to say, CTX Hong Kong has been underpaid, right?**

A. CTX Hong Kong --

**Q. Because actually you're saying --**

A. Yes.

**Q. -- that CTX Hong Kong is the party that underpaid by $13 million?**

A. Underpaid, yes.

**Q. Right?**

A. Correct.

**Q. So that's another mistake, isn't it?**

A. Yes.

R. Paulikens
Q. And in that chart, at the top of page 5 of your report they actually have transactions between ROK in the right-hand side?
A. Yes.
Q. Do you see that? Not Benlida but ROK.
A. Right, okay.
Q. And the only -- well, I'll leave it at that. Okay.
Having pointed out that distinction between ROK and Benlida for purposes of discussion, coming back to this chart here at the top of page 5 of your report, you didn't use this right-hand side of that chart --
A. No.
Q. -- for anything?
A. No, I did not. It was an illustration that the parties were working to reconcile or resolve whatever dispute they had.
Q. Got it. Globally?
A. Yes.
Q. Okay. On page 11 of your report --


R. Paulikens
let me pause and just read it.
Okay. So in the bottom paragraph, page 11, you say, In the table above at the end of 2018, there's a combined -- a typo there, there is a combined, I think the word there should be -- there's a combined $5.879 million balance, right? Owed by CTX entities to Benlida slash ROK.
Do you see that?
A. Yes.
Q. That should just say to Benlida, right?
A. Correct.
Q. So the ROK is an error, correct?
A. Correct.
Q. You're just literally referring there to these prior charts on the same page?
A. Yes.
Q. Okay. And when you did the calculation of the rough monthly amount volume of purchases of 2.1 or $2.2 million a month, which entities were you deriving that from?
A. The combined invoices highlighted in


R. Paulikens
yellow on the left. It's an illustration, it's 26 million divided by 12.
Q. I understand. But the 26 million number as you've now explained is the product, is the sum of business between Circuitronix U.S. and Benlida and Circuitronix Hong Kong and Benlida, right?
A. Yes.
Q. Did you do a calculation of what the volume of business of Circuitronix U.S. and Benlida was monthly?
A. Monthly, no.
Q. Okay. Would it surprise you if it was roughly the same in the $2 million range or would it be substantially less?
A. Repeat your question again? I'm sorry.
Q. No problem. Essentially, what I'm asking you is, was the monthly volume of business between Circuitronix U.S. and Benlida in the range of $2 million?
A. Circuitronix U.S. and Benlida, for which period, no, because when you look at the invoices in the middle of that chart, it


R. Paulikens
says there was $9 million of invoices. I'm looking at 2015 because that's where my finger is.
Q. Okay.
A. You know, that would be one million or less than one million. So my illustration here was just taking the total, divided by the net receivable, gives you a commercially typical relationship.
Q. I thought that you had previously in your report indicated a monthly, like how many months ahead CTX U.S. was?
A. At one point one of the other charts showed a balance due of $5 million -- of overpayment of $5 million. And I think there was 8 or $9 million of revenue. I said there was six months, perhaps, three to six months, I think. And it was, again, an illustration.
Q. And that was a similar kind of calculation?
A. Yes.
Q. So at the end of page 11 you say, Based on the information in the above table at the end of 2018, there is approximately

R. Paulikens
**2.7 months of purchases that CTX owes Benlida slash ROK for using 2018 purchases as a guide.**
**We should cross out the ROK again, right?**
A. Yes.
**Q. Lead time penalties is the next subject.**
**You acknowledge that KM, in its report, did at least mathematically validate the inputs based upon a judgmental sample for lead time penalties, right?**
A. No. I said they recalculated, approximately, eight spreadsheets. They did not validate the inputs used to calculate it.
**Q. You say the following, Since KM by its own report did not seek to validate the inputs, this claim is unsupported, and you say, Other than mathematically in the KM report?**
A. Right. Because I said in the italics version, they did not validate the inputs used to compute the LTPs.
**Q. So what do you mean when you say,**


R. Paulikens
**Other than mathematically?**
A. Okay. What KM did was they checked the math, and I don't want to be pejorative when I say that, but they went into the spreadsheets and we looked at certain of them and said that, okay, shipment one was ten days late. And there's a lead time penalty of some percentages of sales and they calculated that. And then the chart itself showed ship date, receive date, and it was all formula driven. And it calculated if it was on time or if there was a penalty.
**Q. Right.**
A. And I know that KM did check the math and they said they did it without exception. But they didn't go back to the documents to say, okay, did it really ship on April 1st, was it really received on a date, was there any other reason why the lead time penalty may have been waived, like a specific lead time penalty, not like a group of them, which there was a discussion about.
So they said they checked the math and it was, you know, $4 million for CTX U.S.


R. Paulikens
But they didn't go back to see if Benlida agreed with that or disagreed. Because my understanding is they haven't been asserted, I don't know if that's the right word.
**Q. Okay. So I understand your testimony, what you're saying is, the lead time penalty amounts in the KM report are at least mathematically supported, just not validated based upon the underlying data; is that correct?**
A. Correct, yes. Because they didn't say, no, this lead time penalty is correct, based on receiving docs, shipping docs, whatever. They checked -- they didn't check -- they checked the math, they didn't validate the correctness of the inputs. That's what I understand they say they said.
**Q. And have you looked at their math as well?**
A. We checked some of the worksheets that came there, judgmentally in the math work. So the spreadsheets certainly seemed to be functioning correctly.
**Q. Okay. And the next sentence in your**


R. Paulikens
**report in the middle of page 12 says, We are not aware of any acceptance, rejection or waivers that both parties agreed to other than what is spelled out in the KM report at paragraphs 34 to 36, right?**
A. Correct.
**Q. And that means, as I understand what you're saying, if I understand what you're saying, that where they lay out paragraphs 34 and 36, certain evidence of agreements by Circuitronix to waive lead time penalties?**
A. Right.
**Q. You're not contesting that that happened, correct? In other words, you don't dispute their summary of those waivers of lead time penalties, do you?**
A. I'm not disputing their recitation of that. What I said was, we're not aware that Benlida -- I know there's a section there that Benlida said there is none. And under your finger -- I'm trying to read this upside down.
**Q. You have a copy of it.**
A. I do?

R. Paulikens
entitled to and it's not an insignificant amount of money, suggests there's more to the relationship than meets the eye because $4 million of penalties that could be assessed would be material to the amounts in play here. So it suggests to me, and that's all I'm saying is, there's something here, there's more "here" here.

**Q. The interesting insight into the relationship that you're talking about is the relationship then between Circuitronix on one side and Benlida on the other?**

A. Yes. Because there's that -- there's a significant magnitude of lead time penalties that -- it's a big number.

**Q. I understand.**

A. That's all I'm saying. There's more here.

**Q. But take a look at your report on page 13. You say, quote, This provides an interesting insight into the relationship of the CTX entities close quote. You don't say between Circuitronix on one side and Benlida on the other side?**


**R. Paulikens**
A. Oh.

**Q. Is that a mistake or were you trying to make a different point than what you just testified about?**

A. No, I don't think it was a different point. Maybe it wasn't as clear as it could be. It's just there is more here here.

**Q. Then you say, If the CTX entities are truly separate, and CTX considers Benlida and ROK separate, why does CTX calculate the substantial lead time penalties on the same Excel worksheet file and tabs? There's two things there that I want to ask you about. Two or three.**

**What are you talking about, if the CTX entities are truly separate first?**

A. Well, if the CTX and their relationship with the parties, because there's this big number and we've just covered that. But then if the entity, the individual entities themselves are all separate, meaning ROK is completely separate from Benlida which is completely separate from HK which is completely separate from CTX


R. Paulikens
U.S., this calculation, these worksheets from CTX perspective considers Benlida and ROK the same, because they combined the data, at least from what I can tell they combined the data.

And it's just suggestive that the parties don't keep each other, the individual entities completely separate, there is overlap. And it's just suggestive there's more to the relationship than meets the eye.

**Q. You keep on saying that intriguingly more to the relationship than meets the eye, more than just a business relationship, and it just makes me wonder, like, what are you getting at? I don't know what you're getting at.**

A. Okay. It makes no economic sense to have one related entity have an overpayment of 5 and a half million dollars dependent on the data source, and then another entity that's clearly related that has the complete opposite, that can -- the disparate relationship is odd on an individual basis.

However, as I said the prior page,


R. Paulikens
when you combine them, you actually have a commercially reasonable relationship. And I know it's a legal question.

**Q. Right. I just want to illustrate something to you because it might help keep it clear.**

**Four quadrants, this side is CTX, left side, right side is Benlida. Okay?**

A. I'm with you.

**Q. You got CTX U.S., that's one company, right?**

A. Yes.

**Q. And you've got CTX Hong Kong, that's another company, to your knowledge, right?**

A. Yes.

**Q. On the other side, the Benlida side, you have Benlida is a company, correct?**

A. Um-hum.

**Q. And you've got ROK, correct?**

A. Yes.

**Q. What you just testified about was, I understand it to be at least, the relationship between Circuitronix U.S. and Circuitronix Hong Kong, correct, when you**

R. Paulikens

**saying that CTX LLC is a corporate parent of CTX HK?**

A. No. I'm not trying to say in a strict corporate parent. I'm saying in the way I see the relationship -- the way I understand decisions are being made, there's a control aspect over Hong Kong. Whether it's by direct ownership interest or whether it's by direct shared management. Whether it's by direct other issues, there is some layer of influence and control over CTX. And --

**Q. Over CTX Hong Kong, to be precise? You said over CTX. I'm sorry to interrupt you, but I think you meant over CTX Hong Kong, right?**

A. Yes. So, again, from an accounting perspective, when you see disparate relationships like we're seeing in terms of the receivables, it suggests there's more here than the individual pieces might imply.

**Q. Does that perception that you have as an accountant influence in any way your opinions set forth in the report, and if so**



R. Paulikens

**how?**

A. No. Because as I said in my thesis, it wasn't what was in the KM report and what was not. And these other aspects, such as the HK issue, which we've covered extensively today, you know, suggests there's more to the relationship. And I understand there's legal disputes around it, but in order to get to the full economic appropriate outcome, you might need to consider all of that.

**Q. Okay. And then there's this other dynamic of the relationship between Benlida and ROK. What is your understanding of that relationship?**

A. They're affiliated companies on the Benlida side. One is one factory and there's another factory and I forget the towns that they're located in.

**Q. You are aware that they're across the street from each other?**

A. Yeah, but I mean, there's -- but there's two separate entities.

**Q. And do you consider them separate entities for purposes of your analysis?**



R. Paulikens

A. I think they're separate entities, for my analysis I kind of considered them closely similar. I think their financials were consolidated, but as I'm sitting here, I don't have a perfect recollection of that.

**Q. Well, that last point I need to explore with you. You think that their financials were consolidated. Your whole report is about Benlida's financials. So which financials are consolidated that you're talking about?**

A. I believe the audited financials that we talked about as part of the settlement litigation.

**Q. Earlier in the year?**

A. Earlier in the year, the financials, the audited financials as I'm sitting here, I believe were consolidated financials which include the two, I think, but now I'm not sure.

**Q. Okay. Other than that issue, in terms of the financial intercourse between Benlida and Circuitronix, are you aware of there having been consolidated Benlida ROK**



R. Paulikens

**records, other than the lead time penalty spreadsheets that we looked at a few minutes ago?**

A. No. The consolidated ROK and Benlida documents, not that I am aware of, not that I've seen, that I can recall as I'm sitting here.

**Q. In fact, most of the spreadsheets that we've been looking at today that are in the -- that form the basis for charts in your report are Benlida specific, right?**

A. Yes.

**Q. Okay. On page 13 of your report, in that center paragraph, one of the things you say is that the patterns of payment behavior with rounded even payments starting and stopping at nearly the same time suggests strong operational control and influence that reduces the separation from CTX's perspective.**

**What do you mean by that?**

A. Well, simply, you had two entities, CTX Hong Kong and CTX U.S. that from circa 2012 paid in the same pattern, even $10,000

Page 262

R. Paulikens

rounded payments. Payments on account we discussed. And suddenly at the same time, or contemporaneous, they have a complete 180 -- well, not 180 but a significant change in their payment pattern, suggests that there's, from both of them, suggests that there is some level of influence, control, because they both changed substantially the same time. It's -- so it's, again, it's just that change at the same time with everything else, it's indicative that there's more here than meets the eye.

**Q. So you're drawing the inference from the fact that both Circuitronix U.S. and Circuitronix Hong Kong changed their payment behavior to start paying specific dollars and cents numbers for Benlida's invoices that the inference is that there must be something more to the relationship between Circuitronix U.S. and Circuitronix Hong Kong?**

A. Yes. And as well as the relationship and I understand the legal side that one is not in the case and the other is, understanding that, but, again, all of that

Page 263

R. Paulikens

is interrelated.

So you have a payment series that after multiple years suddenly changes, I think, at a contemporaneous time as they're trying to reconcile receivables and amounts due. And you have one with a big overpayment and another with a big underpayment. You know, it suggests that they are all kind of in the same boat. And I'm not trying to be judgmental to get a legal conclusion in, but there is certainly a relatedness to the group.

**Q. You say at the end of that paragraph on page 13 of your report, that you understand it's a legal issue whether orders placed by CTX Hong Kong were actually placed for CTX U.S., right?**

A. Yes.

**Q. But then you say, However, from an accountant's standpoint, the data clearly supports such a conclusion.**

**How does the data clearly support that conclusion?**

A. Because, again, you've got the end

Page 264

R. Paulikens

result, which is one entity is underpaid by significant amount, the other entity is overpaid, and it's the same type of circuit boards -- same type of circuit boards. And my understanding is, it disputes as to the customers and who can make a decision.

So there's a relationship, obviously, between HK and CTX U.S. that suggests that they are together. And all I'm saying is, we need to take into consideration the totality of everything, you know, the similar payment terms, the similar payment style, you know, the disparate receivable and payable information. All suggests there's more to the relationship than necessarily meets the eye on an individual basis.

**Q. The KM report does not address the issue of whether orders placed by Circuitronix Hong Kong were placed for Circuitronix United States, right?**

A. No, it doesn't. No. The KM report does not discuss that issue.

**Q. I think we've covered everything you say on page 13. We can move on to page 14.**

Page 265

**R. Paulikens**

**So on page 14 at the top end of the first paragraph you note, We reserve the right to recalculate lead time penalties once the necessary data is provided to us, right?**

A. Correct.

**Q. What data do you consider necessary to do that?**

A. As I said earlier, when we accumulated the lead time penalties from the spreadsheets that we received from KM, it didn't tie in, that we could tell, into the report paragraph 35 or 36. I couldn't trace A to B. And they didn't give me a trail to follow, to go from the spreadsheet, you know, stack of spreadsheets, and you know how they got to that because when we accumulated the penalties that you saw on the top right-hand corner, it came out to a different number.

**Q. Let me just ask you something because I'm not sure I understood.**

**We looked on your USB that you brought today that contained -- remember you showed me the 2016 to 2018 lead time penalty spreadsheets which you had copied from Excel**

Docket/Tab #197-4

# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-60125-CIV-SCOLA/GOODMAN

JIANGMEN BENLIDA PRINTED
CIRCUIT CO., LTD.,

Plaintiff,

vs.

CIRCUITRONIX, LLC,

Defendant.
_________________________________/

TRANSCRIPT OF PROCEEDINGS
DEPOSITION OF RISHI KUKREJA

Thursday, June 1, 2023
One Southeast Third Avenue, Suite 2300
Miami, Florida 33131
9:22 a.m. - 7:03 p.m.

Stenographically Reported By:
LAUREL A. MAZUR
Florida Professional Reporter

Kong?
A That is correct.
Q He just kept his India --
A Yes.
Q You are the overall boss of all the global operations, right?
A So my mother is the owner of Circuitronix Hong Kong. Circuitronix -- and through that Circuitronix Shenzhen and Circuitronix Europe, and my mom and my dad were the owners of Circuitronix India. My dad passed away a couple of years ago, and since then the second owner is just for -- yeah, there is a second minority owner just for --
Q Who is that?
A Sounendra Mahapatra.
THE REPORTER: You're going to have to spell that for me.
THE WITNESS: Yes. S-O-U-M-E-N-D-R-A, last name M-A-H-A-P-A-T-R-A.
And I am the owner of Circuitronix Hong Kong, and I manage -- I am the owner of Circuitronix LLC.
BY MR. MAZZOLA:
Q But you manage Hong Kong?
A I manage Hong Kong.

Q Because I hear a lot about Ms. Promila.
A That is my mom, yes.
Q Funny enough though, I have never seen an e-mail in the tens of thousands of e-mails -- we did a search -- for Promila, P-R-O-M-I-L-A. Why is that?
A Same reason why you didn't see a single e-mail from Mr. Huang.
Q She is not on e-mails?
A Yes.
Q But you do do the day-to-day management of Circuitronix Hong Kong?
A I do the day-to-day -- so, as one would appreciate, we obviously rely on managers. Akshay runs the day-to-day operations and he reports to me.
Q You have overall management authority?
A I have overall management authority.
Q And naturally you are authorized to sign documents on behalf of Circuitronix Hong Kong, right?
A I am. But I do want to clarify in the event my mother says I cannot sign a document, I cannot sign a document. I do have the authority, but she has the final authority.
Q Are there any documents in this case that have been signed on behalf of Circuitronix Hong Kong that your mother later said, hey, Rishi, you didn't

have authority to sign that?
A No.
Q So if I look at something -- let's look, for example, at this. This was previously marked as Exhibit 40.
A May I have a copy?
Q It's in those binders.
MR. ROSENTHAL: By the way, JC, when -- if you are going to ask about any documents -- JC? Just housekeeping. This doesn't have numbers 1 through 20 in it because they were the ones you marked during the depositions you took last year. I have a set I think somewhere that I have to get.
MR. MAZZOLA: I don't know if we will use any of them. If we do, it will be nothing of any excitement.
MR. ROSENTHAL: Well, if you do need one send us a copy of it and we will work as we go.
BY MR. MAZZOLA:
Q This starts off with an e-mail. Do you see that?
A Yes.
Q It refers to the secondary agreement, do you see that?
A Yes.

Docket/Tab #198

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-60125-CIV-SCOLA/GOODMAN**

JIANGMEN BENLIDA PRINTED
CIRCUIT CO., LTD.,

Plaintiff,

v.

CIRCUITRONIX LLC,

Defendant,
_____________________________________/

**CIRCUITRONIX, LLC'S OMNIBUS MOTION *IN LIMINE***
**AND INCORPORATED MEMORANDUM OF LAW**

Circuitronix, LLC ("CTX") moves, pursuant to Local Rule 7.1, Federal Rule of Civil Procedure 8(c) and 37(c)(1), Federal Rules of Evidence 401, 402 and 403, and the Third Amended Scheduling Order (DE 153), and requests the Court to enter an Order precluding Benlida from arguing or seeking to introduce evidence at trial concerning the following inadmissible, irrelevant, prejudicial, or otherwise improper subjects, for the reasons set forth herein:

1. Any damages computation beyond that pled in the complaint;
2. Debts Circuitronix (Hong Kong) Ltd., a non-party, allegedly owes to Benlida;
3. Debts barred by the statute of limitations;
4. Records of CTX's account that Benlida did not produce during discovery;
5. CTX's experts' testimony regarding "related party" status;
6. Assertions contradicting Benlida's judicial admissions;
7. References to the parties' other lawsuits or alleged litigiousness;
8. The 2022 settlement agreement and CTX's termination thereof; and
9. Benlida's (or ROK's) entire print-run of invoices.

## MEMORANDUM OF LAW

Benlida should be precluded from arguing or introducing evidence about the following subjects at trial, for the particular reasons discussed for each category.

**1. Any Damages Computation Beyond That Pled in the Complaint**

Benlida should be barred from introducing evidence of its damages computation beyond that pled in the complaint as a sanction for failure to disclose that computation. CTX advanced a similar argument in its Motion for Summary Judgment briefing. *See* DE 184-1 at 3-15; DE 193 (Reply) at 7-8. If the Court grants CTX's summary-judgment motion on Benlida's claim for damages against CTX, then the argument here becomes moot. If, however, the Court finds summary judgment inappropriate as to any part of that claim, the Court should nonetheless prohibit Benlida from introducing evidence or arguing about its calculation of its damages beyond the rudimentary arithmetic it pled in the Third Amended Complaint.

Benlida neglected its obligation to disclose a computation of those damages in contravention of its obligations under Rule 26. A party's initial disclosures must provide "a computation of each category of damages claimed." Fed. R. Civ. P. 26(a)(1)(A)(iii). A party must then supplement or correct the disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A). Benlida ignored these obligations, as it failed to disclose a damages computation in its initial disclosure, and never supplemented its deficient initial disclosure, even though CTX supplemented its damages computation for its counterclaim twice after the stay in this case was lifted, on May 31, 2023 and June 26, 2023 (in advance of Mr. Kukreja's initial and continued depositions, respectively). *See* Ex. 1; Ex. 2.

The only number Benlida mentioned in its initial disclosure of its damages "computation" was the grand total it seeks in its complaint: "$13,655,335.93," not including prejudgment interest, costs and attorney's fees. *Compare* DE 177-1 at 43 (initial disclosure), *with* DE 26 (Third Am. Compl. ("complaint")), ¶ 8. Looking back to the complaint, CTX is able to discern nothing more than that $13.6 million figure is comprised of the sum of the alleged amount of hundreds of invoices Benlida claims to be unpaid ($11,539,408.36) "plus $2,115,927.57" representing an undisclosed summation of a claimed price increase. DE 26, ¶ 437.

That superficial calculation (which is not even contained in Benlida's initial disclosure) is *useless* in the context of this case because, as Benlida has admitted, during the regular course of business, CTX paid Benlida even *more* than the claimed amount of the invoices sent to CTX and even specified to Benlida that those payments should be applied to the very invoices Benlida is claiming remain unpaid. *See* DE 177-1 at 54 (Benlida's Ans. to Interrog. No. 14); Ex. 5 (Tracy Huang Depo. Transcript) at 253:6-254:3, 261:7-262:24; DE 177-6 (Decl. of Lina Ochoa) at ¶¶ 3-6. So the complaint and initial disclosure left CTX completely in the dark as to how Benlida could possibly claim that those invoices could be considered unpaid. Benlida must have been using some secret accounting methodology. What it was Benlida did not say.

Discovery failed to compensate for Benlida's failure to disclose its own damages computation, due primarily to Benlida's obstructionism. Benlida delayed divulging key information about its accounting practice and claimed damages until the tail-end of the discovery period, depriving CTX of an opportunity to take critical follow-up discovery and to engage its accounting experts to review and opine about it.[1]

---

[1] Due to Benlida's delay tactics, CTX did not receive responses to its interrogatories seeking to discover Benlida's accounting methodology and how it applied CTX's payments, until May 17, 2023, just weeks before the close of fact discovery. *See* DE 193 at 8 n.9. CTX had propounded

And what Benlida *did* produce left essential questions unanswered, with discovery closed. Benlida's single spreadsheet of commingled invoices and payments for CTX and CTX-HK does not isolate Benlida's invoices to CTX and payments received from CTX, leaving it a mystery which CTX invoices remained unpaid as of May 31, 2020, the supposed "cut-off date" Benlida used to identify allegedly unpaid invoices for purposes of its complaint. *See* DE 177-1 (Benlida's Interrog. Answer) at 76; Ex. 3 (Wu Depo.) at 45:12-46:4.[2] Had Benlida provided CTX that information, or even just divulged its commingled-FIFO allocation earlier than May 17, 2023, CTX could have engaged its expert accountants to opine on the propriety and

---

an interrogatory in April 2022 asking how Benlida computed the $11.5 million figure the complaint alleged to be "the invoiced amount." *See* DE 185-1 at 5 (No. 4). Benlida delayed in responding until May 17, 2023. *See* DE 192-1, ¶ 2. Benlida's CFO ultimately testified (on May 24, 2023) that the $11.5 million figure actually included records of aggregate invoices from both Benlida *and ROK* to both CTX and CTX-HK. Ex. 3 (Roger Wu Depo. Transcript) at 235:13-237:4. Benlida did not produce any bookkeeping record of how it applied CTX's payments until May 25, 2023, after CTX discovered its existence during the deposition of Mr. Wu. While CTX was able to question the author of that spreadsheet, Ms. Chen, the next day, CTX had to wait to question the CFO about it until July 12, 2023, during a follow-up deposition, limited to one hour. Benlida's refusal to produce its witnesses in Florida for depositions as noticed in March and April 2022, *see* DE 66 at 2, deprived CTX of the opportunity to question Benlida's witnesses about its damages until this compressed time frame in May 2023 after the stay in this case was lifted.

[2] We say "supposed" because Benlida's own testimony about the date it used to calculate which invoices remained unpaid was inconsistent. Its bookkeeper who maintained the commingled spreadsheet testified that in December 2020 she applied a payment reflecting that the invoice from December 21, 2018—the one immediately preceding the earliest invoice listed in the complaint—was fully paid. Ex. 4 (Chen Zhanjiao Depo. Transcript.) at 124:20-125:21 (explaining Ms. Chen's process in inputting payments and confirming the last fully paid invoice from December 21, 2018), 129:7-20 (indicating she marked that invoice as fully paid in December 2020). The unpaid invoices in her spreadsheet correspond to the invoices Benlida lists in the complaint as unpaid.

It is difficult to square that testimony with Benlida's CFO's testimony (which is consistent with Benlida's interrogatory answer) that it calculated which invoices were unpaid as of May 31, 2020. If that is true, how is it possible that seven months later, Ms. Chen was still working on Benlida's accounting record for CTX, and only making the allocation that designated the December 29, 2018 invoice as unpaid in December 2020? That remains completely unclear, and Benlida has (despite request) not produced a version of its spreadsheet as of May 31, 2020.

implications of that practice. Because Benlida did not comply with its discovery obligations, CTX has been deprived of the opportunity to have its accounting experts study the issue and formulate opinions about it that can be used at trial.

Nor did Benlida disclose how it computed the figure of $2,115,927.57 for "price increases." DE 26, ¶ 437. CTX had propounded an interrogatory in April 2022 specifically asking how Benlida computed this figure. *See* DE 185-1 at 5 (No. 3). Benlida delayed answering until May 17, 2023. *See* DE 192-1, ¶ 2. Rather than disaggregating the figure for CTX only, as the interrogatory requested, Benlida answered with combined figures for CTX and CTX-HK. Ex. 5 (Huang Depo.) at 47:2-48:2. Ms. Huang testified that the figure derived from a spreadsheet it had sent to CTX in 2019 stating the amount was $3.3 million, but Benlida later discovered that its figure was overstated by one-third, and the correct number was $2.11 million. *Id*. at 51:16-25. Benlida never revealed that error until it served its interrogatory answer on May 17, 2023. *See id.* at 52:1-6. While CTX was able to locate that spreadsheet during Ms. Huang's deposition, with some difficulty, *see id.* at 106:4-108:25, 129:14-135:12, 140:8-141:1, CTX remains in the dark about how Benlida computed the reduction from $3.3 million to $2.11 million.

The rules provide for a sanction where a party fails to make required disclosures and to supplement them: "the party is not allowed to use [the undisclosed] information … at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The Court should impose that evidentiary sanction here. First, there is no justification for Benlida's failure to comply with this basic disclosure obligation. Indeed, when Benlida may have had a last-gasp opportunity to proffer one, in response to CTX's summary-judgment motion, it passed. *See* DE

193 at 7. The unjustified omission appears to have been deliberate[3] because, during the course of the parties' business dealings before this lawsuit, Benlida *knew* that even though CTX expected Benlida to apply its payments on invoices in the manner specified on the monthly payment details CTX sent to Benlida, Benlida was nonetheless secretly applying the funds in a vastly different manner. *See* Ex. 5 (Huang Depo.) at 253:6-254:3, 324:11-325:14, 326:5-327:3; Ex. 3 (Wu Depo.) at 69:2-16.

Second, the non-disclosure has not been harmless, for the reasons discussed above.[4] Had Benlida timely disclosed its computation methodologies, CTX could have used the discovery process to explore it and its forensic accounting experts to address it. This is precisely the kind of deprivation that has recently been recognized as harmful under Rule 37 by Judge Altman and the Eleventh Circuit. *See Vital Pharms., Inc. v. Monster Energy Co.*, No. 19-60809-CIV-ALTMAN/Hunt, 2020 WL 13513442, at *2 (S.D. Fla. May 19, 2020) ("Because the Plaintiff … failed to disclose its damages computation, the Defendants are in the unenviable position of having to guess at … the methodology the Plaintiff will use for computing … damages. Worse, the Defendants had no opportunity to test the Plaintiff's theory in discovery—by, for example, requesting relevant evidence, developing targeting expert testimony, or subjecting the Plaintiff's theory to scrutiny."), *aff'd*, *Vital Pharms., Inc. v. Monster Energy Co.*, No. 21-13264, 2022 WL 3083273, at *3-4 (11th Cir. Aug. 3, 2022).[5]

[3] Not by counsel, but by Benlida, whom we presume was aware of its disclosure obligations.

[4] The Court has discretion to impose a sanction under Rule 37 even if it does not find Benlida's omission to have been unjustified or harmful. *See Circuitronix LLC v. Kinwong Electronic (Hong Kong) Co. Ltd.,* 993 F.3d 1299, 1308 (11th Cir. 2021).

[5] *See also Circuitronix*, 993 F.3d at 1308 (affirming exclusion of damages for lost profits in breach of contract claim for failure to disclose a damages computation); *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1221–22 (11th Cir. 2010) (affirming exclusion of damages evidence

Accordingly, the Court should preclude Benlida from introducing evidence or arguing about its computation of its claimed damages beyond the rudimentary numbers it pled in its Third Amended Complaint. The only exception should be a reduction in its claim by the amounts which it expressly represented in a recent submission "are withdrawn." DE 188 at 11 n.8.[6]

**2. Debts CTX-HK Allegedly Owes to Benlida**

Benlida has sued one company, Circuitronix, LLC ("CTX"), yet its complaint seeks damages for alleged non-payment of numerous invoices sent to a different company, Circuitronix (Hong Kong) Ltd. ("CTX-HK"). *See* Ex. 5 (Huang Depo.) at 26:13-27:7 (acknowledging they are different companies). As CTX has explained in detail in its motion for summary judgment, Benlida never pled any theory by which CTX could be held legally responsible for debts of CTX-HK; indeed, the complaint does not even *mention* CTX-HK at all. *See* DE 184-1 at 4. Benlida has since sought to rely on two unpled theories: agency and alter ego. DE 188 at 2, 4, 6-10. Benlida should be estopped from doing so because it failed to plead these theories.

---

due to Plaintiff's failure to disclose a computation of those damages); *City of Rome v. Hotels.com, L.P.*, 549 F. App'x 896, 905 (11th Cir. 2013) (same); *Ctr. for Indiv. Rights v. Chevaldina*, No. 16-cv-20905-EGT, 2018 WL 2432109, at *10-11 (S.D. Fla. May 30, 2018) (precluding a party from introducing "any evidence of damages" under Rule 37 based on her "fail[ure] to timely disclose here computations for actual damages"); *Boldstar Tech., LLC v. Home Depot USA, Inc.*, No. 07-80435-CIV, 2008 WL 11320010, at *2 (S.D. Fla. Feb. 28, 2008) (stating "parties must perform 'some analysis' and cannot rely on general statements" to comply with their Rule 26 obligations) (citation omitted).

[6] Benlida stated that paragraph 13 of its complaint, which claimed $34,608.09 was unpaid on an invoice to CTX (DE 26, ¶13), should be reduced to $13,548.66, and that Benlida's claims directed to the first three invoices to Circuitronix (Hong Kong) Ltd. ("CTX-HK") "are withdrawn." DE 188 at 11 n.8 (citing TAC, ¶¶ 261, 262, 263). The amounts Benlida had claimed on those three invoices are $96,396.08, $82,678.18, and $30,611.09, respectively. *See* DE 26, ¶¶ 261, 262, 263.

Because CTX has briefed this precise argument in detail in its summary-judgment papers, it respectfully refers the Court to that discussion. *See* DE 184-1 at 7-8; DE 193 at 1-4.

Beyond the pleading deficiency, Benlida's reliance on a 2014 "Business Authorization" letter signed by CTX's CEO, Rishi Kukreja, cannot support an agency theory. As a matter of law, whatever the scope of the promise made in the 2014 document, it was superseded by a 2016 contract between the parties, which contains an integration clause that obviates any prior agreements (other than the 2012 Manufacturing Agreement). *See* DE 177-1 (2016 Letter Agreement) at 3, ¶ 6; DE 184-1 at 9-11 (explaining the effect of the integration clause); DE 193 at 4-5 (same).

Without any legal basis in the case to make evidence or argument about CTX-HK's debts to Benlida relevant to the claims Benlida has asserted against CTX, that subject should be excluded. *See* Fed. R. Evid. 401, 403. That prohibition would extend to a number of documents Benlida may seek to introduce, such as (a) invoices it sent to CTX-HK and (b) two documents from CTX-HK's outside auditing firm stating debts owed to Benlida.[7] For the same reasons, Benlida should also not be permitted to introduce evidence or argue about two additional subjects: (c) that CTX and CTX-HK somehow operate as the same company, and (d) the 2014 Business Authorization authorized Benlida to look to CTX to pay CTX-HK's debts.

[7] As to one of the documents in category (b) there is a separate reason for its preclusion. During the deposition of CTX's accounting experts on July 31 and August 1, 2023, Benlida's counsel utilized two documents that Benlida had not produced during discovery, letters from CTX-HK's outside auditor firm, marked as deposition exhibits 162 and 163. Deposition exhibit 162 is dated August 18, 2022, but Benlida did not produce it during discovery, despite CTX having propounded a request for Benlida to produce "[a]ll documents … that Benlida may use to support its claims or defenses." DE 192-3 at 6 (No. 1). The fact-discovery period ended on June 8, 2023. DE 153 at 1. On June 20, 2023, Benlida served CTX with its Local Rule 26.1(e)(7) notice of completion of production. Because Benlida neglected to produce the August 18, 2022 document during discovery, it should be prohibited from using or referring to it at trial.



**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Fort Lauderdale 954.463.4346 | www.podhurst.com

**3. Debts Barred by the Statute of Limitations**

CTX has been able to discern that a substantial portion of the amount Benlida is suing for is barred by the applicable statutes of limitations.[8] CTX has asserted a statute of limitations defense. DE 34 at 4. The limitations period for a breach of a written contract is five years and for account stated, four years. §§ 95.11(2)(b), (3)(k), Fla. Stat. Benlida filed suit on January 19, 2021. DE 1. Therefore, any debts that were due before January 19, 2017 fall outside the statute of limitations for Benlida's account stated claim (Count II), and any debts that were due before January 19, 2016 fall outside the statute of limitations for Benlida's breach of contract claim (Count I).

It is now apparent that Benlida has calculated its damages using a start date of the beginning of the parties' business relationship from at least as far back as 2012. Benlida's CFO testified that Benlida calculated the claimed amounts owed by looking back even to 2011. Ex. 3 (Wu Depo.) at 235:5-12. Benlida's expert, Mr. Paulikens testified that "CTX-HK underpaid by $13.5 million." Ex. 6 (Randall Paulikens Deposition Transcript) at 183:23-24. He based that conclusion on the following chart in his report, which identifies a balance due of $13,492,823.58 by looking back to 2012:

[8] CTX was unable to discern what alleged debts fell outside the statutes of limitations at the time it filed its motion for summary judgment (on June 10, 2023). *See* DE 178 at 15; *see also* DE 184-1 (version with ECF citations) at 15. But after Benlida disclosed its rebuttal expert (on July 8, 2023) and CTX deposed him (on July 20, 2023), it became ascertainable.



**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Fort Lauderdale 954.463.4346 | www.podhurst.com

**Source Benlida Shipment and Payment Details CTX-HK_2012-2019**

| | | | | | | Payment Type | |
|---|---|---|---|---|---|---|---|
| Payment Detail Year | Total Invoices | Total Debit Memos | Total Payments | Balance Due/(Credit Balance) | Cummulative | Non rounded | 000s |
| 2012 | $ 50,844.68 | | $ - | $ 50,844.68 | $ 50,844.68 | | |
| 2013 | $ 663,041.04 | $ (39,550.39) | $ 242,827.24 | $ 380,663.41 | $ 431,508.10 | 7 | |
| 2014 | $ 2,127,957.19 | $ (15,911.64) | $ 776,987.44 | $ 1,335,058.11 | $ 1,766,566.20 | 4 | 3 |
| 2015 | $ 4,866,595.96 | | $ 3,959,983.86 | $ 906,612.10 | $ 2,673,178.30 | 5 | 15 |
| 2016 | $ 7,449,167.92 | | $ 5,572,718.50 | $ 1,876,449.42 | $ 4,549,627.72 | 5 | 23 |
| 2017 | $ 7,095,140.71 | | $ 4,405,490.00 | $ 2,689,650.71 | $ 7,239,278.43 | 1 | 24 |
| 2018 | $ 9,451,795.08 | | $ 4,555,000.00 | $ 4,896,795.08 | $ 12,136,073.51 | 0 | 22 |
| 2019.01-07 | $ 3,602,117.12 | | $ 2,245,367.06 | $ 1,356,750.07 | $ 13,492,823.58 | 7 | 8 |
| | $ 35,306,659.70 | $ (55,462.03) | $ 21,758,374.10 | $ 13,492,823.58 | | 29.00 | 95.00 |

Source
Benlida Shipment and Payment Details CTX-HK_2012-2019
Original creation date 11-1-2019

*See* Ex. 7 (Paulikens Report) at 8 (rectangles added); Ex. 6 (Paulikens Depo.) at 65:12-71:22 (discussing his reliance on this chart for the $13.5 million figure); *id*. at 183:14-24. The source of data for the amounts in this chart for invoices, payments, and balance due was Benlida's own accounting department.[9] As can be seen from the chart (and the one in the footnote below),

[9] The Paulikens report listed as his source for this chart an Excel spreadsheet entitled "Benlida Shipment and Payment Details CTX-HK_2012-2019." *See* Ex. 6 (Paulikens Depo.) at 70:3-71:22 (identifying the native Excel spreadsheet which was marked as deposition exhibit 146). Deposition exhibit 146 (attached as Ex. 8 hereto) contains this summary table:

| Payment Detail Year | Total Invoices | Total Payments | Balance Due/(Credit Balance) |
|---|---|---|---|
| 2012 | $ 50,844.68 | $ - | $ 50,844.68 |
| 2013 | $ 623,490.65 | $ 242,827.24 | $ 380,663.41 |
| 2014 | $ 2,112,045.55 | $ 776,987.44 | $ 1,335,058.11 |
| 2015 | $ 4,866,595.96 | $ 3,959,983.86 | $ 906,612.10 |
| 2016 | $ 7,449,167.92 | $ 5,572,718.50 | $ 1,876,449.42 |
| 2017 | $ 7,095,140.71 | $ 4,405,490.00 | $ 2,689,650.71 |
| 2018 | $ 9,451,795.08 | $ 4,555,000.00 | $ 4,896,795.08 |
| 2019.01-07 | $ 3,602,117.12 | $ 2,245,367.06 | $ 1,356,750.07 |
| | $ 35,251,197.67 | $ 21,758,374.10 | $ 13,492,823.58 |

That table was prepared by Benlida's accounting department in 2019 and sent to CTX contemporaneously. *See* Ex. 9 (deposition exhibit 87 (email showing first attachment as "Benlida Shipment and Payment Details CTX-HK_2012-2019.xlsx")). The email states, "[p]lease … see attachment 'Benlida Shipment and Payment Details CTX-HK_2012-2019' *for our records* of the transactions between Benlida and CTX-HK." *Id*. (emphasis added). Benlida's

Benlida has counted the balances it claims CTX-HK owes it from years *before* the statutes of limitations.

Drawing directly from that source, the claimed debts that were due outside the statutes of limitations can be calculated as follows:

| Year | Balance Due ($) | | |
|---|---|---|---|
| 2012 | 50,844.68 | | |
| 2013 | 380,663.41 | | |
| 2014 | 1,335,058.11 | | |
| 2015 | 906,612.10 | 2012-2015 (outside 4-year SOL) => | 2,673,178.30 |
| 2016 | 1,876,449.42 | 2012-2016 (outside 5-year SOL) => | 4,549,627.72 |

In other words, Benlida is relying on $4,549,627 of debts that became due outside the statute of limitations for its account stated claim and $2,673,178 of debts that became due outside the statute of limitations for its breach of contract claim.

Applying the bar of the statutes of limitations to Benlida's claims must take into account the way in which Benlida designated which invoices in the complaint are unpaid. Benlida used a commingled-FIFO accounting methodology, in which it combined the debts to and payments received from CTX and CTX-HK to allocate payments from both companies to the combined claimed debt total.[10] Then, using its commingled-FIFO methodology, it designated the invoices chronologically (after the ones that had been fully paid) as "unpaid" for purposes of this lawsuit. *See* DE 177-1 at 66 (Ans. to Interrog. No. 1). In other words, the sued-upon invoices are only "unpaid" because Benlida applied the money CTX (or CTX-HK) had paid towards them to earlier invoices Benlida had issued to either company. Therefore, to take the statutes of

bookkeeper, Ms. Chen, sent the email. Ex. 4 (Chen Depo.) at 152:22-154:7 (adding, "my job was to do a comparison between our own records … and [CTX's] records").

[10] *See* Ex. 5 (Huang Depo.) at 248:11-22, 249:6-18; Ex. 3 (Wu Depo.) at 184:23-185:5, 186:4-15, 189:17-20, 193:4-7.

limitations into account, it is necessary to add up the stated values of the invoices in the complaint, in chronological order, until they approach, first, the amount barred by the four-year statute of limitations for a breach of contract claim ($2,673,178).[11] CTX has added up those invoices in chronological order, and the affected (time-barred) invoices are paragraphs 13-36 (invoices to CTX) and paragraphs 261-282 (invoices to CTX-HK). *See* Ex. 10 (CTX's "TAC Invoices Affected by SOL" Chart).[12] The invoices that add up to that amount rely on debts that were due before that statute of limitations, so evidence and argument concerning those invoices should be excluded from trial on Benlida's breach of contract claim.

Similarly, the summation of the invoice amounts must continue up to the amount barred by the shorter four-year statute of limitations for an account stated claim ($4,549,627). That extends the span of time-barred invoices for that claim to paragraphs 13-66 (invoices to CTX) and paragraphs 261-298 (invoices to CTX-HK).[13] Since those invoices rely on debts that were due before that statute of limitations, evidence and argument concerning those invoices should be excluded from trial on Benlida's account stated claim.

**4. Records of CTX's Account That Benlida Did Not Produce During Discovery**

CTX sought during discovery Benlida's records of CTX's account with the company.[14] Benlida did not produce any ledgers or spreadsheets showing that account until the final weeks

[11] If the Court grants CTX's motion for summary judgment and excludes CTX-HK invoices, then the summation should be done solely against invoices to CTX in the complaint, as to each cause of action (account stated and breach of contract).

[12] The total of those affected invoices is $2,623,608.96.

[13] The total of those affected invoices is $4,520,901.24.

[14] *See*, *e.g.*, Ex. 11 (1st Set of RFP), No. 11 ("All documents showing how Benlida allocated payments from CTX to specific invoices."); No. 14 ("All documents … regarding debts

of the discovery period, in late May 2023. Benlida's CFO, "Roger" Wu, testified that Benlida maintained two sets of records of CTX's account, one separate for CTX, and one combined with CTX-HK. Ex. 3 (Wu Depo.) at 212:1-6. He testified that the segregated account records existed on a computer system called "Jindie." The other, an Excel spreadsheet maintained by Ms. Chen, a bookkeeper in the Finance Department, which commingled CTX's account with that of CTX-HK, was produced on May 24, 2023. When CTX pressed Benlida to produce historical records of CTX's account from the Jindie system, Benlida through counsel represented that they did not exist save for what had been extracted from time to time and transferred to continually updated spreadsheets and emails. *See* Ex. 12 (Letter from R. Lerner to S. Rosenthal dated June 5, 2023) at 3. Similarly, when Benlida sought historical versions of Ms. Chen's spreadsheet, Benlida demurred that none exist because the spreadsheet was updated on a rolling basis. *Id.* at 1.

Consistent with Benlida's representations, and because CTX has been denied access to such records, Benlida should not be permitted to introduce any unproduced documents or testimony based on such documents concerning the status of CTX's account in Benlida's records.

**5. CTX's experts' testimony regarding "related party" status**

During the deposition of CTX's accounting experts, Benlida's counsel repeatedly inquired about factors that might inform whether CTX and CTX-HK are "related parties" from an accounting perspective.[15] CTX's experts did not include any opinion on this subject in their report—which was directed at CTX's counterclaim against Benlida only—and indeed deferred any analysis regarding non-parties, CTX-HK and ROK, to an anticipated rebuttal report that they

---

allegedly owed by CTX to Benlida, or debts owed by Benlida or ROK to CTX or CTX-HK."); No. 16 ("All documents … regarding payments received from CTX.").

[15] Parisi's and Mukamal's deposition transcripts are not yet available. Counsel for CTX can supplement this filing with relevant pinpoint citations once the transcripts become available.

never had the opportunity to assemble because Benlida failed to disclose an initial report. CTX's experts' testimony in response to this line of questioning should be excluded as not relevant under Rule 401 and/or likely to confuse or mislead the jury under Rule 403.

Because the factors that might inform whether corporate parties are "related" for *accounting* purposes are distinct from the *legal* factors pertinent to establishing a principal-agent relationship, alter ego status, or corporate control, the testimony is irrelevant to any of the claims or defenses Benlida might seek to make—specifically, that CTX-HK is CTX's agent or alter ego, *see* DE 188 at 2-13. *See In re Seroquel Prod. Liab. Litig.*, No. 6:06MD1769-ORL-22DAB, 2009 WL 223140, at *5-6 (M.D. Fla. Jan. 30, 2009) (excluding evidence about foreign labeling and regulatory action related to a pharmaceutical drug because it had no relevance to the applicable warning standards in plaintiff's main case and, more specifically, the "legal standards applicable under Florida law") (citing *Deviner v. Electrolux Motor, AB,* 844 F.2d 769, 771 n.2, 773 (11th Cir. 1988)), *aff'd,* 601 F. Supp. 2d 1313 (M.D. Fla. 2009).

Additionally, such testimony—even if it is limited to the accounting context—is likely to confuse jurors and possibly even cause them to conflate the *legal* standards related to corporate relationship and control with those of the accounting industry. Courts in this Circuit have excluded evidence in similar circumstances, where the proffered evidence is likely to cause confusion or mislead a jury because it speaks to a concept or principle in one context that is ostensibly similar but actually distinct from a specific legal concept or standard in the different context of the litigation. *See, e.g.*, *id*; *Montgomery v. Brickell Place Condo. Assn, Inc.*, No. 11-24316-CIV, 2012 WL 1203837, at *1-2 (S.D. Fla. Apr. 11, 2012) (Goodman, J.) (excluding EEOC letter finding "reasonable cause" to believe discrimination occurred given that the EEOC's standard of proof on that finding was "less than … the standard necessary to prevail in a



**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Fort Lauderdale 954.463.4346 | www.podhurst.com

civil trial, [and] the EEOC letter may sow confusion as to the proper burden of proof and mislead the jury as to what weight it should give the EEOC letter"); *Aetna Cas. & Sur. Co. v. Gosdin*, 803 F.2d 1153, 1160 (11th Cir. 1986) (noting that "the different standards of proof between a criminal prosecutorial decision and a civil case might mislead the jury"); *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1347-48 (5th Cir. 1978) (excluding guilty plea where auto driver admitted he "did cause the death of" plaintiff's husband due to the risk of confusion it would create with the concepts of legal cause and duty in the context of the "second collision" doctrine which was central to plaintiff's suit).

Testimony regarding "related party" status in the accounting context should be excluded because, far from being "essential to proving [Benlida's] claim," it at best "is intended merely to bolster" Benlida's argument that CTX-HK's transactions should be factored into any determination of Benlida's damages in the case. *Brown v. Davis*, 656 F. App'x 920, 922 (11th Cir. 2016) (explaining that testimony that is "intended merely to bolster a party's case is more easily excluded under [Rule] 403 than testimony that forms a critical part of the case). That such testimony would almost certainly be duplicative of other witness or documentation Benlida will seek to introduce in an effort to show that CTX and CTX-HK are generally "related" provides further support for exclusion. *See* Fed. R. Evid. 403 (providing for exclusion based on danger of "needlessly presenting cumulative evidence" outweighing probative value of evidence); *Noel Shows, Inc. v. U.S.*, 721 F.2d 327, 330 (11th Cir. 1983) (excluding evidence under Rule 403 because "its confusing and cumulative effect substantially outweighed its probative value" where the appellant had sought to introduce it for the same proposition that multiple witnesses had already testified to).

To avoid the risk that this irrelevant and potentially confusing testimony regarding "related party" status from CTX's experts "may be assigned talismanic significance in the eyes of lay jurors," *Frazier*, 387 F.3d at 1263, the Court should exclude their deposition answers in response to questioning regarding "related party" status in the accounting context and disallow similar questioning to elicit such testimony at trial.

**6. Assertions Contradicting Benlida's Judicial Admissions**

Based on Benlida's admission in its answer to CTX's counterclaim, Benlida should be precluded from arguing at trial that (a) CTX-HK was not made a party to the Manufacturing Agreement between Benlida and CTX in the 2016 Letter Agreement or (b) Benlida never instructed CTX to divert any payments for Benlida invoices to ROK. The applicable allegations in the counterclaim and Benlida's answer thereto are:

| CTX's Counterclaim [DE 34] | Benlida's Answer [DE 43] |
|---|---|
| ¶ 3: "The parties subsequently entered into a Letter Agreement, dated July 21, 2016, that added Circuitronix Hong Kong, Ltd. ("CTX-HK") as an additional party to the Manufacturing Agreement, among other things." | ¶ 3: "Admit." |
| ¶ 30: "In some cases, Benlida has instructed CTX to make payments for Benlida invoices to its affiliate, ROK." | ¶ 30: "Admit." |

Based upon the parties' Local Rule 7.1(a)(3) conferral, CTX understands that Benlida *does not contest* this aspect of CTX's motion. For the sake of completeness, we note that these binding admissions would preclude Benlida from arguing or introducing evidence to the contrary.

> "The general rule is that a party is bound by the admissions in his pleadings." *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1177 (11th Cir. 2009) (citations and quotations omitted). "Indeed, facts judicially admitted are facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them." *Id.* at 1178.



**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Fort Lauderdale 954.463.4346 | www.podhurst.com

*Aligned Bayshore Holdings, LLC v. Westchester Surplus Lines Ins. Co.*, No. 18-21692-CIV, 2020 WL 564037, at *2 (S.D. Fla. Feb. 5, 2020) (Scola, J.).[16]

It also bears mention that Benlida took a contrary position with respect to its interpretation of the 2016 Letter Agreement in opposition to CTX's pending motion for summary judgment. There, Benlida argued that "CTX-HK has never been a party to the Manufacturing Agreement" (DE 188 at 12) and denied that the 2016 Letter Agreement added CTX-HK as a party to the Manufacturing Agreement (DE 189, ¶ 9). Those contentions are flatly inconsistent with Benlida's prior express admission, in response to CTX's counterclaim, that the Letter Agreement added CTX-HK as an additional party to the Manufacturing Agreement. *See* chart above. However, in connection with this motion in limine, CTX understands that Benlida now concedes that CTX-HK was made a party to the Manufacturing Agreement on July 21, 2016.

Thus, the Court should enter an order in limine precluding argument or evidence contradicting both of the uncontested averments in the chart above.

**7. References to the Parties' Other Lawsuits or Alleged Litigiousness**

The parties have agreed, through their conferral, that neither party should reference other lawsuits involving the other or the other's alleged litigiousness. This restriction finds support in the law.[17] The Court should include this two-way restriction in its order in limine.

---

[16] Further, Benlida separately admitted that the 2016 Letter Agreement added CTX as a party to the Manufacturing Agreement when CTX raised the admission from Benlida's answer to the counterclaim in CTX's opposition statement of material facts to *Benlida's* February 2022 motion for partial summary judgment. DE 56 at 4, ¶ 12. Benlida opted not to file a reply in support of its motion, or a reply statement of material facts contesting CTX's additional facts and instead *withdrew* its motion for partial summary judgment. DE 63. Benlida's failure to controvert the additional fact of Benlida's prior admission that the 2016 Letter Agreement added CTX-HK as a party to the Manufacturing Agreement was also binding. *See* S.D. Fla. Local R. 56.1(c).

[17] Such evidence is highly prejudicial and not probative to any of the parties' claims. *See* Fed. R. Evid. 403; *see also Hydentra HLP Int. Ltd. v. Luchian*, No. 1:15-CV-22134-UU, 2016 WL

**8. The 2022 Settlement Agreement and CTX's Termination Thereof**

The parties have likewise agreed, through their conferral, that neither party should reference their settlement agreement and its termination dated November 17, 2022. The parties agree to instruct their witnesses to refer to the stay of the case in lieu of the settlement or termination to refer to events during the time period or work and analysis completed during the time period between approximately June 2022 and April 2023, as necessary. The parties' agreement as to this restriction helps assure, among other things, that they will not run afoul of Rule 408. The Court should include this limitation in its order in limine.

**9. Benlida's (or ROK's) Entire Print-Run of Invoices**

Benlida has advised CTX that it seeks to introduce its "entire print-run of invoices," meaning all of the invoices Benlida (and possibly also ROK) has ever issued to both CTX and CTX-HK, which it wishes to use in support of its claim for account stated. That print run, as Benlida has represented to CTX, would extend back to 2012. For several reasons, these documents, as well as testimony and argument concerning them, should be prohibited, save for the specific invoices Benlida issued *to CTX* which Benlida is claiming remain unpaid (that are not time-barred debts).

5942525, at *2 (S.D. Fla. May 31, 2016) ("'[T]he charge of litigiousness is a serious one, likely to result in undue prejudice against the party charged, unless the previous claims made by the party are shown to have been fraudulent'") (quoting *Outley v. City of New York*, 837 F.2d 587, 592 (2d Cir. 1988)); *Energy Smart Indus., LLC v. Morning View Hotels-Beverly Hills, LLC*, No. 14-CV-23284-UU, 2015 WL 11233085, at *1 (S.D. Fla. June 4, 2015) (excluding evidence of prior similar lawsuits as irrelevant under Rule 402 since defendant seeking to use the evidence "d[id] nothing to show that [plaintiff's] actions [we]re baseless" or that "[p]laintiff breached its contract with [d]efendant"); *Bui v. Minority Mobile Sys., Inc.*, 2016 WL 6518804, at *1 (S.D. Fla. 2016) (excluding prior employee lawsuits, noting that "the effect of raising a prior employee lawsuit would effectively create a 'mini-trial' about the merits of the previous case and other 'collateral issues' that may not relate to the present case).



**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Fort Lauderdale 954.463.4346 | www.podhurst.com

*First*, the invoices to CTX-HK should be excluded for the reasons stated in Section 2, *supra*.

*Second*, any invoices to CTX beyond those which Benlida is claiming remain unpaid are irrelevant and would only potentially confuse the jury concerning the amount of money at issue on Benlida's claims. Benlida itself previously acknowledged that "each allegation as to each unpaid invoice could itself suffice as a properly pled claim for breach of contract." DE 28 at 10. The same is no doubt true for a claim of account stated with respect to a particular invoice.[18] And the Court has recognized that "the invoices identified in Benlida's complaint … comprise the entire subject matter of this action." DE 31 (Order) at 4 n.2.[19] Those invoices to CTX span one-year: December 29, 2018 through December 18, 2019. *See* DE 26, ¶¶ 13, 259. Benlida should not be permitted to go beyond that and introduce hundreds if not thousands of invoices dating back to 2012.

*Third*, if Benlida also seeks to introduce invoices from ROK, that should also be precluded because ROK is not a party to this case, no ROK invoices are being sued upon, and as the Court observed early in the case, Benlida has "explicit[ly] acknowledge[ed] that 'all of the moneys owned by Circuitronix are owed to Benlida, not ROK.'" DE 31 (Order) at 3, n.1 (quoting DE 29-3 (Decl. of Juang Hanchao), ¶ 4).

---

[18] Insofar as Benlida might respond that it needs the older invoices in evidence to show the jury how it calculated that the invoices itemized in the complaint are the ones that allegedly went unpaid, based on Benlida's accounting methodology, that justification falls short because Benlida failed to disclose its commingled-FIFO methodology and should be barred from relying upon it as a result. *See* DE 193 at 7-8 (summary-judgment papers arguing that "Benlida should be barred from relying on a commingled-FIFO methodology as a sanction") (capitalization altered); DE 184-1 at 13-15 (same).

[19] The Court said that in its order on a motion to dismiss, before CTX filed its counterclaim (DE 34), which expanded the subject matter of the action. But the Court's observation remains no less true concerning the subject matter of Benlida's *claims*.

**CONCLUSION**

For all of these reasons, CTX respectfully requests that the Court enter an Order precluding Benlida from introducing evidence or arguing about the following categories of evidence:

1. Any computation of Benlida's damages beyond that pled in the complaint, including documents and testimony regarding how Benlida was applying CTX's payments to outstanding invoices;
2. Debts CTX-HK allegedly owes to Benlida, including through:
   (a) invoices Benlida issued to CTX-HK,
   (b) two documents from CTX-HK's outside auditing firm referencing debts owed to Benlida,
   (c) testimony or arguments that CTX and CTX-HK somehow operate as the same company, and
   (d) the 2014 Business Authorization and any argument it authorized Benlida to look to CTX to pay CTX-HK's debts;
3. Debts barred by the statute of limitations, *i.e.*,
   (a) with respect to the breach of contract claim (Count I), invoices to CTX listed in paragraphs 13-36 of the TAC and invoices to CTX-HK listed in and paragraphs 261-282 of the TAC; and
   (b) with respect to the account stated claim (Count II), invoices to CTX listed in paragraphs 13-66 of the TAC and invoices to CTX-HK listed in and paragraphs 261-298 of the TAC;
4. Records of CTX's account that Benlida did not produce during discovery;
5. CTX's experts' deposition testimony regarding "related party" status or attempts to elicit the same testimony from them at trial;
6. Assertions or testimony contradicting Benlida's judicial admissions;
7. References to other lawsuits involving either of the parties or their alleged litigiousness;
8. The 2022 settlement agreement and CTX's termination thereof; and
9. Benlida's (or ROK's) entire print-run of invoices.



**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Fort Lauderdale 954.463.4346 | www.podhurst.com

**REQUEST FOR HEARING UNDER RULE 7.1(b)(2)**

CTX hereby requests a hearing on this motion given the highly fact-intensive nature of some of the categories of evidence sought to be excluded. The Court may benefit from a colloquy with counsel regarding the more fact-based categories of evidence and pertinent underlying documents. CTX estimates one hour—or around 10 minutes per disputed category—will be sufficient for the parties to address the motion.

**CERTIFICATE OF RULE 7.1(a)(3) CONFERENCE**

Undersigned counsel for CTX has conferred with counsel for Benlida in a good faith effort to resolve the issues raised in the motion. The parties were able to reach agreement on several issues, as discussed in the motion above. As to the remaining issues, the parties were unable to resolve their conflicting positions.

Dated: August 8, 2023

Respectfully submitted,

PODHURST ORSECK, P.A.
One S.E. 3rd Avenue, Suite 2300
Miami, Florida 33131
Tel.: 305-358-2800

*/s/ Stephen F. Rosenthal*
Stephen F. Rosenthal
Florida Bar No. 0131458
srosenthal@podhurst.com
Matthew P. Weinshall
Florida Bar No. 84783
mweinshall@podhurst.com
Christina H. Martinez
Florida Bar No. 1029432
cmartinez@podhurst.com

*Counsel for Circuitronix, LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true copy of the foregoing has been served via transmission of Notices of Electronic Filing generated by CM/ECF on August 8, 2023 as filed with the Clerk of the Court using CM/ECF.

By: /s/ *Stephen F. Rosenthal*
Stephen F. Rosenthal

Docket/Tab #201

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 21-60125-CIV-Scola/Goodman**

---

JIANGMEN BENLIDA PRINTED
CIRCUIT CO., LTD.,

Plaintiff,

v.

CIRCUITRONIX, LLC,

Defendant.

---

# Plaintiff Jiangmen Benlida Printed Circuit Co., Ltd.'s Memorandum of Law in Opposition to Circuitronix LLC's Motion *in Limine* to Preclude the Testimony of Randall Paulikens, CPA

**MAZZOLA LINDSTROM LLP**
Richard E. Lerner
Jean-Claude Mazzola
*Counsel for Jiangmen Benlida Printed Circuit Co., Ltd.*
1350 Avenue of the Americas, Second Floor
New York, New York 10019
646.216.8300
richard@mazzolalindstrom.com
jeanclaude@mazzolalindstrom.com

August 22, 2023

Plaintiff Benlida hereby opposes defendant Circuitronix LLC's first of two motions *in limine*, which seeks an order precluding Benlida's rebuttal expert Randall Paulikens from offering testimony to rebut the anticipated testimony of Circuitronix's experts Mark Parisi and Barry Mukamal. As in prior papers submitted in this action, for consistency Circuitronix LLC is referred to herein as CTX-US, and Circuitronix (Hong Kong) Ltd. is referred to as CTX-HK. The third amended complaint is referred to as TAC.

## Argument

**Point I: CTX-US Cannot Credibly Claim that it is Surprised that Benlida is Seeking to Recover from it for Orders Placed for CTX-US's Exclusive Customers by CTX-HK and that it is Surprised by the Mathematical Functions of Addition and Subtraction.**

As CTX-US acknowledges in its moving papers, this is "a relatively straightforward" case, in that Benlida claims that CTX-US failed to pay for printed circuit boards from 2018 to 2020. In the deposition of CTX-US's expert, Mr. Parisi acknowledged that the issue of whether CTX-US is responsible for the debts of CTX-HK is not an accounting issue, but an issue of law: (Parisi Dep., Ex. A, p. 215)

> Q. Do you consider the issue of whether the U.S. operation [CTX-US] owes Benlida for the debts of the Hong Kong operation [CTX-HK] to be an issue of law or accounting?
> A. Law.

Mr. Parisi also acknowledged that, having read the complaint, he was well aware that Benlida was suing CTX-US for orders placed by CTX-HK: (Parisi Dep., Ex. A, pp. 126-127)

> Q. Are you aware that the plaintiffs in this case have alleged that the CTX invoices are owed by the U.S. entity?
> MR. ROSENTHAL: Object to the form.
> A. Well, the complaint's against -- it's Benlida v. Circuitronix, LLC. So, yes.
> Q. Okay. So that makes sense -- right? -- that that would be the case.
> A. … I don't understand your question.
> Q. Well, my question was, are you aware that the plaintiffs are alleging that those CTX Hong Kong invoices are owed by the -- by CTX U.S. Do you know that to be the case?
> A. From the complaint. Yes.

Likewise, CTX-US's other expert, Mr. Mukamal, acknowledged that he assumed, by reading the complaint, that Benlida is seeking recovery from CTX-US for orders placed with Benlida by CTX-HK: (Mukamal Dep., Ex. B, pp. 62-63, 131)

> Q. I'm asking you … if you or your team, in reviewing this complaint … knew that Benlida was looking to the U.S. Circuitronix, LLC, to pay invoices owed by Circuitronix Hong Kong?
>
> MS. MARTINEZ: Objection.
>
> A. I can only surmise. They include it in a list of invoices. Whether that's legally sufficient or not to draw that conclusion, I can't give an opinion on that.
>
> Q. But from reading this, you know that they're, at a minimum, looking to Circuitronix, LLC, to pay those debts of Circuitronix Hong Kong.
>
> MS. MARTINEZ: Objection.
>
> A. I can only assume.
>
> Q. Are you assuming yes or assuming no?
>
> A. I can only assume that they're looking to collect these invoices on their -- attached to the complaint.
>
> ***
>
> Q. … And you know that in the complaint, Benlida is looking to … CTX U.S. to pay those debts to [sic, should read "of"] the Hong Kong entity. You know that as well. Right?
>
> MS. MARTINEZ: Objection.
>
> A. I assume that from the tenor of the complaint.

What complicates this case is not the fact that Benlida is seeking full recovery from CTX-US, but the fact that CTX-US is claiming that it has no obligation to pay for goods ordered by CTX-HK, even though – as shown in opposition to CTX-US's motion for summary judgment – CTX-HK's orders presented to Benlida were for customers on CTX-US's "exclusive customer list." It is a fiction that CTX-US could not have anticipated that Benlida was seeking the full measure of damages from it, as even its own experts acknowledged (as the above excerpts show) that they understood – from having reviewed the TAC – that, Benlida is suing CTX-US for all unpaid invoices, including for orders placed by CTX-HK. CTX-US has clearly understood

Benlida's position, having moved to dismiss the TAC for failure to name CTX-HK as a defendant (DE 27), which branch of their motion was properly denied. (See DE 31).

Were Benlida to have submitted its own "affirmative" expert report in support of its claims, it would have said no more than, "I, Randall Paulikens, have added up the numbers in the invoices alleged to have not been paid (subtotal: $11,539,408.36), plus the agreed-upon price increase ($2,115,927.57),[1] and subtracted the amounts that Benlida has acknowledged were paid (−$230,744.78), resulting in a total due of $13,424,591.10." On motion *in limine*, CTX-US would then have argued that a CPA adding up the numbers, and presenting them to the jury, would constitute improper bolstering, and that simple math is not the proper subject of expert testimony.

CTX-US's defense (and counterclaim) to this lawsuit is that it actually overpaid for goods ordered from Benlida, and that such "overpayments" reduce to zero the amounts owed by CTX-US, despite the commercial and common-sense reality that companies normally do not overpay for goods. CTX-US argues that "overpayments" made by CTX-US do not reduce the debts owed on orders placed by CTX-HK. To make this argument, CTX-US asserts that FIFO bookkeeping is inappropriate, even though Mr. Parisi himself (CTX-US's own expert) testified that FIFO bookkeeping is in fact proper: (Parisi Dep., Ex. A, pp. 241-242, 248)

> Q. If the payment doesn't -- if the payment made by the payor does not define what invoices or identify what invoices they should be attributable to, is there anything unreasonable about the payee applying that money to their oldest invoices?

---

[1] The question is whether the parties mutually agreed to a specific price increase, not the myriad factors that went into the price increase, including the increased costs of various materials. Was there a meeting of the minds as to the increase? That is the issue of fact for the jury, not whether the price increase was warranted based on the prices of gold and other materials. If, after review of all of the evidence, the jury believes that CTX-US did not agree to the price increase, then CTX-US won't have to pay it. If, on the other hand, the jury believes that there was a meeting of the minds as to the $2,115,927.57 price increase, then CTX-US will be held liable therefor. This doesn't involve a whit of expert testimony.

A. That's one option.

Q. Okay.

A. Another option would be to call the company and say, Hey, which invoices are you paying specifically?

Q. But it is reasonable to apply it to the oldest invoices.

A. It could be. As long as it's applied to the appropriate entity that issued those invoices.

You wouldn't want to have a matching issue. You know, the -- accounting's very big on matching. Right? You want to have the revenues and expenses in the proper period, in same way you'd want to have the invoices applied against the proper payments.

Q. So assuming it's the proper entity, there's nothing unreasonable about a bookkeeping department taking a payment that doesn't otherwise identify to what invoice it's attributable to and applying it to its old invoices.

A. Hypothetically?

Q. Yes.

A. That could happen.

Q. And is it reasonable to do that?

A. It depends on the facts and circumstances. I'd reach out and ask for detail to apply issues.

In this example, you know, if it wasn't applied FIFO, some of these, you know, invoice differences would have been flushed out, hopefully. But it could -- but payments on accounts certainly can happen.

Q. But it is -- it remains reasonable -- now, while you may prefer someone to pick up the phone and call, it does remain reasonable for a bookkeeping department to apply monies to the oldest invoices. Is that correct?

MR. ROSENTHAL: Object to form.

A. If applied to the proper entity, it – that could be an appropriate method of accounting for payments.

***

Q. Okay. So still talking about payment application and applying of payments. [¶] I guess, hypothetically, if CTX U.S. is responsible for the debts of CTX Hong Kong, is it -- would it be appropriate and reasonable for Benlida to apply payments from the U.S. operation to the oldest invoices of either U.S. or Hong Kong?

A. If Circuitronix, LLC, is responsible for all the debts of Circuitronix Hong Kong.

Q. Hong Kong. Um-hmm.

A. Then you could presumably combine the balances.

As the issue of whether CTX-US is responsible for the debts of CTX-HK is not, as CTX-US's expert acknowledges, an accounting question, it is unclear why CTX-US is seeking to

preclude Benlida's accounting expert Paulikens from testifying *as a rebuttal witness*, and, in doing so, presenting testimony showing that CTX-US's expert testimony is flawed for not having taken into account the moneys owed by CTX-US for the orders placed by CTX-HK for CTX-US's "exclusive customers." It is Benlida's position that the complaint itself sets forth the basis for its claim of damages, using simple math, and that an expert is not needed to tally the amounts claimed in the invoices and the agreed-upon price increase.

CTX-US has also been aware since the filing of the TAC that Benlida's damages claim includes debts owed by CTX-HK, and cannot disclaim such.[2] The following is a statement from CTX-US's motion to dismiss dated June 15, 2021: "For example, in the TAC, Benlida purports to assert claims against CTX based on over 170 invoices issued to CTX-HK, not CTX." (DE 27).

To the extent, however, that CTX-US continues to maintain that it was, somehow, not given sufficient notice of the math behind Benlida's claim in a Rule 26 disclosure, we note Your Honor's decisions, as follows:

> ***Ore v. Tricam Indus*., 2017 U.S. Dist. LEXIS 171639, *18-19:**
>
> "Even assuming that the Plaintiff failed to adequately comply with the requirements set forth in Rule 26(a)(2)(C), the Defendants' argument is not well-taken. First, the Defendants had ample opportunity during the pendency of this case to seek the intervention of the Court for the Plaintiff's non-compliance. … The Defendants never sought relief for what they claim to be prejudicial non-compliance. Furthermore, the Defendants' attempt to claim an inability to adequately prepare for cross examination falls flat, since the Plaintiff's treating physicians testified at trial via depositions taken well in advance of trial. Thus, the Defendants' attempt to obtain a new trial on a technicality must fail."
>
> ***FTC v. On Point Global LLC*, 2021 U.S. Dist. LEXIS 201532, *20:**
>
> "[A] motion *in limine* should "not serve as reinforcement regarding the various rules governing trial[.]" *See Powers v. Target Corp.*, No. 19-cv-60922-Bloom/Valle, 2020 U.S. Dist. LEXIS 73289, 2020 WL 1986968, at *7 (S.D. Fla. Apr. 27, 2020) (Bloom, J.). The FTC is already bound by Rule 26(e)(1) and Rule 37(c)(1), even absent court order. If the FTC uses evidence at trial in a manner

[2] CTX-US thus also cannot credibly allege that Benlida developed this "worldview… explicitly in response to CTX's motion for summary judgement" over two years later.

> that implicates Rule 26(e)(1) and Rule 37(c)(1), the moving Defendants can raise this objection at that time."

> ***Ramones v. Experian Info. Sols., LLC*, 2021 U.S. Dist. LEXIS 168243, *13:**

> "The Court denies without prejudice motion *in limine* IV. ARR argues for the exclusion of any evidence from undisclosed witnesses or documents pursuant to Federal Rules of Civil Procedure 26(a) and 37(c). (ECF No. 115 at 9-11.) However, '[m]otions *in limine* should be limited to specific pieces of evidence and not serve as reinforcement regarding the various rules governing trial[.]' Powers, 2020 U.S. Dist. LEXIS 73289, 2020 WL 1986968, at *7. If Ramones' attempts to introduce evidence from an undisclosed witness or documents, then ARR can renew this motion, and the parties would have the benefit of a more specific objection in order to determine whether the undisclosed witnesses or documents fell within Rule 26(a)(1)(A) and whether the failure to disclose, if any, was substantially justified or harmless under Rule 37(c)."

As for the issue of CTX-US being responsible for the debts of CTX-HK – an issue of law, rather than of accounting – we remind the Court that in opposition to the motion for summary judgment, which remains *sub judice*, Benlida demonstrated that CTX-HK's purchases were made for customers on the CTX-US exclusive customer list. (See DE 188 at 2-5, 10). We further note that CTX-US has alleged in its answer and counterclaim that CTX-HK became a party to the 2012 manufacturing agreement when Rishi Kukreja – acting on behalf of both CTX-US and CTX-HK signed the 2016 letter agreement between them and Benlida. (See DE 34, Counterclaim at ¶ 3). That is, CTX-US and CTX-HK, through the 2016 Letter Agreement (DE 177-1, Ex. C to Martinez Decl.), are said to have become co-signers of the 2012 Manufacturing Agreement (DE 177-1, Ex. A to Martinez Decl.), meaning that CTX-US made itself a co-signer on *all* debts incurred by CTX-HK.

That a co-signer is jointly and severally liable to the counterparty is a widely recognized legal principle. *See*, *e.g.*, *Trinity Universal Ins. Co. v. Drake*, 587 S.W.2d 458, 465 (Tex. Civ. App., Dallas 1979), *aff'd in part, rev'd in part on other grounds* ("Generally, joint and several liability arises when two or more persons jointly engage in the commission of a tort or *co-sign* a

note or *contract*." (Emphasis added)).[3] A case illustrating the point is *Thomas v. Capital Medical Management Associates, LLC*, 189 Md. App. 439, 985 A.2d 51 (Md.App. 2009), wherein a principal of an LLC signed a contract without designating that she was signing in her representative capacity. Consequently, she was found to have been a co-signer in her individual capacity, and therefore personally liable. Analogously, CTX-US and CTX-HK – by their principal Rishi Kukreja – were made co-obligors when he signed the 2016 Letter Agreement in his representative capacity for each of the two entities.

The Restatement (Second) of Contracts § 289 says: "(1) Where two or more parties to a contract promise the same performance to the same promisee, each is bound for the whole performance thereof, whether his duty is joint, several, or joint and several. (2) Where two or more parties to a contract promise the same performance to the same promisee, they incur only a joint duty unless an intention is manifested to create several duties or joint and several duties. (3) By statute in most states some or all promises which would otherwise create only joint duties create joint and several duties."

In accordance with § 289(3) above, in Florida, "joint obligors are not indispensable parties to a suit based on breach of contract." *WBDH-BC Holdings Ltd. v. Varsatel Corp.*, 2022 U.S. Dist. LEXIS 154726, at *29 (S.D. Fla. 2022) (citing *Brackin Tie, Lumber & Chip Co. v. McLarty Farms, Inc.*, 704 F.2d 585, 586 (11th Cir. 1983)). Accordingly, a plaintiff may seek

---

[3] See also *In re Hall*, 2019 Bankr. LEXIS 4062, at *7 (Bankr. M.D. Fla. 2019) ("[W]hen Ms. Daley agreed to co-sign the loan, she assumed the full legal obligation to pay it. It is a common risk that co-signors must pay co-signed loans when the other party files bankruptcy."); and *Southeastern Bank v. Brown*, 266 B.R. 900, 907 (S.D. Ga. 2001) ("Before giving the loan to the debtor, the creditor secured the promise of the cosigner that if for some reason the debtor could not pay, the cosigner would be liable on the debt. As a result, the creditor protected itself through contract from the very problem that has arisen here, the debtor's inability to pay his or her debts.")

recovery from one of two co-signers in Florida, as Benlida has done here. CTX-HK is, indeed, dispensable, because Benlida can properly look to CTX-US for the entirety of the CTX-US and CTX-HK debt, and it is more believable that CTX-US was aware of such and making payments for the debts of CTX-HK than that CTX-US was "overpaying" Benlida for goods.

As § 288 of the Restatement explains, "(2) Unless a contrary intention is manifested, a promise by two or more promisors is a promise that the same performance shall be given." Here, neither the 2012 Manufacturing Agreement nor the 2016 Letter Agreement evinces a contrary intention. They do not assign to CTX-US and CTX-HK mutually exclusive duties of performance owed to Benlida. *Cf.*, *e.g.*, *Eastern Electrical Co. v. Taylor Woodrow Blitman Constr. Corp.*, 11 Mass. App. Ct. 192, 199 (1981) (Mutually exclusive contractual duties that are "sharply contrasted and cover two clearly defined and largely separate areas of responsibility" suggest intention of different performance.) CTX-HK doesn't have any defined duties under the language of the 2012 Manufacturing Agreement. Rather, as shown in opposition to the motion for summary judgment, CTX-HK issued purchase orders to Benlida, identifying in the purchase orders customers designated by CTX-US as being CTX-US's "exclusive customers." With respect to such orders, CTX-HK was necessarily CTX-US's agent. And, by becoming a signatory to the 2012 Manufacturing Agreement, it became jointly and severally liable for CTX-US's debts, and vice versa.

CTX-US's motion to preclude Paulikens is misplaced as he will be a pure rebuttal witness, because (a) whether CTX-US is responsible for the debts of CTX-HK is a question of law; and (b) it doesn't take an expert to add up the invoices forming Benlida's affirmative damages claim. Thus it is odd that Mr. Parisi and Mr. Mukamal were instructed to disregard the amounts claimed by Benlida against CTX-US for orders placed by CTX-HK for CTX-US's

exclusive customers, strategically hiding their heads in the sand so that counsel could feign surprise. Such testimony is not intended to "bolster" Benlida's case in chief; rather, it is intended to counter CTX-US's claims for recoupment of "overpayments."

**Point II: Preclusion is Not Warranted on Grounds that Benlida Did Not Plead the "Theory" Why CTX-US is Liable for the Debts of CTX-HK.**

As the above testimony of Mr. Parisi and Mr. Mukamal demonstrates, and as CTX-US's motion to dismiss makes clear – and as the Court no doubt can see for itself – the TAC alleges that CTX-US is liable to Benlida for orders placed by both CTX-US and CTX-HK. Yet CTX-US argues in its motion *in limine* that the "theory" why CTX-US is responsible for the orders placed by CTX-HK was not pled in the TAC, and that preclusion of Mr. Paulikens is therefore warranted, as he would be "smuggling" into the case in rebuttal a theory that was neither pled nor advanced in an affirmative expert report.[4] To the contrary, however, Benlida was not required to plead any particular legal theory in its TAC.

Notice pleading merely required that CTX-US be put on notice that Benlida was seeking recovery from it for the orders placed by CTX-HK. This is made clear by myriad cases, such as, *Houston Specialty Ins. Co. v. Titleworks of Sw. Fla., Inc.*, 2017 U.S. Dist. LEXIS 91997, *5 (M.D. Fla. 2017), wherein the court stated:

> It is true that the operative Second Amended Complaint (Doc. #51) does not expressly allege Titleworks had "prior knowledge of a Wrongful Act." But these specific words were not needed for Houston to pursue such a theory. Even in the *Twombly/Iqbal* era, "[f]ederal pleading rules call [only] for 'a short and plain statement of the claim showing that the pleader is entitled to relief,'; they do not countenance [penalizing a plaintiff] for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 135 S. Ct. 346, 346, 190 L. Ed. 2d 309 (2014) (per curiam) (quoting Fed. R. Civ. P. 8(a)(2)). In other words, the pleading obligation Rule 8 imposes is one of including

---

[4] Benlida has no quarrel with the general principles cited in CTX-US's motion. Benlida simply does not intend to present "new" theories of damages on rebuttal through Mr. Paulikens. Rather, Benlida will offer classic rebuttal testimony. If at trial, CTX-US's counsel believes that the questioning is leading Mr. Paulikens into impermissible territory, the Court can rule on the objection at that time.

> sufficient facts to support a claim, not of alleging all possible legal theories underlying that claim. *Brisk v. Shoreline Found., Inc.*, 654 F. App'x 415, 417 (11th Cir. 2016) (per curiam) ("A complaint need not specify in detail the precise theory giving rise to recovery." (citing *Sams v. United Food & Comm'l Workers Int'l Union*, 866 F.2d 1380, 1384 (11th Cir. 1989))). All that Rule 8 requires "is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests." *Id.*; see also *Hamilton v. Allen-Bradley Co., Inc.*, 244 F.3d 819, 825 (11th Cir. 2001) (observing that a complaint need only "outline[] sufficient facts to put [the defendant] on notice of [a particular] claim," not contain any "specific words").

In this case, the TAC puts CTX-US on notice of the claim asserted against it, and the grounds upon which the claim rests – specifically, the unpaid CTX-US and CTX-HK invoices, and the unpaid but agreed-to price increase. And inasmuch as it doesn't take an expert to add up the numbers to educate a jury as to how much is owed to Benlida, there can be no legitimate claim that Benlida would be sandbagging CTX-US by introducing rebuttal testimony to show that CTX-US's experts did not take into account the entirety of the amounts in dispute when it issued their report.

CTX-US's argument might have legs if this were a case where its counterclaim was unrelated to Benlida's affirmative case. Here, however, each side disagrees about the same issue: As between Belinda and CTX-US, who owes whom what? Benlida is not introducing anything into this case that CTX-US has not been on notice of since at least June of 2021, when the TAC was interposed. Highlighting the omissions and faulty premises of an affirmative expert report is squarely within the province of a rebuttal expert.

**Point III: CTX-US Cannot Fault Paulikens for Fairly Criticizing the Mukamal-Parisi Report, and Paulikens's Opinions Regarding the CTX-US and CTX-HK Relationship are Admissible Specialized Knowledge in Rebuttal to Help the Jury to Understand Why it is Reasonable, from an Accounting Standpoint, to Treat CTX-HK's Debts as Owed by CTX-US, and Unreasonable to Treat Them Otherwise.**

The Paulikens report, and his anticipated testimony, is nothing but rebuttal, as there is no need to present him as an affirmative witness at trial. Plaintiff Benlida's case in chief will be

simple and routine, along the lines of – *Q*. Did CTX-US and CTX-HK issue purchase orders to Benlida for customers on the CTX-US exclusive customer list? *Q*. Did Benlida accept the purchase orders? *Q*. Did it manufacture and then ship the goods? *Q*. What's the dollar amount of what was shipped? *Q*. Were invoices sent? *Q*. How much is owed? *Q*. Did Benlida and CTX-US and CTX-HK come to an agreement about a price increase? *Q*. How much was agreed to? *Q*. What did CTX-US and CTX-HK pay Benlida? *Q*. What is the balance due?

Defendant CTX-US seeks to present Mr. Mukamal and Mr. Parisi to show their math – by which they would show that Benlida actually owes CTX-US millions of dollars, because (as CTX-US curiously claims) all of the money that it paid, even if such money matches up with money owed for CTX-HK purchases, was improperly applied by Benlida to CTX-HK invoices, and that Benlida should have treated the money as a loan to Benlida by CTX-US instead.

Mr. Paulikens's rebuttal testimony would be perfectly appropriate to show that CTX-US is proposing accounting methods that are not in accordance with ordinary and customary principles. To make this showing, Mr. Paulikens would explain (a) that attributing payments by a purchaser to the oldest debts is in accordance with generally accepted accounting and bookkeeping principles, (b) that the payments to Benlida by CTX-US only make sense in the context of the entire relationship, where CTX-US and CTX-HK are acting as related entities, and (c) that the "the individual pieces don't necessarily make economic sense in a vacuum." (See, e.g., Paulikens Dep., p. 82). Indeed, Mr. Paulikens explained: (Paulikens Dep., Ex. C, pp. 111-112, 168-169, 256-258)

> Q. And how does your understanding of that relationship play into your evaluation of the financial dispute between these companies?
>
> A. It plays into the inverse relationship towards the end of my report that discusses that one entity claims it overpaid its supplier by 5-million-odd dollars and that another entity that's clearly related was underpaid by 13 million from the chart we talked about. And individually, you wouldn't have those kind of transactions.

Ordinarily, … a customer doesn't overpay its supplier ever. Or certainly not by months worth of revenue. And you don't have another supplier that may have one year of sales -- one year of transactions being owed.

I mean, individually, those are odd transactions. And I covered that in my report, which is simply wanting to say why is that. It doesn't make sense that these two pieces are so isolated and disparate.

***

Q. Let me come back to what you were writing about on page 6 of your report that we talked about a few minutes ago, which is this custom of payment on account being applied to the -- on a FIFO basis unless there's a specification of specific invoices.

A. Yes.

Q. Is it your intention to offer an opinion in this case that that custom is applicable to the relationship between the parties in this case?

MR. LERNER: Objection. [¶] You could answer.

A. Because, I mean, a formal opinion, it's customary, again -- let me start the answer again. [¶] To give a formal opinion, I'm unsure. Because it's such a strange – the payments on account to me is just basic business, that that's norm and I've seen that in every business I've seen in 35 years. So if that's an opinion you're asking, yes, I've seen that. You know, payments on account, apply the oldest one first. I've seen that consistently for 35 years. [¶] If that's the opinion you're asking, yes, that's the opinion I would give on the witness stand.

***

Q. … You say in the next line of your report, quote, put another way, CTX HK and CTX U.S. would appear to be controlled and dominated by CTX. [¶] When you say "by CTX," what are you referring to?

A. The parent, CTX LLC.

Q. When you say "the parent," are you saying that CTX LLC is a corporate parent of CTX HK?

A. No. I'm not trying to say in a strict corporate parent. I'm saying in the way I see the relationship -- the way I understand decisions are being made, there's a control aspect over Hong Kong. Whether it's by direct ownership interest or whether it's by direct shared management. Whether it's by direct other issues, there is some layer of influence and control over CTX. And --

Q. Over CTX Hong Kong, to be precise? You said over CTX. I'm sorry to interrupt you, but I think you meant over CTX Hong Kong, right?

A. Yes. So, again, from an accounting perspective, when you see disparate relationships like we're seeing in terms of the receivables, it suggests there's more here than the individual pieces might imply.

Not only does CTX-US's claim of overpaying (or extending loans) to Benlida not pass the straight-face test, one would expect – if that's what CTX-US was doing – for there to be evidence indicating that CTX-US was extending a loan, or even evidence where CTX-US cautioned Benlida not to apply any of its "overpayments" to debts owed by co-signer CTX-HK, but there is no such evidence. The Court should not let CTX-US hide the true amounts owed to Benlida from the jury on the contention that Benlida should have had an affirmative expert to do the rudimentary addition and subtraction, and that any criticism of omissions in CTX-US's expert report make such opinions and testimony inadmissible. Were CTX-US's position correct, every party in a litigation would simply have their expert omit the warts of their case, such that a rebuttal expert could never address them.

Unlike in *Kroll v. Carnival Corp.*, No. 19-23017-CIV, 2020 WL 4793444 (S.D. Fla. Aug. 17, 2020) (Goodman, J.), where there was a documented history of plaintiff designating an affirmative expert, being unsatisfied with that expert's deposition testimony, and then offering a second expert as an alleged rebuttal, Benlida looked at its affirmative case – at the strength of the documentary evidence in the form of invoices underlying its damages calculations as to its affirmative case – and decided that no affirmative expert was necessary to perform simple arithmetic. However, the Mukamal-Parisi report – in explaining CTX-US's view of the amounts owed between the two parties – missed the critical issue of debts owed by CTX-US for orders placed by CTX-HK, which CTX-US has paid for in the past. Any expert opinion on this same subject matter – the correct *accounting* between the two parties – is admissible rebuttal testimony.

Indeed, critical omissions are fair game for rebuttal opinions when they are on the same subject or topic. *Burger King Corp. v. Berry*, 2019 U.S. Dist. LEXIS 36187, *5 (S.D. Fla. Jan. 8, 2019):

> Courts are empowered to exercise their discretion and judgment in determining if a rebuttal expert report addresses the same subject matter as the opposing party's initial expert report. *citing Lebron v. Royal Caribbean Cruises, Ltd.*, No. 16-24687, 2018 U.S. Dist. LEXIS 124820, 2018 WL 3583002, at *2 (S.D. Fla. July 26, 2018) (*quoting ITT Corp. v. Xylem Grp., LLC*, No. 1:11-CV-3669-WSD, 2012 U.S. Dist. LEXIS 197312, 2012 WL 12871632, at *3 (N.D. Ga. Oct. 15, 2012)).
>
> The term "same subject matter" has been broadly construed. *See Northrup v. Werner Enterprise, Inc.*, No. 8:14-cv-1627-T-27JSS, 2015 U.S. Dist. LEXIS 105281, 2015 WL 4756947, at *2 (M.D. Fla. Aug. 11, 2015); *1550 Brickell Assocs. v. OBE Ins. Corp.,* No. 07-22283-CIV, 2010 U.S. Dist. LEXIS 58083, 2010 WL 1947636, at *2 (S.D. Fla. May 13, 2010).

Benlida is not introducing any new damages on rebuttal, but is merely pointing out that CTX-US's expert report failed to take into account co-signer CTX-US's debt for orders placed by co-signer CTX-HK, which have always plainly been included in Benlida's damages as CTX-US's own motion to dismiss submitted over two years ago plainly demonstrates.

In addition, Paulikens's opinions regarding the nature of CTX-US's and CTX-HK's relationship from an accounting perspective are admissible expert opinions under FRE 702 and *Daubert*, as related-party analysis is the typical domain of an accountant, and is necessarily done in order to understand how and why a business is acting in a certain way. See, *e.g.*, *SEC v. Das*, 723 F. 3d 943 (8th Cir. 2013) (expert testimony of CPA Steven Henning, PhD., regarding related-party transactions and analysis deemed appropriate); *Ad Astra Recovery Servs. v. Heath*, 2021 U.S. Dist. LEXIS 56438, *17-19 (D. Kansas 2021) ("[CPA] Zayas defines control as who directed where the money could go and states that this standard is used in related party and VIE [variable interest entity] considerations under accounting principles. … Zayas further explained

that in these types of cases, the entity that controls the funds generally will most often control the entity." The District Court held such testimony to be proper.)

Here, relatedness explains why CTX-US is claiming that it overpaid by millions of dollars for orders it placed with Benlida, when in fact they were not overpayments (as companies normally do not repeatedly and so greatly overpay for goods) and were attributed upon receipt to the A/R of CTX-HK, because CTX-US was responsible for making payments for CTX-HK's debts. Relatedness is necessary to explain the reasonableness of Benlida's actions, aside from the grounds that CTX-US and CTX-HK became co-signers on the 2012 Manufacturing Agreement upon execution of the 2016 Letter Agreement, and that CTX-HK was purchasing as an agent for CTX-US, by virtue of its making purchases for CTX-US's "exclusive customers." In sum, Mr. Paulikens will be offered in rebuttal to explain why Benlida's bookkeeping practice of attributing CTX-US's payments to orders placed by CTX-HK was appropriate, given the relationship between the parties. This is highly relevant in rebuttal to CTX-US's counterclaim arguments, especially its claim of having made substantial "overpayments" to Benlida.

***

WHEREFORE, CTX-US's motion in limine to preclude Benlida's expert Randall Paulikens from testifying at trial should be denied.

Dated: New York, New York
August 22, 2023

**Mazzola Lindstrom LLP**

By:____________________
Richard E. Lerner
Jean-Claude Mazzola
*Counsel for Jiangmen Benlida Printed Circuit Co., Ltd.*
1350 Avenue of the Americas, Second Floor
New York, New York 10019
Tel.: 646.216.8300
richard@mazzolalindstrom.com
jeanclaude@mazzolalindstrom.com

Service via ECF

Docket/Tab #201-1

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

JIANGMEN BENLIDA PRINTED )
CIRCUIT CO., LTD., )
Plaintiff, )
vs. ) Civil Action No.
CIRCUITRONIX, LLC, ) 21-601-125-civ
Defendant. )

ORAL DEPOSITION
MARK PARISI, CPA, CIRA, CFE, CTCE
Monday, July 31, 2023

Reported by:
Rebecca Callow, RMR, CRR, RPR
Job No. 131875

ORAL DEPOSITION OF MARK PARISI, CPA, CIRA, CFE, CTCE, produced as a witness at the instance of the Defendant and duly sworn, was taken in the above-styled and numbered cause on the 31st day of July 2023, from 10:26 a.m. to 4:45 p.m., before Rebecca J. Callow, Registered Merit Reporter, Certified Realtime Reporter, Registered Professional Reporter and Notary Public for the State of Florida, reported by computerized stenotype machine at the offices of Orseck, P.A., One S.E. 3rd Avenue, Suite 2300, Miami, Florida, pursuant to the Federal Rules of Civil Procedure.

APPEARANCES

FOR PLAINTIFF:

Podhurst Orseck, P.A.
One S.E. 3rd Street
Suite 2300
Miami, Florida 33131
(305) 358-2800
By: Stephen Rosenthal, Esq.
srosenthal@podhurst.com
Christina Martinez, Esq.
cmartinez@podhurst.com

FOR DEFENDANT:

Mazzola Lindstrom LLP
1350 Avenue of the Americas
2nd Floor
New York, New York 10019
(646) 216-8300
By: Jean-Claude Mazzola, Esq.
jeanclaude@mazzolalindstrom.com
Richard Lerner, Esq.
richard@mazzolalindstrom.com

ALSO PRESENT:

Jessica Miller
Rishi Kukreja (via Zoom)

that nuanced. They're more general.
Q. So then at some point, some instruction was given to you to only address the counterclaim. Is that correct?
A. That's not correct.
Q. Did you make the decision to only address the counterclaim?
A. Well, again, I testified on this issue a few times. But we were retained for the counterclaim.
And then Footnote 4 states that we assembled some data for use in a rebuttal, but we didn't get an a affirmative report by the plaintiff to rebut.
Q. Okay. Why do you need a report?
You know what the allegations are in the complaint. Right?
A. In which complaint?
Q. You read the third amended complaint. Right?
A. The plaintiff's complaint.
Q. Yes.
A. Okay.
Q. You did read it. Right?
A. I did.

Q. And you do know, then, in the third amended complaint drafted by the plaintiffs, there are allegations that the Hong Kong entity owes it $13 million. You must know that.

A. I don't know if that's how the number shakes out precisely. There's invoices included. I don't know if all those invoices necessarily equate to the 13.5, but I do know that Benlida claims it's owed money from Circuitronix Hong Kong.

Q. And the fact of the matter is that when you did your analysis, you looked solely at transactions between the U.S. entity and Benlida. Only.

MR. ROSENTHAL: Object to the form.

BY MR. MAZZOLA:

Q. For purposes of this report. Is that correct?

MR. ROSENTHAL: Object to the form.

A. As identified in the counterclaim, we identified the transactions between Circuitronix, LLC, and Benlida.

BY MR. MAZZOLA:

Q. Are you aware that the plaintiffs in this case have alleged that the CTX invoices are owed by

the U.S. entity?
MR. ROSENTHAL: Object to the form.
A. Well, the complaint's against -- it's Benlida v. Circuitronix, LLC. So, yes.
BY MR. MAZZOLA:
Q. Okay. So that makes sense -- right? -- that that would be the case.
A. "That makes sense. Right?"
I don't understand your question.
Q. Well, my question was, are you aware that the plaintiffs are alleging that those CTX Hong Kong invoices are owed by the -- by CTX U.S. Do you know that to be the case?
A. From the complaint. Yes.
But they didn't put it in an affirmative report where I would understand the basis for which CTX, LLC, would be responsible for the debts of another company.
Q. But you as an accounting professional, because you reviewed the complaint. When you reviewed the complaint, you understood that Benlida was alleging that the -- the CTX Hong Kong invoices are owed by CTX U.S.S. That's correct. Right?
A. The CTX Hong Kong invoices appear in

Benlida's complaint.

Q. And that the allegation by Benlida is that those invoices are owed by the U.S. operation. Is that correct as you understood the complaint?

A. That's Benlida's allegation.

Q. And is it correct as you understood the complaint?

A. That's Benlida's allegation.

Q. Okay. The question is, is it correct?

A. Is "what" correct? You say saying "its," and --

Q. Is their allegation that you under -- not the ultimate question.

But is it your understanding, from reading the complaint, that Benlida is alleging that CTX Hong Kong's invoices are owed by CTX U.S.

A. I don't know if they artfully say it that well.

But the Circuitronix Hong Kong invoices are included in the complaint between Benlida and Circuitronix, LLC.

MR. MAZZOLA: Do you want to break now?

MR. ROSENTHAL: Sure.

(Off record: 12:52 p.m. to 1:36 p.m.)

Docket/Tab #201-2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| JIANGMEN BENLIDA PRINTED | ) | |
| CIRCUIT CO., LTD., | ) | |
| Plaintiff, | ) | |
| vs. | ) | Civil Action No. |
| CIRCUITRONIX, LLC, | ) | 21-601-125-civ |
| Defendant. | ) | |

ORAL DEPOSITION
BARRY MUKAMAL, CPA, PFS, ABV, CIRA, CFE, CFF, CGMA
Tuesday, August 1, 2023

Reported by:
Rebecca Callow, RMR, CRR, RPR
Job No. 131876

ORAL DEPOSITION OF BARRY MUKAMAL, CPA, PFS, ABV, CIRA, CFE, CFF, CGMA, produced as a witness at the instance of the Defendant and duly sworn, was taken in the above-styled and numbered cause on the 1st day of August 2023, from 10:30 a.m. to 4:02 p.m., before Rebecca J. Callow, Registered Merit Reporter, Certified Realtime Reporter, Registered Professional Reporter and Notary Public for the State of Florida, reported by computerized stenotype machine at the offices of Podhurst Orseck, P.A., One S.E. 3rd Avenue, Suite 2300, Miami, Florida, pursuant to the Federal Rules of Civil Procedure.

APPEARANCES

FOR PLAINTIFF:

Podhurst Orseck, P.A.
One S.E. 3rd Avenue
Suite 2300
Miami, Florida 33131
(305) 358-2800
By: Christina Martinez, Esq.
cmartinez@podhurst.com
Stephen Rosenthal, Esq.
srosenthal@podhurst.com

FOR DEFENDANT:

Mazzola Lindstrom LLP
1350 Avenue of the Americas
2nd Floor
New York, New York 10019
(646) 216-8300
By: Jean-Claude Mazzola, Esq.
jeanclaude@mazzolalindstrom.com
Richard Lerner, Esq.
richard@mazzolalindstrom.com

ALSO PRESENT:

Jessica Miller
Rishi Kukreja (via Zoom)

BY MR. MAZZOLA:
Q. When you issue an invoice to someone, you're expecting that person to pay it. Right?
A. I assume so. But I'm not sure what you're asking.
Q. Well, the question I'm asking is, the complaint by Benlida suing Circuitronix, LLC, here in Florida, you know it because you looked at it, also contains invoices that have the "HK" numbering conventions. Is that correct?
A. I believe that's a fact.
Q. Okay. That is a fact.
So in reviewing this complaint, whether or not Benlida wins, whether or not a judge says they win, whether or not a jury says it wins, those are all legal issues. You don't do that; you do accounting things.
Is it fair to assume, looking at this as an accountant, that Benlida, whether they're right or wrong, is looking to Circuitronix here in Florida to pay those Hong Kong invoices. Is that a fair assumption?
MS. MARTINEZ: Objection.
A. I think that's the positions they're taking. But to me, it's a legal determination

whether this indicates what you said. Whether that's legally sufficient, what it means from a legal standpoint.

But the fact of the matter -- all I'm saying is, they included invoices that include Benlida and Hong Kong in the complaint, that -- a reference to Benlida and Hong Kong in the complaint --

BY MR. MAZZOLA:

Q. But --

A. -- that's all I can say.

You're asking me to draw a conclusion from that, but I'm not going to.

Q. But you did review it.

A. Yeah. I saw the --

Q. So in reviewing this complaint, you and your team would have been aware that Benlida was looking to Circuitronix here in the U.S. to pay invoices issued to Circuitronix Hong Kong. Yes or no.

MS. MARTINEZ: Objection.

A. So you're asking whether Benlida was asking --

BY MR. MAZZOLA:

Q. No. No. I'm asking you --

A. Yeah.
Q. -- if you or your team, in reviewing this complaint --
A. Right.
Q. -- knew that Benlida was looking to the U.S. Circuitronix, LLC, to pay invoices owed by Circuitronix Hong Kong?
MS. MARTINEZ: Objection.
A. I can only surmise. They include it in a list of invoices. Whether that's legally sufficient or not to draw that conclusion, I can't give an opinion on that.
BY MR. MAZZOLA:
Q. But from reading this, you know that they're, at a minimum, looking to Circuitronix, LLC, to pay those debts of Circuitronix Hong Kong.
MS. MARTINEZ: Objection.
A. I can only assume.
BY MR. MAZZOLA:
Q. Are you assuming yes or assuming no?
A. I can only assume that they're looking to collect these invoices on their -- attached to the complaint.
Q. You can assume --
A. Whether they're Hong Kong, otherwise,

whether they're third-party invoices or not, I'm not -- this was not relevant to my opinions.

Q. Because some days, I'm happy with a sloppy transcript. Other days, I want a really clean, crisp one.

A. Yes.

Q. Today I'm in clean, crisp mode. So --

A. Aren't I lucky?

MR. ROSENTHAL: It's the bow tie.

MR. MAZZOLA: It's the bow tie.

BY MR. MAZZOLA:

Q. So you can assume, yes, that Benlida is looking to Circuitronix here in the U.S. to pay the debts of Circuitronix Hong Kong? Can you assume yes to that?

A. I'm not so sure I can.

I mean, the complaint has a list of invoices. The circumstances that surround those invoices and why they're on the list is -- I could only surmise at this point.

BY MR. MAZZOLA:

Q. How about this:

At a minimum, can you assume -- well, when you say "surmise," what does that mean?

You can surmise what? Can you surmise

attention of Mr. Kukreja.
Do you see that?
A. Yes, it is.
Q. And do you see with respect to the Hong Kong entity, it's being sent -- although to a Hong Kong address -- to Mr. Kukreja as well.
Do you see that?
A. Yes.
Q. From an accounting perspective, is that a -- just one minor -- maybe not a big piece -- but just one minor indicia that they're related parties? That U.S.A CTX and Hong Kong CTX are related parties with this both addressed to Mr. Kukreja?
A. They could be related parties. But I don't understand what related parties have to -- what you're suggesting here.
I mean, related parties does not create anything other than potential disclosure issues, unless there is -- unless there's some -- the companies are being audited -- you know, subject to audit and it requires a determination by the auditors if there's any fraud or defalcation that's taking place. That's the consideration to me --
Q. Let me ask this question --
A. -- by an auditor.

Just being a related party may rise to a level of disclosure if it's significant enough, but it doesn't mean that the economic interests aren't maintained separately.

Q. If CTX U.S.A and CTX Hong Kong are related parties from an accounting audit and business perspective, let's assume that.

A. If what? I'm sorry.

Q. Is they are. So --

A. Which two entities?

Q. CTX Hong Kong and CTX U.S.A.

A. Okay.

Q. If you assume that they're related parties. With that assumption, would it then make sense for you to review the debts claimed to be owed by CTX Hong Kong to Benlida?

A. In what context?

MS. MARTINEZ: Objection.

BY MR. MAZZOLA:

Q. In any context.

You know Benlida's claiming that CTX Hong Kong owes them money. You know that.

A. I'm sorry?

Q. You know that Benlida is claiming that CTX Hong Kong owes them money.

A. Yes.
Q. You know that --
A. Yes. Yes.
Q. -- whether it's true or not, but you know that's their allegation.
A. Yes.
Q. And you knew that was their allegation from the beginning when you read the complaint. Isn't that correct?
A. Yes.
Q. And my question -- it's kind of a bigger question here.
And you know that in the complaint, Benlida is looking to the U.S. -- CTX U.S. to pay those debts to the Hong Kong entity. You know that as well. Right?
MS. MARTINEZ: Objection.
A. I assume that from the tenor of the complaint.
Q. So you know that? So if you --
A. But I don't -- I didn't see it in the complaint.
Q. But you assume it from the tenor of the complaint.
A. Well, after the fact.

see any indication what they were providing to --
you know, my understanding is that your client just
didn't inform the company what it was doing, how it
was applying -- how it was applying payments.

BY MR. MAZZOLA:

Q. Did you see any instruction from CTX as to
how to apply the payments?

A. I believe I did. It's -- they sent every
three months, a payment application.

Q. So let's look at this document we had
before, which is --

MR. LERNER: Which one?

MR. MAZZOLA: -- the statement
detail from May 1, 2016.

(Pause in proceedings.)

MS. MARTINEZ: This is the ROK
payment detail on Exhibit 158 still?

MR. MAZZOLA: Yes. 158. Thank
you, Christina.

BY MR. MAZZOLA:

Q. Do you see this ROK payment detail that's
from Circuitronix?

A. I see it.

Q. Does this indicate --

It's dated May 1. Do you see that?

A. 2016. Yes.
Q. Do you know on what date this payment detail would have been transmitted to, in this case, ROK?
A. I don't know looking at it.
Q. And if it was transmitted on May 1 for invoices from February and some from April, and there was whole numbers, as it is here, made in the end of April, would this be reasonable and sufficient to let a bookkeeper know to what invoices to apply the money to?
MS. MARTINEZ: Objection.
BY MR. MAZZOLA:
Q. Round numbers, I meant. Round numbers.
A. Rounds numbers where? I'm sorry.
Q. Over here.
A. Right. So that was a course of conduct between the parties that were paying round numbers. I saw emails that Benlida was, you know, constantly asking for money, so there were payments being made. I mean, it's -- but the invoices that are being paid are clearly -- that they want that applied against are clearly indicated on the top part of that document.
Q. But you see even after this, he's carrying

a balance --
A. Yes.
Q. -- of 189,000.
A. That doesn't give your client -- yes.
But that doesn't give your client leave to decide where they're going to apply a credit balance and not provide an accounting, indicating what they were doing to give the party a chance to object to that. Because that's obviously not what was intended by that -- by that type of document.
Q. But if it's sent a month later, is that timely?
MS. MARTINEZ: Objection.
A. If that's the course of conduct between the parties, it could be, yes. I think so.
BY MR. MAZZOLA:
Q. You said our clients were always begging for money.
A. I didn't say "begging."
Q. "Harping" or "chasing" for money.
MS. MARTINEZ: Objection.
A. I saw emails to that effect.
BY MR. MAZZOLA:
Q. Do you think maybe they were chasing for

money because, pursuant to Exhibit 158, they were owed $13 million?
A. I'm sure that had a part of it.
They should have then pursued Circuitronix Hong Kong for that. That would be one way to deal with it.
Q. Mr. Mukamal, we have your invoices here.
A. Yes, sir.
Q. I can hand them to you. But if you know the grand total --
A. I do not.
Q. I guess I'm going to hand them to you. It's Exhibit 164.
MS. MARTINEZ: I think you have them.
THE WITNESS: Oh. I do. I do.
A. I'm sorry. I have it. Okay.
(Deposition Exhibit 164 marked for identification.)
BY MR. MAZZOLA:
Q. I'm just looking for a grand total.
A. Oh, I'm sorry. I'd have to add them up.
Q. I asked Mr. Parisi yesterday. He thought it was north of 100,000. I think it's north of 200,000.

Docket/Tab #203

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 21-60125-CIV-Scola/Goodman**

JIANGMEN BENLIDA PRINTED CIRCUIT CO., LTD.,

Plaintiff,

v.

CIRCUITRONIX, LLC,

Defendant.

# Plaintiff Jiangmen Benlida Printed Circuit Co., Ltd.'s Memorandum of Law in Opposition to Circuitronix LLC's Second "Omnibus" Motion *in Limine*

**MAZZOLA LINDSTROM LLP**
Richard E. Lerner
Jean-Claude Mazzola
*Counsel for Jiangmen Benlida Printed Circuit Co., Ltd.*
1350 Avenue of the Americas, Second Floor
New York, New York 10019
646.216.8300
richard@mazzolalindstrom.com
jeanclaude@mazzolalindstrom.com

August 22, 2023

Plaintiff Benlida hereby opposes defendant Circuitronix LLC's second of two motions *in limine*, which seeks an order precluding nine potential items of proof. As in prior papers submitted in this action, for consistency Circuitronix LLC is referred to herein as CTX-US, and Circuitronix (Hong Kong) Ltd. is referred to as CTX-HK. The third amended complaint is referred to as the TAC. To avoid repetition, we incorporate herein by reference the arguments made in opposition to CTX-US's first motion *in limine*, which sought to preclude Benlida's rebuttal expert from testifying, and apologize for unavoidably repeating some of the prior arguments herein.

## Argument

**Point I: The Court Should Reject, or Reserve for Trial, the Issue Whether Benlida may Present a Damages "Computation" Beyond that Pled in the Complaint.**

As noted in opposition to CTX-US's first motion *in limine*, during its case in chief Benlida expects to testify that goods were ordered by CTX-US and CTX-HK, that Benlida delivered the goods that were ordered, that Benlida issued invoices, and that CTX-US and CTX-HK failed to pay in full. Benlida expects to show, further, that CTX-HK's orders were placed for customers on CTX-US's "exclusive customer list," and thus that CTX-HK purchased them as an agent for CTX-US and thus that CTX-US is liable therefor, and additionally that they are each jointly and severally liable for the other's purchases by virtue of having become co-signers to the 2012 Manufacturing Agreement. There should be very little dispute about how much was invoiced and was paid, as CTX-US's expert Barry Mukamal acknowledges that there is 99% agreement between the parties as to the amounts at issue: (See Mukamal Dep., Ex. A, pp. 86, 88-89)

> Q. You said there was a – there is concurrence between the parties as to over 99 percent of the payments.
>
> A. Correct.

Q. So what did that tell you from an accounting perspective?

A. It told me what Benlida and Circuitronix were relying on for the payments were within like $92,000 of 60 – almost 70 – $68 million of payments.

Q. So that's indicative that the CTX numbers had a degree of reliability to them. Right?

MS. MARTINEZ: Objection.

A. It gave me comfort that there was alignment between the two entities in terms of payments relating to the two entities, CTX, LLC, and Benlida.

***

Q. And then -- so the numbers, then, coming out of Benlida, the answer has to be the same. There was nothing alerting you to an inaccuracy of the numbers coming from Benlida. That's got to be the answer because CTX, there's no alert of inaccuracy by their numbers. It's got to be the same on the other side of the coin.

MS. MARTINEZ: Objection.

A. They agreed with each other. Whether they were accurate or inaccurate, I can't say for sure.

BY MR. MAZZOLA:

Q. But is it true, then, because it was true for Circuitronix, that insofar as the -- Benlida's numbers were concerned, there was nothing in your words alerting you to an inaccuracy.

MS. MARTINEZ: Objection.

A. Well, there wasn't --

BY MR. MAZZOLA:

Q. If not yes, explain why.

A. -- a 92,000 inaccuracy --

Q. Okay.

A. -- aligning the two numbers. How's that?

Q. Okay.

A. That's the best I could answer.

Q. But the question was, was there anything in the Benlida numbers alerting you to an inaccuracy?

A. As to that line? No.

Q. Okay. And the same thing for CTX.

A. I accepted the accuracy of the numbers on both sides for that line.

Q. Here's an interesting question I want to ask you about. Now that we've accepted the accuracy of these numbers. Right? We've accepted that they're not inaccurate.

A. I accepted they agreed to each other within $92,000.

This is to say, a simple computation beyond that pled in the complaint may well be unnecessary, and surely Benlida would not make a federal case of such a trivial difference, especially since Benlida and CTX-US and CTX-HK continue to do business with each other. However, it would appear that CTX-US is trying to place Benlida in a straitjacket, barring it from offering any explanation of the numbers in response to CTX-US's cross-examination of Benlida's witnesses, or to rebut CTX-US's case in chief.

As CTX-US argues (as it did in its first motion *in limine*) that Benlida should be precluded from offering such testimony because of some violation of Rule 26, we reiterate that Your Honor rejected such arguments in *Ore v. Tricam Indus*., 2017 U.S. Dist. LEXIS 171639, *18-19; *FTC v. On Point Global LLC*, 2021 U.S. Dist. LEXIS 201532, *20, and *Ramones v. Experian Info. Sols*., LLC, 2021 U.S. Dist. LEXIS 168243, *13. For the reasons previously stated, we respectfully submit that CTX-US's motion *in limine* to preclude any damages computation beyond that presented in the TAC should be denied, or at least the issue should be reserved for trial, where the Court will be in the best position to determine the relevance and probative value of such testimony.

**Point II: The Court Should Flatly Deny CTX-US's Motion *in Limine* to Preclude Testimony Regarding the Debts of CTX-HK.**

CTX-US's defense in this action is that moneys it paid to Benlida for goods ordered by both itself and by CTX-HK (even though the CTX-HK orders were placed for CTX-US's "exclusive customers" and even if CTX-US and CTX-HK became co-signers of the 2012 Manufacturing Agreement by virtue of the 2016 Letter Agreement) should have only been

attributed by Benlida to CTX-US's accounts receivable. The preposterousness of CTX-US's position is illustrated by the following *If/Then* example demonstrating CTX-US's logic:

***If:*** (a) CTX-US orders $10,000,000 in goods from Benlida, and

(b) CTX-HK also orders $10,000,000 in goods from Benlida, and

(c) CTX-US sends a wire payment of $15,000,000 to Benlida,

***Then:*** (d) CTX-US now has a credit balance with Benlida of $5,000,000, and CTX-HK still owes Benlida $10,000,000, and

(e) Benlida should look to CTX-HK for $10,000,000, and Benlida should give back to CTX-US the $5,000,000 on its counterclaim.[1]

It is Benlida's position that CTX-US is responsible for the orders placed by CTX-HK, because (a) orders placed by CTX-HK were for CTX-US's "exclusive customers," and thus CTX-HK was the agent of CTX-US with respect to such purchases; (b) even if there were no principal-agent relationship, they functioned as one and the same company; and (c) they are jointly and severally liable in any event as co-signers. In sum, Benlida respectfully submits that, inasmuch as CTX-US's obligation to pay for the orders placed by CTX-HK remains a live issue, there is no basis to preclude testimony regarding the debts of CTX-HK. Additionally, the "overpayment" is only explicable by the fact that CTX-US and CTX-HK are related entities, and is not an overpayment at all, but a payment that reduces the overall A/R of the two combined entities.[2]

---

[1] See CTX-US's Answer/Counterclaim (DE 34, Counterclaim ¶ 23, at p. 12) ("CTX currently maintains a significant credit balance due to overpayments that have accumulated over the course of the companies' relationship.")

[2] This will be the subject of the rebuttal testimony of Benlida's expert Randall Paulikens, which is addressed in the memorandum submitted by Benlida in opposition to CTX-US's motion to preclude Mr. Paulikens.

**Point III: As Under Florida Law there is No Statute of Limitations Problem in This Case, and as CTX-US's Own Expert Acknowledged that FIFO Accounting is Proper, Preclusion of Testimony Regarding "Stale" Claims is Inapt.**

In opposition to CTX-US's motion for summary judgment, Benlida showed that – according to Florida's highest court – when a debtor makes a payment to a creditor without designating "at the time of payment" on the check itself or including within the wire-transfer instruction itself the invoice to which the payment should be applied, the creditor may apply the payment to the earliest invoices. See *Randall v. Pettes*, 12 Fla. 517, 534, 1868 Fla. LEXIS 20, at **26 (Fl. Sup. Ct. 1868). This is not just black-letter Florida law: CTX-US's own expert acknowledged the propriety of such accounting method during his deposition: (Parisi Dep., Ex. B, pp. 241-242, 248) ("*Q.* If the payment doesn't -- if the payment made by the payor does not define what invoices or identify what invoices they should be attributable to, is there anything unreasonable about the payee applying that money to their oldest invoices? *A.* That's one option. … *Q.* Okay. So still talking about payment application and applying of payments. [¶] I guess, hypothetically, if CTX U.S. is responsible for the debts of CTX Hong Kong, is it -- would it be appropriate and reasonable for Benlida to apply payments from the U.S. operation to the oldest invoices of either U.S. or Hong Kong? *A.* If Circuitronix, LLC, is responsible for all the debts of Circuitronix Hong Kong. *Q.* Hong Kong. Um-hmm. *A.* Then you could presumably combine the balances.")

Moreover, there is nothing at all improper about applying payments by a debtor to unpaid debts that might be time-barred by statute of limitations, where the payment by the creditor does not specify that, for example, the moneys are to be applied to only more recently incurred debts. See *Henry v. Halifax Hospital Dist*., 368 So. 2d 432, 433 (Fla. Dist. Ct. App., 1st Dist. 1979) ("The law is clear that the expiration of the period of time prescribed by a statute of limitations

does not extinguish the debt itself but only precludes the bringing of legal action to collect that debt. *Hoagland v. Railway Express Agency,* 75 So.2d 822 (Fla. 1954); 21 Fla.Jur., Limitations of Action, section 4 at 168; *Danielson v. Line,* 135 Fla. 585, 185 So. 332 (1938)." See also *Somohano v. PRA Receivables Mgmt. LLC*, 819 Fed. Appx. 873, 876 (11th Cir. 2020) (interpreting Florida law: "Even after the statute of limitations extinguishes the remedy, however, the right to payment of a debt continues to exist. *Danielson v. Line*, 135 Fla. 585, 185 So. 332, 333 (Fla. 1938).")

An illustrative case, albeit a New York case, is *Hahn Automotive Warehouse, Inc. v. American Zurich Ins. Co*., 81 A.D.3d 1331, 916 N.Y.S.2d 678, 679-680, 2011 N.Y. App. Div. LEXIS 960 (NY Appellate Division 4th Dep't 2011) (internal citations and punctuation omitted; emphasis added), wherein the court stated:

> We reject the contention of plaintiff on its appeal that the court erred in determining that defendants were entitled to apply the letter of credit to all debts, including those that were time-barred. A letter of credit is interpreted in accordance with the same rules that apply to any other contract, and a familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing. Contrary to plaintiff's contention, the letter of credit unequivocally permitted defendants to apply the letter of credit to any debts that plaintiff owed to defendants. The letter of credit did not permit plaintiff to direct the particular debt to which the letter of credit should be applied, ***nor did it prohibit defendants from using the letter of credit to satisfy otherwise time-barred debts.*** Furthermore, plaintiff provided the letter of credit well before the current controversy arose. Thus, because the payment in question was already in the creditor's possession as security for a debt, the money already belonged to the creditor and they were entitled to apply it to the obligation in any manner that they chose. Contrary to plaintiff's further contention, plaintiff could not set conditions upon the use of the letter of credit after it had been provided to defendants. As previously noted, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms, and the letter of credit at issue specifically stated that it "cannot be modified or revoked without [defendants'] consent."
>
> With respect to plaintiff's contention that defendants could not apply the letter of credit to the debts that arose prior to the expiration of the statute of limitations, ***we note the well-settled proposition that the expiration of the time period prescribed in a statute of***

> ***limitations does not extinguish the underlying right, but merely bars the remedy.*** … ***The theory of the statute of limitations generally followed in New York is that the passing of the applicable period does not wipe out the substantive right; it merely suspends the remedy.*** Notably, plaintiff does not contend that the debts at issue are not due and owing. Thus, despite the expiration of the statute of limitations with respect to those debts, defendants were entitled to apply the letter of credit to them.
>
> Contrary to the contention of defendants on their cross appeal, however, the court properly concluded that the counterclaims for any debt that arose more than six years prior to the commencement of this action were time-barred. The contention of defendants that the claims for those debts did not accrue until they made a demand for payment is without merit. Where, as here, the claim is for payment of a sum of money allegedly owed pursuant to a contract, the cause of action accrues when the [party making the claim possesses a legal right to demand payment. Thus, in such a case, the statute of limitations begins to run when the right to make the demand for payment is complete, and the party making the claim will not be permitted to prolong the statute of limitations simply by refusing to make a demand. Here, the court properly determined that the counterclaims for payment of the debts at issue were time-barred because defendants had the right to demand payment for those debts more than six years prior to the commencement of this action. ***That conclusion does not, however, prevent defendants from applying the letter of credit, which plaintiff had previously provided to them, to any debt, including those debts that are time-barred, inasmuch as the expiration of the statute of limitations merely bars the remedy but does not extinguish defendants' rights.***

Moreover, CTX-US's reliance on out-of-context shipment and payment detail charts (see p. 10 of the second motion *in limine*) is utterly misplaced and obfuscatory, particularly since CTX-US's expert Mark Parisi himself acknowledged that FIFO application of moneys received to the oldest debts is appropriate. As Benlida expert Paulikens testified, the vast majority of the payments recorded were in round thousands-of-dollar increments until the middle of 2019 when the parties started trying to negotiate and reconcile their books. (Paulikens Dep., pp. 157-159; see also Paulikens report, p. 6). Mr. Paulikens explained that round-number payments are very indicative of payments on account (see Paulikens Dep., pp. 160-162), which would almost universally be applied using FIFO. (See Paulikens Dep., pp. 163-164).

While the chart excerpted from the Paulikens report was reproduced properly, CTX-US either misapprehends or pretends to misapprehend what it means. The table (which was also

produced by CTX-US and used by its experts) was not intended to be a true representation of the aging accounts receivable, to show the amounts that were outstanding, nor from what period the amounts were unpaid. That table is simply a summary of the total invoices and the total payments reflected in each period by the records shared by both parties. Counsel's interpretation that there are balances due from prior to the statute-of-limitations cutoff period is simply incorrect.

Applying payments to the oldest outstanding invoices is a long-time customary practice in business. We present the same chart with the additional analysis to make it an appropriate representation of accounts receivable. (Obviously Benlida's accounts receivable are CTX-HK's – and thus CTX-US's – accounts payable). As shown below, as of the date that this table was created (circa November 1, 2019), the most recent invoices were outstanding and everything prior to 2017 was paid in full. There are no invoices outstanding that are subject to the mischievous statute-of-limitations argument that is being made. The following table puts the numbers in context, on a FIFO basis. (Note: an enlarged version of the chart is included as an addendum to this memorandum)

| Source Benlida Shipment and Payment Details CTX-HK_2012-2019 | | | | | | | FIFO Payments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Payment Detail Year | Total Invoices | Total Debit Memos | Total Payments | Balance Due/(Credit Balance) | Cummulative | Net Invoices and Debit Memos | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019.01-07 | FIFO Balance |
| 2012 | $ 50,844.68 | | $ - | $ 50,844.68 | $ 50,844.68 | $ 50,844.68 | | $ (50,844.68) | | | | | | | $ - |
| 2013 | 663,041.04 | (39,550.39) | 242,827.24 | 380,663.41 | 431,508.09 | 623,490.65 | | (191,982.56) | (431,508.09) | | | | | | - |
| 2014 | 2,127,957.19 | (15,911.64) | 776,987.44 | 1,335,058.11 | 1,766,566.20 | 2,112,045.55 | | | (345,479.35) | (1,766,566.20) | | | | | - |
| 2015 | 4,866,595.96 | | 3,959,983.86 | 906,612.10 | 2,673,178.30 | 4,866,595.96 | | | | (2,193,417.66) | (2,673,178.30) | | | | - |
| 2016 | 7,449,167.92 | | 5,572,718.50 | 1,876,449.42 | 4,549,627.72 | 7,449,167.92 | | | | | (2,899,540.20) | (4,405,490.00) | (144,137.72) | | - |
| 2017 | 7,095,140.71 | | 4,405,490.00 | 2,689,650.71 | 7,239,278.43 | 7,095,140.71 | | | | | | | (4,410,862.28) | (2,245,367.06) | 438,911.37 |
| 2018 | 9,451,795.08 | | 4,555,000.00 | 4,896,795.08 | 12,136,073.51 | 9,451,795.08 | | | | | | | | | 9,451,795.08 |
| 2019.01-07 | 3,602,117.12 | | 2,245,367.06 | 1,356,750.06 | 13,492,823.57 | 3,602,117.12 | | | | | | | | | 3,602,117.12 |
| | $ 35,306,659.70 | $ (55,462.03) | $ 21,758,374.10 | $ 13,492,823.57 | | | $ - | $ (242,827.24) | (776,987.44) | (3,959,983.86) | (5,572,718.50) | (4,405,490.00) | (4,555,000.00) | (2,245,367.06) | $13,492,823.57 |
| | | | | Agrees | | | | | | | | | | | Agrees |
| Source | | | | | | | | | | | | | | | |
| Benlida Shipment and Payment Details CTX-HK_2012-2019 | | | | | | | | | | | | | | | |
| Original creation date 11-1-2019 | | | | | | | | | | | | | | | |

This is to say:

- In 2012, there were $50,844.58 in invoices and no payments were made.
- In 2013 there were a total of $242,827.84 in payments made. Using FIFO, the first $50,844.58 was applied to the 2012 invoices. The balance of 2013 payments or $191,982.56 was applied to the 2013 net invoices of $623,490.65. Therefore, the balance

due at the end of 2013 is in fact $431,508. But this represents 2013 invoices only, as the 2012 invoices were paid with the first $50,844.58. This is proven by the fact that there were $623,490.65 in net invoices in 2013 against $191,982.56 in remaining payments, leaving a balance due of $431,508.09. This is what was shown in the cumulative column.

- In 2014 there was a total of $776,987.44 in payments. The first $431,508.09 was applied against the 2013 invoices. As a result, the 2013 invoices using FIFO, are paid in full. The balance of the 2014 payments or $345,479.35 is applied against the 2014 invoices of $2,112,045.55. This leaves $1,766,566.20 on 2014 invoices at the end of 2014. All of the 2012 and 2013 were fully paid using FIFO. The cumulative balance due at the end of 2014 remains $1,766,566.20 as shown in the original table, but this represents only 2014 invoices – the most recent – again consistent with normal and customary business practices testified to by CTX-US's own expert using FIFO.
- The same pattern follows 2015 to 2019. In fact, using FIFO, CTX-HK (and thus CTX-US, jointly and severally) still owed Benlida a portion of the 2017 invoices ($438,911.37); all of the 2018 invoices ($9,451,795.08); and the 2019 invoices of $3,602,117.12 as shown in the table. The total is $13,492,823.57.

This shows that as of the date of the source file, Benlida was owed $13,492,823.57 on invoices from the 2017, 2018, and 2019 invoices, and only those invoices, as the older invoices were cleared by properly using FIFO bookkeeping, applying recent payments to the oldest debts, where there was no express designation "at the time of payment" by CTX-US or CTX-HK that only certain invoices were to be treated as having been paid. Thus, there simply is no statute-of-limitations issue in this case, despite CTX-US's attempt to manufacture one.

In any event, as it remains a live issue whether CTX-US is or is not responsible for the debts of CTX-HK, it would be premature to hold that FIFO treatment of payments made to Benlida was improper.

**Point IV: There Should be No Pre-Trial Preclusion of Accounting Records Not Produced During Discovery.**

Benlida does not expect to introduce at trial records of account that have not previously been produced. Nonetheless, in the unlikely event that a document may have slipped through the cracks, so to speak, the Court could make the determination at trial whether (a) the failure to produce it was a mere inadvertence, and (b) introduction of the document would be prejudicial to

CTX-US. At this time, there is no "live" issue, as we are unaware of any data that had been extracted from the Jindie accounting system that have not been produced.

**Point V: There Should be No Preclusion of Testimony Regarding "Related Party" Status.**

There should be no preclusion of testimony regarding the relationship between CTX-US and CTX-HK, as such testimony will help the jury to understand CTX-US's approach to the case, as explained using the *If/Then* example above. The fact that CTX-US and CTX-HK are related must be allowed into evidence to show that CTX-US is trying to claim back moneys from Benlida that were actually payments for goods ordered for it by CTX-HK. Benlida's accounting expert, in rebuttal, will assist the jury, by showing why the relatedness of CTX-US and CTX-HK negates the idea that Benlida owes money back to CTX-US. The jury cannot be left to sit in the dark and wonder what CTX-HK has to do with this case, when it is clear that CTX-HK was placing orders for CTX-US's "exclusive customers," and thereby acting as CTX-US's agent if not as a mere division of CTX-US, and when CTX-US and CTX-HK became co-signers to the 2012 Manufacturing Agreement by virtue of the 2016 Letter Agreement, as CTX-US alleges in its counterclaim. (DE 34, Counterclaim ¶3, at p. 7). Benlida has no quarrel with the case law cited by CTX-US for the proposition that testimony regarding foreign labeling of pharmaceutical products might be irrelevant.[3] Nor does Benlida have any quarrel with the idea that expert testimony should be precluded where it would serve to confuse the jury. Here, however, testimony regarding the relationship between CTX-US and CTX-HK could only serve to educate the jury, to help the jurors understand why alleged "overpayments" made by CTX-US were actually payments to reduce the CTX-HK accounts receivable. Such testimony is not intended to

[3] *In re Seroquel Prod. Liab. Litig.*, No. 6:06MD1769-ORL-22DAB, 2009 WL 223140, at *5-6 (M.D. Fla. Jan. 30, 2009).

"bolster" Benlida's case in chief; rather, it is intended to counter CTX-US's claims for recoupment of "overpayments."

**Point VI: Benlida Does Not Intend to Contradict Its Admission That Under the 2016 Letter Agreement, CTX-HK Became a Party to the 2012 Manufacturing Agreement. Therefore, No Preclusion Order in This Regard is Warranted.**

The issue in this case is not whether CTX-HK became a party to the 2012 Manufacturing Agreement when its principal Rishi Kukreja signed the 2016 Letter Agreement in behalf of both CTX-US and CTX-HK. Though Benlida did argue in opposition to the motion for summary judgment that CTX-HK did not become a party to the 2012 Manufacturing Agreement through the execution of the 2016 Letter Agreement, a more refined argument would have stated that CTX-US's "exclusive customers" did not thereby become CTX-HK's exclusive customers, as "exclusive" means "exclusive to CTX-US."

In opposition to the motion for summary judgment, Benlida focused on the principal-agent relationship between CTX-US and CTX-HK, and that point stands, whether or not CTX-US and CTX-HK became co-signers through the execution of the 2016 Letter Agreement. In other words, Benlida's imprecise argument in opposition to the motion for summary judgment is of no moment, because (a) CTX-US is liable as principal for the purchases made by CTX-HK for CTX-US's "exclusive customers," whether or not CTX-HK became a signatory to the 2012 Manufacturing Agreement, and (b) CTX-HK's having become a party to the 2012 Manufacturing Agreement actually establishes an additional basis for CTX-US's liability for orders placed by CTX-HK, as CTX-US and CTX-HK thereby became co-signers.

That is, when CTX-HK and CTX-US became co-signers, they thereby became jointly and severally liable for each other's debts to Benlida. And this position is supported by CTX-US's payments in behalf of CTX-HK, as companies do not regularly "overpay" one another. CTX-US

has not presented any authority that might show otherwise. Whether it is decided as a matter of law that CTX-US is liable for CTX-HK's purchases, or the determination is left to the jury, remains to be seen. Benlida does not intend to argue at trial that the 2016 Letter Agreement did not make CTX-US and CTX-HK co-signers to the 2012 Manufacturing Agreement; rather, Benlida maintains that CTX-US's "exclusive customers" nonetheless remained CTX-US's exclusive customers and thus that CTX-HK acted as the agent for CTX-US when it made purchases for CTX-US's exclusive customers, and in any event as co-signers they remain jointly and severally liable. In sum CTX-US is liable both on principal-agent grounds, and because CTX-US and CTX-HK are co-signers. At least a jury may so find, if the Court does not so hold as a matter of law.

**Point VII: The Entire Print Run of Invoices Should Not be Precluded, as It Is Proof of the Total Amount that CTX-US and CTX-UK Were Invoiced, and When Measured Against the Payments Received, the Total Comes out to the Same Amount Sought.**

While Benlida is suing on several hundred specific invoices, as pled in the TAC, and maintains that CTX-US and CTX-HK wire transfers, which were bereft of notations as to specific invoices to which payments should be attributed, were properly (*i.e.*, in accordance with, e.g., *Randall v. Pettes*, supra) applied to the earliest invoices, a presentation to the jury of all of the invoices will be demonstrative of the sheer volume of business that the parties were doing, but – more importantly – provide the jury with the full and complete amount that was billed to CTX-US and CTX-HK for the goods delivered. With that print run, it is a matter of simple math to show (a) how much was invoiced, and (b) how much was paid by CTX-US and CTX-HK, resulting in (c) the number that is owed by CTX-US, both for itself and for orders placed for it by CTX-HK or as to which CTX-US is a co-signer and thus co-obligor. CTX-US's expert Mr. Parisi testified that the math should work out the same: (Parisi Dep., Ex. B, pp. 241-242)

Q. Are you familiar with the term – the accounting term "FIFO"?

A. Absolutely.

Q. Okay. What does that mean?

A. First in, first out.

Q. Did you consider FIFO in reviewing this claim? This matter?

A. So when you review everything -- right -- we're only talking about invoices, payments, and debit memos. And you may remember a long time ago called "the order of operations." Right? Parentheses, exponents, multiplication, addition --

Q. PEMDAS.

A. PEMDAS. Yes. I didn't want to be that nerdy and say it, but yes. PEMDAS. [¶] And so when you're just adding -- right? -- there's no multiplication here. We're just in the addition/subtraction component of the PEMDAS. And so no matter what order -- as in FIFO or LIFO -- you add and subtract, you're going to get the same answer.

Q. It makes no difference, then.

A. When you analyze everything. Correct. [¶] Because it's all -- it's all out [sic] at the end of the day.

In other words, should the Court find (as a matter of law) or the jury find (as a matter of fact) that Benlida properly applied payments on a FIFO basis, the math should work out the same, no matter how the math is done. By bringing in the entire print run of invoices, which Benlida's witnesses will testify were routinely sent to CTX-US and CTX-HK, and Benlida will testify as to how much was received from CTX-Us and CTX-HK, it's simple math to determine what is owed, prior to any entitlement to an offset proved by CTX-US for lead-time penalties or air-freight bills. CTX-US should not be heard to argue that Benlida has failed to provide a computation of its damages, when the invoices *are* that computation, but then simultaneously ask that the invoices be precluded. Again, Benlida cannot argue this case in a straitjacket, particularly with respect to information, *viz* the invoices, that CTX-US has been in possession of since before this case was even filed.

None of this could plausibly cause any confusion to the jury, and CTX-US cannot claim prejudice because, as its principal Rishi Kukreja acknowledged at deposition, all of Benlida's invoices were in fact received by CTX. (See, e.g., Kukreja Dep., Ex. C, pp. 74-75, 100-101).

Accordingly, the full print run of invoices will aid the jury in seeing how much in total was invoiced. Then, based upon the total amounts paid by CTX-US and CTX-HK (which will be testified to by Benlida, and presumably CTX-US's principal Rishi Kukreja), the jurors could do the simple math and determine how much is owed. The next step will be to determine whether CTX-US is entitled to any offsets, or money back based upon the *If/Then* illustration above, and report its verdict to the Court. As CTX-US said in its first motion *in limine*, this is indeed a straightforward case.

**Conclusion**

Wherefore, except as to those points of agreement noted in CTX-US's moving papers, it is respectfully submitted that its second motion *in limine* should be denied in all other respects.

Dated: New York, New York
August 22, 2023

**Mazzola Lindstrom LLP**

*By:* ____________________
Richard E. Lerner
Jean-Claude Mazzola
*Counsel for Jiangmen Benlida Printed Circuit Co., Ltd.*
1350 Avenue of the Americas, Second Floor
New York, New York 10019
Tel.: 646.216.8300

Service via ECF

## Addendum

| Source Benlida Shipment and Payment Details CTX-HK_2012-2019 | | | | | | | FIFO Payments | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Payment Detail Year | Total Invoices | Total Debit Memos | Total Payments | Balance Due/(Credit Balance) | Cummulative | Net Invoices and Debit Memos | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019.01-07 | FIFO Balance |
| 2012 | $ 50,844.68 | | $ - | $ 50,844.68 | $ 50,844.68 | $ 50,844.68 | | $ (50,844.68) | | | | | | | $ - |
| 2013 | 663,041.04 | (39,550.39) | 242,827.24 | 380,663.41 | 431,508.09 | 623,490.65 | | (191,982.56) | (431,508.09) | | | | | | - |
| 2014 | 2,127,957.19 | (15,911.64) | 776,987.44 | 1,335,058.11 | 1,766,566.20 | 2,112,045.55 | | | (345,479.35) | (1,766,566.20) | | | | | - |
| 2015 | 4,866,595.96 | | 3,959,983.86 | 906,612.10 | 2,673,178.30 | 4,866,595.96 | | | | (2,193,417.66) | (2,673,178.30) | | | | - |
| 2016 | 7,449,167.92 | | 5,572,718.50 | 1,876,449.42 | 4,549,627.72 | 7,449,167.92 | | | | | (2,899,540.20) | (4,405,490.00) | (144,137.72) | | - |
| 2017 | 7,095,140.71 | | 4,405,490.00 | 2,689,650.71 | 7,239,278.43 | 7,095,140.71 | | | | | | | (4,410,862.28) | (2,245,367.06) | 438,911.37 |
| 2018 | 9,451,795.08 | | 4,555,000.00 | 4,896,795.08 | 12,136,073.51 | 9,451,795.08 | | | | | | | | | 9,451,795.08 |
| 2019.01-07 | 3,602,117.12 | | 2,245,367.06 | 1,356,750.06 | 13,492,823.57 | 3,602,117.12 | | | | | | | | | 3,602,117.12 |
| | $ 35,306,659.70 | $ (55,462.03) | $ 21,758,374.10 | $ 13,492,823.57 | | | $ - | $ (242,827.24) | (776,987.44) | (3,959,983.86) | (5,572,718.50) | (4,405,490.00) | (4,555,000.00) | (2,245,367.06) | $13,492,823.57 |
| | | | | Agrees | | | | | | | | | | | Agrees |
| Source | | | | | | | | | | | | | | | |
| Benlida Shipment and Payment Details CTX-HK_2012-2019 | | | | | | | | | | | | | | | |
| Original creation date 11-1-2019 | | | | | | | | | | | | | | | |

Docket/Tab #203-3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-60125-CIV-SCOLA/GOODMAN

JIANGMEN BENLIDA PRINTED
CIRCUIT CO., LTD.,

Plaintiff,

vs.

CIRCUITRONIX, LLC,

Defendant.
_______________________________/

TRANSCRIPT OF PROCEEDINGS
DEPOSITION OF RISHI KUKREJA

Thursday, June 1, 2023
One Southeast Third Avenue, Suite 2300
Miami, Florida 33131
9:22 a.m. - 7:03 p.m.

Stenographically Reported By:
LAUREL A. MAZUR
Florida Professional Reporter

APPEARANCES:

On behalf of the Plaintiff:

MAZZOLA LINDSTROM, LLP
1350 Avenue of the Americas, 2nd Floor
New York, New York 10019
BY: RICHARD LERNER, ESQ.
richard@mazzolalindstrom.com
BY: JEAN-CLAUDE MAZZOLA, ESQ.
jeanclaude@mazzolalindstrom.com

GABLES ESTATES TAX & ADVISORY SERVICES
396 Alhambra Circle, Suite 200
Miami, Florida 33134
BY: XIAOMING "ANGELA" GUAN, ESQ.
aguan@gecpas.com

On behalf of the Defendant:

PODHURST ORSECK, P.A.
SunTrust International Center
One Southeast Third Avenue, Suite 2300
Miami, Florida 33131
BY: STEPHEN F. ROSENTHAL, ESQ.
srosenthal@podhurst.com
BY: CHRISTINA H. MARTINEZ
cmartinez@podhurst.com

Also Present:

HUANG SULAN

an understanding of the types of questions I would ask. I don't want to know what you talked about. Perhaps they showed you some documents.

After that preparation with your lawyers, do you feel comfortable today to provide testimony in this case?

A I do.

Q And you feel you have been adequately prepared?

A I do.

Q What I don't want to happen is we get to trial and I ask you a question at trial or I refer to this transcript and you say, Mr. Mazzola, I would have wanted more time with my lawyers to prepare. So I want to be very clear right now, you are set and ready to go?

A I am set and ready to go.

Q We understood you weren't feeling well. I think maybe we got a text -- might have been Tuesday as you were coming down -- and I see Mr. Rosenthal has just put on a mask. He likes to be safe it seems. How are you feeling physically?

A I feel good.

Q Do you feel physically prepared to go forward with this deposition?

A I do.
Q You know it's going to be a number of hours. It will likely be shorter than the other ones, because we don't have a translator, but you are prepared to sit here for the better part of today?
A I am.
Q I also presume you know the ground rules here. All we are asking for is for you to tell the truth; is that correct?
A That is correct.
Q You know that you have been sworn to tell the truth?
A That is correct.
Q You know that you are under oath to tell the truth?
A That is correct.
Q I assume you know that if you don't tell the truth while you are under oath you could subject yourself to some serious repercussions; is that correct?
A Yes.
Q Mentally speaking -- we just talked about physically speaking. Mentally speaking do you feel your head is clear today and you are ready to proceed?
A I do.

Q Have you taken any medications that would impact your ability to remember things clearly?
A No.
Q Anything that would impact your ability to stay sharp?
A No.
Q You answered that very quickly. You have been deposed before; is that correct?
A Yes.
Q I assume this is not your first deposition, right?
A It is not.
Q And can you talk to me about other times you have been deposed?
A What would you like to know?
Q Well, let's talk about the last case that you were deposed in.
A Sure.
Q Which one was that one?
A The last case I was deposed in was a case against -- which we were the plaintiffs against a law firm which we brought for malpractice.
Q When did that deposition happen?
A So that deposition happened sometime in 2022, but I am just trying to recollect the month. I am not

being able to recollect the month.

Q That is okay. Who was the law firm you were suing?

A Carlton Fields.

Q Did you tell Mr. Rosenthal you brought a malpractice suit against a prior attorney?

A Yes.

MR. ROSENTHAL: And I still stay here.

MR. MAZZOLA: Still sitting here.

BY MR. MAZZOLA:

Q There was a case that went to trial I understand a couple weeks ago or couple months ago?

A Yes.

Q Chauncey Cole, your attorney -- Chauncey Cole is still your attorney; is that correct?

A He is.

Q What you are doing is great, because you are nodding your head, but try to speak audibly, because sometimes the court reporter may not be catching it. She is very good, I am sure she might be, but --

A Sure.

Q Chauncey Cole, is he still your attorney?

A Yes.

Q And there was a bench trial I was just asking about. I think it was a few weeks ago or few months

ago. I know about that because Mr. Cole told us about it.
A Yes.
Q What was that case about?
A We were the defendant in that case -- defendants and counter-plaintiffs -- and it was about trademark rights.
Q Who was the counter-party in that lawsuit?
A Shenzhen Kinwong.
Q Is that what people collectively understand as the Kinwong lawsuits?
A There were three Kinwong lawsuits. The first two we were the plaintiffs; and we won the first one, they settled the second one, and the third one is ongoing.
Q The third one is ongoing. That is the one you just tried a couple weeks ago?
A Yes, because after closing statement the judge told us that he would need to see us again and over the next couple of weeks he will be calling us for -- and giving each side 30 minutes each.
Q Post-trial briefings?
A No. We were not able to close properly because he had given us 90 minutes each to close and each side had taken two hours and he had some other --

Q So the trial is still ongoing?
A That is what -- yes.
Q What was the Kinwong lawsuit all about? Can you give me some background on that?
MR. ROSENTHAL: Objection to the form.
BY MR. MAZZOLA:
Q Do you understand my question?
A Sort of.
Q Here is another ground rule. If I ask you a question and you don't say to me I don't understand the question or can you rephrase that question, Mr. Mazzola, I am going to assume you understood the question; is that fair?
A That is I fair.
Q And when you give an answer to that question, I am going to assume, and ultimately a jury and finder of fact is going to assume, that you understood the question as that question is most properly understood by people, okay?
A Understood.
Q I asked you can you give me some idea or describe in your words about what the Kinwong dispute was about.
MR. ROSENTHAL: Object to the form.
THE WITNESS: We -- Circuitronix --

Circuitronix registered the Kinwong trademark in United States, since we believe that we had first use from 2005, and they brought a lawsuit against us because they believe that they had the rights to Kinwong.

BY MR. MAZZOLA:

Q And was Benlida involved in that in any way?

A Benlida was involved to the extent that they believed that we were manufacturing parts at Benlida using the Kinwong UL logo.

Q When you say they, Kinwong thought that you were manufacturing parts at Benlida using Kinwong UL logo?

A That is correct.

Q Were you doing that?

A No.

Q What was this about Benlida's name being on some of the products being scratched off or removed?

A I do not know.

Q Did you ever hear that?

A No. Benlida's name being on some products and being scratched off?

Q Or removed, changed.

A Never.

Q Where were you getting -- who was the

manufacturer of the Kinwong products?
A Who was the manufacturer of -- Kinwong was the manufacturer.
Q Kinwong was the manufacturer of the products?
A Of the products which Kinwong -- yes.
Q Did --
MR. ROSENTHAL: Sorry, Robert. Is that your computer?
MR. LERNER: I'm trying to shut it off.
BY MR. MAZZOLA:
Q Did -- with respect to this Benlida -- so it was Kinwong believed you were manufacturing parts at Benlida?
A No, we were manufacturing parts at Benlida.
Q But Kinwong was alleging that you were manufacturing Kinwong parts at Benlida and using Kinwong's UL?
A Yes.
Q And that wasn't happening?
A No.
Q I heard something about CTX registering a Benlida trademark. Did that ever happen?
A Never.
Q Not here in the United States?
A No.

A The spread sleets do, but we didn't give them a physical credit note, because both parties accepted that they would hold back giving their invoice for price increase as we would hold back -- this entire thing boils down to that -- because of whatever problems -- misreporting they did to China Customs. They were not in a position to make their numbers look any worse, so they requested us to hold back.

Q Why do you keep talking about this China Customs thing?

A Because they really messed up. There is acknowledgment all over the place from their side. There is so many documents out there which show that they messed up reporting to China Customs.

Q So you think the whole thing is made up to cover up something with China Customs?

A It absolutely is. It's a very serious problem for them. And whatever lies they said to Sinosure and whatever lies they said to the banks to get the lines of credit, this is all what this case is about.

Q You keep talking about lies. I have heard that a few times now. I wrote down lies and I put a circle around it, meaning to get at it, and I am going to get back at that.

How many years have you been doing business with Benlida and Tracy and Mr. Huang and ROK? How many years?

MR. ROSENTHAL: Object to form.

THE WITNESS: From 2005.

BY MR. MAZZOLA:

Q So we are going on 23 years -- no. A lot of time. Eighteen years.

A Yes.

Q During that period of time, did you ever lie to anyone at Benlida or ROK?

A Did I lie?

Q Yes.

A I didn't -- all these lies from their side started in 2018 -- in 2018-2019. Until that time nobody was lying to each other. One day though just to justify the numbers backwards and they were in such financial trouble and they were being audited by China Customs and the Tax Department, and that is where this entire thing -- that is the -- they fabricated everything.

Q The question was during the time that you have done business with these people, did you ever lie to them? That is a yes or no.

A No.

Q Have you ever misled them?
A I have never deliberately misled them.
Q Have you ever told them a half truth?
A I do not believe that I have deliberately told them a half truth.
Q Did you ever lie to any of your upstream customers?
A Every sales organization has to lie to sugarcoat. When are these parts going to get delivered? They are in route to Hong Kong. They are stuck in China Customs. They are in the last stages of production. So there may have been white lies like that, yes.
Q Misleading?
A Yes.
Q To customers?
A It's part of the sales -- there is no organization which can say they did not sugarcoat stuff when presenting information to a customer.
Q Or lie to a customer, right?
A You can use that as -- you can characterize it as lie. I do not characterize it as lie.
Q I don't know. This lady is writing it all down. She wrote it down.
A I did not characterize it, you characterized

engineering.
Q What about Akshay, where does he work?
A Whenever you have a chance, can I take a break?
Q We will take a break right now. Where does Akshay work?
A Akshay is based in Circuitronix Hong Kong.
Q Akshay is in -- so A-K-S-H-A-Y K-O-U-L -- is in Circuitronix Hong Kong?
A Yes.
Q Was he working at Circuitronix Hong Kong in 2018?
A Yes. I think he has been there since 2014.
Q Why would he keep an e-mail address that says Circuitronix.co.India?
A Because he started in India and he was moved from India.
Q So he just kept the e-mail address?
A Yes.
MR. MAZZOLA: Let's take a break.
(Thereupon, there is a short break.)
BY MR. MAZZOLA:
Q So we were asking about Akshay.
A Yes.
Q And Akshay works, as you said, for CTX Hong

Kong?
A That is correct.
Q He just kept his India --
A Yes.
Q You are the overall boss of all the global operations, right?
A So my mother is the owner of Circuitronix Hong Kong. Circuitronix -- and through that Circuitronix Shenzhen and Circuitronix Europe, and my mom and my dad were the owners of Circuitronix India. My dad passed away a couple of years ago, and since then the second owner is just for -- yeah, there is a second minority owner just for --
Q Who is that?
A Sounendra Mahapatra.
THE REPORTER: You're going to have to spell that for me.
THE WITNESS: Yes. S-O-U-M-E-N-D-R-A, last name M-A-H-A-P-A-T-R-A.
And I am the owner of Circuitronix Hong Kong, and I manage -- I am the owner of Circuitronix LLC.
BY MR. MAZZOLA:
Q But you manage Hong Kong?
A I manage Hong Kong.

Q Because I hear a lot about Ms. Promila.
A That is my mom, yes.
Q Funny enough though, I have never seen an e-mail in the tens of thousands of e-mails -- we did a search -- for Promila, P-R-O-M-I-L-A. Why is that?
A Same reason why you didn't see a single e-mail from Mr. Huang.
Q She is not on e-mails?
A Yes.
Q But you do do the day-to-day management of Circuitronix Hong Kong?
A I do the day-to-day -- so, as one would appreciate, we obviously rely on managers. Akshay runs the day-to-day operations and he reports to me.
Q You have overall management authority?
A I have overall management authority.
Q And naturally you are authorized to sign documents on behalf of Circuitronix Hong Kong, right?
A I am. But I do want to clarify in the event my mother says I cannot sign a document, I cannot sign a document. I do have the authority, but she has the final authority.
Q Are there any documents in this case that have been signed on behalf of Circuitronix Hong Kong that your mother later said, hey, Rishi, you didn't

July 21, 2016. That is the document that you are referring to as the secondary -- that is what you mean by the second agreement?

A Secondary.

Q Second agreement?

A Secondary.

Q So I am holding it up. This is the secondary agreement, Exhibit 41, right?

A Yes.

Q Exhibit 21, that is the Manufacturing Agreement; is that correct? The existing agreement; is that correct?

A What do you mean by existing? Both of them are existing agreement. It's the existing agreement referred to in 41, yes.

THE WITNESS: By the way, it's not 41, it's 40.

BY MR. MAZZOLA:

Q I beg your pardon. There is a reference in the second paragraph of Page 2 of Exhibit 41.

A 41 or 40?

Q I beg your pardon, 40.

MR. ROSENTHAL: Off the record.

(Thereupon, there is a short break.)

BY MR. MAZZOLA:
Q So you are referring -- in Exhibit 40 you are referring to a secondary Manufacturing Agreement; is that correct?
A Yes.
Q Was that secondary Manufacturing Agreement ever prepared, agreed to, or signed, entered into?
A It was prepared, but it was never signed -- never agreed to and never signed.
Q So insofar as you are concerned, the relationship between CTX and Benlida is governed by this Exhibit 21, the Manufacturing Agreement; is that correct?
A Yes.
Q And this letter agreement, Exhibit 40?
A And subsequent minutes of meeting post July 21, 2016.
Q You stated three purposes for this -- what I am going to call the letter agreement, because that is what it says, Exhibit 40. One was to bring CTX Hong Kong into the agreement; is that correct?
A Yes.
Q The second one is the second paragraph, and it relates to discrepancies between CTX USA and the manufacturer. Do you see that?

A Yes. But it was more about the change in payment terms.
Q Well, it says what it says, right?
A Yes, the last -- yeah, it says what it says.
Q And you talk about the discrepancy, and next to discrepancy in the second line you talk about CTX USA, CTX Hong Kong, and the manufacturer. The idea was that a new second Manufacturing Agreement would be negotiated, right?
A Yes.
Q But until such Manufacturing Agreement was negotiated, you agree to continue to make payments to Benlida, right?
A Make payments to Benlida based upon what ships this week will be paid next week.
Q I am not sure I understand that. Why would you volunteer that?
A Why would I volunteer that statement?
Q Why would you volunteer that statement just now, yeah.
A Nothing. That was something what they requested for. So --
Q You are saying they requested that?
A Okay.
Q It says what it says, right?

no, this money -- whether it's the 86,000 or 101,000 or the 6 million -- do not apply that way. We have applied it this entire -- the entire game they started playing started in 2019 or 2020.

BY MR. MAZZOLA:

Q What game was that?

A Of saying that -- the first time we heard that they were applying any of these payments to something in 2011, '12, '13, '14 was far, far -- actually it may even have been after the lawsuit. I cannot recollect. And --

Q What is wrong with them applying payments to old unpaid invoices? Why is that a problem?

A So the first thing is that we are clearly on a month-by-month basis showing what we are doing, and they are not objecting to it. That is number one.

Number two, you don't wake up one day in 2019 and say something is open in 2012 where all the minutes of meetings from 2015, '16, '17, '18, '19 show -- do not show my past due balances.

Q So you don't believe there were any past due balances?

A There were no past due balances. They are all fabricated. And we have given enough opportunity for -- through our statements to show -- through these

statements to show what we were doing.

And the final one is the reconciliation, that we gave -- we gave two reconciliations. First we gave one from 2015 to 2019. They sat on it for a few months, and then they came back and said now we need stuff from 2011 onwards.

Q Did you give them a reconciliation going back to 2011?

A To 2012. And I had -- and then they provided the feedback on that two thousand -- they provided feedback on the reconciliation. We addressed any errors which we had made on the reconciliation, and we resubmitted it to them addressing all the -- every observation they gave. And we still demonstrated we were up by $7 million.

Q So my question is this. What is wrong from a business accounting perspective with a business person applying payments to old unpaid invoices?

A Two things which are wrong. The first thing which is wrong -- actually three things which are wrong. The first one is -- the first thing that is wrong, if it's fabricated, it's wrong.

The second thing, in 2019 or 2018 you cannot -- 2019 you cannot bring up, hey, you guys have adequately shown us the reconciliation from 2015 to

2019, so now we need to go back to 2012. In 2019, if you apply the statute of limitations, you passed 2012, 2013, and all of 2014 actually.

But leave that aside. The most important thing is that once we gave the reconciliations, they have accepted our reconciliations. They have accepted our -- they flagged certain errors in our reconciliations, we corrected those errors, and actually what they flagged increased the number, did not decrease what was owed by them to us.

Q So you simply just don't believe that those invoices remained unpaid from 2011, '12, '13, '14?

MR. ROSENTHAL: Object to the form.

THE WITNESS: I don't -- it's not that I don't believe. I don't think they believe the same.

BY MR. MAZZOLA:

Q But you don't believe it either?

A I certainly do not believe it.

Q Let me ask you this question. What does your accounts receivable department do if a customer has got some AR and they pay in to you? Does your accounts receivable department apply to the oldest invoice or apply to the newest invoice?

A GAAP doesn't allow that.

Q What does your accountant do?
A GAAP does not allow that. You put it into a suspense account and you continue to follow up with the customer to provide you with a statement of what they have paid. And until the time they provide you with a statement, you leave it in the suspension account. International accounting rules do not allow you to randomly apply invoices wherever you want to apply invoices.
Q So your people don't do that?
A It's not -- it's not allowed by GAAP.
Q So your people don't do that; is that what you are telling me?
A Yes, yes, they do not do that.
Q Yes, they do not do that?
A Yes.
Q They don't do that?
A They do not do that.
Q And you don't believe the Benlida people were doing that?
A They didn't tell us they were doing, they just fabricated everything for Sinosure, for Sinosure and for China Customs.
Q Do you have -- have you ever lied to the Tax Authority or Customs officials?

A Never.
Q Ever lie to your insurer?
A Never.
Q Did you ever sugarcoat anything for the Customs officials?
A Never.
Q What about for your insurance companies --
A Never.
Q Who is Ralph Bischoff, B-I-S-C-H-O-F-F?
A Ralph Bischoff was a -- Ralph Bischoff used to own 50 percent of a company called EIEMS in India.
Q EIEMS, what do they do?
A They are in to PCBA, printed circuit board assemblies.
Q And his company was called -- what was it?
A EIEMS.
Q Is he -- are you part owner of that business, or were you ever part owner?
A Not me. My mother bought 50 percent -- 60 percent of his ownership stake.
Q When did she buy that?
A 2017 or 2018. I have forgotten.
Q Did he ever own any of your business?
A No.
Q She bought 60 percent of it?

Q So I want to have you help me understand
these payment details. The payment detail is dated sometime in December, beginning of December -- December 2 -- and it's attached to a December 4 e-mail. Do you see that?
A Because September invoices are due in December.
Q AMS 60?
A Yes.
Q So the invoice numbers or the bill numbers and the bill dates are all in September?
A Yes.
Q So the idea would be sometime within that 60-day period after everything was paid, your team would send everything off to Benlida and say here is the payment?
A Yes.
Q Does Todor still work there?
A No.
Q Why was Sunny copied on this? I thought Sunny was in India.
A Sunny is in -- Sunny in December 4, 2014, was in Hong Kong.
Q Why would he have been copied on this if there were no Hong Kong invoices being paid?

A So in the beginning of 2013 I had decided that Sunny Kapoor would become the CEO of Circuitronix globally.
Q Globally?
A Yes. And the agreement which we had was that he would have the co-CEO role for two years, under which I would mentor and train him. And part of the agreement was those two years he was going to be spending in Hong Kong, and his employment was with Circuitronix Hong Kong at that time. And so as a part of the co-CEO role, I was -- he was being copied on a lot of correspondence globally.
Q Sunny doesn't work for you anymore, does he?
A He does not.
Q There was a falling out between you two?
A Yes.
Q What happened? Did he sue you or did you sue him?
A I think everybody sued each other. I started a lawsuit with him -- he sued me, went into settlement agreement; I sued him, went into settlement agreement.
Q Was it resolved?
A Yes.
Q When is the last time you spoke to Sunny?
A I speak with him often.

Q What kind of business is he in?
A Sunny runs EIEMS for me.
Q He works for you again?
A He is -- he -- so Sunny owns 14 percent of the EIEMS.
Q IEMS?
A EIEMS.
Q EMES?
MR. ROSENTHAL: EIEMS.
MR. MAZZOLA: EIEIO, okay.
BY MR. MAZZOLA:
Q And that is the outfit that you purchased --
A My mom purchased 60 percent.
Q And he owns the other 40 percent?
A Yes.
Q And your mom paid $150,000 for that 60 percent?
A I think she paid a little bit more.
Q What is that company worth now?
A Not too much. It does $3 million in revenue.
(Thereupon, Deposition Exhibit No. 123 is marked for identification.)
BY MR. MAZZOLA:
Q This is an exhibit we marked as 123. I guess this is along the lines of the last one, Rishi. This

Docket/Tab #204

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-60125-CIV-SCOLA/GOODMAN**

JIANGMEN BENLIDA PRINTED
CIRCUIT CO., LTD.,

Plaintiff,

v.

CIRCUITRONIX LLC,

Defendant,
______________________________________/

**REPLY IN SUPPORT OF CIRCUITRONIX, LLC'S OMNIBUS MOTION *IN LIMINE***

Stephen F. Rosenthal
Florida Bar No. 0131458
srosenthal@podhurst.com
Matthew P. Weinshall
Florida Bar No. 84783
mweinshall@podhurst.com
Christina H. Martinez
Florida Bar No. 1029432
cmartinez@podhurst.com
PODHURST ORSECK, P.A.
One S.E. 3rd Avenue, Suite 2300
Miami, Florida 33131
Tel.: 305-358-2800

*Counsel for Circuitronix, LLC*

Circuitronix, LLC ("CTX") replies to Plaintiff Benlida's response to CTX's Omnibus Motion *in Limine*. *See* DE 203 ("Resp."); DE 198 ("Mot."). The motion should be granted.

**1. Any Damages Computation Beyond that Pled in the Complaint**

CTX's motion explains why Benlida should be barred from introducing evidence of its damages computation beyond the superficial calculation pled in the complaint as a sanction for failure to disclose that computation: Benlida failed to meet its disclosure obligations under Rule 26(a) or (e), delayed responding to CTX's discovery specifically targeting the computation until the close of discovery, and even then omitted essential information that would allow CTX to evaluate how Benlida calculated its assertions that the invoices listed in the complaint were unpaid. Mot. at 2-5. Rather than rebut these points, Benlida tries to waive the problem away by suggesting that "a simple computation beyond that pled in the complaint may well be unnecessary." Resp. at 4. That's little comfort to CTX, who has already identified multiple complexities impairing its ability to fairly assess the assumptions behind Benlida's allegations of what invoices were unpaid, and other components of its claimed damages, all stemming from Benlida's disclosure omissions. Three such difficulties are detailed in the footnote.[1]

Yet another complication flowing from Benlida's failure to disclose how it computed its damages has only just become evident from Benlida's response to CTX's statute-of-limitations

[1] *First*, Benlida claims to have calculated the damages sought in the complaint and performed *undisclosed* computations to identify the supposedly unpaid invoices, as of May 31, 2020, yet it has never shown that work nor produced any contemporaneous version of its accounting records from which CTX can derive the list of what invoices would be paid/unpaid as of that date. Second, the $11.5 million sum of total invoices in the complaint (DE 26, ¶ 437) somehow includes consideration of invoices from *ROK*, not just Benlida, even though the listed invoices are only from Benlida. *See* Mot. at 3 n.1 (citing Benlida's CFO's testimony). Third, Benlida gave a complex and positively opaque explanation of how it arrived at the $2.11 million figure for claimed damages relating to price increases. *See id*. at 4-5. They started with a $3.3 million figure they had sent CTX in 2019, then later, for litigation purposes, reviewed their internal periodic purchasing price data for copper clad laminate ("CCL") over the more than two-year period involved, factored in value-added tax ("VAT"), applied some formula of "FIFO" use of the laminate for production (presumably to account for the variable of CTX being just one of many customers whose orders consumed the CCL), and *somehow* calculated a "correct[ed]" figure of $2.11 million. Ex. 1 (T. Huang Depo.) at 46:6-52:13, 140:8-143:7. Benlida has never disclosed any of those variables or the formula it used to derive that figure. Its interrogatory response asserted that "VAT of CCL in Belida records support this number" (DE 185-5 at 2 (No. 2)), but it never produced or identified those records.

argument, which is predicated on CTX's understanding that Benlida relied on time-barred debts of CTX-HK to compute which invoices from both CTX (and CTX-HK) remain unpaid. *See* Mot. at 9-10. Relying on a table Benlida produced showing debts of CTX-HK by year, the motion interprets the "Balance Due" column of the table to mean exactly what it says: the debt Benlida claims existed each year. *See id.* at 10. In response, Benlida asserts, for the very first time, that the table "was not intended to be a true representation of the aging accounts receivable, to show the amounts that were outstanding, nor from what period the amounts were unpaid." Resp. at 9. And, also for the first time *ever* in this case, Benlida provides an illustration of "additional analysis" to show how it claims to have applied payments from CTX-HK, in the aggregate, over time. *See* Resp. at 9-10. It has *never* before produced *any* such illustrative computation, let alone a contemporaneous document showing such a FIFO calculation for a CTX-HK (or CTX) only. All it produced was a *commingled*-FIFO chart for both companies, which it swore it used. Mot. at 3-4. Benlida's new illustration of how it supposedly "cleared" older invoices to CTX-HK "by properly using FIFO bookkeeping" (Resp. at 10) conflicts with its sworn testimony that it used a commingled-FIFO methodology (*i.e.*, lumping the CTX and CTX-HK invoices and payments into a single bucket), somehow also including ROK invoices.

Benlida deflects its own failure to disclose a comprehensible damages computation by assailing CTXs' attempt to apprehend it as "obfuscatory" and based on "pretend[] … misapprehen[sion]." Resp. at 8. To the extent CTX has truly misapprehended, it's only further demonstration of the prejudice flowing from Benlida's utter disclosure failure, a point Benlida ducks entirely. Benlida complains this motion seeks to "place Benlida in a straightjacket," *id*. at 4, but the restraint that should limit Benlida's freedom to expound upon its damages at trial is a product of its own making and Federal Rules 26 and 37(c)(1). Benlida has *never* provided a straight story as to how it computed its claimed damages in this case, leaving CTX grasping for straws on the eve of trial. This is precisely the type of harmful, unjustifiable non-disclosure that Rules 26 and 37 are designed to combat.

Avoiding confronting the Rule 37 issues of justification and harmfulness, Benlida vaguely asserts that this Court has "rejected such arguments" in three cases. Resp. at 4 (citing *Ore v. Tricam, Indus.*, No. 14-60269-Civ-Scola, 2017 WL 6597517 (S.D. Fla. Oct. 16, 2017), *FTC v. On Point Global LLC*, No. 19-25046-Civ-Scola, 2021 WL 4891334 (S.D. Fla. Sept. 23, 2021), and *Ramones v. Experian Info. Solns., LLC*, No. 19-62949-Civ-Scola, 2021 WL 4050874,



**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Fort Lauderdale 954.463.4346 | www.podhurst.com

at *5 (S.D. Fla. Sept. 4, 2021)). In two of those cases, this Court denied particular motions *in limine* because Rules 26(a) or (e), and 37(c), are self-executing. *On Point*, 2021 WL 4891334, at *5; *Ramones*, 2021 WL 4050874, at *5.[2]

None of those rulings, however, addressed a motion seeking to preclude the use of undisclosed damages computations. A plaintiff's computation of its damages is virtually certain to figure prominently at trial, particularly in a commercial case. A plaintiff's violation of its discovery obligations to disclose its damages computations deprives the defendant of the "ability to prepare a targeted defense" and affects "the fairness of the trial." *Vital Pharms., Inc. v. Monster Energy Co.*, No. 21-13264, 2022 WL 3083273, at *4 (11th Cir. Aug. 3, 2022). Imposing the appropriate sanction *before* trial helps ameliorate that unfairness. Such a pre-trial ruling will also streamline the trial by avoiding foreseeable and likely time-consuming objections in the presence of the jury. The Eleventh Circuit has repeatedly affirmed district courts' *in limine* rulings excluding damages evidence. *Circuitronix v. Kinwong Elec. (Hong Kong) Co., Ltd.*, 993 F.3d 1299, 1308 (11th Cir. 2021); *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1221–22 (11th Cir. 2010); *Vital Pharms., Inc.*, 2022 WL 3083273, at *4.

To the extent the Court requires a more narrowly focused argument on a motion *in limine*, CTX clarifies that this aspect of its motion is directed specifically at precluding Benlida from offering evidence or arguing about the way it computed its damages that varies from, or is any more specific than, the threadbare information it disclosed to CTX. That means Benlida should be barred from evidence or argument: (1) that it calculated which invoices are allegedly unpaid by any means other than the commingled-FIFO process that Benlida's bookkeeper, Ms. Chen, testified about having done; (2) showing any computations more specific than those on the face

[2] The opinion in *Ore* involved a post-trial motion. 2017 WL 6597517, at * 5. Benlida appears to cite it to argue, without elaboration, that CTX did not seek relief for Benlida's non-compliance. That is inaccurate. CTX sought relief from the Court on two prior occasions to obtain critical evidence from Benlida during the discovery period. The first was CTX's motion to compel Benlida to produce its witnesses for deposition, including Ms. Chen and CFO, Roger Wu, back in April 2022. *See* DE 66. The second was a request for a hearing before Magistrate Judge Goodman on June 1, 2023 to address discovery disputes pertaining to outstanding discovery requests, including for Benlida's database of aging dets of accounts receivable for CTX. *See* DE 166 (hearing setting). The hearing on those disputes was obviated after Benlida stated that, other than what had already been produced, there were no responsive communications. *See* DE 198-12 (Letter from R. Lerner to S. Rosenthal (June 5, 2023)). Benlida ended up producing no documents that showed any non-commingled accounts receivable.

of the only document Benlida produced evidencing its payment allocation that coincides with the invoices listed in the complaint, an Excel spreadsheet entitled "CTX Unpaid Invoices, 2020 December" (Depo. Ex. 84);[3] and (3) showing any computations as to how Benlida actually derived the $2.11 million figure attributable to a price increase.

Last, Benlida mischaracterizes CTX's expert's testimony, saying there is "99% agreement between the parties *as to the amounts at issue*." Resp. at 2 (emphasis added). Mr. Mukamal was referring only to data "relating to the two entities, CTX, LLC and Benlida." *Id*. at 3 (quoting deposition). He was *not* talking about CTX-HK. Half of Benlida's claims implicate CTX-HK. The resulting computations are anything but simple, and Benlida's substantial disclosure failures have placed CTX in the untenable position of facing sandbagging at trial on millions in claimed damages. The exclusionary sanction Rule 37(c)(1) prescribes is warranted.

**2. Debts CTX-HK Allegedly Owes to Benlida**

This aspect of the motion is largely, though not entirely, contingent upon the Court's ruling on CTX's summary-judgment motion. If the Court rules that Benlida is estopped from suing upon the invoices it issued to CTX-HK because it failed to plead any theory by which CTX could be responsible for those asserted debts, or as a sanction for failing to plead or disclose its commingled-FIFO methodology, then an order excluding argument and evidence as to those CTX-HK debts logically should follow. The same result should obtain if the Court grants the Rule 56 motion on the ground that the promise in the 2014 Business Authorization was superseded by the integration clause of the 2016 Letter Agreement. Mot. at 7-8.

Even if the Court denies the Rule 56 motion, argument and evidence about deposition exhibit 162, a letter from CTX-HK's outside auditor, should be barred because Benlida did not produce it during discovery. *See* Mot. at 8 n.7. Benlida offers no defense to this argument.

The arguments Benlida *does* make suffer from multiple flaws. It leads with an argument that is entirely non-responsive to the failure-to-plead and sanctions arguments in the motion, seeking instead to illustrate the "preposterousness" of CTX's (merits) position. Though there is

[3] By way of illustration, that would mean Benlida should not be allowed to show, for the first time at trial, a demonstrative that purports to illustrate (a) *how* Benlida applied a particular wire transfer payment from CTX (or CTX-HK), identified by its amount or date received, to all or some of a particular invoice, or (b) *when* Benlida allocated such a payment to that particular invoice. Such important details of aging accounts receivable do not appear in exhibit 84 or anything else Benlida has disclosed.

no such exception to the legal principles raised in the motion, we note, in direct response that Benlida's attempted illustration (of "preposterousness") through an "*If/Then* example," that it glaringly omits a crucial, inconvenient, but admitted and legally salient, fact: that CTX sent instructions with its monthly payment details for which invoices its wire transfers for that payment period should be applied to. *See* DE 184-1 at 15-18; DE 193 at 8-10. Contrary to Benlida's characterization that CTX was paying money to Benlida for goods *CTX-HK* ordered (Resp. at 4), for all of the invoices to CTX that Benlida is suing upon, CTX's monthly payment details designated payment only for invoices to CTX, not for invoices to CTX-HK.[4]

Undeterred by CTX previously having pointed out Benlida's failure to have pled any legal basis for CTX's legal responsibility for invoices Benlida issued to CTX-HK, Benlida doubles down on its reliance on unpled theories, trotting out a third new theory for the first time in response to CTX's motions *in limine*. Forced to concede that CTX-HK became a party to the Manufacturing Agreement with Benlida via the 2016 Letter Agreement (Resp. at 12), such that CTX-HK had standing itself to place its own orders with Benlida from the date of that agreement forward, Benlida pivots—out of nowhere—to claim that CTX thereby became "jointly liable" for CTX-HK's debts as a "co-signer[,]" *id*. at 5. Benlida's attempt to move the goalposts yet again, after already doing so in response to CTX's summary-judgment motion, is way out of bounds. *See* CTX's Reply in Support of Its Motion to Exclude or Limit Testimony of Benlida's Rebuttal Expert at 6-9.

**3. Debts Barred by the Statute of Limitations**

Benlida offers a two-part response to CTX's statute of limitations defense: first, they used an appropriate accounting method (FIFO); second, CTX misapprehends how they performed that accounting to isolate the debts they sue upon. Both analytic steps are flawed.

They proclaim their reliance on FIFO accounting to rest on "black-letter Florida law" that a debtor must designate payment instructions "at the time of payment," Resp. at 6 (citing *Randall v. Pettes*, 12 Fla. 517 (1868)). That bold claim is simply stunning given the more recent Florida case law CTX discussed at length in prior briefing, which Benlida willfully ignores. *See* DE 193 at 8-10 (discussing *Urrea v. Koplow*, 359 So. 3d 1212, 1215 (Fla. Dist. Ct. App. 2023) (holding

[4] *See* DE 177-6 (Ochoa Decl.), ¶¶ 4-6; DE 184-2 (CTX's Stmt. of Mat. Facts), ¶ 23 (citing Ochoa Decl.); DE 189 (Benlida's Resp. Stmt. of Mat. Facts), ¶ 23 (not contesting this fact).

that the principle from *Randall* is "inapplicable" to situations involving two separate debtors), and *Ott v. Bray*, 154 So. 209, 210 (Fla 1934) (holding that a debtor's payment instructions remain binding even if sent within a reasonable time after payment)).

Just as it ignores the law, Benlida also ignores the *admitted* facts that CTX sent monthly payment details which Benlida *knew* instructed it to apply CTX's payments to the listed invoices to CTX. *See* DE 184-1 at 16. Notwithstanding that, Benlida tries to pass this case off as one where a creditor was free to apply payments to time-barred debts because "the payment … does not specify that … the moneys are to be applied to only more recently applied debts." Resp. at 6. But Benlida has admitted that CTX *did* so specify in its payment details. *See* note 4, *supra*.

Benlida denigrates CTX's reliance on the stubborn fact of its payment details as somehow "out-of-context" and "obfuscatory" because CTX's expert, Mr. Parisi, "acknowledged that FIFO application of moneys received to oldest debts is appropriate." Resp. at 8. Even if that were correct, it would not justify disregarding CTX's payment instructions. Oblivious to its glass house, Benlida buries through ellipses Mr. Parisi's qualifier that FIFO application would be appropriate "[a]s long as it's applied to the appropriate entity that issued those invoices." DE 201-1 (Parisi Depo.) at 242:14-15; *see id.* at 243:13-21; Resp. at 6.

Regardless, and more importantly, Florida law forbids Benlida's commingled-FIFO methodology, *Urrea*, 359 So. 3d at 1215, particularly in light of CTX's payment instructions. None of the case law Benlida cites (Resp. at 6-7) holds otherwise. There is no dispute that the passage of a limitations period does not *automatically* bar a creditor from applying other funds of the debtor to time-bared debt.[5] The creditor's right to do so, however, remains constrained by the debtor's payment instructions, a point Benlida fails to mention. *Henry v. Halifax Hosp. Dist.*, 368 So. 2d 432, 433 (Fla. Dist. Ct. App 1979) (also holding that the debtor's payment instruction separately precluded the creditor from applying the funds to old debt); *cf. Hahn Auto. Warehouse, Inc. v. Am. Zurich Ins. Co.*, 81 A.D.3d 1331, 1332 (N.Y. App. Div. 4th Dept. 2011) (distinguishable because the terms of debtor's "letter of credit unequivocally permitted defendants to apply the letter of credit to any debts that plaintiff owed to defendants").

---

[5] *Henry v. Halifax Hosp. Dist.*, 368 So. 2d 432, 433 (Fla. Dist. Ct. App 1979); *Hoagland v. Ry. Exp. Agency*, 75 So. 2d 822, 827 (Fla. 1954); *Danielson v. Line*, 185 So. 332, 333 (Fla. 1938); *In re: Soler Somohano v. PRA Receivables Mgmt. LLC*, 819 F. App'x 873, 876 (11th Cir. 2020).



**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Fort Lauderdale 954.463.4346 | www.podhurst.com

This reply has already addressed the impropriety of Benlida's virgin debut of illustrating old data "with . . . additional analysis to make it an appropriate representation of accounts receivable." Resp. 9; *see supra*, at 2-3. The tardy roll-out of such a computation, without any evidentiary support, not only renders it unreliable; it exemplifies the quandary that Benlida's broader non-disclosure of its damages computations creates for CTX. On its own terms, it must be disregarded as predicated on the errant reading of Florida law that CTX's payment instructions (or in this example CTX-HK's) could be disregarded because they were not sent "'at the time of payment.'" Resp. at 10.

**4. Records of CTX's Account That Benlida Did Not Produce During Discovery**

This aspect of the motion concerns a class of documents of central importance to the claims (and counterclaims) in this case: Benlida's internal records of CTX's account. Mot. at 12-13. Benlida argues against an order *in limine* due to the "unlikely event that a [such] document may have slipped through the cracks, so to speak." Resp. at 10. Were this class of documents merely tangential to the core dispute between the parties, Benlida's position might be persuasive. But counsel should exercise particular diligence with respect to undisclosed information about CTX's account at Benlida, both in documentary and testimonial form. There is no good reason an order *in limine* should not be entered on this subject. Specifically, the order should bar argument and evidence of (a) undisclosed versions of Ms. Chen's Excel spreadsheet concerning CTX's account or (b) undisclosed historical records of CTX's account from Benlida's "Jindie" computer system.

**5. CTX's experts' testimony regarding "related party" status**

Benlida misreads the scope of this aspect of the motion, which targets only the introduction of testimony of *CTX's experts* about the "related" status of CTX and CTX-HK, because the speculation of an accountant cannot supplant questions of law governing the legal relationship or obligation between two corporations. Mot. at 13-14.[6] Benlida reads this aspect of the motion more broadly than it's framed. *See* Resp. at 11. If the Court grants point 2 of this

[6] The portions of CTX's experts' depositions in which Benlida's counsel elicited such testimony include: DE 201-1 (Parisi Depo.) at 66:2-67:23, 83:8-84:4, 116:21-118:12,120:5-124:9, 196:21-197:11, 204:9-207:2, 209:6-212:21, 214:5-21, 219:14-221:5, 228:14-229:16, 233:4-12; 201-2 (Mukamal Depo.) at 80:3-81:13, 125:17-127:18, 129:9-130:17, 137:20-139:18, 140:19-141:18, 150:23-151:19,

motion—excluding evidence and argument concerning CTX-HK's debts—*that* ruling would encompass the subject of "CTX and CTX-HK somehow operat[ing] as the same company." Mot. at 8, 20. In that case, the jury would appropriately be kept "in the dark" about CTX-HK (Resp. at 11), since CTX-HK serves only a distraction from the claims Benlida *actually* asserted against CTX (not the ones it has belatedly and inappropriately tried to articulate in response to CTX's summary-judgment motion and motions *in limine*).

Benlida's response to this aspect of the motion fails to address the gist of the argument: that there is a distinction between an accountant's testimony about the perceived business relationship between two companies and the legal question of whether one is responsible for the debts of another. That legal question is not even one that belongs in this case, since Benlida's complaint utterly failed to plead an agency or alter ego theory (let alone the joint-and-several liability theory Benlida voiced for the first time in response to CTX's motions *in limine*). *See* DE 184-1 at 7-11; DE 193 at 1-4. Nor did Benlida raise the theory as an affirmative defense to CTX's counterclaims to recoup its overpayments to Benlida. *See* DE 43.

**6. Assertions Contradicting Benlida's Judicial Admissions**

Benlida's response to this point is both perplexing and incomplete. The motion addresses two judicial admissions Benlida made in its answer: (1) that the 2016 Letter Agreement made CTX-HK an additional party to the Manufacturing Agreement and (2) that in some cases, Benlida instructed CTX to make payments for Benlida invoices to ROK instead. During the meet-and-confer conference, Benlida represented it would not contradict either admission at trial. Mot. at 16. Its response says nothing about the second issue, so presumably it agrees. When presented with an agreement, the Court has granted motions *in limine*. *See, e.g.*, *Ramones*, 2021 WL 4050874, at *4.

With respect to the first issue (that CTX-HK became a party to the Manufacturing Agreement in July 2016), however, Benlida takes a decidedly squirrely position. It says it "does not *intend* to contract its admission" yet resists entry of an order *in limine*. Resp. at 12 (emphasis added; capitalization altered). That kind of hedge should raise an eyebrow. Benlida's surprise non-committal appears to stem from its recognition that this binding admission undercuts its argument (at summary judgment) that CTX-HK was dependent on CTX to place orders with Benlida. Benlida is forced to confess error that the argument it made in response to CTX's Rule



**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Fort Lauderdale 954.463.4346 | www.podhurst.com

56 motion contradicted its earlier admission that the 2016 Letter Agreement made CTX-HK a party to the Manufacturing Agreement.

In a belated damage-control effort, Benlida tries in its response to "refine[]" (i.e., rewrite) its summary-judgement position. *Id*. As noted above, Benlida cannot at the eleventh hour assert yet another unpled legal theory of CTX's liability for CTX-HK's debts—joint-and-several liability as a co-signer. *See* DE 184-1 at 7-8; DE 193 at 1-4. Recall that the complaint does not even mention CTX-HK or the 2016 Letter Agreement; it certainly contains no facts supporting an allegation of joint-and-several liability based on that contract. If the Court denies the Rule 56 motion, the issue will be addressed during trial of how the parties' adapted the Manufacturing Agreement's prohibition against Benlida dealing with companies related to CTX's listed exclusive customers, *see* DE 15-2, § 1.6, to purchase orders *CTX-HK* independently placed with Benlida for those new customers on its own account.

**7. References to the Parties' Other Lawsuits or Alleged Litigiousness**

The motion should be granted as to this uncontested issue. *See* Mot. at 17; Resp. at 15.

**8. The 2022 Settlement Agreement and CTX's Termination Thereof**

The motion should be granted as to this uncontested issue. *See* Mot. at 18; Resp. at 15.

**9. Benlida's (or ROK's) Entire Print-Run of Invoices**

Even though Benlida only sued on invoices spanning a one-year period (December 2018 though December 2019), it argues that introducing all of the invoices it issued to CTX and CTX-HK dating back to 2012 is necessary to prove its damages, and that "the jurors could do the simple math and determine how much is owed." Resp. at 13-15. Benlida's position—based on the assertion that "the invoices *are* th[e] computation" of damages (*id*. at 14)—papers over substantial complexity and ignores the waste of time and risk of jury confusion adding *seven more years* worth of invoices will create. Benlida's plan to introduce the entire print-run of invoices will geometrically expand the evidence which may need to be subjected to the following cumbersome and complicated set of considerations for the jury. These considerations may become necessary if the Court does not, for various reasons, preclude Benlida from suing upon the invoices to CTX-HK, relying upon its undisclosed commingled-FIFO allocation methodology, and introducing brand-new testimony about its damages at trial:

- Comparing every invoice against the corresponding CTX and CTX-HK monthly payment detail to assess which were reasonably close enough in time to be controlled by CTX's (or CTX-HK's) payment instructions, *see Ott*, 154 So. at 210, such that Benlida was not free to apply the affected funds on a commingled-FIFO basis;

- Applying every debit memo listed on the payment detail to reduce the amount due;

- Re-computing the chain-reaction effect of such findings on the allocation of payments to older debts, which could require totaling up the value of hundreds of discrete, short periods of time as to which FIFO allocation could permissibly be performed;

- And finally, ascertaining the effect of that calculation upon which of the invoices Benlida actually sued upon in the complaint remain unpaid, in full or in part.

This is far from "simple math." It would be vastly more complex than that depicted in Benlida's illustrative chart (Resp. at 9), which just shows a straight-FIFO application of payments on an *annualized* basis for a *single* company.

Benlida won't admit it, but these complexities may already dog its burden of proof of its damages, even as to the one year's worth of invoices it sued upon. Unjustifiably multiplying that exercise seven-fold would create a nightmare for trial, particularly considering that Benlida has never disclosed any aspect of those calculations, lacks a damages expert for its case-in-chief, and thereby deprived CTX of the opportunity to prepare a rebuttal expert. *See generally* DE 197.

Two further considerations should weigh on the Court's consideration of this aspect of the motion. *First*, and critically, it does not appear that Benlida even produced its entire print-run of invoices for all time during discovery. Rule 26 and CTX's requests for production would have obligated it to do so. It is little solace to CTX that it may have been in "possession" of the old invoices because Benlida sent them. Resp. at 14. Benlida has never before articulated that its damages theory involves computation of all prior invoices. That works unfair surprise of its own, and the documents should be excluded. *See* Fed. R. Civ. P. 37(c). Benlida's supposition that CTX has ready access to the old invoices to CTX-HK, a separate company, is even further afield. *Second*, Benlida has dodged the question of whether the entire print-run of invoices includes those from its sister company, ROK, a prejudice-compounding factor. *See* Mot. at 19.

**CONCLUSION**

For all of these reasons, CTX respectfully requests that the Court enter an order *in limine* on each of the items listed in the Conclusion to the motion. Mot. at 20.



**Podhurst Orseck, P.A.**
One S.E. 3rd Avenue, Suite 2300, Miami, FL 33131 • Miami 305.358.2800 Fax 305.358.2382 • Fort Lauderdale 954.463.4346 | www.podhurst.com

Respectfully submitted,

*/s/ Stephen F. Rosenthal*
Stephen F. Rosenthal
Florida Bar No. 0131458
srosenthal@podhurst.com
Matthew P. Weinshall
Florida Bar No. 84783
mweinshall@podhurst.com
Christina H. Martinez
Florida Bar No. 1029432
cmartinez@podhurst.com
PODHURST ORSECK, P.A.
One S.E. 3rd Avenue, Suite 2300
Miami, Florida 33131
Tel.: 305-358-2800

*Counsel for Circuitronix, LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true copy of the foregoing has been served via transmission of Notices of Electronic Filing generated by CM/ECF on August 29, 2023 as filed with the Clerk of the Court using CM/ECF.

By: */s/ Stephen F. Rosenthal*
Stephen F. Rosenthal

Docket/Tab #221

United States District Court
for the
Southern District of Florida

| | | |
|---|---|---|
| Jiangmen Benlida Printed Circuit Co., Ltd., Plaintiff, | ) | |
| v. | ) | Civil Action No. 21-60125-Civ-Scola |
| Circuitronix, LLC, Defendant. | ) | |

**Order Granting Motion for Summary Judgment**

Plaintiff Jiangmen Benlida Printed Circuit Co., Ltd. ("Benlida") complains Defendant Circuitronix, LLC, owes it over $13 million for unpaid invoices for printed circuit boards Circuitronix ordered and which Benlida delivered. (3rd Am. Compl. ("Compl." or the "complaint"), ECF No. 26.)[1] The complaint encompasses two counts: the first for breach of contract; and the second for account stated. (*Id.* ¶¶ 438–57.) After the Court granted in part and denied in part Circuitronix's motion to dismiss, Circuitronix filed an answer as well as a counterclaim (ECF No. 34). Circuitronix now seeks summary judgment, as to both counts on Benlida's complaint, arguing, among other points, that (1) nearly half of the 419 identified invoices belong to another company, Circuitronix (Hong Kong) Ltd. ("CTX-HK"); and (2) as to the remaining invoices, that were issued to *Circuitronix*, Circuitronix paid Benlida for all of them. (Def.'s Mot., ECF No. 184-1.) In response, Benlida counters that (1) CTX-HK placed its orders on Circuitronix's behalf; and (2) Benlida applied Circuitronix's payments to older unpaid invoices, not mentioned in its complaint. (Pl.'s Resp., ECF No. 188.) Circuitronix has timely replied (Def.'s Reply, ECF No. 193), both parties have submitted statements of facts (Def.'s Stmt. of Facts, ECF No. 184-2; Pl.'s Stmt. of Facts, ECF No. 189), and Circuitronix's motion is now ripe for review. For the reasons that follow, the Court **grants** Circuitronix's motion. (**ECF No. 184-1**.)

## 1. Background[2]

Circuitronix is a domestic limited liability company, operating out of Florida. (Pl.'s Stmt. ¶ 1; Def.'s Stmt. ¶ 1.) Circuitronix says it specializes in the manufacture and distribution of printed circuit boards used in a variety of

[1] The Court previously dismissed Plaintiff ROK Printed Circuit Co., Ltd. ("ROK"), based on its failure to mediate prior to filing suit, as required by the parties' agreement. (Order, ECF No. 31, 3.)

[2] Unless indicated otherwise, the facts presented below are undisputed.

consumer products. (Def.'s Mot. at 2.) CTX-HK, although a Circuitronix affiliate, is a separate company, headquartered in Hong Kong. (Pl.'s Stmt. ¶ 3; Def.'s Stmt. ¶ 3 (denying only that the companies are "independently run and operated" but not that they are separate entities).) Benlida is a Chinese limited liability company that manufactures and sells printed circuit boards. (Def.'s Stmt. ¶ 4.)

Since at least 2012, Benlida (along with ROK, its affiliate and former co-plaintiff) were engaged in a business relationship with Circuitronix, involving the manufacture, sale, processing, and distribution of printed circuit boards. (*Id.* ¶ 6 (defining the memorialization of that relationship as the "Manufacturing Agreement").) In 2014, the parties looped CTX-HK into their Manufacturing Agreement, as CTX-HK became involved in part of the post-production processing of the boards. (*Id.* ¶ 8.) In doing so, Circuitronix authorized CTX-HK to place orders with Benlida on Circuitronix's behalf and agreed to "assume all CTX-HK debts due on those orders." (*Id.* (cleaned up) (defining the memorialization of that arrangement as the "Business Authorization").)

A few years later, however, in 2016, the parties entered into another agreement, the nature of which the parties partly dispute (the "Letter Agreement"). Circuitronix says that, through the Letter Agreement, the parties agreed to formally add CTX-HK directly into the 2012 manufacturing agreement. (*Id.* ¶ 9.) Benlida, however, denies this and instead maintains that the Letter Agreement merely provided that CTX-HK was to be included in negotiations aimed at developing a new manufacturing agreement (which never came to fruition). (Pl.'s Stmt. ¶ 9; Pl.'s Resp. at 16.) Importantly, the Letter Agreement provided that the Manufacturing Agreement and the Letter Agreement would "supersede any and all prior agreements or understandings between [Circuitronix] and [Benlida and ROK]"—thus superseding the Business Authorization in which Circuitronix assumed responsibility for certain of CTX-HK's orders. (Def.'s Stmt. ¶ 10.) While Benlida does not dispute that the Letter Agreement says this, it maintains that Circuitronix was nonetheless still responsible, under Florida law and as CTX-HK's principal, for paying CTX-HK's debts. (Pl.'s Stmt. ¶ 10.)

Regardless, in 2018, Benlida asked Circuitronix to sign a new agreement which would have required it to make payments for CTX-HK's orders. (Def.'s Stmt. ¶ 11.) Circuitronix, however, declined. (*Id.* ¶ 12.) And, over a year later, Benlida's own accounting records reflected that, as of December 31, 2019, Circuitronix owed Benlida "USD 0.00" and that, actually, Circuitronix was due "USD 75,684.83" from Benlida. (*Id.* ¶ 13.) While Benlida says that it denies

this, its response to this fact is both procedurally as well as substantively defective and, therefore, the Court deems this fact undisputed.[3]

In any event, just over a year beyond the date referenced in that Audit Form, in January 2021, Benlida initiated this case, seeking over $13.5 million in damages, claiming that Circuitronix—and Circuitronix alone—failed to pay for hundreds of invoices issued in 2018 and 2019. (Pl.'s Stmt. ¶ 14.) Because much of the salient controversy raised in the parties' summary-judgment briefing centers on whether Benlida pleaded allegations that support the arguments it now raises in response to Circuitronix's motion, the Court reviews the contours of the complaint in detail.

Despite the complaint's being 51-pages long, its bare-bones substantive allegations are straightforward, confined within a narrow scope of facts.[4] According to the complaint, Circuitronix ordered circuit boards from Benlida (and ROK) in 2018 and 2019; the boards were delivered to and accepted by Circuitronix; but Circuitronix did not pay for them.[5] (Compl. ¶¶ 8, 11, 12.) In addition, Benlida references a December 2016 agreement, memorialized in October 2017, through which "the parties agreed to increases of 4% and 5% with respect to the . . . invoices." (*Id.* ¶ 433.) Benlida says that, under this agreement, there is an additional $2,115,927.57 owed, on top of the

---

[3] Circuitronix's record support for this fact is an audit confirmation form, prepared by an auditor engaged by Benlida. (Audit Form, ECF No. 177-1, 34.) In marking this fact "Denied," without any elaboration, Benlida cites to an "accompanying declaration of Wu Yukun," with no pincite or even any indication of where on the docket that declaration might be found. (Pl's Stmt. ¶ 13.) As a starting point, Benlida's citation is not in compliance with Local Rule 56.1(b)(1)(B)'s requirement that each statement be "supported by specific, pinpoint references to particular parts of record material." Indeed, "[w]hen a material fact requires specific evidentiary support, a general citation to an exhibit without a page number or pincite (*e.g.*, "Smith Affidavit" or "Jones Deposition" or "Exhibit A") is non-compliant." L.R. 56.1(b)(1)(B). Based on this defect alone, the Court deems Circuitronix's statement regarding the Audit Form undisputed. *Jones v. Unity Behavioral Health, LLC*, 20-14265, 2021 WL 5495578, at *4 (11th Cir. Nov. 23, 2021) (finding the trial court "authorized to deem admitted those facts" that the plaintiff failed to properly support "by specific, pinpoint references to particular parts of record material"). Additionally, though, Wu's declaration does not, in any event, controvert that Benlida's own accounting form showed that, if anything, Benlida owed Circuitronix in excess of $75,000 as of the end of 2019. Wu's declaration instead provides only that this Audit Form was accompanied by another form, showing that CTX-HK owed $12,154,164.25. (Wu Decl. ¶ 3, 187, 1.) But Wu's explanation, as Benlida's chief financial officer, that the Circuitronix Audit Form was "an error" because he viewed "the two companies as one and the same" does nothing to controvert either the existence or authenticity of the Audit Form or the information conveyed by it. (*Id.* ¶¶ 5–6.) In other words, Wu's legal conclusion, about the relationship between Circuitronix and CTX-HK, has no bearing on the facts conveyed by the Audit Form.

[4] Pages six through forty-seven are comprised of 419 paragraphs, listing the invoices Benlida alleges Circuitronix has not paid.

[5] Benlida clarifies now that some of the invoices were actually paid off, reducing the total sought in the complaint by $230,744.78. (Pl.'s Resp. at 15 n. 8.)

$11,539,408.36 originally invoiced amounts, resulting in a total liability, as set forth in the complaint, of $13,655,335.93, plus interest and costs. (*Id.* ¶¶ 436–37.)

As to its breach-of-contract claim specifically, Benlida says that, in exchange for the boards, which Benlida delivered to Circuitronix's designated place of delivery, "[Circuitronix] agreed to pay [Benlida]". (*Id.* ¶¶ 439–40.) Benlida also notes that Circuitronix received and accepted the shipments without any complaints or protestations. (*Id.* ¶ 441.) According to Benlida, it timely demanded payment but Circuitronix (1) did not "make full payment" for the goods and (2) instead complained that Benlida and ROK owed Circuitronix "a total of $6,561,044.21, citing an extra-contractual and unconsented-to lead time penalty and citing an Excel spreadsheet of purported itemizations." (*Id.* ¶ 444.)

In support of its other cause of action—account stated—Benlida adds that Circuitronix "expressly agreed" to purchase the boards and pay for the amounts specified in the invoices. (*Id.* ¶¶ 447–48.) According to Benlida, the invoices sent to Circuitronix "reflect the dollar amounts agreed to by Circuitronix for the purchase of the goods" which Circuitronix accepted without protest. (*Id.* ¶¶ 451–52.) Further, says Benlida, Circuitronix did not object to the invoiced amounts but nonetheless "failed to remit payment." (*Id.* ¶¶ 454–55.)

In contrast, much of Benlida's opposition to Circuitronix's motion for summary judgment is based on theories that (1) Circuitronix is responsible for goods that CTX-HK ordered and (2) Benlida applied Circuitronix's payments, submitted in response to the listed invoices, to old debts, incurred by both Circuitronix as well as CTX-HK well before the timeframe outlined in the complaint.

**2. Legal Standard**

Under Federal Rule of Civil Procedure 56, "summary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" *See Alabama v. N. Carolina*, 130 S. Ct. 2295, 2308 (2010) (quoting Fed. R. Civ. P. 56(a)). At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmovant, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970), and it may not weigh conflicting evidence to resolve disputed factual issues, *see Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007). Yet, the existence of some factual disputes between litigants will not defeat an otherwise properly grounded summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the record as a whole could not lead a rational trier of fact to find in the nonmovant's favor, there is no genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[O]nce the moving party has met its burden of showing a basis for the motion, the nonmoving party is required to 'go beyond the pleadings' and present competent evidence designating 'specific facts showing that there is a genuine issue for trial.'" *United States v. $183,791.00*, 391 F. App'x 791, 794 (11th Cir. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but [instead] must set forth specific facts showing that there is a genuine issue for trial." *See Anderson*, 477 U.S. at 248 (citation omitted). "Likewise, a [nonmovant] cannot defeat summary judgment by relying upon conclusory assertions." *Maddox-Jones v. Bd. of Regents of Univ. of Ga.*, 2011 WL 5903518, at *2 (11th Cir. Nov. 22, 2011). Mere "metaphysical doubt as to the material facts" will not suffice. *Matsushita*, 475 U.S. at 586.

### 3. Analysis

Circuitronix's motion divides the invoices listed in Benlida's complaint into two tranches: one that it says reflects orders placed by CTX-HK and the other that it acknowledges it placed itself. As to the first tranche, Circuitronix says CTX-HK, and not Circuitronix, is responsible for those orders. And as to the second, Circuitronix says it paid Benlida in full (or even more than in full).

In response, as to the first tranche of invoices, Benlida does not deny that those orders were placed by CTX-HK. But, says Benlida, the evidence shows that CTX-HK, in placing those orders, was acting either as Circuitronix's agent or as Circuitronix's alter ego, contending that Circuitronix and CTX-HK are actually "one and the same company." (Pl.'s Resp. at 8.) As to the second tranche, Benlida does not deny that Circuitronix sent payments to Benlida but, instead, explains that Benlida applied those payments to older—rather than current—debts, owed by both Circuitronix and CTX-HK. (*Id.* at 17–24.) As Circuitronix points out, Benlida neglected to mention any of these theories, or any facts supporting them, in its complaint. The Court agrees with Circuitronix that this failure is fatal to Benlida's ability to ward off summary judgment.

Notably, nowhere among the complaint's allegations is there any indication that Benlida is seeking to hold Circuitronix liable under an agency or alter-ego theory nor is there any hint that Benlida applied all of Circuitronix's payments to old debts, belonging to both Circuitronix and CTX-HK, that were incurred prior to the time frame specifically delineated in the complaint. Instead, Benlida's entire complaint focuses on goods ordered by

Circuitronix alone, in 2018 and 2019, and for which Circuitronix failed to remit any payment. There is no mention of (1) another entity who was purchasing goods on Circuitronix's behalf or (2) any payments that were contemporaneously received from Circuitronix but which Benlida used to apply to older debts—not only belonging to Circuitronix but to another company entirely. The threshold issue then, before the Court, is whether Benlida's theories of liability are properly before the Court. Because none of the complaint's factual allegations support, or even directly imply support, for Benlida's new theories, the Court concludes, as more fully explained below, they are not properly raised.

Although Rule 8(a) sets forth "a liberal pleading standard for civil complaints," that standard, importantly, does not afford plaintiffs the "opportunity to raise new claims at the summary judgment stage." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004). This "simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Id.* (cleaned up). But that liberality depends on a plaintiff's sufficiently framing its claims at the inception of litigation. *See id.* at 1315 (recognizing that "[e]fficiency and judicial economy require that the liberal pleading standards under [the United States Supreme Court's decision in] *Swierkiewicz* and Rule 8(a) are inapplicable after discovery has commenced" and that a plaintiff cannot amend its complaint after the fact, "through argument in a brief opposing summary judgment").[6] The issue boils down to the expectations that spring from a complaint: the complaint should sufficiently put an opposing party—as well as the Court—on notice of, at a minimum, the grounds supporting the plaintiff's claims without the defendant or the Court having to "infer all possible claims that could arise out of facts set forth in the complaint." *Gilmour*, 382 F.3d at 1315; *see also Cacciamani v. Target Corp.*, 622 F. App'x 800, 804 (11th Cir. 2015) ("The district court correctly held that [the plaintiff's] new responsive theory at the summary-judgment stage was too little, too late. It is the complaint that must give the defendant notice of what the plaintiff complains."); *Moise v. Miami-Dade Cnty.*, 17-20993-CIV, 2018 WL 4445111, at *12 (S.D. Fla. Aug. 22, 2018) (Lenard, J.) ("Federal courts also routinely hold that a plaintiff may not assert a new theory supporting an existing claim in response to a motion for summary judgment.").

---

[6] It is worth noting that "that *Gilmour* was decided before the Supreme Court decided [*Twombly* and *Iqbal*], effectively promulgating a stricter pleading standard than that of *Swierkiewicz.*" *San Francisco Residence Club, Inc. v. Baswell-Guthrie*, 897 F. Supp. 2d 1122, 1201 (N.D. Ala. 2012).

The Court's fuller evaluation of each of Benlida's new theories of liability follows.

**A. The complaint provides no hint that Benlida's theory of relief rests on Circuitronix's liability through some form of vicarious liability for debts incurred by CTX-HK.**

Rather than address Circuitronix's argument head on, regarding Benlida's failure to plead facts supporting its agency or alter-ego theories of liability, Benlida focuses most of its argument on those portions of the record that it says support the inference of both theories. Benlida's response to Circuitronix's pleading concerns are confined primarily to one paragraph of its twenty-page response. Within that paragraph, Benlida says it has never shifted its focus, always basing its case on the allegations in its complaint. (Pl.'s Resp. at 15.) In support, Benlida points to (1) its allegations that "Circuitronix ordered circuit boards from plaintiffs"; (2) that nearly half of the invoices listed in the complaint are "***invoiced to CTX-HK***"; and (3) its allegations that Circuitronix "expressly agreed to pay the amounts specified in the invoices." (*Id.* (emphasis in original).) Without elaboration, Benlida then contends "[t]hese are still the bases of recovery today" and that there has been "no change of position" and "no surprise." (*Id.*) Then, without citing any legal authority or connecting its theory to the facts it identifies, Benlida announces, "By operation of principal-agent law, [Circuitronix] is liable for the goods purchased by CTX-HK, and by the language of [two agreements], it is liable as well." (*Id.*) Without more, the Court is not persuaded.

First, Benlida's reliance on its allegations that "Circuitronix ordered circuit boards from plaintiffs" and that Circuitronix "expressly agreed to pay the amounts specified in the invoices" actually undercuts its position that it has been proceeding under an agency or alter-ego theory all along. Both allegations attribute the debt to orders placed by Circuitronix itself, going so far as to describe Circuitronix as having "*expressly*" agreed to pay for the orders. Those allegations are diametrically opposed to allegations of agency or alter ego. Indeed, as Benlida itself points out, to establish liability based on the actions of an agent, a plaintiff would have to show: "(1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Goldschmidt v. Holman*, 571 So. 2d 422, 424 (Fla. 1990).[7] Benlida fails to point to any allegations in the complaint that would support any one of these

[7] There appears to be no dispute that Florida law applies to this litigation based on a governing-law provision in the parties' agreement. (*See, e.g.*, Pl.'s Resp. at 20.)

elements, never mind all three.[8] Nor does the complaint come even close to alleging a basis for piercing CTX-HK's corporate veil.[9]

Further, Benlida's reliance on representations it made in response to Circuitronix's motion to dismiss, based in part on Rule 19, is also unavailing. In that briefing, Benlida sought to ward off Circuitronix's claim that CTX-HK was either a necessary or indispensable party by characterizing Circuitronix's responsibility for CTX-HK's orders as undisputed and uncontested. In other words, according to Benlida, CTX-HK's status as either an agent or Circuitronix's alter ego was simply undeniable, or at least undenied, and therefore not at issue in this case. And, since there was no mention whatsoever of CTX-HK in Benlida's complaint, the Court found itself hard pressed to conclude that CTX-HK had "an interest in *this* litigation," at least as it was framed in Benlida's pleading. (Order, ECF No. 31, 5 (emphasis in original).) Between the absence of a single allegation about CTX-HK—never mind about CTX-HK's status as an agent or alter ego—in the complaint and Benlida's insisting that CTX-HK had absolutely "no interest in the outcome of the case" (Pl.'s Resp. to Mot. to Dismiss, ECF No. 28, 9), Benlida adeptly avoided the jurisdictional implications of CTX-HK's being joined in this case. Certainly, had Benlida properly pleaded the facts upon which its agency and alter-ego theories are based, CTX-HK's interest in this litigation would have been laid bare: a finding in Circuitronix's favor as to the agency or alter-ego claims would necessarily have at least some bearing on CTX-HK's own potential liability for the debts listed in the complaint. But, in trying to avoid the jurisdictional implications of including or joining CTX-HK in this case, by not pleading any agency or alter-ego theories in its complaint and claiming any question in that regard to be a nonissue, Benlida cannot raise the point now. *See Ewing v. Carnival Corp.*, 19-20264-CIV, 2020 WL 3839699, at *16 (S.D. Fla. July 7, 2020) (Goodman, Mag. J.) ("[The plaintiff] may be correct that [the defendant] knew of [the plaintiff's] agency theory by the time [the defendant] submitted its summary judgment memoranda, but that does not alter the reality that the

---

[8] To the extent Benlida might seek to rely on a theory of apparent agency, its complaint supplies no allegations in that regard either. *See Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1252 (11th Cir. 2014) ("[A]pparent agency liability requires finding three essential elements: first, a representation by the principal to the plaintiff, which, second, causes the plaintiff reasonably to believe that the alleged agent is authorized to act for the principal's benefit, and which, third, induces the plaintiff's detrimental, justifiable reliance upon the appearance of agency.").

[9] Under Florida law, in order "to pierce the corporate veil and hold a parent corporation liable for its subsidiary's actions," a plaintiff must "demonstrate first, that the subsidiary was a mere instrumentality of the parent, and second, that the parent engaged in improper conduct through its organization or use of the subsidiary." *SEB S.A. v. Sunbeam Corp.*, 148 F. App'x 774, 800 (11th Cir. 2005) (cleaned up).

*Complaint* does not expressly invoke agency or vicarious liability.") (emphasis in original).

Accordingly, even if Benlida was able to point to genuine issues of material fact supporting its vicarious liability theories (as it attempted to do in the first twelve pages of its opposition), its efforts would be futile. The parties do not dispute that 170 of the invoices identified in Benlida's complaint reflect goods ordered by CTX-HK. But the complaint never mentions CTX-HK itself at all. While the codes Benlida uses to identify these invoices include the letters "HK," that alone falls far short of signaling the full blown vicarious-liability-based theories Benlida now promotes. There is not a single allegation in the complaint indicating that Circuitronix assumed any of CTX-HK's debts or that CTX-HK was acting as Circuitronix's agent or alter ego. And, tellingly, even at this late juncture, Benlida itself is not even sure which of those two theories of liability it ultimately seeks to apply. (*See, e.g.*, Pl.'s Resp. at 5 (describing CTX-HK as either "an agent of CTX-US or a de facto constituent part of [Circuitronix]"); 8 (contending that "CTX-HK functioned either as [Circuitronix's] agent when it placed orders, or the two entities functioned as one and the same company"); 9 (similar); 14 (maintaining that "[Circuitronix] and CTX-HK functioned as, respectively principal and agent, or as different sales offices of the same business organization").)

While a complaint certainly need not set forth "the precise theory advanced by the plaintiff," "the federal notice pleading standard" requires that it at least provide "allegations as to every material point necessary to sustain a claim on any legal theory" the plaintiff seeks to pursue. *Ray v. Comm'r, Alabama Dep't of Corr.*, 915 F.3d 689, 697 n. 3 (11th Cir. 2019). Since Benlida's complaint supplies neither any notice nor factual allegations that could be construed as advancing its vicarious liability theories, the Court rejects those theories when presented, belatedly, in response to Circuitronix's motion for summary judgment. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006) (rejecting new theory of liability raised in summary-judgment briefing where the complaint had provided "no notice" of it "whatsoever"). Accordingly, the Court grants summary judgment in Circuitronix's favor as to the invoices identified in the complaint which the parties agree were all issued to CTX-HK. (Def.'s Stmt. ¶ 19; Pl.'s Stmt. ¶ 19.)

### B. The complaint provides no hint that Benlida's theory of relief rests on its application of Circuitronix's invoice payments to debts incurred either outside the time period of the complaint or by CTX-HK.

This leaves for resolution only the second tranche of invoices, issued to Circuitronix. As to these invoices, the parties do not dispute that Benlida shipped $10,058,195.91 worth of goods to Circuitronix between December 2018 and July 2020 and that Circuitronix paid Benlida $12,240,285.87 within that timeframe. (Def.'s Stmt. ¶¶ 20–22; Pl.'s Stmt. ¶¶ 20–22.) But, says Benlida, none of these payments were applied to the relevant invoices in the complaint; instead, Benlida applied these payments "to the oldest invoices on its books, in accordance with Florida law" (Pl.'s Stmt. ¶ 23), using what the parties call a first-in/first-out accounting practice ("FIFO"). In support of its contention, in disputing Circuitronix's statement of facts, Benlida cites generally to 60 pages of deposition excerpts and various exhibits thereto. (*Id.*)

Among Circuitronix's arguments in support of its entitlement to summary judgment on the second tranche of invoices, similar to its argument as to the first tranche, is that nothing in the complaint provides notice to Circuitronix that Benlida applied Circuitronix's 2018 and 2019 payments to older invoices, reflecting amounts Circuitronix and CTX-HK had failed to pay in the past. (Def.'s Mot. at 13–14; Def.'s Reply at 7–8.)

Notably, once again, Benlida does not offer any real counter to Circuitronix's position that Benlida failed to plead the accounting grounds on which it now relies to support its claims. Instead, Benlida simply insists, without offering any analysis, that "Benlida clearly notes in the [complaint] that [Circuitronix] has unpaid invoices from 2018[] and 2019" and that, by listing each invoice number and its corresponding amount, "the only methodology required" to evaluate Benlida's claim is "simple math." (Pl.'s Resp. at 20–21.) Similarly, without citing any legal authority or specific allegations, Benlida summarily submits that is has "adequately alleged the elements of [an] action for an account stated, thereby putting [Circuitronix] on notice that it was seeking recovery of a balance due on a running account, for an aggregate total of $13,655,335.93." (*Id.* at 21.) Without explaining how, Benlida also argues that the mere fact that its complaint identifies the invoices as unpaid should have alerted Circuitronix that FIFO practices were being applied. (Pl.'s Stmt. ¶ 26.) To Benlida, Circuitronix's pleading argument is nothing more than a "red herring" (Pl.'s Resp. at 20), apparently unworthy of serious response. The Court disagrees.

As a starting point, Benlida relies on a quote from a recent order issued by this Court where the Court pointed out that, although a pleader need not

"allege a 'specific fact' to cover every element or to plead 'with precision' each element of a claim," it must nonetheless set forth "either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." (Pl.'s Resp. at 22 (quoting *Haynes v. Carnival Corp.*, 20-21921-CIV, 2020 WL 7711642, at *2 (S.D. Fla. Dec. 29, 2020) (Scola, J.)). Benlida appears to focus only on the first part of that quote rather than the latter, which echoes longstanding caselaw explaining that "the purpose of Rule 8's liberal pleading guidelines is to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Cacciamani*, 622 F. App'x at 804 (quoting *Twombly,* 550 U.S. at 555). Here, Benlida's claims are for breach of contract and account stated. As Benlida itself acknowledges, the only grounds proffered in the complaint to support these claims are that (1) Circuitronix ordered goods; (2) Benlida delivered those goods to Circuitronix; and (3) Circuitronix did not pay for those goods. That is, the sole focus of liability set forth in Benlida's barebones complaint is that Circuitronix failed pay for the goods that Benlida invoiced Circuitronix for.

The problem with Benlida's reliance on Circuitronix's failure to pay, as the only ground upon which Circuitronix's liability is premised, is that the undisputed facts show, as set forth in detail above, that Circuitronix actually *did* pay Benlida for the invoiced amounts. Accordingly, the only way for Benlida to establish Circuitronix's liability is to introduce new grounds. These grounds, as Benlida now describes them, are that the payments Circuitronix remitted on the identified invoices were applied to *older*, unpaid invoices. That is, while the Court agrees with Benlida, that the theory of liability is not new—failure to pay for goods ordered and received—the grounds upon which that theory now rests are. In other words, Circuitronix is not liable because it failed to pay the invoiced amounts; rather, Benlida's real claim, revealed in recently disclosed discovery and in response to Circuitronix's motion for summary judgment, is that Circuitronix is liable because Circuitronix had an outstanding debt due and so Benlida applied all of Circuitronix's invoice payments to those debts rather than the invoiced amounts listed in the complaint.

Further, not only does Benlida now claim that Circuitronix's payments were applied to older debts belonging to Circuitronix, but that Circuitronix's payments were also applied to older debts belonging to CTX-HK. (*E.g.*, Pl.'s Resp. at 22.) This only compounds the flaws in Benlida's argument: its theory of liability rests not only on an unpleaded first-in/first-out accounting practice, but on an application of that policy to debts that the Court has already found were not properly alleged as belonging to Circuitronix in the first place.

As Circuitronix points out, Benlida's allegations that it relied on a first-in/first out accounting methodology, without more, is not even implied, never

mind explicitly referenced, anywhere in Benlida's complaint. The mere listing of the unpaid invoices does not, as Benlida posits, provide notice that its claims rest on the application of FIFO accounting practices. While that is perhaps a basis Circuitronix could have possibly inferred, assuming the validity of Benlida's new allegations, the liberal pleading standards that apply simply do not require defendants to "infer all possible claims that could arise out of facts set forth in the complaint." *Gilmour*, 382 F.3d at 1315. Instead, "the proper procedure" would have been for Benlida to seek leave to amend its complaint to assert the new grounds. *Id.* But, without such an amendment, Circuitronix would have no way of anticipating (1) that Benlida's theory of liability rested on Benlida's having applied the $12,240,285.87 that Circuitronix issued in payments, on invoices received in in 2018 and 2109, to older, unspecified amounts Benlida claimed were unpaid; (2) that some of those allegedly unpaid amounts, to which Benlida applied Circuitronix's payments, were incurred by CTX-HK; or (3) the relevance of debts incurred by both companies prior to the timeframe specifically defined by Benlida's allegations. Benlida does not even acknowledge, in its complaint, the more than $12 million paid by Circuitronix. Nor does it allege that any invoices generally, never mind specifically identified invoices, issued outside the timeframe delineated in the complaint, were left unpaid. (*See, e.g.*, Def.'s Mot. at 15 (noting that "Benlida apparently has no documentation showing which older debts it applied CTX's current payments to"); Pl.'s Stmt. ¶ 23 (referring to payments from Circuitronix as being applied to, generally, the "oldest invoices on its books").) In sum, Benlida's position that, on the one hand, the invoices listed in the complaint "are the only invoices at issue" is simply incompatible with its newly proffered theory that Circuitronix's payments were applied to invoices that are not mentioned anywhere in the complaint or otherwise specifically identified anywhere in the record. Accordingly, the Court grants summary judgment in Circuitronix's favor as to the second tranche of invoices as well.

**4. Conclusion**

Because the parties do not dispute that Circuitronix owed, at most, $10,058,195.91 on the invoices listed in the complaint (attributable to goods ordered by Circuitronix) (Def.'s Stmt. ¶ 21; Pl.'s Stmt. ¶ 21); and because the parties do not dispute that Circuitronix remitted at least that amount to Benlida (Def.'s Stmt. ¶ 22; Pl.'s Stmt. ¶ 22; Pl.'s Am. Interrog. Resp., ECF No. 177-1, 54 (reflecting a payment total of $12,240,285.87 from Circuitronix to Benlida from the date of the earliest invoice listed in the complaint through July 1, 2020), the Court finds no genuinely disputed issue of material fact as to

Circuitronix's liability on either of Benlida's claims.[10] Accordingly, and for the reasons more fully set forth above, the Court **grants** Circuitronix's motion for summary judgment (**ECF No. 184**) as to both counts of Benlida's complaint. Because the Court agrees with Circuitronix that Benlida improperly raised new theories and grounds for relief in its opposition briefing, essentially sandbagging Circuitronix's ability to defend itself in this case, it declines to address Circuitronix's additional arguments that (1) there are no genuinely disputed issues of material fact regarding those new theories and grounds (based on either Circuitronix's vicarious liability for CTX-HK's debts or Benlida's first-in/first-out accounting policy); or (2) Benlida should be sanctioned for its late disclosure of its alleged accounting methodology.

Because the Court's order disposes of Benlida's claims against Circuitronix, only Circuitronix's counterclaims against Benlida remain for resolution at trial. As this has substantially narrowed the scope of the upcoming trial, the Court orders the parties, by noon on **September 29, 2023**, to (1) file an amended joint pre-trial stipulation, excising those aspects of the stipulation that have been mooted by this order; (2) file amended witness and exhibit lists (each exhibit must be individually listed, not consolidated with other exhibits); and (3) submit a joint report that identifies which aspects of the parties' motions in limine or to strike (ECF Nos. 196, 197, 198) are now obviated. The parties may not, without prior leave of Court, use this as an opportunity to expand on any of their presentations or briefing. Additionally, in light of what appears to be the parties' ongoing business relationship, combined with the resolution of a substantial aspect of the parties' dispute, the Court orders the parties to revisit the possibility of a reconciliation prior to trial and to file a status report on or before noon on **October 2, 2023**, notifying the Court of the results of that conference and whether the parties are able to further narrow any of their remaining differences.

**Done and ordered** in Miami, Florida, on September 25, 2023.

Robert N. Scola, Jr.
United States District Judge

[10] As noted above, it is also undisputed that, as of December 31, 2019, Benlida's own accounting "reflected that [Circuitronix] owed Benlida 'USD 0.00' and that [Circuitronix] was due USD 75,684.83." (Def.'s Stmt. ¶ 13.)

Docket/Tab #237

United States District Court
for the
Southern District of Florida

| | | |
|---|---|---|
| Jiangmen Benlida Printed Circuit Co., Ltd., Counter-Defendant, | ) | |
| v. | ) | Civil Action No. 21-60125-Civ-Scola |
| Circuitronix, LLC, Counter-Plaintiff. | ) | |

## Omnibus Order on Pretrial Motions

On October 3, 2023, the Court held a hearing on the parties' motions in limine and to exclude expert witness testimony. (C. Def.'s Mot., ECF No. 196; C. Pl.'s Mot. to Excl., ECF No. 197; C. Pl.'s Mot. in Lim., ECF No. 198.) For the reasons stated in open court and as further described below, the Court **grants in part and denies in part** all three motions (**ECF Nos. 196, 197, 198**).

### 1. Circuitronix's Motion in Limine (ECF No. 198)

- § 1. Any of Benlida's damages computation beyond that pleaded in the complaint (Pl.'s Mot. in Lim. at 2–7): *Denied as moot*, as a result of the Court's summary-judgment order.
- § 2. Debts Circuitronix (Hong Kong) Ltd. ("CTX-HK") allegedly owes Benlida (*id.* at 7–8): *Granted*—Benlida is precluded from presenting evidence of CTX-HK's debts or Circuitronix's responsibility therefor.
- § 3. Debts barred by the statute of limitations (*id.* at 9–12): *Denied* (as to Circuitronix's own debts); *denied as moot* (as to CTX-HK's debts).
- § 4. Records of Circuitronix's account that Benlida did not produce during discovery (*id.* at 12–13): *Denied as moot.*
- § 5. Circuitronix's experts' testimony regarding "related party" status (*id.* at 13–16): *Granted.*
- § 6. Assertions contradicting Benlida's judicial admissions (*id.* at 16–17): *Granted* by agreement.
- § 7. References to the parties' other lawsuits or alleged litigiousness (*id.* at 17): *Granted* by agreement.
- § 8. The parties' 2022 settlement agreement and CTX's termination thereof (*id.* at 18): *Granted* by agreement.
- § 9. Benlida's (or ROK's) entire print run of invoices (*id.* at 18–19.): *Granted* as to the entire print run; however Benlida may introduce the invoices listed in its complaint that were issued to Circuitronix (but not to CTX-HK).

**2. Benlida's Motion in Limine (ECF No. 196)**

The Court grants Benlida's motion, in part, precluding Circuitronix from presenting expert testimony as to Chinese law but reserves ruling, in part, as to any lay testimony that may incidentally refer to such issues. The Court denies Benlida's motion, however, to the extent it seeks to exclude evidence related Benlida's trade-credit insurance, with the understanding that Benlida can request an appropriate limiting instruction to the jury.

**3. Circuitronix's Motion to Exclude or Limit Benlida's Rebuttal Expert's Testimony (ECF No. 197)**

To the extent Benlida has agreed not to introduce its rebuttal expert's testimony regarding the $3 to $8 million he says Benlida is owed, Circuitronix's motion is denied as moot. But, for the same reasons that the Court has excluded evidence related to CTX-HK's debts or Circuitronix's liability for those debts, the Court grants the motion in part. Accordingly, Benlida may not introduce its rebuttal expert's testimony to the extent he opines on Circuitronix's experts' failures to account for CTX-HK's debts and on the relationship between Circuitronix and CTX-HK.

**Done and ordered** in Miami, Florida, on October 3, 2023.

Robert N. Scola, Jr.
United States District Judge

Docket/Tab #266

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-60125-CIV-SCOLA/GOODMAN**

JIANGMEN BENLIDA PRINTED
CIRCUIT CO., LTD.,

Counter-Defendant,

v.

CIRCUITRONIX, LLC,

Counter-Plaintiff,
_________________________________/

**CIRCUITRONIX, LLC'S MOTION TO MINIMIZE PREJUDICE FROM INADVERTENT DISPLAY OF REDACTED INFORMATION TO JURY DURING TRIAL**

Counter-Plaintiff, Circuitronix, LLC ("CTX-US") respectfully requests that the Court take additional action to try to ameliorate the severe prejudice to CTX-US likely to flow from the inadvertent publishing to the jury of an unredacted exhibit (Ex. 136) containing highly prejudicial financial information during the testimony of Benlida's Chief Financial Officer, Wu Yukun (a/k/a "Roger" Wu) during trial on Friday, October 20, 2023. For the reasons set forth below, CTX-US requests that the Court:

(1) preclude Benlida's counsel from referencing or alluding to the unredacted exhibit (or its content about CTX-HK's balance) as a basis for reaching a verdict in favor of Benlida during the remainder of the trial; and

(2) allow CTX-US to substitute the redacted version of Exhibit 136 for the unredacted one in the set of exhibits that goes to the jury for deliberations.

## BACKGROUND

### A. The Court's Pre-Trial Orders Regarding the CTX-HK Debt Issue

As the Court is well aware, the single most significant issue that the parties in this case have battled over for many months is whether CTX-US can be held responsible for the debts of CTX-HK. The Court has entered three orders on this issue, each successively limiting Benlida's ability to introduce evidence or argument on that subject. First the Court granted CTX-US's motion for summary judgment against Benlida's claims predicated upon CTX-US's liability for CTX-HK's debts because Benlida had failed to plead any theory by which CTX-US could be held liable for CTX-HK's debts. ECF No. 221. Then the Court granted CTX-US's motion in limine, ruling that "Benlida is precluded from presenting evidence of CTX-HK's debts ***or Circuitronix's responsibility therefor***." ECF No. 237, 1 § 2 (emphasis added). In implementing the Court's order, CTX-US's counsel and paralegals painstakingly redacted hundreds of documents, including "locking" certain tabs on live Excel spreadsheets, for use at trial.

Third, the day before trial started, because Benlida had recently listed documents that suggested it intended to smuggle in prohibited information based on the way Benlida commingled the accounts receivable for CTX-US and CTX-HK, CTX-US protectively filed a motion to enforce the pre-trial ruling excluding evidence regarding CTX-HK. ECF No. 254. The motion recited that "Benlida should be precluded from eliciting testimony from its witnesses concerning CTX-HK debts, orders, invoices, and balances, either by itself or embedded in collective, undifferentiated financial data of Circuitronix entities." *Id*. at 2. The motion further argued that "Benlida's counsel and witnesses should be instructed to refrain from eliciting or providing testimony pertaining to such CTX-HK financial data." The Court granted that motion. ECF No. 256.

**B. Benlida's Persistence in Seeking to Rely on Figures Implicating CTX-HK During Trial**

Notwithstanding the Court's clear pre-trial rulings, Benlida remained intent on seeking to introduce evidence derived from its commingling of accounts between CTX-US and CTX-HK. During opening statements, Benlida's counsel voiced themes that sounded—at least to CTX-US's piqued ears—like they were primed for a subsequent insinuation that the jury was missing some critical piece of information (CTX-HK's purported indebtedness) which would undermine CTX-US's case. Mr. Mazzola argued that "something is missing" and that "if something is missing from their side, they lose."[1] He added that CTX-US's claims are "a house of cards," "a shell game," like "three-card Monty." During cross-examination of CTX-US's fact witnesses, Rishi Kukreja, Lina Ochoa, and Sourabh Sharma, Mr. Mazzola repeatedly focused attention on CTX-HK, though he did not, at that stage, transgress the Court's instructions not to discuss debts of CTX-HK or issues concerning CTX-US's responsibility therefor. Yet he continued insinuating that something not-quite-right was afoot. While cross-examining Mr. Kukreja, Mr. Mazzola discussed a "bucket of orders" and how "a related company" has "its hands in the bucket" along with CTX-US. Shortly afterwards, Mr. Mazzola identified the related company as CTX-HK. While CTX-HK's submission of orders to Benlida may bear some minimal relevance to the calculation of lead-time penalties and price discounts, Benlida's heavy focus on the relationship between CTX-US and CTX-HK was beyond disproportionate to such a narrow issue.

On Thursday, October 19, before Benlida called its first witness to commence its case, a discussion between counsel revealed Benlida's intention to elicit testimony from its witnesses

[1] No trial transcript is available. Quotations are from notes of counsel so they may be imprecise.

that the group of invoices issued to CTX-US in 2018-2019 (from the Third Amended Complaint (the "TAC invoices")) remained unpaid. This revelation prompted CTX-US to move *ore tenus*, while the jury was at lunch, to prohibit that line of questioning, as violative of the Court's prior rulings. CTX-US displayed the argument attached as Exhibit 1 to the Court during that argument. *See* Exhibit 1 (arguing that "Benlida cannot elicit testimony that the TAC invoices were not paid without contradicting their admission and multiple Court orders"). The essence of CTX-US's argument was that, as was undisputed from Benlida's witness' deposition testimony, the ***only*** reason Benlida considered those invoices unpaid was that it had comingled CTX-US's account with that of CTX-HK and applied CTX-US's payments on a first-in-first-out basis ("FIFO") *to CTX-HK's larger, earlier debts*. Without relying on this excluded argument, no Benlida witness could testify that CTX-US's invoices were unpaid, because it is undisputed that CTX-US had paid *more* than the value of the invoices Benlida issued to *it*.[2]

The Court entertained argument on CTX-US's motion. Benlida, as predicted, argued that it should be able to ask its witnesses whether the invoices issued to CTX-US had been paid. Despite CTX-US's arguments, the Court declined to preclude Benlida from asking its witnesses whether the invoices to CTX-US had been paid.

This ruling—which, given the known way that Benlida had done its accounting, permitted the indirect introduction or suggestion of evidence regarding CTX-HK that had previously been excluded—required CTX-US to immediately adjust its trial strategy. It was now necessary for CTX-US to plan to introduce evidence that would undercut the credibility of Benlida's forthcoming testimony that the TAC invoices to CTX-US remained unpaid. CTX-US

---

[2] Indeed, Sulan "Tracy" Huang admitted as much on cross-examination later on Friday afternoon.

had to pivot to showing the jury several documents in which Benlida had informed CTX-US that it had a credit balance (rather than owed money) after the period of time covered by the TAC invoices.

### C. The Accidental, Explosive Revelation of an Unredacted Exhibit Showing CTX-HK's Account

During the direct examination of Benlida's first witness, it's CFO, Roger Wu, Benlida elicited testimony, over CTX-US's objection, that a sworn audit statement reflecting that Benlida owed CTX-US money at the end of December 31, 2019, was actually incorrect, because, in Benilda's view, the accounts of CTX-US and CTX-HK must be considered together and could not be disaggregated. On cross-examination, seeking to impeach Mr. Wu's disaggregation assertion, CTX-US's counsel asked whether Mr. Wu was aware that Benlida had produced documents in the regular course of business showing that CTX-US was in an overpaid position and the amount of that overpayment. Mr. Wu said yes, but that they calculate the figures all together.

What happened next was nothing more than sheer human folly, under the pressure of last-minute changes at trial. CTX-US's counsel requested that the AV technician hired to display electronic documents during trial, Mr. Vega, bring up Exhibit 136 for impeachment. Mr. Vega had been instructed throughout trial to bring up redacted versions of documents where they existed in the digital exhibit folder on his computer, something he had done flawlessly for the first three days of trial. The PDF document on Mr. Vega's laptop for the redacted version of Exhibit 136 was entitled "Ex136Re.pdf." and looks like this:

**From:** accounting@benlida.com
**Sent:** Thursday, September 9, 2021 2:28 AM
**To:** CCT对账邮箱; LinaO; 美国CCT财务经理Ivonne Suarez; NicoleD (CCT); WindyZ(香港CCT); 香港CCT对账ChuW
**Cc:** sales01; 黄素兰; 吴宇焜
**Subject:** the statement of Aug in 2021(BLD)
**Attachments:** 2021年BLD-CCT对账单 (8) .xlsx; [redacted]

Hello:

Here we have statement against 2021/08 attached ( USD shipment amount USD612,643.00 + [redacted]
Up till to 2021/8/31, [redacted] Benlida owes CTX USD 1,589,731.52. [redacted]
Pls check. If there's any problem, pls raise it up within one week.

FM: JIANGMEN BENLIDA/MS CHEN
TEL:750-3962068
accounting@benlida.com

That document shows Benlida's accounting department saying, long after the period of the TAC invoices, that "Benlida owes CTX[-US] USD 1,589,731.52."

Unfortunately, Mr. Vega accidentally clicked on a PDF with a different name, "Ex. 136.pdf," immediately displaying throughout the entire courtroom, including on the jurors' monitors, the ***unredacted*** version of Exhibit 136, which looks like this:

**From:** accounting@benlida.com
**Sent:** Thursday, September 9, 2021 2:28 AM
**To:** CCT对账邮箱; LinaO; 美国CCT财务经理Ivonne Suarez; NicoleD（CCT); WindyZ(香港CCT); 香港CCT对账ChuW
**Cc:** sales01; 黃素兰; 吴宇焜
**Subject:** the statement of Aug in 2021(BLD)
**Attachments:** 2021年BLD-CCT对账单（8）.xlsx; 2021年BLD-HKCCT对账单（8）.xlsx

Hello:

Here we have statement against 2021/08 attached ( USD shipment amount USD612,643.00 + HKG shipment amount USD330,404.59).
Up till to 2021/8/31, CTX HKG owes Benlida USD12,616,815.82, Benlida owes CTX USD 1,589,731.52. Then CTX owes Benlida USD 11,027,084.30 in total.
Pls check. If there's any problem, pls raise it up within one week.

FM: JIANGMEN BENLIDA/MS CHEN
TEL:750-3962068

accounting@benlida.com

As everyone in the courtroom craned forward at their monitors to read the short email, the critical line smack in the middle of the page, "CTX HKG owes Benlida USD12, 616, 815.82," leapt off the screen. The jurors had previously been instructed to ignore precisely this kind of information, which had heretofore been redacted in other exhibits.

As soon as CTX-US's counsel recognized the AV operator's shocking mistake, he asked that the unredacted version be taken down and that redacted version be displayed instead. The Court, however, directed the AV operator keep the unredacted document on the screen, since the jury had seen it already. The utterly irrelevant and potentially devastatingly prejudicial fact that Benlida said non-party CTX-HK owed Benlida $12.6 million in 2021 sat like a toad in the courtroom. CTX-US's claim is for less than that figure, and Benlida's defense was that it (somehow) owes nothing. This new fact was like manna from heaven for Benlida, a fact (albeit contested) that multiple Court orders had barred it from telling the jury, but which just fell into its lap through an errant mouse-click.

CTX-US's counsel was forced to proceed with questioning Mr. Wu about other portions of the unredacted document. The Court also asked Mr. Wu how he could have testified earlier that it was impossible to disaggregate figures between CTX-US and CTX-HK if they could do so in this email. During this questioning, however, the Court pointedly asked Mr. Wu something to the effect of: "CTX-HK owes Benlida over $12 million. You see it says that?" After the witness's answer, the Court issued an instruction to the effect of: "I said it yesterday, and I will say it again: these are separate entities, whether HK owes one dollar or $1 billion or $1 million, you are to decide whether and what CTX-US is owed, if anything, from Benlida."

Subsequently, during Benlida's direct examination of its corporate representative, Huang Sulan (a/k/a "Tracy Huang"), Benlida did precisely what it prefigured it would do in its case: ask whether the TAC invoices to CTX-US were paid or not, thereby eliciting Ms. Huang's testimony that they were not. Over CTX-US's objection, the Court allowed Benlida's counsel to ask her questions on that subject. She then testified that Benlida's accounting team had determined that CTX-US owed $7,385,000 on those invoices. CTX-US's counsel was forced to explore on cross-examination that, as Ms. Huang conceded, that figure derived from Benlida's account books which commingled the funds and debts of CTX-US and CTX-HK.

At the conclusion of the day on Friday, October 21, CTX-US requested that when the evidence is given to the jury at the conclusion of trial, the redacted version of Exhibit 136 be provided. The Court declined this request and said that they would be given the unredacted version.

At the time of the filing of this motion, over the weekend, Ms. Huang remains on the stand for cross-examination. The trial is set to resume and conclude on Tuesday, October 24.

## ARGUMENT

### I. The Court Should Take Additional Measures to Attempt to Ameliorate the Severe Prejudice to CTX-US by the Course of Events

The extent of the prejudice to CTX-US from the state of events in this trial need not be further elaborated. Suffice it to say that, due to a combination of Benlida's stubborn insistence on injecting CTX-HK debts into this trial despite the Court's pre-trial rulings and the pure bad luck of a colossally impactful errant mouse click, members of the jury have seen highly prejudicial evidence that the Court's prior rulings correctly prohibited them from seeing. The purpose of this motion is to make a clear contemporaneous record in time for the Court to act in a manner that may at least reduce the prejudice that CTX-US has suffered.

There are at least two steps that the Court can and should take to minimize the reverberations of the inadvertent disclosure of the redacted information. The Eleventh Circuit has identified each of these steps as ameliorative actions when evidence is inadvertently disclosed to a jury. *See United States v. Perkins*, 204 F. App'x 799, 804 (11th Cir.2006) (per curium) (any error in admission of recorded jailhouse conversation in which defendant referenced her decision to remain silent was harmless; references to defendant's silence were not highlighted by prosecutor, and district court redacted references at issue from transcript before giving it to jury).

*First*, the Court should act to prevent Benlida from capitalizing unfairly upon the clerical error that thrust the damaging redacted information before the jurors. The Court should instruct Benlida's counsel that they may not reference or allude to the unredacted version exhibit (or its content about CTX-HK's balance) as a basis for finding in Benlida's favor. *See Perkins*, 204 F. App'x at 804 (referencing fact that prejudicial evidence was not highlighted by counsel). Such

an argument would essentially invite the jury to disregard the Court's instructions and the law, clearly an impermissible line of attack.

*Second*, the Court should reconsider its decision rejecting CTX-US's request that the redacted version of Exhibit 136 be submitted to the jury for their deliberations. *See Perkins*, 204 F. App'x at 804 (lauding similar corrective action by a district court). Submitting the redacted version of the document will emphasize that the blacked-out information is unavailable for the jury's evaluation.

**CERTIFICATE OF RULE 7.1(a)(3) CONFERENCE**

Undersigned counsel for CTX has conferred with counsel for Benlida in a good faith effort to resolve the issues raised in the motion. The parties unable to reach agreement.

DATED October 23, 2023

Respectfully submitted,

**PODHURST ORSECK, P.A.**
One S.E. 3rd Avenue, Suite 2300
Miami, Florida 33131
Tel.: 305-358-2800

*/s/ Stephen F. Rosenthal*
Stephen F. Rosenthal
Florida Bar No. 0131458
srosenthal@podhurst.com
Matthew P. Weinshall
Florida Bar No. 84783
mweinshall@podhurst.com
Christina H. Martinez
Florida Bar No. 1029432
cmartinez@podhurst.com

*Counsel for Circuitronix, LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true copy of the foregoing has been served via transmission of Notices of Electronic Filing generated by CM/ECF on October 23, 2023 as filed with the Clerk of the Court using CM/ECF.

By: /s/ *Stephen F. Rosenthal* .
Stephen F. Rosenthal

Docket/Tab #267

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 21-60125-Civ-Scola/Goodman**

-----------------------------------------------------x
JIANGMEN BENLIDA
PRINTED CIRCUIT CO., LTD.,

Plaintiff,

v.

CIRCUITRONIX, LLC,

Defendant.
-----------------------------------------------------x

**Plaintiff Jiangmen Benlida Circuit Co., Ltd.'s Motion for Reconsideration of Order Granting Partial Summary Judgment [DE 221]**

**MAZZOLA LINDSTROM LLP**
Richard E. Lerner
Jean-Claude Mazzola
*Counsel for Jiangmen Benlida Printed Circuit Co., Ltd.*
1350 Avenue of the Americas, Second Floor
New York, New York 10019
646.216.8300
richard@mazzolalindstrom.com
jeanclaude@mazzolalindstrom.com

October 23, 2023

Plaintiff Benlida respectfully requests that this Court reconsider its order of September 25, 2023 [DE 221] that granted defendant Circuitronix, LLC's motion for partial summary judgment, and, upon reconsideration, now deny the motion. In support of this motion, Benlida states as follows:

**Applicable Standard of Review**

"'[T]he purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence.'" *Z.K. Marine v. M/V Archigetis*, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992) (quoting *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)); see also *ABB Power T&D v. Gothaer Versicherungsbank*, 939 F. Supp. 1568, 1572 (S.D. Fla. 1996). For example, a motion for reconsideration may be appropriate where "'the Court has patently misunderstood a party, or … has made an error not of reasoning but of apprehension.'" *Id.* (quoting *Above the Belt v. Mel Bohannan Roofing*, 99 F.R.D. 99, 101 (E.D. Va. 1983)). "[T]here are three major grounds which justify reconsideration 1) an intervening change in controlling law; 2) the availability of new evidence; and 3) the need to correct clear error or prevent manifest injustice." *In Re: Managed Care Litigation*, 2002 U.S. Dist. LEXIS 11809, (S.D. Fla. 2002); see also *Ramos v. Boehringer Manheim Corp*., 896 F. Supp. 1213, 1214 (S.D. Fla. 1994). Benlida seeks reconsideration on the third ground – to correct a clear error and thereby prevent a manifest injustice.

**Argument**

**Point I: The Third Amended Complaint Put CTX-US on Notice that Benlida was Seeking Recovery from it for the PCB's Ordered for CTX-US's Customers by CTX-HK.**

Benlida respectfully submits that the Court's erroneous ruling arises out of the misapprehension that CTX-US simply did not understand from reading the TAC – the third amended complaint [DE 26] – that Benlida was seeking recovery from it for the invoices issued by Benlida for orders placed by CTX-HK for CTX-US's exclusive customers. To the contrary, however, CTX-US's principal Rishi Kukreja testified at deposition that he did understand that Benlida was suing CTX-US for payment of the CTX-HK invoices. Referring to deposition exhibit 62 – the TAC – CTX-US's principal Rishi Kukreja testified as follows: (Kureja Dep., pp. 194-196) (Exhibit A hereto)

*Q.* You read the Complaint, right?
*A.* I read the Complaint.
*Q.* It's Exhibit 62. Let's look at it. Let's go to Page 37.
*A.* I have gone through it.
*Q.* It's long, but let's go to Page 37.
*A.* Yes.
*Q.* There are invoice numbers referenced there, right?
*A.* Yes.

*Q*. They say HK on them, right?
*A*. Yes.
*Q*. That means these are invoices from purchase orders out of the Hong Kong office, right?
*A*. Yes.
*Q*. So why do you say you don't know anything about a claim for Hong Kong unpaid invoices?
MR. ROSENTHAL: Objection. Misstates testimony.
THE WITNESS: So as I said, following this -- following this Complaint we filed a motion to dismiss -- we filed our response, and in our response we basically objected to this being the proper venue for any claims against Hong Kong invoices.
And we in our response to your -- in your request we did advise that we would provide all information related to Circuitronix US transactions. So we did communicate what we believed our position generally is.
*Q*. But you do know based upon this document that Benlida is suing you here in the US --
*A*. Yes.
*Q*. -- CTX LLC for payment of these Hong Kong invoices? You know that, right?
MR. ROSENTHAL: Objection to suing you.
MR. MAZZOLA: CTX.
THE WITNESS: I do.

Although this testimony was not brought to the Court's attention in opposition to CTX-US's motion for summary judgment, reconsideration – taking into consideration Mr. Kukreja's own testimony – is warranted to correct a manifest injustice, which injustice arises out of CTX-US's feigned position that CTX-US simply did not understand from reading the complaint that it was being sued for invoices for PCB's ordered by CTX-HK for CTX-US's exclusive customers.[1]

**Point II: Notice Pleading Does Not Require that Legal Theories be Pled. Legal Theories Get Developed and Refined During Discovery, and Such Theories, After Development, May be Interposed in Opposition to a Motion for Summary Judgment or at Trial.**

In the case at bar, the Court's order granting summary judgment was clearly erroneous because (a) the legal theory that a principal is responsible for the orders placed for it by its agent need not be pled; and (b) Rule 8(f) provides that pleadings shall be so construed as to do substantial justice, which this Court's ruling failed to do. As the Supreme Court held in *Johnson v. City of Shelby*, 574 U.S. 10

[1] CTX-US's two experts, Mark Parisi and Barry Mukamal, also testified that they understood, from having read the TAC that Benlida was looking to CTX-US to pay the CTX-HK invoices. See Parisi Dep. [DE 201-1, p. 127] ("*Q.* Well, my question was, are you aware that the plaintiffs are alleging that those CTX Hong Kong invoices are owed by the – by CTX U.S. Do you know that to be the case? *A.* From the complaint. Yes."); Mukamal Dep. [DE 201-2, p. 131 (*Q.* … And you know that in the complaint, Benlida is looking to … CTX U.S. to pay those debts to [sic, should read "of"] the Hong Kong entity. You know that as well. Right? MS. MARTINEZ: Objection. *A.* I assume that from the tenor of the complaint.")

(2014), when a complaint alleges facts which, if proved, would support a legal theory for recovery, it is error to grant summary judgment on the basis that such theory had not been pled, which is exactly what this Court did in this case, thereby contravening Supreme Court precedent. Because the *Johnson* case makes this so manifestly clear, and does so quite succinctly, we quote the decision in its entirety: (emphasis added)

> Plaintiffs below, petitioners here, worked as police officers for the city of Shelby, Mississippi. They allege that they were fired by the city's board of aldermen, not for deficient performance, but because they brought to light criminal activities of one of the aldermen. Charging violations of their Fourteenth Amendment due process rights, they sought compensatory relief from the city. ***Summary judgment was entered against them in the District Court, and affirmed on appeal, for failure to invoke Rev. Stat. § 1979, 42 U.S.C. § 1983, in their complaint.***
>
> ***We summarily reverse.*** Federal pleading rules call for "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. Rule Civ. Proc. 8(a)(2); ***they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted.*** See Advisory Committee Report of October 1955, reprinted in 12A C. Wright, A. Miller, M. Kane, R. Marcus, & A. Steinman, Federal Practice and Procedure 644 (2014) (Federal Rules of Civil Procedure "are designed to discourage battles over mere form of statement"); 5 C. Wright & A. Miller, Federal Practice and Procedure § 1215, p. 172 (3d ed. 2004) ***(Rule 8(a)(2) "indicates that a basic objective of the rules is to avoid civil cases turning on technicalities").*** In particular, no heightened pleading rule requires plaintiffs seeking damages for violations of constitutional rights to invoke § 1983 expressly in order to state a claim. See *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (a federal court may not apply a standard "more stringent than the usual pleading requirements of Rule 8(a)" in "civil rights cases alleging municipal liability"); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (imposing a "heightened pleading standard in employment discrimination cases conflicts with Federal Rule of Civil Procedure 8(a)(2)").
>
> The Fifth Circuit defended its requirement that complaints expressly invoke § 1983 as "not a mere pleading formality." 743 F.3d 59, 62 (2013) (internal quotation marks omitted). The requirement serves a notice function, the Fifth Circuit said, because "[c]ertain consequences flow from claims under § 1983, such as the unavailability of respondeat superior liability, which bears on the qualified immunity analysis." *Ibid.* This statement displays some confusion in the Fifth Circuit's perception of petitioners' suit. No "qualified immunity analysis" is implicated here, as petitioners asserted a constitutional claim against the city only, not against any municipal officer. See *Owen v. Independence*, 445 U.S. 622, 638, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (a "municipality may not assert the good faith of its officers or agents as a defense to liability under § 1983").
>
> Our decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), ***are not in point, for they concern the factual allegations a complaint must contain to survive a motion to dismiss***. A plaintiff, they instruct, must plead facts sufficient to show that her claim has substantive plausibility. Petitioners' complaint was not deficient in that regard. Petitioners stated simply, concisely, and directly events that, they alleged, entitled them to damages from

> the city. Having informed the city of the factual basis for their complaint, they were required to do no more to stave off threshold dismissal for want of an adequate statement of their claim. See Fed. Rules Civ. Proc. 8(a)(2) and (3), (d)(1), (e). For clarification and to ward off further insistence on a punctiliously stated "theory of the pleadings," petitioners, on remand, should be accorded an opportunity to add to their complaint a citation to § 1983. See 5 Wright & Miller, supra, § 1219, at 277-278 (***"The federal rules effectively abolish the restrictive theory of the pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief"*** (footnotes omitted)); Fed. Rule Civ. Proc. 15(a)(2) ("The court should freely give leave [to amend a pleading] when justice so requires").
>
> For the reasons stated, the petition for certiorari is granted, the judgment of the United States Court of Appeals for the Fifth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.
>
> It is so ordered.

As there is no obligation under Rule 8 to plead a legal theory in a complaint, the decision of the District Court in *Baemmert v. Credit One Bank*, 271 F. Supp. 3d 1043, 1049 (WD Wis. 2017), is clearly correct, as it aligns with the reasoning of *Johnson*. In *Baemmert* the District Court stated: (emphasis added)

> Credit One contends that Baemmert did not allege agency theory or vicarious liability in the complaint so the court should disregard Baemmert's theory that Credit One's vendors called Baemmert. But plaintiffs need not "plead specific legal theories" in their complaints. *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 783 (7th Cir. 2015).… So Baemmert's ***failure to plead an agency theory*** or vicarious liability ***in his complaint is no basis for summary judgment***.

Following *Johnson*, the Eleventh Circuit held in *PBT Real Est. v. Town of Palm Beach*, 988 F.3d 1274, 1286 (11th Cir. 2021), that Rule 8 does "not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."[2] Also, in line with – albeit preceding the Supreme Court's *Johnson* decision – the Seventh Circuit stated in *Bennett v. Schmidt*, 153 F.3d 516, 518-519 (7th Cir. 1998): (citations omitted; emphasis added)

> Complaints need not plead law or match facts to every element of a legal theory. But "[a]ll pleadings shall be so construed as to do substantial justice." Fed.R.Civ.P. 8(f). … Bennett's complaint could be improved, but it is intelligible and gives the defendants notice of the claim for relief.
>
> As for Rule 12(b)(6): a requirement that complaints contain all of the evidence needed to prevail at trial, or at least all the facts that would have been required under the pre-1938 system of code pleading, would induce plaintiffs to violate Rule 8(e) ("Each averment of a pleading shall be simple, concise, and direct") by larding their complaints with facts and legal theories. The Rules of Civil Procedure make a complaint just the starting point. Instead of lavishing

---

[2] In *Fuerst v. Housing Authority of the City of Atlanta*, 38 F.4th 860, 875 (11th Cir. 2022), the Eleventh Circuit, albeit in dictum, noted that "the district court's omission" of a legal theory raised in response to a dispositive motion "was clearly erroneous."

> attention on the complaint until the plaintiff gets it just right, a district court should keep the case moving[,] if the claim is unclear, by requiring a more definite statement under Rule 12(e), and if the claim is clear but implausible, by inviting a motion for summary judgment.
>
> ***
>
> To the extent the district court required plaintiff to include in the complaint allegations sufficient (if proved) to prevail at trial, the court imposed a requirement of fact-pleading. But … a complaint is not required to allege all, or any, of the facts logically entailed by the claim.... A plaintiff does not have to plead evidence.... [A] complaint does not fail to state a claim merely because it does not set forth a complete and convincing picture of the alleged wrongdoing.
>
> Defendants urge on us another supposed defect in the complaint. They observe that the complaint seeks relief under state as well as federal law but that it does not identify any "state causes of action." ***This is a defect, however, only if a complaint must identify legal theories. It need not.*** This is the difference between notice pleading and code pleading; abandonment of code pleading is the fundamental choice behind Rule 8, the reason why it does not contain the phrase "cause of action," a term of art in code-pleading days.… Defendants received notice that Bennett believed that their refusal to hire her was racial discrimination; that is all the notice a complaint has to convey. A general reference to state law would not support, say, a claim that Bennett slipped on ice and was injured while applying for a job, for the complaint does not give notice about any claim other than employment discrimination; but having stated a discrimination claim the complaint need not offer specifics about which rules of law, state or federal, racial discrimination offends.

It is Federal Rule of Civil Procedure 9 ("Pleading Special Matters") that states which particular facts *must* be pled; ***principal/agency is not on the list***. FRCP 8 merely requires a pleading that would suffice to put the defendant on notice of the general nature of the claim. And, as the Court can see from Mr. Kukreja's testimony above, as well as CTX's own experts' testimony (see fn. 1, supra), the TAC *did* give CTX-US notice that Benlida was suing it for non-payment of invoices for orders placed for CTX-US's exclusive customers by CTX-HK.

Fair notice is supplied where the legal theory is supported by facts alleged in the complaint. *Whitaker v. Milwaukee County*, 772 F.3d 802, 808 (7th Cir. 2014). And inasmuch as legal theories need not be pled, the idea that one cannot oppose a motion for summary judgment with a "new" legal theory – when there was no duty to plead a legal theory in the first place – both misstates the law, and invites gamesmanship through feigned ignorance of what was actually being alleged. After all, it would only be in opposition to a motion for summary judgment (if there has been no prior motion to dismiss on the pleadings) that the opponent would raise the legal theories, and thus any argument made in opposition to a motion for summary judgment could be claimed to be "new."

Judge Easterbrook was on the panel that decided *Whitaker*. In *Vincent v. City Colleges of Chicago*, 485 F.3d 919, 923-925 (7th Cir. 2007), writing for the majority, Judge Easterbrook was far more pointed in his criticism of decisions like the one herein: (emphasis added; citations omitted)

> [A] judicial order dismissing a complaint because the plaintiff did not plead facts has a short half-life. Any decision declaring "this complaint is deficient because it does not allege X" is a candidate for summary reversal, unless X is on the list in Fed. R. Civ. P. 9(b). Civil Rule 8 calls for a short and plain statement; the plaintiff pleads claims, not facts or legal theories. Factual detail comes later – … ***perhaps in response to a motion for summary judgment.*** Until then, the possibility that facts to be adduced later, and consistent with the complaint, could prove the claim, is enough for the litigation to move forward."
>
> Facts that substantiate the claim ultimately must be put into evidence, but the rule "plaintiff needs to prove Fact Y" does not imply "plaintiff must allege Fact Y at the outset." ….
>
> Rule 8 was adopted in 1938, and *Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957), stressed that it does not require fact pleading. ***It is disappointing to see a federal district judge dismiss a complaint for failure to adhere to a fact-pleading model that federal practice abrogated almost 70 years ago.*** …
>
> "Any district judge … tempted to write 'this complaint is deficient because it does not contain...' should stop and think: What rule of law *requires* a complaint to contain that allegation?" *Doe v. Smith*, 429 F.3d 706, 708 (7th Cir. 2005) (emphasis in original). That question should have been asked in this case but wasn't. Take, for example, Vincent's contention that "Smart Foreclosure Buying" is a service mark, so that only she may teach a course under that banner. The district judge found the complaint defective because it "failed to state [Vincent's] registered U.S. Patent and Trademark number or provide any [similar] information". What rule requires that information to be in a complaint? None that we know of. If registration is essential to prevail, then Vincent must prove it eventually, but it need not be alleged; only the *claim* – which is to say, enough to alert the defendant to the nature of the grievance – need be pleaded.

Were he analyzing the case at bar, Judge Easterbrook would ask, "What rule of law requires that a complaint allege that CTX-US is liable, *as principal*, for orders placed by CTX-HK, *as agent*, for CTX-US's exclusive customers?" Benlida submits that there is no such rule, and thus – as Judge Easterbrook and the Supreme Court in *Johnson* confirm – this Court clearly erred. All that was required was that it be plausible that CTX-US *could* be liable for the "CCT-HK"-denominated invoices, inasmuch as (a) the Supreme Court reads Rule 8 to require that factual allegations meet a threshold "plausibility standard," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and (b) there is no requirement that the complaint state "a precise legal theory." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).

Finally, even if this Court still believes that there was a pleading deficiency (notwithstanding case law such as *Baemmert* which is indisputably correct in light of the Supreme Court's decision in *Johnson*), we note that in *Johnson* the Supreme Court directed that the lower court simply allow the complaint to be amended to cure the perceived pleading deficiency, while recognizing that such would not even be necessary. ("For clarification and to ward off further insistence on a punctiliously stated 'theory of the pleadings,' petitioners, on remand, should be accorded an opportunity to add to their complaint a citation to § 1983.") In light of *Johnson*, this Court should have – at the very least –

accorded Benlida an opportunity to amend the complaint to add an allegation of principal/agent liability. Dismissing half of Benlida's claims on a technicality – the captious code-pleading rules of yore having been abrogated – and where CTX-US was aware that it was being sued on the CTX-HK invoices, warrants reconsideration, and denial of the motion.

**Point III: The Court Erred in Relying Upon *Jones v. Unity Behavioral Health* in Holding that the Statement of Undisputed Facts was Not Properly Rebutted with Pincites.**

The Court erred in interpreting the appellate-level decision of *Jones v. Unity Behavioral Health*, 2021 WL 5495578 (11th Cir. 2021), as a basis for disregarding Benlida's denial of the claim that CTX-US owed no money to Benlida. The Court erred in deeming it undisputed that Benlida's own records showed that CTX-US owed no money to Benlida, and in stating that there was no indication of where on the docket the Wu declaration could be found. The declaration [DE 187] was submitted with the opposition memorandum of law [DE 188] and the document denying CTX-US's statement of undisputed facts. [DE 189]. In *Jones*, a party had submitted to the court a document with no pincites at all *and did not remedy this failure by a certain date specified by the court*. That is, the court had given the party an opportunity to cure the perceived defect. Here, the Court gave Benlida no opportunity to cure what it believed to have been a failure to specifically set forth pincite references to the paragraph numbers of the Wu declaration. The *Jones* case is also inapplicable because here it was clear where in the record the accompanying Wu declaration was. After all, the Court reviewed it.

The Wu declaration responded to and denied the statement in defendant Circuitronix's statement of undisputed facts that Circuitronix owed no money to Benlida and that Benlida owed money to Circuitronix – see paragraphs 3-13. [DE 187]. This Court, however, rejected Mr. Wu's explanation, thereby taking away from the jury the duty to decide whether the explanation was credible. The Court erred because Mr. Wu provided a sworn explanation that CTX-HK's orders were placed for CTX-US's exclusive customers, that such orders were always treated as the debts of CTX-US, and that CTX-US actually owed Benlida $12,078,479.42 on December 31, 2019. Moreover, exhibit "B" to the Wu declaration [see DE 187-2] showed that Mr. Kukreja himself acknowledged that CTX-US had in fact made payments of the CTX-HK invoices.

Thus, the Court erred in stating – in reliance upon *Jones* – that CTX-US's assertion of facts was unopposed by Benlida. In this regard, the Court clearly misapprehended the *Jones* decision, and reconsideration is warranted, particularly since the Court did not give Benlida an opportunity to cure the perceived defect, as the *Jones* court had done. And here, in contrast to the *Jones* case, there was no mystery as to where in the docket the Wu Yukun declaration was. Again, the Court did review it.

The purpose of Local Rule 56.1(b)(1)(B) is obviously to aid the Court, to spare it from having to pore through voluminous materials to find a specific point in rebuttal. Here, however, the 2½ page Wu declaration responded *in its entirety* to the statement that CTX-US owed no money to Benlida. Save for introductory paragraphs 1 and 2, the entire document was *the* pincite; the Court didn't have to comb through it to find where there was a denial of the claim that CTX-US owed no money to Benlida. It was submitted at the same time as, and alongside, Benlida's opposition to CTX-US's proposed statement of undisputed material facts. And the Wu declaration needed to be read in its entirety to understand why the claim that CTX-US owed no money to Benlida was false, and clearly a disputed material fact. To insist upon a specific pincite and docket number – when the two documents were filed contemporaneously – is excessively formalistic, and it is respectfully submitted (in light of the *Jones* decision) without legal basis, where Benlida was accorded no opportunity to cure.

**Point IV: The Court Erred Deciding the Wu Declaration Did Not Say Exactly What It Did Say.**

This Court erred in finding that Mr. Wu failed to deny that the audit confirmation confirmed that CTX-US owed no money to Benlida:

> Wu's declaration does not … controvert that Benlida's own accounting form showed that, if anything, Benlida owed Circuitronix in excess of $75,000 as of the end of 2019. Wu's declaration instead provides only that this Audit Form was accompanied by another form, showing that CTX-HK owed $12,154,164.25. (Wu Decl. ¶ 3, 187, 1.) But Wu's explanation, as Benlida's chief financial officer, that the Circuitronix Audit Form was "an error" because he viewed "the two companies as one and the same" does nothing to controvert either the existence or authenticity of the Audit Form or the information conveyed by it. (Id. ¶¶ 5–6.) In other words, Wu's legal conclusion, about the relationship between Circuitronix and CTX-HK, has no bearing on the facts conveyed by the Audit Form." (DE 221, p. 3, footnote 3).

But Mr. Wu *did* deny the information contained in the form. Paragraph 5 states, "The audit confirmations requested that CTX-US and CTX-HK confirm that these [*i.e.*, the $12,078,479.42 referred to in the preceding ¶4] were the total amounts owed from each of the two companies, but this was error because the moneys [again referring to the antecedent $12,078,479.42 in ¶4] ***were actually owed by CTX-US***, and because CTX-HK's purchases were made for CTX-US's customers." (Emphasis added.)

The Court misunderstood the Wu declaration, erring when it said: "Wu's explanation ... that the Circuitronix Audit Form was 'an error' ... does nothing to controvert ... the information conveyed by it." Wu's explanation was not an ex-post-facto ad-hoc conclusory legal argument. He said quite literally, and clearly, that he made a mistake **at the time he confirmed the audit**, and he explained

how and why he made the mistake. [DE 187 ¶5]. It is for a jury to decide whether he is credible. The Court erred in treating it as a binding judicial admission.

**Point V: The Court Erred in Focusing on the Phrase "Expressly Agreed," Which Does Not Appear in the Claim for Breach of Contract, but for Account Stated.**

The Court also erred in finding that Benlida's allegation that CTX-US "expressly agreed" to pay the amounts specified in the invoices vitiates the claim of liability of the principal, CTX-US, for orders placed for CTX-US's exclusive customers by CTX-HK as agent. The phrase "expressly agreed" appears only in Count 2, the cause of action for account stated, at paragraphs 447 and 448. However, Count 1 does not use the phrase, and as we demonstrate above, there was no need for the complaint to plead that CTX-US was liable for the orders placed by CTX-HK because that would be alleging a legal theory, where notice pleading sufficed: After all Mr. Kukreja admitted that he knew that Benlida was suing CTX-US for the orders placed for its exclusive customers by CTX-HK. (See pp. 1-2, supra).

But if it is alleged that a party expressly agreed to pay money, and it turns out at trial that, no, he actually did so implicitly, by – for example – having accepted the benefit of the goods ordered, having derived a further benefit by getting another two years of exclusivity for that customer, by adding to the overall discount that CTX-US can get for volume purchases, does that mean the claim must be dismissed? Of course not. We are no longer living in the days of code-pleading, where an incorrect or unstated word gets a claim dismissed. Whether the agreement to pay was express or implied does not alter Benlida's right to recovery.

The Court further erred in stating that there was no mention of CTX-HK in Benlida's complaint, when "CCT-HK" – the alternate abbreviation for CTX-HK – is mentioned throughout, hundreds of times, and CTX-US was aware that it was being sued for the orders placed for its exclusive customers by CTX-HK, based upon invoices that had the "CCT-HK" designation, as Mr. Kukreja testified. (See pp. 1-2, supra). In Count 1, it was alleged that CTX-US had "agreed" to pay for them, and whether the "agreement" is express or implicit need not be pled, per binding Supreme Court precedent. The Court stated that there is not a single allegation by Benlida in its complaint that CTX-US assumed CTX-HK's debts or that CTX-HK was acting as CTX's agent, but – as the Supreme Court made clear in *Johnson* – this was not necessary. The complaint *did* allege that CTX-US was responsible for all of the invoices, some of which were designated "CCT-HK," which happened to have been for PCB's ordered by CTX-HK for CTX-US's exclusive customers. So the complaint *did* allege that CTX-US was responsible to pay *those* invoices, and CTX-US was thereby put on notice that Benlida was

seeking to recover from it for orders placed by CTX-HK for CTX-US's customers. Mr. Kukreja admitted this. (See pp. 1-2, supra).

There was no need to plead that CTX-US was liable for the orders placed by CTX-HK, just as there is no need for a plaintiff, for example, to allege vicarious liability of a restaurant because a porter left a soapy film after mopping up. As the *Baemmert* court stated, a plaintiff's "failure to plead an agency theory or vicarious liability in his complaint is no basis for summary judgment." *Baemmert*, supra, 271 F. Supp. 3d at 1049. Under Rule 8, it is enough to allege that the restaurant floor was slippery, that the plaintiff slipped and fell, and was injured. Upon this Court's reasoning herein, however, that complaint would be dismissed if it is not also alleged that the porter left a soapy mess, and that the restaurant is liable therefor under the legal theory of *respondeat superior*. And the Court's decision would, under *Johnson*, be unsustainable: Just as the hypothetical restaurant would understand that it was being sued for the act of its employee, Mr. Kukreja would and *did* understand that he was being sued for orders placed by CTX-HK for CTX-US's exclusive customers. This understanding was not only confirmed by him under oath, but it was also understood by CTX-US's experts.[3] And Benlida submits that it is fair to assume that if Mr. Kukreja understood that CTX-US was being sued for orders by CTX-HK, and its experts knew it, so too did its attorneys.

The Supreme Court has repeatedly held that complaints need only plead facts, not legal theories. Under Rule 8, plaintiffs need only inform defendants of "the factual basis for their complaint" to "stave off threshold dismissal." *Johnson*, 574 U.S. at 12. A complaint "need not pin plaintiff's claim for relief to a precise legal theory." *Skinner*, 562 U.S. at 530. It follows that a failure to plead a legal theory – such as principal/agent liability – does not bar a plaintiff from invoking that legal theory in defense to a motion for summary judgment or at trial. Thus, this Court clearly erred, and it should therefore vacate its decision granting summary judgment, and now deny Circuitronix LLC's motion for summary judgment.

***

WHEREFORE, plaintiff Jiangmen Benlida Printed Circuit Co., Ltd, respectfully requests that this Court reconsider its decision and order of September 25, and now deny defendant Circuitronix LLC's motion for summary judgment.

[3] See fn. 1, supra.

**Certification of Counsel**

Our office has conferred with Stephen Rosenthal, counsel for defendant Circuitronix, who advises that Circuitronix will submit opposition to this motion.

Dated: October 23, 2023
Miami, Florida

Richard E. Lerner

*/s/ Jean-Claude-Mazzola*
Counsel for Benlida

**Service via ECF**

Docket/Tab #269

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-60125-CIV-SCOLA/GOODMAN**

JIANGMEN BENLIDA PRINTED
CIRCUIT CO., LTD.,

Counter-Defendant,

v.

CIRCUITRONIX LLC,

Counter-Plaintiff,
_______________________________/

**PLAINTIFF'S MOTION FOR PARTIAL JUDGMENT AS A MATTER OF LAW**

Counter-Plaintiff Circuitronix, LLC ("CTX-US") hereby moves, pursuant to Federal Rule of Civil Procedure 50(a), for partial judgment as a matter of law against Counter-Defendant Jiangmen Benlida Printed Circuit Co., Ltd. as to the following specific issues:

I. That Benlida breached the Manufacturing Agreement and Letter Agreement by refusing to return overpayments on invoices which had accumulated due to Benlida's improper payment demands not allowed under the parties' agreements;

II. That Benlida may not advance a FIFO defense for CTX-US's claimed damages for overpayment of invoices; and

III. That Benlida may not advance a price-increase defense to set off or reduce CTX's claimed damages for overpayment of invoices.

**ARGUMENT**

The Eleventh Circuit has summarized the applicable standard to Rule 50(a) motions as follows:

> A district court may enter a judgment as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for a party on an issue. Fed. R. Civ. P. 50(a); *see Thorne* [*v. All Restoration Servs., Inc.*], 448 F.3d [1264,] 1266 [(11th Cir. 2006)]. The district court must view the evidence in the light most favorable to the non-moving party and must refrain from "decid[ing] the credibility of witnesses [ ]or

> weigh[ing] the evidence." *Mich. Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998). Where there exists a "substantial conflict in the evidence, such that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, [a] motion [for a judgment as a matter of law] must be denied." *Christopher v. Florida*, 449 F.3d 1360, 1364 (11th Cir. 2006) (internal quotation marks omitted); *see also EEOC v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1250 (11th Cir. 1997) (holding that a judgment as a matter of law "can be [entered] only when the evidence favoring the [movant] is so one-sided as to be of overwhelming effect").

*Davila v. Menendez*, 717 F.3d 1179, 1184 (11th Cir. 2013).

**I. Benlida breached the Manufacturing Agreement and the Letter Agreement by refusing to return CTX's overpayments.**

CTX has introduced evidence at trial that Benlida demanded accelerated or advanced payments, improperly failed to credit payments on Benlida invoices that CTX made to ROK Printed Circuit Co., Ltd. at Benlida's direction, and demanded premium payments in excess of contractual pricing terms. The parties' agreements specify pricing and payment timing terms and acknowledge that Benlida owes CTX-US a duty of good faith, fair dealing, loyalty, and care. In violation of these terms, Benlida refused to return overpayments from CTX-US that had accumulated as a result of Benlida's improper demands for payment. Benlida has not put forth *any* evidence in the record to *disprove* these facts. Accordingly, CTX seeks partial judgment as a matter of law as to liability on its breach-of-contract claim and as to certain undisputed categories of damages, with the jury determining the amount of any disputed damages.

<u>*Existence of a Valid Contract:*</u> There is no dispute regarding the first element of the claim—that the parties entered a valid contract. Witnesses on behalf of CTX and Benlida alike have affirmed that the parties entered into the Manufacturing Agreement and Letter Agreement. Neither is there any dispute that CTX-US satisfied the conditions precedent for bringing suit under the contracts. *See* ECF No. 34 at ¶ 14 (Counterclaim: "All conditions precedent to bringing this action have occurred or have been waived."); ECF No. 43 at ¶ 14 (Answer to Counterclaim: "Admit that all conditions precedent to suit have been satisfied, but deny that there has been any waiver.").[1]

[1] To the extent that Benlida has attempted to present evidence and elicit testimony to the contrary, the question of whether CTX-US satisfied any condition precedent to suit has already been foreclosed by the parties' pleadings, where Benlida "admit[ted] that all conditions

*Material Breach:* As to breach, the second element in a breach-of-contract action, CTX has proffered sufficient evidence, and Benlida has failed to disprove, that Benlida breached the Manufacturing Agreement and Letter Agreement by refusing to return overpayments resulting from Benlida's (1) improper demands for accelerated payments, (2) its improper demands for advance payments, (3) its failure to credit payments diverted to ROK Benlida's direction, and (4) its demands for payment premiums.

CTX-US CEO Rishi Kukreja testified at length about Benlida's various extra-contractual demands. For instance, he described Benlida's demands for payments on schedules different from the Manufacturing Agreement's "AMS 60 days" payment term. He explained, for example, that in December 2016, Benlida demanded that CTX would pay on a "what ships this week is paid next week" basis. On cross-examination, Benlida's Sales Director, Huang "Tracy" Sulan, acknowledged that CTX made payments on a weekly or very frequent basis. Similarly, Mr. Kukreja testified that, beginning in August 2019, Benlida demanded and CTX began to prepay on all invoices issued by Benlida—despite being in an overpaid situation. Benlida's CFO, Wu "Roger" Yukun acknowledged that Benlida stopped updating a spreadsheet tracking invoices and payments since it began requiring CTX to make prepayments and CTX was making those prepayments. Tracy Huang also testified that prepayments began in August 2019.

Additionally, Mr. Kukreja testified in painstaking detail about the nine payments CTX made to ROK between 2017 to 2018, which Benlida never credited to CTX. Benlida offered zero evidence or testimony to contradict those facts. Similarly, Benlida presented no evidence to controvert Mr. Kukreja's testimony that Benlida demanded payment premiums above the contractual price terms and threatened to cancel orders or stop production unless CTX complied with its demands.

*Damages:* Finally, regarding the third element of a breach-of-contract action—damages—CTX put forth substantial evidence that it overpaid on the Benlida-issued invoices as a result of these payment demands, and Benlida has not disproved *the fact of* the overpayments. Mr. Kukreja, for example, testified as to these overpayments, including the amount quantified in the 2012-2019 reconciliation process, the diverted payments to ROK, and the premiums that

---

precedent to suit have been satisfied …." ECF No. 43 at ¶ 12. Indeed, the parties agreed to remove any jury instructions regarding conditions precedent at a conference with the Court regarding the instructions on October 20, agreeing that there was no dispute as to that aspect of CTX's breach-of-contract claim.

Benlida demanded after 2019. CTX's accounting expert Barry Mukamal also analyzed the parties' reconciliation efforts and testified to the amount that CTX overpaid on Benlida's invoices—more than $4.7 million.

Far from creating "substantial conflict" in the evidence, Benlida's evidence *accords with* CTX's regarding the *fact of* overpayment. Ms. Huang admitted that CTX-US actually paid Benlida more than the total owed under the 2018 to 2020 invoices Benlida entered into evidence. Although she testified on direct examination that there was no overpayment, she admitted that she was only able to maintain that view because of Benlida's commingled FIFO accounting methodology, which the Court disallowed, as discussed further below in Section II. Mr. Wu also repeatedly conceded that—after isolating and considering only transactions between Benlida and *CTX-US*—he was unable to testify whether Benlida owed CTX-US or CTX-US owed Benlida, or what amount was owed. When discussing an audit as of the end of 2019, which was based on *Benlida's own books*, for example, he testified that the amount reflected on the audit statement was inaccurate, but that he could not determine the accurate amount. He also testified that he was unable to compare only CTX-US invoices and payments because Benlida commingled CTX-US and CTX-HK records, particularly during the pre-2016 period.

In all, Benlida has not provided any basis "to create a substantial conflict in the evidence on an[y] essential element of [its]" defense to a breach-of-contract claim, that there was *no breach and no damages*. *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1210 (11th Cir. 2006). The evidence overwhelmingly favors CTX on the issue of Benlida's breach of contractual provisions requiring specified payment terms and obligating Benlida to treat CTX-US fairly and deal with it in good faith. Benlida does not dispute that if CTX-US overpaid, Benlida would be liable for breach of contract.

The only matter left for the jury's consideration is the precise amount of damages that remain in dispute—the amount of overpayment during the 2012-2019 reconciliation period and lead-time penalty damages—resulting from these breaches. Benlida presented no evidence, however, to contradict the amount of damages flowing from the diverted ROK payments and the premium charges. As the undisputed documents establish, CTX-US, at Benlida's direction, diverted $2,825,000 in payments to ROK (Ex. D-Q13), and CTX-US paid Benlida $317,539 in premium charges (D-X13). Judgment as a matter of law, therefore, should be entered in favor of CTX-US as to liability and as to damages for the ROK payments and premium charges.

## II. Benlida may not advance a defense regarding non-payment of invoices based on FIFO application of payment

Judgment as a matter of law is appropriate as to Benlida's defense that, due to its FIFO allocation of payments to debts across two separate companies (CTX-US and CTX-HK), CTX-US did not pay Benlida or CTX owes Benlida money based on non-payment of invoices. Consistent with that defense, Benlida's witnesses admitted at trial that they applied CTX-US payments to the oldest debts as between CTX-US *and CTX-HK.* This commingled FIFO argument (and the trial testimony supporting it) are improper both because they violate the Court's Omnibus Order and because they are contrary to Florida law and to Benlida's own admitted understanding of how CTX-US was directing payments to be applied. The Court should disallow the defense as a matter of law prior to the jury's consideration of the issues.

First, the Court has already determined that Benlida may not "present[] evidence of CTX-HK debts or Circuitronix's responsibility therefore." ECF No. 237 at Item 1, § 2. Benlida's claim that CTX-US owes it money under its FIFO accounting method seeks to circumvent the Court's clear ruling. That is because FIFO, on its own, does not allow Benlida to argue that CTX-US has underpaid. After all, Tracy Huang testified that, if one were to isolate to only CTX-US transactions and payments, CTX-US *overpaid*. Thus, it is only by employing a *commingled* FIFO accounting methodology—in which Benlida applies CTX-US payments to the oldest supposed debts of *both* CTX-US or CTX-HK—that Benlida argues CTX-US owes it any money. The Court should not give Benlida an escape hatch from its omnibus ruling by allowing Benlida to rely on a FIFO defense that necessarily requires reference to CTX-HK debts—and "Circuitronix's responsibility therefor"—to reduce Benlida's liability.

Apart from contravening the Court's Omnibus Order, Benlida's FIFO argument is also inconsistent with Florida law, which prohibits a creditor company from applying a debtor's payments to the debts of *another* company. *Urrea v. Koplow*, 359 So. 3d 1212, 1215 (Fla. Dist. Ct. App. 2023) (reversing trial court's ruling allowing a creditor to apply a payment without allocation instructions from one debtor (Ms. Urrea) to the older debt of another debtor (her company). In its summary judgment briefing and again at trial, Benlida has cited *Randall v. Pettes*, 12 Fla. 517, 535 (1868) for the contrary proposition that a creditor may allocate a debtor's payments on debts as the creditor sees fit, absent a contractual provision otherwise or instruction from the debtor about payment application. Florida's Third District Court of Appeal

in *Urrea*, however, clarified that *Randall* "stand[s] for the proposition that *if a single debtor* did not specify how funds were to be applied, then the creditor was free to apply the funds to whichever of the debtor's multiple debts … is desired." *Urrea*, 359 So. 3d at 1215 (emphasis added). In other words, *Randall*'s general principle applies only in a bilateral situation between one debtor and one creditor, in cases where a "*single debtor* had multiple debts or judgments against him or her." *Id.* (emphasis added). Conversely, as in *Urrea*, "the instant case involves … *two separate debtors* …" in CTX-US and CTX-HK, and the *Randall* authority Benlida "relied upon is *inapplicable*." *Id*. (emphasis added).

Benlida has doubled down on its use of a commingled FIFO methodology and held fast to its reliance on *Randall* at trial, without addressing or confronting how *Urrea* precludes its argument. Indeed, Benlida's witnesses' trial testimony confirms *Urrea* is the more analogous case, since Tracy Huang and Roger Wu both testified that Benlida was utilizing commingled records and applying CTX-US payments to the debts of two separate supposed debtors. Specifically, Ms. Huang confirmed that Benlida maintained combined accounts receivable records for both CTX-US and CTX-HK. She acknowledged that she could not confirm the precise numbers that CTX-US paid or did not pay because Benlida was mixing the payments for both companies together. Likewise, Mr. Wu testified that he was unable to distinguish what, if anything, was owed to Benlida as between CTX-US versus CTX-HK. It is clear from this testimony that Benlida's effort to use a FIFO methodology as a defense is really an effort to use *commingled* FIFO *across CTX-US and CTX-HK* as a defense. Tracy Huang confirmed, moreover, that CTX-US overpaid. This testimony reinforces *Urrea*'s application to the case, and *Urrea* forecloses Benlida's invocation of *commingled* FIFO as a defense.

Even setting aside Florida law's prohibition of Benlida's use of FIFO across CTX-US and CTX-HK debts, CTX-US has introduced unrebutted evidence at trial that Benlida received CTX-US's payment instructions in the form of payment details and that it understood but ignored the direction to allocate payment to the listed invoices for CTX-US. Rishi Kukreja and Lina Ochoa both testified that, through the payment details, CTX-US indicated which CTX-US invoices it intended Benlida to apply payments to. Tracy Huang acknowledged that the payment details reflected that CTX-US was issuing payments for CTX-US invoices. There is no dispute among the parties that Benlida is not free to apply payments to invoices *if CTX-US has made a timely instruction to the contrary* (only one with respect to whether CTX-US timely did so). *See,*

*e.g.*, DE 188 at 14-15 (Benlida's opposition to CTX's motion for summary judgment, quoting the general rule from *Randall* and arguing the payment instruction must occur at the time of payment).

While Benlida has previously insisted that payment instructions must accompany a payment to have any legal effect legally, Benlida has neither contended with authority indicating payment instructions need only be "reasonably prompt," nor proffered evidence indicating that the short lag between receipt of the wire and the transmission of the payment detail did not meet that standard. *Ott v. Bray*, 154 So. 209, 210 (Fla. 1934) (stating that "under the circumstances … the [debtors] had the right to direct and insist upon the application according to their directions" because equity requires that so long as a creditor is not prejudiced, a payment "should be applied in such mode as will be least onerous to the debtor," particularly "where the request for a particular application has been made with *reasonable promptness* after payment"). Benlida also has not explained how it can maintain that it did not receive allocation instructions when it knew CTX-US would eventually be sending instructions through the payment detail for that period and consistently did so.

In light of the one-sided evidence regarding Benlida's improper use of FIFO to allocate payments to debts of CTX-US and CTX-HK alike, the Court should decide the issue as a matter of law against Benlida. Relatedly, the jury instructions should be modified to remove mention of *Randall v. Pettes*, and of any FIFO argument which necessarily depends on consideration of CTX-HK debts.

## III. Benlida may not advance a price-increase defense to set off or reduce CTX-US's claimed damages amount for non-payment

CTX-US is entitled to judgment as a matter of law on Benlida's defense seeking to reduce CTX's damages by setting off price increases claimed by Benlida. For the first time at trial, Benlida has asserted that CTX-US owes it some *$1.5 million* in unpaid price increases. Previously, Benlida had calculated a different price increase amount owed as part of its then-extant claims. Regardless, because Benlida has never disclosed *how* it computed any price increases it claims to be owed—much less specified the amounts supposedly owed by CTX-US versus CTX-HK—it cannot now introduce these numbers for the very first time for jury consideration. *See* Fed. R. Civ. P. 26(a)(1)(A)(iii) .

CTX-US previously moved to exclude evidence pertaining to any price-increase set-off from Benlida's affirmative case when Benlida's claims remained active, arguing that under Federal Rule 37(c)(1), Benlida should not be allowed to introduce evidence of any damages computation beyond that pled in the complaint. ECF No. 198 at 5-7. Benlida disclosed information about the price-increase amount sought in its affirmative case—around $2.11 million—less than a month before the close of discovery, and it never provided a computation of damages for that figure. *See id.* at 5; ECF No. 204 at 1 n.1 (summarizing how Benlida began with a $3.3 million price increase damages figure and how it eventually reduced that amount to a "corrected" figure of $2.11 million without "disclos[ing] any of those variables or the formula it used to derive that figure" and without providing records that purportedly supported the number). Although CTX-US noted that its *in limine* argument to exclude the price-increase amounts would become moot if the Court granted its motion for summary judgment, since Benlida had not raised an affirmative defense of set-off based on price increases, Benlida persisted in raising the price-increase issue, over CTX-US's pretrial objection (ECF No. 255), at trial in response to CTX-US' breach-of-contract claim.

For the same reasons that Benlida should have been precluded from asserting a price increase claim in its now-dismissed claim, it should be precluded from asserting a set-off affirmative defense based on alleged price increases. Benlida did not allege an affirmative defense for set-off for unpaid price increases in its Answer. *See* ECF No. 34, ¶¶ 23-24; ECF No. 43, ¶¶ 23-24 (discussing only CTX-US' allegations regarding the manner in which Benlida could validly seek price increases under the Manufacturing Agreement). Nor did it disclose its price-

increase calculation related to that defense at any point during discovery. The very first time CTX-US learned of the $1.5 million price-increase amount was at trial, during Tracy Huang's testimony. Benlida's disclosure failures were neither "substantially justified" nor "harmless," Fed. R. Civ. P. 37(c), since they prejudiced CTX-US's ability to meet the price-increase defense by testing Benlida's set-off amount during depositions or through its experts. Accordingly, Benlida should not be allowed to submit for the jury's consideration a price-increase set-off defense.

Additionally, at the time of the drafting of this motion, Benlida has not yet rested its defensive case, but CTX-US reserves the right to orally address Benlida's evidentiary deficiencies with respect to the price increase defense at the appropriate time.

## CONCLUSION

The Court should decide these three issues in CTX's favor prior to closing arguments, to avoid confusing the jury and to focus the factual issues before it.

Dated: October 24, 2023

## CERTIFICATE OF RULE 7.1(a)(3) CONFERENCE

Undersigned counsel for CTX has conferred with counsel for Benlida in a good faith effort to resolve the issues raised in the motion. The parties are unable to reach agreement.

Respectfully submitted,

*/s/ Christina H. Martinez*
Stephen F. Rosenthal
Florida Bar No. 0131458
srosenthal@podhurst.com
Matthew P. Weinshall
Florida Bar No. 84783
mweinshall@podhurst.com
Christina H. Martinez
Florida Bar No. 1029432
cmartinez@podhurst.com
PODHURST ORSECK, P.A.
One S.E. 3rd Avenue, Suite 2300
Miami, Florida 33131

Tel.: 305-358-2800

*Counsel for Circuitronix, LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true copy of the foregoing has been served via transmission of Notices of Electronic Filing generated by CM/ECF on October 24, 2023 as filed with the Clerk of the Court using CM/ECF.

By: /s/ *Christina H. Martinez*
Christina H. Martinez

Docket/Tab #273

United States District Court
for the
Southern District of Florida

| | | |
|---|---|---|
| Circuitronix, LLC, Plaintiff,<br><br>v.<br><br>Jiangmen Benlida Printed Circuit Co., Ltd., Defendant. | )<br>)<br>)<br>)<br>)<br>) | Civil Action No. 21-60125-Civ-Scola |

**Verdict Form**

We, the jury in the above-titled action, unanimously find as follows:

**Question 1**: Did Benlida breach the parties' contract?

✓ Yes ______ No

If your answer to Question 1 is NO, your verdict is for Benlida, and you should not proceed further except to date and sign this verdict form and return it to the courtroom. If you answered YES to Question 1, please answer Question 2.

**Question 2**: Was CTX-US damaged by Benlida's breach of the contract?

✓ Yes ______ No

If your answer to Question 2 is NO, your verdict is for Benlida on this claim, and you should not proceed further except to date and sign this verdict form and return it to the courtroom. If your answer to Question 2 is YES, please answer Question 3.

**Question 3**: What are CTX-US's damages as a result of Benlida's breach of the contract?

Total: $ 7,585,841

So say we all, [redacted]

Foreperson's signature

2
Foreperson's juror number

Dated: October 24, 2023